IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| LONG TERM CARE PHARMACY ALLIANCE, 1776 Massachusetts Avenue, N.W., Suite 410 Washington, D.C. 20036, and<br><br>AMERICAN SOCIETY OF CONSULTANT PHARMACISTS, 1321 Duke Street, Alexandria, VA 22314,<br>                       Plaintiffs,<br><br>          v.<br><br>UNITEDHEALTH GROUP, INC.,<br>                       Defendant. | Case No: _____ |

## VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs Long Term Care Pharmacy Alliance ("LTCPA"), and American Society of Consultant Pharmacists ("ASCP"), for themselves and on behalf of their members (collectively the "Long Term Care Pharmacies" or "LTC Pharmacies"), bring this Complaint for Declaratory Judgment and Injunctive Relief, and state as follows:

### NATURE OF THE DISPUTE

1.  Plaintiffs bring this action to enjoin UnitedHealth Group, Inc. ("Defendant" or "UnitedHealth"), the largest Medicare Prescription Drug Plan ("PDP"), from disbursing millions of dollars of checks, many for $1 and $3, to Medicare and Medicaid eligible nursing home residents representing "co-payment" amounts that Defendant wrongfully withheld from the reimbursement they paid to Long Term Care pharmacies for these residents' prescription drugs. The residents did not pay the co-payment amounts when the pharmacies dispensed their medication. Nonetheless, the co-payments were deducted from the reimbursement Defendant paid to the Long Term Care pharmacies when those pharmacies dispensed the medications. As a result, Plaintiffs seek a

4815293

declaration and injunctive relief requiring Defendant to reimburse those funds to the LTC Pharmacies to whom the funds are actually owed. There is no dispute that the amounts at issue are owed by Defendant, and that Defendant is about to disburse them.

2. Unfortunately, although Defendant is on specific notice that the amounts are actually owed to the LTC Pharmacies, and although the Federal Government has directed Defendant (and all other PDPs) to reimburse the LTC Pharmacies directly, it continues to insist that, beginning July 7, 2006, it will disburse the funds to residents, requiring the LTC Pharmacies to try to collect thousands of $1 and $3 (and other) checks from these individuals. To avoid significant disruption in the lives of these frail, elderly, and sometimes cognitively impaired residents, to streamline the payment process, and to otherwise resolve the issue, the Court must enter injunctive relief, stopping the distribution of the checks to residents, and declaring that the funds are appropriately owed to the pharmacies.

3. On January 1, 2006, the new Medicare Prescription Drug Benefit took affect. On that date, over 1.2 million Medicaid beneficiaries residing in nursing homes and other institutional settings (collectively "nursing homes") had their prescription drug coverage switched from their state Medicaid programs to the new Medicare program. By law, Medicaid ceased paying for prescription drugs for so called "dual eligibles" (meaning that they were dually eligible for both Medicare because they were older than 65 and Medicaid because they were poor) on January 1. Practically speaking, the nursing home residents did not experience any interruption in service; each of their nursing homes had a contract with one of Plaintiffs' member LTC Pharmacies (or another LTC Pharmacy) that provided the prescription medications for each resident (along with numerous other specialized services).

4. Prior to January 1, state Medicaid programs normally charged ambulatory beneficiaries a nominal $1 or $3 co-payment for each prescription dispensed, which was paid at the

retail pharmacy counter. Nursing home Medicaid beneficiaries, however, did not have any co-payment requirements, and never paid one. Congress, knowing that these "institutionalized dual eligibles" had no co-payment obligation whatsoever for their drugs under Medicaid, in the Medicare statute explicitly barred the PDPs to which these dual eligibles were assigned from charging them any payments, including any "co-payments."

5.     Beginning January 1, however, when the LTC Pharmacies dispensed the drugs to the nursing home residents and began billing the PDPs for the drugs, they were surprised to find that the PDPs' reimbursement was less than the full payment due, and that the PDPs were withholding the co-payment amounts. As was routine in the nursing home context, the LTC Pharmacies dispensed the drugs without collecting any funds from the dual eligible beneficiaries, believing in good faith reliance that they would be paid pursuant to the LTC Pharmacies' "network" contracts with the PDPs, including Defendant.

6.     For whatever reason, the PDPs took months to acknowledge that these co-payments were improperly withheld and should have been reimbursed to the LTC Pharmacies. Defendant, however, decided to send the reimbursement to the nursing home residents, rather than the LTC Pharmacies to which the funds were owed. Because Defendant typically operated in a retail environment, it likely assumed the LTC Pharmacies had collected the $1 and $3 (and other) amounts from the beneficiaries, just as occurs at the retail pharmacy counter. The LTC Pharmacies, however, had not collected such co-payments, and so advised the Defendant. Even after the LTC Pharmacies detailed to Defendant each claim for which a co-payment had not been collected, Defendant continues to insist that it would only reimburse the beneficiaries, rather than the LTC Pharmacies. Because Plaintiffs and their members have exhausted every possible avenue of recourse, including appeal to the federal agency responsible for the benefit, the Federal Centers for Medicare and Medicaid Services ("CMS"), an agency of the Department of Health and Human Services, they have

no choice but to initiate this action to prevent the improper distribution of the co-payments to residents, and instead re-direct those undisputed amounts owed to the entities to whom the funds are properly owed– Plaintiffs' member LTC Pharmacies.

Parties

7. Plaintiff LTCPA is a Delaware limited liability company headquartered in the District of Columbia and organized for the express purpose of protecting the interests of LTC pharmacies and long term care facility residents and advocating on their behalf before governmental and other entities.

8. In addition to speaking for the nation's nursing home residents, LTCPA represents its members, the three largest LTC pharmacy companies in the United States--Kindred Pharmacy Services, Omnicare, Inc., and PharMerica,. Kindred is a Delaware corporation and its principal place of business is in Kentucky. Omnicare is also a Delaware corporation that has its principal place of business in Kentucky. PharMerica is a wholly-owned subsidiary of AmerisourceBergen, a Delaware corporation with its principal place of business in Pennsylvania. PharMerica's principal place of business is in Florida. The LTC pharmacies represented by LTCPA play a vital role in providing prescription medications and drug therapy for tens of thousands of senior citizens and individuals with chronic illnesses living in long term care facilities, including seniors and other individuals residing in nursing homes within the new Medicare drug benefit. LTCPA is authorized, on behalf of itself and its members, to bring this action.

9. Plaintiff ASCP is a Massachusetts corporation, with its principle place of business in Alexandria, Virginia. ASCP serves as the international professional society representing senior care and consultant pharmacists, including pharmacists across the United States and in the District of Columbia, by providing leadership, education, advocacy, and resources to advance the practice of senior care pharmacy. Consultant pharmacists and senior care pharmacists play a vital

role in reviewing optimal drug therapy for millions of senior citizens and individuals with chronic illnesses living in long term care facilities and other community settings, including individuals in the District of Columbia. ASCP represents thousands of practicing pharmacists in the United States. ASCP is authorized, on behalf of itself and its members, to bring this action.

10. Defendant UnitedHealth is a corporation organized and existing under the laws of the State of Minnesota, with its headquarters and principal place of business in Minnetonka, Minnesota. UnitedHealth, directly and through its subsidiaries, owns and operates the largest PDP (and other PDPs) which, among other things, provides prescription drugs to tens of thousands of full benefit dual eligible Medicare beneficiaries residing in nursing homes and other institutions that are enrolled in its Plan. UnitedHealth accounts for about 27 percent of all PDP enrollees nationwide. Upon information and belief, UnitedHealth is doing business in the District of Columbia.

## Jurisdiction and Venue

11. Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 2201 and 28 U.S.C. § 1332 in that this is a diversity action for declaratory relief, Plaintiffs and Defendant are residents of different jurisdictions, there is an actual case or controversy present in this case, and the amount in controversy exceeds ten million dollars. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because Plaintiff LTCPA resides in this District, events giving rise to the claim occurred in this District, and Defendant is doing business in this District.

## Long Term Care Pharmacies

12. LTCPA and ASCP members operate LTC pharmacies, meaning they are not open to the public, and do not provide retail services. LTCPA member pharmacies focus on serving the needs of individuals who are frail, elderly, or disabled and reside in nursing homes. The average

nursing home patient is approximately 83 years of age, has approximately 8 different medical diagnoses, and requires an average of 8 medications at any given time.

13. In order to serve this frail and fragile population, LTC Pharmacies provide numerous additional services in dispensing drugs to this population beyond those provided by retail pharmacies. For example, LTC Pharmacies provide specialized medication packaging in "unit dose packages" (referred to as "blister packs"), specialized drug regimen reviews, chart reviews, and consultant pharmacy services. In addition, the LTC Pharmacies deliver medications to long term care residents and are available on a 24-hour a day, 7-day a week basis each and every day of the year. These extra services not only provide effective and efficient care for nursing home residents, but also save the poor and frail from possible medication errors or the need to be transported from their homes to hospitals for more intensive care. In turn, the federal health care programs, Medicare and Medicaid, save billions of dollars through the avoidance of medication errors and additional health care costs.

### The Federal Medicare Prescription Drug Program

14. In December 2003, Congress enacted the Medicare Prescription Drug Improvement and Modernization Act ("Act" or the "MMA") to provide prescription drug coverage for all Medicare beneficiaries. The benefit, also known as "Part D," became effective on January 1, 2006. LTC Pharmacies participate in the program by contracting with the PDPs – the private entities directly providing the benefit to Medicare beneficiaries. However, since the first day of implementation, the PDPs have failed to honor their contracts with Plaintiffs' member LTC Pharmacies, and instead, the PDPs have been reducing the reimbursement due to the LTC Pharmacies for hundreds of thousands of prescriptions dispensed to the PDPs' nursing home residents by an amount known as the "co-payment."

15. Each PDP, including Defendant above, contracts with the federal Centers for Medicare and Medicaid Services ("CMS"), an agency within the Department of Health and Human Services, to provide the benefit to Medicare beneficiaries. Many PDPs are well-known health insurers such as Aetna, Cigna, and Defendant UnitedHealth. Medicare beneficiaries enroll (or are auto-enrolled) in the various PDP plans and receive their drugs from the PDPs' network pharmacies – in this case the LTC Pharmacies. Once the pharmacy dispenses a drug to a Plan enrollee (the nursing home resident, in this case), it bills the Plan (the PDP) for reimbursement pursuant to the network contract.

16. Within the class of all Medicare beneficiaries, there exists a special class of beneficiaries who are eligible under both the Medicare and Medicaid programs, commonly referred to as "dual eligibles." These individuals had previously received prescription drug coverage through their respective state Medicaid programs and are not voluntary participants in Part D. Rather, they were automatically enrolled by CMS in the program. The Part D coverage for dual eligibles effectively replaced the previous coverage available to them under the Medicaid program, which was no longer offered to these patients once the Part D program was effective on January 1, 2006.

17. Over 90 percent of the long term care residents participating in Part D qualify as "institutionalized dual eligibles," which allows them access to special subsidization under Part D that relieves them of the obligation to pay most premiums and co-payment amounts.

## COST SHARING UNDER PART D

18. Traditional Medicare and Medicaid programs typically include some aspect of cost sharing, or "co-payments," by beneficiaries in the structure of the benefit. Co-payments are flat, pre-determined payment amounts assigned to specific services that are paid by the beneficiary to contribute to cost coverage and prevent over-utilization. The calculation and implementation of co-

payment amounts, however, is critical to ensuring that beneficiaries are not priced-out of essential medical care.

19.     Congress, when implementing the Part D benefit, set co-payments for all dual eligibles at the same rate as had been in effect for the Medicaid program under which the duals had previously received their drugs.[1]  Congress also mandated a zero co-payment for nursing home duals, as had been the practice in Medicaid.  Thus, under the Act and its implementing regulations subsequently promulgated by CMS, individuals who qualify as "institutionalized full-benefit dual-eligibles" were not to be assessed any co-payments for covered medication obtained through their Part D plans.

20.     More specifically, MMA section 1860D-14(a)(1)(D)(i), 42 U.S.C. § 1395w-114D-14(a)(1)(D)(i), provided, "in the case of an individual who is a full-benefit dual eligible and who is an institutionalized individual ... [for] the elimination of any beneficiary coinsurance described [in the Act]."  Consistent with the statutory bar on co-payments for institutionalized dual eligibles, CMS in its implementing regulations provided: "[f]ull benefit dual eligibles who are institutionalized have no cost sharing for covered Part D drugs covered under their PDP or MA-PDP plans."  42 C.F.R. §423.782(a)(2)(ii).  The regulatory definition of "institutionalized" found in Section 1902(q)(1)(B) of the Act and 42 C.F.R §423.772 specifically includes residents of a nursing facility whose services are being covered by Medicaid.  As such, Congress specifically barred PDPs from charging dual eligibles residing in a LTC facility, including nursing homes, *any* co-payment amount for drugs received through their PDP.

---

[1] In addition, Congress also created an additional co-payment, known as the "doughnut hole," when beneficiaries reached a certain level of drug spending.  Some "doughnut hole" co-payments are also implicated in this case.

21. In its discussion of Congress' explicit elimination of the Part D co-payment obligation for institutionalized dual-eligibles, CMS noted that for these patients in particular, assessment of even a small cost sharing amount would be a hardship. The preamble to the final Part D regulation promulgated by CMS explained that "[w]e believe that the Congress intended this provision to address the fact that dual-eligible persons residing as inpatients in medical institutions are permitted to retain only a small personal needs allowance, which preclude payment of even nominal co-payments." 70 Fed. Reg. 4372 (Jan. 28, 2005).

### DEFENDANT ILLEGALLY WITHHELD CO-PAYMENTS FOR THE INSTITUTIONALIZED DUAL-ELIGIBLES

22. On January 1, 2006, the Part D program began and the LTC Pharmacies started providing prescription drugs to institutionalized dual-eligibles. The PDPs were supposed to begin immediately reimbursing the LTC Pharmacies for each prescription dispensed at rates determined by contracts between each LTC pharmacy and PDP. However, virtually every PDP failed to recognize that this special class of institutionalized dual-eligibles had no co-payments, and the PDPs improperly reduced LTC pharmacy reimbursement by the standard Part D co-payment amount. Cognizant of the fact that these beneficiaries did not have the means to pay the cost sharing amounts and assured by CMS that these issues would be retroactively resolved, LTC Pharmacies refrained from assessing the cost sharing amount to beneficiaries.

23. Among others, Plaintiffs on behalf of the LTC Pharmacies, immediately brought the issue to the attention of CMS, and began working with CMS and the PDPs to address this significant problem.

### CMS RESPONSE TO INCORRECT COST SHARING CHARGES

24. Throughout February, March, and April, Plaintiffs worked with CMS and the PDPs to address this issue. Yet, by the end of March, the magnitude of the problem was enormous,

with millions of dollars of improperly withheld co-payments accumulating on the PDP books, and with a corresponding amount of debt for these unpaid amounts accumulating at the LTC Pharmacies. On April 18, 2006, CMS issued a guidance for Part D participants that directly addressed the issue:

> **How will pharmacies be reimbursed for reduced payments on behalf of unidentified dual eligibles who live in long-term care facilities and qualify for the $ 0 copayment?**
> Dual eligibles who reside in long-term care facilities may not have to pay co-payments for their prescription drugs. Pharmacies will receive a one-time payment for the amount of any uncollected co-payments for people who were incorrectly identified as having to pay co-payment amounts. The pharmacy will need to submit a spreadsheet with claim information to the prescription drug plan.

Exhibit 1 ("How Medicare Drug Plan Members can Seek Repayment of Premiums and Copayments", Centers for Medicare and Medicaid Services, Apr. 18, 2006).

25. CMS again directly addressed this issue in an April "question and answer" guidance:

> When implementing retroactive subsidy level changes for a full-benefit dual-eligible who meets the definition of an institutionalized individual but is incorrectly charged cost sharing amounts under the Part D benefit, *plans should not automatically reimburse beneficiaries residing in long-term care facilities*. In such situations, it is unlikely that LTC pharmacies have collected the applicable cost-sharing from beneficiaries due to the expectation that the plan eventually would reimburse the pharmacy retroactively for such amounts. In such situations, Part D plans should work with their pharmacies to provide them with direct reimbursement for any cost-sharing amount not collected from institutionalized individuals. (emphasis added)

Exhibit 2 ("Reimbursement to LTC Pharmacies for Retroactive Subsidy-level Cost Sharing Charges," Centers for Medicare and Medicaid Services (Apr. 2006)). Yet, the PDPs, who by this point were holding tens of millions of dollars in improperly withheld co-payments, took no action to reimburse the LTC Pharmacies that were holding the debt.

26. Subsequent to the guidance from CMS, LTC Pharmacies through their Plaintiff associations again contacted the PDPs, and specifically Defendant UnitedHealth, to make

4815293                                    10

arrangements to retroactively receive the "one time" payments for claims where they had been underpaid due to the failure to properly identify institutionalized dual-eligibles. During the resulting discussion, however, UnitedHealth steadfastly refused to agree to process the retroactive payments.

27.  Given UnitedHealth's endless excuses, Plaintiffs LTCPA and ASCP, on behalf of their members, again appealed to CMS to address the UnitedHealth concerns, which resulted in yet another CMS guidance document on the issue. Specifically, CMS on May 5, 2006, instructed PDPs to "use the 'best available data' when [PDPs] have knowledge that a beneficiary's cost sharing level is not correct." Additionally, the CMS letter stated that PDPs "are encouraged to reimburse LTC Pharmacies directly when implementing retroactive subsidy level changes. *Plans should not automatically reimburse beneficiaries in long-term care facilities* because it is unlikely that the LTC Pharmacies have billed the beneficiaries for their co-payments." Exhibit 3 (Letter to All Part D Plan Sponsors from Centers for Medicare and Medicaid Services, May 5, 2006).

## DEFENDANT'S FAILURE TO REIMBURSE LTC PHARMACIES

28.  By May 2006, following three separate and clear CMS guidance documents, many PDPs began to work with the LTC Pharmacies and reimbursed the backlog of inappropriately withheld co-payments directly to the LTC Pharmacies. Defendant, however, took a different approach and continued to refuse to take such action. Instead, Defendant insisted that rather than submitting a 'bulk claim" for the amounts of improperly withheld co-payments, supported by specific claim information, each of the LTC Pharmacies had to reverse the original transactions and rebill them. When Plaintiffs' members tried to follow Defendant's direction, however, they quickly learned that Defendant was rejecting the entirety of the claim, rather than just not paying the improperly withheld co-payment.

29.  By mid-June 2006, Defendant UnitedHealth communicated with Paul Baldwin, Executive Director of the LTCPA, and informed him that, effective June 16, 2006, UnitedHealth

was going to begin distributing checks for each individual improperly withheld co-payment directly to the nursing home residents, rather than to the LTC Pharmacies who were owed the funds, unless the LTC Pharmacies reversed and rebilled each transaction.

30. Following repeated requests by both Mr. Baldwin and CMS, UnitedHealth agreed to extend its "deadline" until June 23. On June 23, however, UnitedHealth refused to extend the deadline further. Prior to June 23, 2006, many of Plaintiffs' member pharmacies, and all of LTCPA's member LTC Pharmacies, had submitted bulk claims with individual prescription backup for all the improperly withheld co-payments that UnitedHealth owed each of them. Notwithstanding the LTC Pharmacies direct compliance with CMS direction, and CMS's clear statement that the PDPs (including UnitedHealth) to make a "one-time payment for the amount of any uncollected co-payments for people who were incorrectly identified as having to pay co-payment amounts," Exhibit 1, UnitedHealth refused to process those requests.

31. Defendant has informed Plaintiff LTCPA that payments will be issued directly to nursing home residents beginning July 7, 2006, and that its subsidiary, PacifiCare, will begin issuing its payments directly to nursing home residents the following week, July 14, 2006. Upon information and belief, Defendant has not, as of the filing of this Complaint, actually begun issuing such payments.

32. At best, UnitedHealth will create confusion across this frail population due to its failure to appropriately program its computer systems to recognize which of its members are institutionalized dual eligibles. At worst, UnitedHealth will be inappropriately benefited at the expense of tens of thousands of nursing home residents across the country, as well as Plaintiffs' member LTC Pharmacies, by the funds remaining in its accounts. It is widely known that some nursing home residents do not have the capacity or wherewithal to understand what these checks represent, or that the funds are actually owed to the LTC Pharmacies that dispensed their drugs

without full payment. By sending checks to nursing home residents, approximately 60% of which suffer from some form of cognitive impairment, a large number of the checks will go unredeemed.

### COUNT I – DECLARATORY AND INJUNCTIVE RELIEF (28 U.S.C. § 2201)

33.  Paragraphs 1-32 of this Complaint are incorporated by reference.

34.  Defendant has a "network pharmacy contract" with each of Plaintiffs' members, as required by the Act and CMS regulation. Upon information and belief, Defendant's network contract is virtually uniform in all relevant parts. Yet, Defendant has violated 42 U.S.C. § 1395w-114D-14(a)(1)(D)(i), the MMA co-payment provision, and its implementing regulation, 42 C.F.R. § 423.782(a)(2)(ii), subsequent CMS guidance (including Exhibits 1, 2 and 3, quoted above) and their contractual obligations, by reimbursing the indisputably and illegally withheld co-payment amounts at issue directly to nursing home residents, rather than to the LTC Pharmacies to whom such payments are owed. Both under the Defendant-LTC Pharmacy network contracts and pursuant to specific and repeated CMS guidance, Defendant was, and remains, obligated to reimburse the improperly withheld co-payment amounts directly to Plaintiffs' member pharmacies, in (according to CMS) one lump sum upon presentation of information documenting the claims at issue. Yet, Defendant has repeatedly refused to directly reimburse LTC Pharmacies for the incorrectly withheld amounts despite being directed to do so by Plaintiffs, Plaintiffs' member LTC Pharmacies, and CMS.

35.  Plaintiffs seek a declaration pursuant to 28 U.S.C. § 2201, that the direct distribution of refund checks to misidentified institutionalized dual-eligible Part D beneficiaries is illegal and contrary to law and contract, and that Defendant must direct the reimbursement of such

funds to LTC Pharmacies consistent with law, CMS policy, CMS guidance, and the network contracts.

36. A justiciable controversy now exists between the parties that Plaintiff has standing to pursue and that is capable of resolution by this Court, given that:

   a. Defendant has already indicated that, beginning July 7, 2006, it will begin improperly disbursing the illegally withheld co-payments refunds directly to beneficiaries;

   b. If allowed to distribute the co-payment checks to beneficiaries, Defendant's action will significantly harm vulnerable nursing home residents who will experience confusion and anxiety when receiving dozens of $1 or $3 refund checks from Defendant without reason, particularly because they never made any co-payments to PDPs or LTC Pharmacies in the first instance.

   c. If allowed to distribute refund checks to beneficiaries, Defendant will also prevent LTC Pharmacies from being properly reimbursed for the prescription drug services rendered to Part D beneficiaries under the PDP-pharmacy network contracts, thereby breaching the Defendant-LTC Pharmacy network contracts and jeopardizing the LTC Pharmacies' ability to continue to fulfill this vital role in providing services to nursing home residents.

   d. Part D beneficiaries, Plaintiffs and their members, all have an interest to be free from the adverse impact of co-payment refund checks improperly distributed to Part D beneficiaries, and seek to protect this interest and to obtain prospective injunctive relief through the filing of this action. This action is also germane to the interests of LTCPA as a trade organization and ASCP as a professional society representing

long-term care pharmacies and pharmacists and nursing home residents affected by the issuance of these checks.

37. Plaintiffs and their members request injunctive relief to preserve the status quo and prevent significant injury to nursing home residents, among others, that will occur if Defendant's improper distribution of refund checks to beneficiaries is not enjoined.

38. Defendant will not be injured in any way if a temporary restraining order and preliminary injunction is granted, in that it has admitted that it must disburse the improperly withheld co-payment amounts.

## RELIEF REQUESTED

WHEREFORE, Plaintiffs respectfully request the following relief:

a. That the Court enter judgment declaring that the Defendant owes Plaintiffs' member LTC Pharmacies and pharmacists the co-payment amounts, in an amount to be determined consistent with CMS policy and procedure, and that Defendant is improperly retaining those amounts in violation of law and contract;

b. That the Court enter a temporary restraining order, preliminary injunction, and ultimate judgment declaring that Defendant may not disburse the co-payment amounts to individual nursing home resident Medicare beneficiaries who are institutionalized full benefit dual eligibles;

c. That this Court enter judgment awarding Plaintiffs' costs, expenses, and attorneys' fees incurred herein; and

d. That this Court order such other relief as the Court deems proper and necessary.

Respectfully submitted,

_____
David Farber (D.C. Bar No. 415899)
Harry Silver (D.C. Bar No. 168104)
PATTON BOGGS LLP
2550 M Street, N.W.
Washington, D.C. 20037
Telephone: (202) 457-6000
Facsimile: (202) 457-6315

Counsel for Plaintiffs

Dated: July 6, 2006

## VERIFICATION

I, Paul Baldwin, Executive Director of the Long Term Care Pharmacy Alliance, pursuant to 28 U.S.C. § 1746, do hereby verify and state under penalty of perjury that I have reviewed the foregoing complaint and attest that the facts stated therein are true and correct to the best of my knowledge.

_____
Paul Baldwin

4815293

16