## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **LONG TERM CARE PHARMACY ALLIANCE and AMERICAN SOCIETY OF CONSULTANT PHARMACISTS,**<br><br>Plaintiffs,<br><br>v.<br><br>**UNITEDHEALTH GROUP, INC.**<br><br><br><br>Defendant. | Civil Action No. _____ |

## PLAINTIFFS' MOTION FOR TEMPORARY
## RESTRAINING ORDER AND PRELIMINARY INJUNCTION

On Friday, July 7, 2006, Defendant will begin mailing large numbers checks, many for $1 and $3, to tens of thousands of nursing home residents, setting into motion a chain of events guaranteed to cause confusion, anxiety, distress, and emotional, as well as financial harm to the long term care sector of the new Medicare Prescription Drug program. These checks, representing millions of improperly withheld "co-payment" amounts that Defendant should never have assessed for the drugs dispensed to nursing home residents in the first place, are indisputably owed to Plaintiffs' member Long Term Care Pharmacies or "LTC Pharmacies," who dispensed nursing home residents their prescription drugs with the expectation that Defendant would comply with its contractual obligations to reimburse the pharmacies. Rather than reimbursing the LTC Pharmacies for the improperly withheld co-payment amounts, as the federal agency administering the Medicare program instructed it to do, Defendant has announced that on July 7 it will begin mailing checks to

nursing home residents, and requiring the LTC Pharmacies to recover the co-payment amounts from those elderly beneficiaries.

To prevent the impending harm, Plaintiffs Long Term Care Pharmacy Alliance ("LTCPA") and American Society of Consultant Pharmacists ("ASCP"), on their own behalf and by and on behalf of their members and through their undersigned counsel, seek prospective injunctive relief pursuant to Rule 65(a) of the Federal Rules of Civil Procedure and Local Civil Rule 65.1, and hereby move this Honorable Court to enter a temporary restraining order and preliminary injunction against Defendant barring it from releasing improperly withheld prescription drug "co-payment" payments to so-called Medicare Part D Full Benefit Dual Eligible residents of nursing homes and other institutions.

A memorandum of points and authorities in support of Plaintiffs' motion, request for expedited hearing, proposed Order, and Rule 7.1 disclosure statement are filed herewith for the Court's consideration.

Respectfully submitted,

David Farber (D.C. Bar No. 415899)
Harry R. Silver (D.C. Bar No. 168104)
PATTON BOGGS LLP
2550 M Street, N.W.
Washington, D.C. 20037
Telephone: (202) 457-6000
Facsimile: (202) 457-6315

Counsel for Plaintiffs

Dated: July 6, 2006

4815310

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

LONG TERM CARE PHARMACY )
    ALLIANCE, *et al.* )
                 )
        Plaintiffs, )
                 )
v. )    Civil Action No. _____
                 )
UNITEDHEALTH GROUP, )
                 )
        Defendant. )
                 )

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Plaintiffs Long Term Care Pharmacy Alliance ("LTCPA") and American Society of Consultant Pharmacists ("ASCP"), by and through their undersigned counsel, on their own behalf and on behalf of their members, pursuant to Rule 65(a) of the Federal Rules of Civil Procedure and Local Civil Rule 65.1, have moved this Honorable Court to enter a temporary restraining order and preliminary injunction against Defendant UNITEDHEALTH GROUP, Inc. ("Defendant" or "UnitedHealth"), enjoining it from disbursing tens of thousands of small checks to nursing home residents participating in the Medicare Prescription Drug Benefit for amounts that Defendant has previously improperly withheld from the reimbursement paid to Long Term Care Pharmacies ("LTC Pharmacies") for prescription drugs dispensed by the LTC Pharmacies to such residents. There is no dispute that, under the "network" contracts between the LTC Pharmacies and Defendant, the amounts at issue are owed by Defendant to Plaintiffs' members. If Defendant is allowed to disburse the funds to nursing home residents, rather than the LTC Pharmacies to whom the funds are owed, Defendant will create rampant confusion, anxiety and distress across the nation's nursing homes,

and require the LTC Pharmacies to chase the checks from each nursing home resident one at a time. To prevent these harms, the Court should freeze the funds, and, upon resolution on the merits, require them to be disbursed in accordance with federal direction.

Defendant is well aware of its contractual obligation to pay the LTC Pharmacies for the improperly withheld co-payment amounts. If there were any question, the federal government has repeatedly directed Defendant to reimburse the pharmacies directly. Yet, as recent as July 5, 2006, Defendant continues to insist that it will reimburse the residents, and let the pharmacies attempt to collect the thousands checks, many for $1 and $3, from them.[1] To avoid significant disruption in the lives of these frail, elderly, and often cognitively impaired residents, as well as to avoid substantial and permanent disruption of the pharmacies' relationships with their patients and with their nursing home clients, and to resolve the issue, this Court must enter injunctive relief freezing the funds, and ultimately requiring they be reimbursed to the Pharmacies to whom they are owed.

## INTRODUCTION

On January 1, 2006, the new Medicare Prescription Drug Benefit took effect. On that date, over one million Medicaid beneficiaries residing in nursing homes and other institutional settings (collectively "nursing homes") had their prescription drug coverage switched from their state Medicaid programs to the new Medicare program. Practically speaking, nursing home residents did not experience any interruption in service; each of their nursing homes had a contract with Plaintiffs' member LTC Pharmacies that provided the prescription medications for each resident (along with numerous other specialized services).

Before implementation of the Medicare drug benefit, approximately two-thirds of nursing home residents qualified for Medicaid and were receiving a drug benefit through the Medicaid

---

[1]    Although the typical co-payments at issue are $1 and $3, the amounts may vary, as so-called "doughnut hole" co-payments, which are likely greater sums, also are at issue in this case.

program that covered all their prescription drugs. Because of their elderly and very poor status, Medicaid beneficiaries residing in nursing homes never had any co-payment requirements. By contrast, ambulatory Medicaid beneficiaries outside the nursing home setting typically were charged a nominal $1 or $3 co-payment for each prescription. Nursing home resident prescriptions were normally dispensed by specialized LTC pharmacies, which were paid by Medicaid for each drug dispensed. Continuing to this day, LTC Pharmacies have never charged co-payments to nursing home residents.

On January 1, 2006, the Medicare Drug Benefit took effect, and Medicaid was barred by law from paying for prescription drugs for its beneficiaries who were also eligible for Medicare (meaning that they were over 65), – so called "full benefit dual eligibles" (meaning that they were dually eligible for both Medicare because they were older than 65 and Medicaid because they were poor). Congress was aware that "institutionalized" "dual eligibles," those in nursing homes, had previously not had any co-payment requirement under Medicaid, and statutorily barred the new Medicare Prescription Drug Plans (known as "PDPs") to which these dual eligibles were assigned from charging any co-payments for the institutionalized dual eligibles as well. Agency implementing regulations included this same prohibition. However, when on January 1, 2006, the LTC pharmacies dispensed the drugs to the nursing home residents and began billing the PDPs for the drugs, they were shocked to discover that the PDPs reimbursement was short of the full payment due, and that the PDPs were withholding the co-payment amounts. It is these improperly withheld co-payment amounts for the first six months of the Medicare drug program that are at issue in this case.

For a variety of reasons, the PDPs took months to acknowledge that they had improperly withheld these co-payment amounts, and that the funds were owed to the pharmacies. After this acknowledgment, however, the Defendant announced that it intended to send the reimbursement to the nursing home residents. Defendant's purported reason for doing so was that they had

"assumed" the LTC Pharmacies had collected the funds from the nursing home residents, even though Defendant knew this not to be the case and the LTC Pharmacies had not done so. Even after the LTC Pharmacies offered to submit (and in several cases actually submitted) verifications to the PDPs that they had not collected any co-payments from the beneficiary residents, Defendant continued to insist that, beginning July 7, 2006, it would reimburse only the beneficiaries, and not Plaintiffs' member LTC Pharmacies who are actually owed the co-payment amounts.

Defendant will create rampant confusion and harm if it is not enjoined from sending the reimbursement checks to nursing home residents. Most significantly, nursing home residents will be assaulted with dozens of checks, many for $1 and $3 for no reason, further complicating implementation of an already complex benefit that they barely understand, and creating anxiety among this frail and elderly population. Immediately following, Plaintiffs member pharmacies will be forced to attempt to recoup these funds from elderly and, in many cases, cognitively impaired nursing home residents. Neither the residents nor their families will understand or sympathize with such collection efforts on the part of LTC pharmacies.

Plaintiffs and their members have exhausted every possible avenue of recourse, including appeal to the federal agency responsible for the benefit, the Federal Centers for Medicare and Medicaid Services ("CMS"), an agency of the Department of Health and Human Services ("HHS"). Declaration of Paul Baldwin, July 6, 2006 ("Baldwin Dec.") ¶ 19. Plaintiffs' members have pursued negotiations and appeals to Defendant up through July 5, 2006. *Id.* Given the immediacy of the impending harm, Plaintiffs have no choice but to initiate this action to prevent the improper distribution of co-payments to beneficiaries, and instead re-direct those undisputed amounts owed to the entities holding the debt – Plaintiffs' member LTC pharmacies.

STATEMENT OF FACTS

A.    **Nursing Home Residents and the Long Term Care Pharmacies That Serve Them**

Unlike nursing home residents of the past, today's nursing home residents are older (average age 83) and sicker (averaging three or more concurrent illnesses, with over 60% suffering some form of cognitive disability).[2] Baldwin Dec. ¶ 4. Thus, they have far greater medication needs (typically eight or more simultaneous prescriptions) than either a typical elderly person or a typical non-elderly Medicaid beneficiary. Because of the severity of their illnesses, prescription drugs are used far more extensively in the nursing home setting than what the Court may be familiar with in the ambulatory setting. *Id.* Thus, in the past 25 years, a specialized pharmacy industry, called the Long Term Care Pharmacy industry, represented by LTCPA and ASCP,[3] has emerged to service these residents.

---

[2] Bernabei, R. *et al.*, *Characteristics of the SAGE Database: A New Resource for Research on Outcomes in Long-term Care*, J. Gerontol. A. Biol Sci. Med. Sci. 54:M25-33 (1999). At the time it was published, the Bernabie study and the SAGE database were the only published statistics specific to long-term care structured to capture specific processes of care provided in LTC facilities. *Id.* at M29. The 2003 National Medication Usage Study, in 637 nursing home facilities consisting of 63,671 residents, revealed an average of 8.07 routine medication orders per resident, with 41.1% receiving 9 or more routine medications per day. The most commonly consumed drug classes were antidepressants (45%), analgesics (30%), antipsychotics (24%), and anxiolytics (11%). Tobias, D.E. and Sey, M. *General and Psychotherapeutic Medication Use in 328 Nursing Facilities: A Year 2000 National Survey*, 16 Consult. Pharm. 54 (2001).

[3] Both ASCP and LTCPA appear in their representational and associational capacities on behalf of their members, all of whom are identically situated with respect to the co-payment issues involved in this case. *See Hunt v. Washington State Apple Adver. Comm'n*, 432 U.S. 333 (1977)); *International Union, United Automobile, Aerospace and Agricultural Implement Workers of America v. Brock*, 477 U.S. 274 (1986) (association permitted standing to pursue prospective declaratory relief notwithstanding impact on underlying contracts); *AMA v. United Healthcare*, No.00 Civ. 2800, 2002 WL 31413668 *3 (S.D.N.Y. Oct. 23, 2002) (same). LTCPA and ASCP meet all three requirements of the associational standing doctrine in that: (1) the two associations' members have standing to sue on their own behalf for the prospective declaratory relief at issue here; (2) LTCPA alone represents the three major long-term care companies that serve more than 1.5 million people through networks of nearly 500 pharmacies nationwide, including long-term care pharmacies in the District of Columbia, and ASCP represents thousands of pharmacists working in LTC pharmacies across the country and in the District, and the co-payment reimbursement issue will cause injuries to the associations' members which directly pertain to the associations' purposes, which are to protect the interests of long-term care pharmacies and long-term care facility residents; *see* LTCPA Homepage *available at* www.ltcpa.org; *see also* ASCP

LTC Pharmacies are unlike retail pharmacies with which the Court is likely familiar – they are not open to the public and will not dispense prescriptions to customers who walk in the door. Baldwin Dec. ¶¶ 5-6. Rather, these pharmacies only serve long term care facilities such as nursing homes and assisted living facilities. Nursing homes are typically too small to have their own in-house pharmacies and they do not have the expertise to dispense drugs to nursing home residents. Thus, almost all nursing homes contract with an LTC Pharmacy to provide the necessary prescription drugs to nursing home residents. *Id.* Second, LTC Pharmacies provide a large number of specialized services that are particularly important in today's health care environment. *Id.*

Among the most vital specialized services provided by LTC Pharmacies is a complex drug control system that includes safeguards such as "unit dose" packaging in "blister packs" -- each of which is specifically labeled for a specific patient (often times including a bar code). Baldwin Dec. ¶ 5. This packaging is critical in eliminating medication errors and ensuring that the right patient gets the correct medication at the right time. These pharmacies also provide 24-hour pharmacy and delivery to the nursing homes, 365 days per year, which is critical for incoming patients, who could be checked in late on a Friday night, or for patients needing an intravenous ("IV") medication. *Id.* If that 24 hour delivery service were not available and a nursing home resident needed an IV for dehydration, the nursing home resident would likely have to be transported to a hospital for the

---

homepage at www.ascp.com; and directly injures the associations' interests by jeopardizing its members' ability to exist in the Medicare market; and (3) neither the claims asserted nor the relief requested requires participation of individual members in that the associations are seeking prospective injunctive and declaratory relief . *AMA, supra, citing Brock, supra.* Other Courts have recognized both LTCPA's and ASCP's associational standing for their respective members. *See Long Term Care Pharmacy Alliance v. Ferguson,* 260 F. Supp. 2d 282, 289-90 (2003), *affirmed in part and reversed in part,* 362 F.3d 50 (1st Cir. 2004); *American Society of Consultant Pharmacists,* 214 F. Supp.2d 23, 29 (D. Me. 2002).

necessary IV administration, resulting in discomfort and delay for the resident, and significant increased costs for the health care system.[4]

### B.    The Part D Program

In December 2003, Congress enacted the Medicare Prescription Drug Improvement and Modernization Act ("Act" or the "MMA"), 42 U.S.C. § 1395w, *et seq.*, creating the Medicare drug benefit to provide prescription drug coverage for all Medicare beneficiaries. The benefit, also known as "Part D," became effective on January 1, 2006. Baldwin Dec. ¶ 7. Perhaps no group was more affected by the change than nursing home residents and the Long Term Care pharmacies who served them. Baldwin Dec. ¶¶ 7-9. Almost all nursing home residents had their drugs changed from Medicaid to Medicare. In turn, the LTC Pharmacies, which had half their revenue shifted from Medicaid, a series of 50 state programs, found themselves billing to hundreds of Prescription Drug Plans ("PDP"s)[5] – the private insurance plans with which beneficiaries enrolled, and with which the LTC pharmacies contracted to serve as the providing (or "network") pharmacies. *Id.* Thus, while nursing home residents continued to receive their drugs in January from the same pharmacy, and in the same way, that they had in December, the pharmacies found themselves billing an entirely different payor – the PDPs. This new billing arrangement began pursuant to a set of "network provider contracts" that each of Plaintiffs' member pharmacies entered into with each PDP, including Defendant. *Id.* However, since the first day of implementation, the PDPs have

---

[4] Also critical is drug regimen review service provided by LTC Pharmacies – where each nursing home resident's medical chart is reviewed by pharmacy professionals to ensure that the proper medications and being administered and that there are not inappropriate drug interactions. Because nursing home patients are often very elderly, and their bodies handle drugs differently, LTC Pharmacies have developed specialized geriatric drug guidelines, and know which are the best medicines for the elderly to take for given health problems.

[5] The currently participating PDPs, including Defendant, contracted with CMS to serve as PDPs. Many PDPs are well known health insurers such as Aetna, Cigna, and Defendant UnitedHealth.

failed to honor their obligations to Plaintiffs' member LTC Pharmacies, and instead have been reducing the reimbursement by the "co-payment."

Among the approximately 41 million Part D eligible seniors are just over 6 million beneficiaries also eligible for Medicaid, commonly referred to as "dual eligibles." As explained above, these individuals had previously received prescription drug coverage through their respective state Medicaid programs, and were not voluntary participants in Part D but rather were automatically enrolled in the program. Baldwin Dec. ¶ 9. The Part D coverage for dual eligibles effectively replaced the previous coverage available to them under the Medicaid program, which was no longer offered to these beneficiaries (including approximately 1.2 million nursing home residents) once the Part D program was operational on January 1, 2006. *Id.*

### C. Cost Sharing and the Institutionalized Dual Eligibles

Traditional Medicare and Medicaid programs typically feature beneficiary cost sharing, or co-payments, in the benefit structure. Baldwin Dec. ¶ 10. Co-payments are flat, pre-determined payment amounts assigned to specific services that are the responsibility of the beneficiary. The use of co-payments in federal health care programs, as well as the private insurance market, is appealing for a number of reasons, primarily because it contributes to covering the costs of providing services to patients while deterring unnecessary beneficiary utilization. Consistent with this rationale, Congress included the co-payments for almost all of the eligible beneficiaries in the Part D design.

Under the Medicaid program, several beneficiary classes were exempt from co-payment requirements, including nursing home residents. *Id.* Recognizing this, Congress exempted "institutionalized full-benefit dual-eligibles" from any co-payments for covered medication obtained through their Part D plans. MMA § 1860D-14(a)(1)(D)(i), 42 U.S.C. § 1395w-114D-14(a)(1)(D)(i) ("in the case of an individual who is a full-benefit dual eligible and who is an institutionalized individual... the elimination of any beneficiary coinsurance described [in the Act]"); Baldwin Dec.

¶ 11.    Consistent with the statutory bar, CMS regulations provide: "[f]ull benefit dual eligibles who are institutionalized have no cost sharing for covered Part D drugs covered under their PDP or MA-PDP plans."  42 C.F.R. §423.782(a)(2)(ii).[6]  The regulatory definition of "institutionalized" found in Section 1902(q)(1)(B) of the Act and 42 C.F.R §423.772 specifically includes residents of a nursing facility whose services are being covered by Medicaid.  As such, Congress and CMS specifically barred PDPs from charging dual eligibles residing in a long term care facility any co-payment amount for drugs received through the PDP of their choice. Baldwin Dec. ¶¶ 11-12.

### D.  January 1 -- the PDPs Failure to Recognize the Co-payment Issue

In order to ensure that dual-eligibles who previously received prescription drug coverage through their state Medicaid program did not lose coverage due to failure to enroll in Part D, CMS utilized a random assignment model to automatically enroll dual-eligibles in approved PDPs as of January 1, 2006.  Thus, by January 1, every PDP had some number of institutionalized dual eligibles in its plan, including Defendant.  However, from the very first day of the program, the PDPs failed to recognize the institutionalized dual eligible co-payment exemption. Baldwin Dec. ¶ 13.  Rather, the PDPs incorrectly assumed, without foundation, that LTC Pharmacies operated like retail pharmacies, and had collected the co-payment amounts at the pharmacy counter, which in turn led the PDPs to reduce the reimbursement rates of LTC Pharmacies by the standard co-payment amounts. Baldwin Dec. ¶ 14.  Of course, LTC Pharmacies have never operated in that manner, and the LTC Pharmacies understood that the nursing home residents had no co-payments, and thus had never collected one.  Baldwin Dec. ¶ 13.  Sadly, the PDPs, including Defendant, claimed that they

---

[6] In its discussion of Congress' explicit elimination of the Part D co-payment obligation for institutionalized dual-eligibles, CMS noted that for these patients in particular, assessment of even a small cost sharing amount would be a hardship.  The preamble to the final Part D regulation promulgated by CMS explained that "[w]e believe that the Congress intended this provision to address the fact that dual-eligible persons residing as inpatients in medical institutions are permitted to retain only a small personal needs allowance, which preclude payment of even nominal co-payments."  70 Fed. Reg. 4194, 4372 (Jan. 28, 2005).

could not properly identify those beneficiaries who were residing in nursing homes and other institutions, even though the LTC Pharmacies had been providing that data to them since January 1, 2006, through certain "resident locator codes."  Baldwin Dec. ¶ 13.

### E.  The LTC Pharmacies Work With CMS to Try Resolve the Problem.

1.        The LTC Pharmacies immediately brought the issue to the attention of both the PDPs (including Defendant) and CMS and began working with CMS and the PDPs to address the significant problem.  Baldwin Dec. ¶ 14.  Yet, by the end of March, the problem was not resolved, and the magnitude of the problem had grown to millions of dollars of improperly withheld co-payments accumulating on the PDP books, with a corresponding amount of debt for these unpaid amounts accumulating at the LTC Pharmacies.  On April 18, 2006, CMS issued a guidance for Part D participants that directly addressed the issue:

> **How will pharmacies be reimbursed for reduced payments on behalf of unidentified dual eligibles who live in long-term care facilities and qualify for the $ 0 copayment?**
> Dual eligibles who reside in long-term care facilities may not have to pay co-payments for their prescription drugs. Pharmacies will receive a <u>one-time payment</u> for the amount of any uncollected co-payments for people who were incorrectly identified as having to pay co-payment amounts. <u>The pharmacy will need to submit a spreadsheet with claim information to the prescription drug plan</u>.

Exhibit 1 ("How Medicare Drug Plan Members can Seek Repayment of Premiums and Copayments", Centers for Medicare and Medicaid Services, Apr. 18, 2006)(emphasis added). Consistent with this guidance, the LTC Pharmacies prepared spreadsheets with claim information and submitted them to the PDPs.  However, Defendant refused to address the issue.

Given the lack of resolution, in April 2006 CMS again directly addressed this issue in a "question and answer" document,[7] and specifically indicated that reimbursement should be directed to the LTC Pharmacy, rather than to the individual nursing home residents:

---

[7] The CMS "Question and Answer" documents are a major source of CMS subregulatory guidance on Part D issues.

> When implementing retroactive subsidy level changes for a full-benefit dual-eligible who meets the definition of an institutionalized individual but is incorrectly charged cost sharing amounts under the Part D benefit, <u>plans should not automatically reimburse beneficiaries residing in long-term care facilities</u>. In such situations, it is unlikely that LTC pharmacies have collected the applicable cost-sharing from beneficiaries due to the expectation that the plan eventually would reimburse the pharmacy retroactively for such amounts. In such situations, Part D plans should work with their pharmacies to provide them with direct reimbursement for any cost-sharing amount not collected from institutionalized individuals. (emphasis added)

Exhibit 2 ("Reimbursement to LTC Pharmacies for Retroactive Subsidy-level Cost Sharing Charges," Centers for Medicare and Medicaid Services, Apr. 2006). Yet, the PDPs, who by this point were holding tens of millions of dollars in improperly withheld co-payments, took no action to reimburse the LTC Pharmacies that were holding the debt. Baldwin Dec. ¶ 14.

Subsequent to the guidance from CMS, LTC Pharmacies through their Plaintiff associations again contacted the PDPs, and specifically Defendant UnitedHealth, to make arrangements to retroactively receive the "one time" payments for claims where they had been underpaid due to the failure to properly identify institutionalized dual-eligibles. Exhibit 2; Baldwin Dec. ¶ 15. During the resulting discussion, however, Defendant, steadfastly refused to agree to process the retroactive payments, arguing that the data they had received from CMS about beneficiary status was not entirely accurate. *Id.*

Given UnitedHealth's endless excuses, Plaintiffs, on behalf of their members, again appealed to CMS to address the UnitedHealth concerns, which resulted in a third CMS guidance document on the issue. Specifically, on May 5, 2006, CMS again instructed PDPs to "use the 'best available data' when they have knowledge that a beneficiary's cost sharing level is not correct." Exhibit 3 (Letter to All Part D Plan Sponsors from Centers for Medicare and Medicaid Services, May 5, 2006). Thus, CMS negated the UnitedHealth excuse that it did not have completely accurate data, and permitted UnitedHealth to pay the wrongly withheld co-payments based upon a representation by the LTC Pharmacies of a beneficiary's institutional and dual eligible status. Additionally, the CMS

letter stated that PDPs "are encouraged to reimburse LTC pharmacies directly when implementing retroactive subsidy level changes. <u>Plans should not automatically reimburse beneficiaries in long-term care facilities</u> because it is unlikely that the LTC pharmacies have billed the beneficiaries for their co-payments." *Id.* (emphasis added); *see also* Exhibit 4 (CMS Question and Answer document, May 26, 2006, clarifying what PDPs can use as best available data).

### F. Defendant's Continued Refusal to Reimburse the LTC Pharmacies

By May 2006, following three separate and clear CMS guidance documents, many PDPs began to work with the LTC Pharmacies, and reimbursed the backlog of inappropriately withheld co-payments directly to the pharmacies. Defendant, however, took a different approach, and continued to refuse to take such action. Instead, Defendant insisted that rather than submitting a 'bulk claim" for the amounts of improperly withheld co-payments, supported by specific claim information, each of the LTC Pharmacies had to reverse the original transactions and rebill them. Baldwin Dec. ¶ 16. When Plaintiffs' members followed that direction, however, they quickly learned that Defendant was rejecting the entirety of the claim, rather than just not paying the improperly withheld co-payment.

By early June 2006, Defendant communicated with Paul Baldwin of the LTCPA, and informed him that effective June 16, 2006, UnitedHealth was going to begin distributing checks for each individual improperly withheld co-payments directly to the nursing home residents, rather than to the LTC Pharmacies to whom the funds were owed, unless the LTC Pharmacies reversed and rebilled each transaction. Baldwin Dec. ¶ 16. UnitedHealth knew that reversing and rebilling the tens of thousands of transactions would take the pharmacies months, not a few days, to accomplish, and that it was denying the entirety of the claims in any event. *Id.*

Following repeated requests by both Mr. Baldwin and CMS, UnitedHealth agreed to extend its June 16 "deadline" until June 23. On June 23, however, UnitedHealth refused to extend the

deadline further. *Id.* Prior to June 23, 2006, the vast majority of Plaintiffs' member LTC Pharmacies, and all of LTCPA's member LTC Pharmacies, had submitted bulk claims with individual prescription backup for all the improperly withheld co-payments that UnitedHealth owed each of them. None has been honored. Notwithstanding the LTC Pharmacies compliance with CMS direction, and CMS's clear statement that the PDPs, including UnitedHealth, would have to make a "one-time payment for the amount of any uncollected co-payments for people who were incorrectly identified as having to pay co-payment amounts," Exhibit 1, UnitedHealth refused to process those requests. Baldwin Dec. ¶ 16.

### G.  UnitedHealth's Threat To Issue Checks to Nursing Home Residents

Effective June 23, 2006, UnitedHealth threatened to begin issuing individual checks to thousands of full benefit dual eligible nursing home residents across the country for hundreds of thousands of improperly withheld co-payment amounts. Subsequently, UnitedHealth informed Mr. Baldwin that on Friday, July 7, 2006, it would begin disbursing checks to individual nursing home residents. Baldwin Dec. ¶ 17. To the best of Plaintiffs' knowledge, UnitedHealth has not, as of the date of the filing of this Motion, actually begun that process.

It is widely known that many nursing home residents do not have the capacity or wherewithal to understand what these checks represent, or that the funds are actually owed to the LTC Pharmacies that dispensed their drugs without full payment. Baldwin Dec. ¶ 20. Indeed, that is precisely what UnitedHealth is counting upon. By sending checks to nursing home residents, 60% of whom suffer from some form of cognitive impairment, UnitedHealth is at best refusing to adjust its internal systems to account for the unique needs of the nursing home population, and at worst counting on the checks going uncashed, and leaving the funds in its accounts earning interest. Thus, UnitedHealth will be unjustly enriched at the expense of the LTC Pharmacies. What will also result, however, is mass confusion within the nursing home population, as the poorest of the frailest and

elderly will be bombarded with dozens of $1 and $3 checks, which will increase their anxiety, confusion and stress (the Court can readily imagine how it would react to 32 different $1 and $3 checks from its health insurer coming through the mail in a short time period).    Baldwin Dec. ¶ 20. Further, the LTC Pharmacies' collection efforts, likely more expensive than the funds themselves, will cause a second round of disruption.  Baldwin Dec. ¶ 21.  The LTC Pharmacies stand to face a human and public relations disaster that could destroy their business. The elderly residents will not understand why their pharmacist is trying to take money away from them.  Residents' families will be extremely upset at collection efforts against this vulnerable population and will make their anger known to the nursing home as well as the LTC Pharmacy. *Id.*

There is no dispute that Defendant owes the money, and that it is owed, pursuant to the relatively standard "network pharmacy" contracts, to the LTC Pharmacies.  CMS, recognizing the very harms articulated above, has clearly spoken to the issue, and directed Defendant to reimburse the LTC Pharmacies directly.  To preserve the status quo, and avoid a wave of massive disruption in the lives of tens of thousands of nursing home residents, an injunction must be issued prohibiting Defendant from sending their checks out to nursing home residents pending ultimate resolution sending the appropriate reimbursement to the LTC Pharmacies to which the funds are actually owed.

<u>**ARGUMENT**</u>

The standard for granting a preliminary injunction is well-settled in this circuit.  The Court will grant a preliminary injunction where the movant has demonstrated: "1) a substantial likelihood of success on the merits, 2) that it would suffer irreparable injury if the injunction is not granted, 3) that an injunction would not substantially injure other interested parties, and 4) that the public interest would be furthered by the injunction." *Mova Pharmaceutical Corp. v. Shalala*, 140 F.3d 1060, 1066 (D.C. Cir. 1998); *Ramah Navajo Sch. Bd., Inc. v. Babbitt*, 87 F.3d 1338, 1341 n.1 (D.C. Cir. 1996);

*O'Donnell Constr. Co. v. District of Columbia*, 963 F.2d 420, 428 (D.C. Cir. 1992); *Doe v. Rumsfeld*, 297 F.Supp.2d 119, 126 (D.D.C. 2003); *A.F.L.-C.I.O. v. Chao*, 297 F.Supp.2d 155, 161 (D.D.C. 2003); *Fund for Animals v. Norton*, 281 F.Supp.2d 209, 219 (D.D.C. 2003); *Blackman v. District of Columbia*, 277 F.Supp.2d 71, 77 (D.D.C. 2003).

Although <u>each</u> of the four factors weighs strongly in favor of an injunction, in this Circuit, such a showing as to each factor is far more than what is required for this Court to grant the requested injunctive relief. *Blackman*, 277 F.Supp.2d at 77 ("Plaintiffs are not required to prevail on each of these factors. Rather, under *Holiday Tours*, the factors must be viewed as a continuum, with more of one factor compensating for less of another.") (*citing Washington Metro Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841 (D.C. Cir. 1977)). *See also Fund for Animals*, 281 F.Supp.2d at 219 ("No one factor is determinative... 'If the arguments for one factor are particularly strong, an injunction may issue even if the arguments in other areas are rather weak.'") (*quoting CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995)); *Davenport v. Int'l Brotherhood of Teamsters, AFL-CIO*, 166 F.3d 356, 360-61 (D.C. Cir. 1999) ("These factors interrelate on a sliding scale and must be balanced against each other."); *Chao*, 297 F.Supp.2d at 161 ("A particularly strong showing on one factor may compensate for a weaker showing on one or more of the other factors.") (*citing Serono Labs. v. Shalala*, 158 F.3d 1313, 1318 (D.C.Cir. 1998)). Indeed, although Plaintiffs' persuasive showing of likely success on the merits goes beyond what is necessary in light of its incontrovertible showing of irreparable injury and public interest, the obvious balance of harms lies clearly in its favor. *Chao*, 297 F.Supp.2d at 161 ("The necessary 'level' or 'degree' of possibility of success will vary according to the court's assessment of the other factors.") (*quoting New Mexico v. Richardson*, 39 F.Supp.2d 48, 50 (D.D.C. 1999)); *Fund for Animals*, 281 F.Supp.2d at 219 ("A court may accept a modified showing of the substantial likelihood of success on the merits, and grant injunctive relief upon a lesser showing of a '<u>substantial case on the merits</u>,' where 'the other

three factors strongly favor interim relief.'") (*quoting Holiday Tours*, 559 F.2d at 841) (emphasis added); *Blackman*, 277 F.Supp.2d at 78 ("when the other three factors strongly favor interim relief, a court may grant injunctive relief when the moving party has merely made out a 'substantial' case on the merits. The necessary level or degree of likelihood of success that must be shown will vary according to the Court's assessment of the other factors.").

The converse is also true, thus the high probability of Plaintiffs' ultimate success on the merits of its breach on contract action supports a lesser standard of irreparable injury. *Fund for Animals*, 281 F.Supp.2d at 219 ("Conversely, where a party can demonstrate 'probable success on the merits,' the party need only establish a 'possibility of irreparable injury.'") (*quoting Holiday Tours*, 559 F.2d at 841); *Blackman*, 277 F.Supp.2d at 78 ("An injunction may be justified 'where there is a particularly strong likelihood of success on the merits even if there is a relatively slight showing of irreparable injury.'") (*quoting CityFed Fin.*, 58 F.3d at 747). "In sum, an injunction may be issued 'with either a high probability of success and some injury, or vice versa.'" *Id., quoting Cuomo v. U.S. Nuclear Regulatory Comm'n*, 772 F.2d 972, 974 (D.C. Cir. 1985); *see also Bracco Diagnostics, Inc. v. Shalala*, 963 F.Supp. 20, 27 (D.D.C. 1997) (same).

I.    **Plaintiff Has a Substantial Likelihood of Succeeding on the Merits of its Claims Against Defendant**

Plaintiffs' Complaint seeks a declaratory judgment pursuant to 28 U.S.C. § 2201 that the Part D program requires Defendant's improperly withheld co-payments to be reimbursed directly to the LTC Pharmacies. The narrative set out above makes an overwhelming likelihood of success on that claim. First, there is absolutely no contractual provision that would prohibit such payments – indeed, quite the opposite is true in that the various contracts between Defendant and Plaintiffs' members could not permit Defendant to withhold reimbursement for amounts that they improperly were charging to institutionalized dual eligibles – the co-payments . *See, e.g. Hurd v. Hodge*, 334 U.S. 2, 5 (1948) ("The power of the federal courts to enforce the terms of private agreements is at all

times subject to the restrictions and limitations of the public policy of the United States as manifested in the Constitution, treaties, federal statutes... "). Second, CMS has spoken to the issue not once, but four different times. Each communication has mandated that Defendant reimburse improperly withheld co-payments to the LTC Pharmacies directly. Many PDPs have done precisely that, but Defendant has not.

> This Court has previously recognized that:

> [t]he Declaratory Judgment Act ("the Act") provides, in pertinent part, that [i]n a case of actual controversy within its jurisdiction ⋯ any Court in the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration ⋯⋯ 28 U.S.C. § 2201(a). *Cf.* Fed.R.Civ.P. 57. This statute was enacted, at least in part, to "enable[ ] litigants to narrow the issue, speed the decision, and settle the controversy before an accumulation of differences and hostility [ ] engendered a wide and general conflict, involving numerous collateral issues." S.Rep. No. 1005, 73d Cong., 2d Sess. 3 (1934) ("Senate Report"). To facilitate these ends, courts have repeatedly stated that the Act should have a liberal interpretation.....To aid courts in this endeavor, the Supreme Court has set out a somewhat more workable test: [t]he question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment. *Maryland Casualty Co., supra,* 312 U.S. at 273, 61 S.Ct. at 512 (citations omitted).

*National Railroad Passenger Corp. v. Consolidated Rail Corp.*, 670 F. Supp 424, 427-28 (D.D.C. 1987). There is clearly such a live controversy at issue here, where Defendant is on the cusp of sending contractually-owed funds to tens of thousands of nursing home residents, rather than to their rightful owners – the LTC Pharmacies.

It bears emphasizing that there is no dispute that Defendant owes the funds. Indeed, it is prepared to write checks beginning July 7, 2006. The only question is to whom the funds should be sent. Under their "network" contracts, there is no dispute that the PDPs are obliged to reimburse their network pharmacies for each prescription dispensed. As is somewhat self-evident, no contract provides that reimbursement can be "value minus illegally withheld co-payment." There is also no dispute whether institutionalized dual eligibles have paid co-payments to the LTC Pharmacies –

they have not, and the LTC Pharmacies have so represented to Defendant. Further, there is no question that the co-payment amounts at issue are due and owing now that Defendant has specific notice that the amounts relate to institutionalized full benefit duals, which Defendant should never have withheld in the first instance. 42 U.S.C. § 1395w-114(d)(1)(D)(i); 42 C.F.R. § 423.782(a)(2)(i)(B)(2).

Defendant is on the verge of disbursing the amounts, albeit to the wrong parties. Thus, Plaintiffs are likely to succeed on the merits of their request for a declaration, pursuant to 28 U.S.C § 2201, that Defendant may not disburse the funds to nursing home residents but must instead directly reimburse the LTC Pharmacies.

## II.    Plaintiff Will Suffer Irreparable Injury If Defendant is Not Enjoined From Disbursing the Funds to Nursing Home Residents

Normally an aggrieved party suffers irreparable injury if it "has little hope of obtaining 'adequate compensatory or other corrective relief at a later date' if the injunction does not issue." *O'Donnell Constr.*, 963 F.2d at 428, *quoting Virginia Petroleum Jobbers Ass'n v. FPC*, 259 F.2d 921, 925 (D.C. Cir. 1958). The calculus is different in this case, where Defendant's actions are a clear violation of Federal law. "Indeed, because Congress has seen fit to act in a given area by enacting a statute, irreparable injury must be presumed in a statutory enforcement action." *United States v. Richlyn Labs., Inc.*, 827 F. Supp. 1145, 1150 (E.D. Pa. 1992) ("The passage of the Food, Drug and Cosmetic Act is, in a sense, an implied finding that violations will harm the public and ought to be restrained if necessary"); *see also Government of the Virgin Islands v. Virgin Islands Paving, Inc.*, 714 F.2d 283, 286 (3d Cir. 1983) ("Nor is the irreparable harm factor a significant hurdle to a preliminary injunction in most statutory violation cases."). Congress has spoken clearly to the issue here, and has forbidden Defendant from charging co-payment amounts to institutionalized full benefit dual eligibles. MMA § 1860D-14(a)(1)(D)(i), 42 U.S.C. § 1395w-114D-14(a)(1)(D)(i). Defendant having done so, and

then improperly failed to remit those payments to the party to which they are due – the LTC Pharmacies – in direct violation of CMS direction, irreparable harm should be presumed.

Even if Federal law was not being violated, however, and this was a pure contractual dispute with no interplay to the Medicare benefit, irreparable harm would still exist. *See Fund for Animals*, 281 F.Supp.2d at 221 (the question of irreparable injury focuses on "whether the injury, irrespective of its gravity, is *irreparable* -- that is whether there is any adequate remedy at law"); *Bracco Diagnostics*, 963 F.Supp. at 29 ("While the injury to plaintiffs is 'admittedly economic,' there is 'no adequate compensatory or other corrective relief' that can be provided at a later date, tipping the balance in favor of injunctive relief.") (*quoting Hoffmann-Laroche Inc. v. Califano*, 453 F.Supp. 900, 903 (D.D.C. 1978). While Plaintiffs recognize that normally <u>purely</u> economic loss "does not, in and of itself, constitute irreparable harm," the injury here is far from purely economic.

In this Circuit, "courts have found irreparable harm where the movant has made a strong showing that the economic loss would significantly damage its business above and beyond a simple diminution in profits." *Mylan Pharmaceuticals, Inc. v. Shalala*, 81 F.Supp.2d 30, 43 (D.D.C. 2000); *see also World Duty Free Americas, Inc. v. Summers*, 94 F.Supp.2d 61, 67 (D.D.C. 2000) (economic loss will constitute irreparable harm where <u>either</u> it threatens the existence of the business <u>or</u> it significantly damages business beyond simple profit diminution); *Bracco Diagnostics*, 963 F.Supp. at 29 (Because plaintiffs' small size made the lost research and development costs particularly significant, Court found that "[w]hile the injury to plaintiffs is 'admittedly economic,' there is 'no adequate compensatory or other corrective relief' that can be provided at a later date, tipping the balance in favor of injunctive relief") (internal citation omitted). Here, Defendant's wrongful refusal to pay the co-payments directly to the LTC Pharmacies, to whom the funds are actually owed, and instead pay them to the beneficiaries, would compound multiple and irreparable harms, any one of which would support injunctive relief here.

First, and most important, would be the harm to nursing home residents. As explained above, these residents suffer from multiple illnesses, are on average 83+ years old, and often suffer from cognitive impairment. Imagine their confusion upon receiving dozens of $1 and $3 checks in the mail from their PDP, about which they have no understanding, only then to receive demand letters and collection actions from the pharmacies trying to recoup those same funds. The residents' carefully managed lives would be significantly disrupted by this intrusion, they would become more confused than they already are about the new Medicare benefit,[8] and many would fear a potential loss of benefit. Of course, those with cognitive impairment would be all the more confused.

Second, irreparable harm would befall the LTC Pharmacies, who, due to Defendant's actions, would have to chase checks sent to hundreds of thousands of nursing home residents. Quite simply, the cost of initiating thousands of such recoupment actions such action would very quickly eclipse the value of the payments at issue. *See Bracco Diagnostics*, 963 F.Supp. at 29 (irreparable harm found where plaintiff's millions of dollars the plaintiffs could "never be recouped" and thus were "significant and irreparable losses"). Indeed, as the *Bracco* Court found, though the losses at issue in that case were "admittedly economic," the Court determined that there were "'no adequate compensatory or other corrective relief' that [could] be provided at a later date, tipping the balance in favor of injunctive relief." *Id*; *World Duty Free Americas*, 94 F.Supp.2d at 67 (irreparable harm found due to "the fact that such losses are not likely to be recovered given the fact that plaintiffs' business necessarily relies on customers who travel, and thus lost sales will not necessarily be recouped"). Thus, the imminent and irreparable damage to LTC Pharmacies warrants issuance of

---

[8] *See, e.g.,* U.S. General Accounting Office, Report to Congress,"Medicare: Communications to Beneficiaries on the Prescription Drug Benefit Could Be Improved, Rep. No. GAO-06-654 (May 2006) (noting that "Widespread confusion among beneficiaries about the costs and coverage under the new benefit has been reported by the media and others" and documenting same).

a restraining order and preliminary injunction to preserve the funds at issue by enjoining their disbursement pending resolution on the merits.

In addition, Plaintiffs' member LTC Pharmacies will be harmed by the irreparable damage to its corporate goodwill and resulting loss of customers. If the LTC Pharmacies attempt to recover the co-payments from the nursing home residents, the LTC Pharmacies will face a human and public relations catastrophe that could destroy their business. The elderly nursing home residents will not understand why their pharmacist is trying to take money away from them. The families of the nursing home residents, even if they understand that the pharmacy was forced into attempting to recover the money, will be extremely upset that efforts were made to collect such seemingly small amounts of money from frail and vulnerable nursing home residents. The residents' families are certain to make their displeasure known to the nursing home as well as to the LTC Pharmacy. This is unquestionably a loss of goodwill. *See, e.g., World Duty Free Americas*, 94 F.Supp.2d at 67 (plaintiffs were irreparably harmed by their "considerable injury in terms of customer goodwill"); *Malarkey-Taylor Associates, Inc. v. Cellular Telecommunications Industry Ass'n*, 929 F.Supp. 473, 478 (D.D.C. 1996) (plaintiff suffered irreparable injury to its goodwill and business reputation, "harms not compensable in money damages"); *Patriot, Inc. v. Dept. of Housing and Urban Development*, 963 F.Supp.1, 5 (D.D.C. 1997)("Moreover, plaintiffs have demonstrated irreparable harm in damage to their business reputation."); *Morgan Stanley DW Inc. v. Rothe*, 150 F.Supp.2d 67, 78 (D.D.C. 2001) ("The plaintiff has persuaded the court that it would likely suffer irreparable harm in the loss of its customers and by the possibly permanently damaged relationships with its customers."); *see Dr. Pepper/Seven-Up Companies, Inc. v. Federal Trade Commission*, Civ.A.No. 91-2712(GHR), 1992 WL 237377, *1 (D.D.C. September 10, 1992) (same).

## III. Defendant Will Not Be Injured By an Injunction That Bars it From Paying Nursing Home Residents

The Court must consider whether the injunction, if issued, would substantially injure other interested parties, a factor known commonly as the "balance of harms." *See Cobell v. Norton*, 283 F.Supp.2d 66, 212 (D.D.C. 2003) ("In determining whether to grant preliminary injunctive relief, this Court must weigh the potential harm to Plaintiffs if the injunction is not granted against the potential harm to other interested parties who will be affected by the injunction."). Courts in this Circuit will issue a preliminary injunction upon a showing "that the threatened irreparable injury outweighs the threatened harm that the injunction would cause Defendants and third parties." *Whitaker v. Thompson*, 248 F.Supp.2d 1, 8 (D.D.C. 2003); *Pearson v. Shalala*, 130 F. Supp. 2d 105, 112 (D.D.C. 2001).

Here, the requested injunction will not harm Defendant one iota. The ultimate issue on the merits is to whom the funds should be disbursed, not whether they must be disbursed. Not one single nursing home resident will be disadvantaged, in that they never paid co-payments in the first instance, and likely have no idea of the existence of this dispute between UnitedHealth and the LTC Pharmacies. *See, e.g., Dynalectron Corp. v. United States*, 659 F.Supp. 64, 70 (D.D.C. 1987) (Court found that the defendant "will be harmed less if Dynalectron continues performing the contract pending outcome of this dispute. Thus, I conclude that the 'balance of harms' is in plaintiff's favor. A preliminary injunction is clearly the best way to preserve the status quo until a final decision can be made.").

## IV. The Public Has a Strong Interest in Defendant's Compliance With Law and In Ensuring Medicare Beneficiaries Access to Their Prescription Drugs

The fourth factor in the preliminary injunction analysis, which considers whether the public interest would be served by the injunction, is never a more significant factor than when compliance

with law is implicated, or when the public's health is implicated.[9]  The public interest is served by enforcing provisions of the Federal Medicare law aimed directly at ensuring Medicare beneficiaries – and particularly frail and elderly nursing home residents -- the equality of access to high quality healthcare.  *See, e.g., Condon v. Andino,* 961 F. Supp. 323, 331  (D. Me. 1997) ("It is hard to conceive of a situation where the public interest would be served by enforcement of an unconstitutional law or regulation"); *Mova Pharm. Corp. v. Shalala,* 140 F.3d 1060, 1066 (D.C. Cir. 1998) (affirming public interest in the "faithful application of the laws").  It is also in the public interest to ensure that pharmacies can continue to provide an unimpeded flow of medically necessary prescription drugs to such residents without impediment by artificial and unfortunate payment obstacles, as were created by Defendant's improperly withheld co-payments at issue here.

The public also has a strong interest in assuring that the Medicare Prescription Drug Benefit operates according to the intent of Congress and the regulations, guidance, and policies promulgated by CMS.  This prescription drug benefit is a groundbreaking effort on the part of the federal government to ensure that the prescription drug needs of the Medicare population are met and that Medicare beneficiaries will have confidence in the program.  Any mass confusion of the sort to ensue here could result in undermining the public's confidence in the administration of the benefit

---

[9] *See, e.g., Whitaker,* 248 F.Supp.2d at 16 ("the public health risk from cancer is undeniably substantial"); *Collagenex Pharmaceuticals,* 2003 WL 21697344 at *11 ("public's interest in the initial development of new drugs"); *Allergan,* 6 Food & Drug Rep. at 391 ("public interest favors having drugs marketed for uses for which they are effective"); *Community Nutrition Institute v. Butz,* 420 F. Supp. 751, 756 (D.D.C. 1976) ("The paramount public interest to be vindicated here is the protection of the consuming public against possible health hazards"); *Pearson,* 130 F. Supp. 2d at 119-20 ("the public health risk from neural tube defects is undeniably substantial"); *see also Mylan Pharmaceuticals Inc. v. Henney,* 94 F.Supp.2d 36, 59-60 (D.D.C. 2000) (recognizing "the public interest in maximizing the availability of drugs useful in the treatment of breast cancer"); *Mylan Pharmaceuticals,* 81 F.Supp.2d at 45 (recognizing the public interest in increasing the availability of low cost pharmaceuticals); *American BioScience v. Thompson,* 141 F.Supp.2d 88, 105 (D.D.C. 2001) (recognizing public interest in both increased access to pharmaceuticals and expanded development of pioneer medications).

and could adversely affect Medicare beneficiaries' enrollment and participation in this major public health program.

In addition to the public health ramifications, the public has a recognized interest in ensuring that contracting parties honor their agreements, particularly where the requested injunction simply preserves a long-standing status quo. *See, e.g., Barnstead Broadcasting Corp. v. Offshore Broadcasting Corp.*, 865 F.Supp 2, 8 (D.D.C. 1994) (Court found that "an injunction would further the integrity of the judicial process by assuring that parties honor their contractual obligations ... [and] that the public interest will be served by preventing Defendant from profiting from its own wrongdoing and by enforcing the parties' agreement. Here, the public has a strong interest in ensuring that Defendant continues to timely and fully pay its network pharmacies so that Medicare beneficiaries receive timely and broad access to needed prescription drugs. Thus, ensuring that Defendant makes its contractually required payments is directly within the public interest. [10]

---

[10] Although Fed. R. Civ. P. 65(c) normally requires the party obtaining injunctive relief to post a bond or other security, "the special nature of suits to enforce important federal rights or 'public interests' arising 'out of comprehensive federal health and welfare statutes'," often dictates that no bond need be posted. *Temple Univ. v. White*, 941 F.2d 201, 220 (3d Cir. 1991), *quoting Crowley v. Local No. 82*, 69 F.2d 978, 1000 (1st Cir. 1982), *rev'd on other grounds*, 502 U.S. 1032 (1992). Such is the case here. The waiver of a bond not only applies to public interest groups, but to Medicaid and Medicare providers such as Plaintiffs and their members as well. *Temple Univ., supra*. Plaintiffs' status as a trade association and professional society provide further cause to exempt them from the bond requirements in this case. *Pharmaceutical Soc. of State of New York v. New York State Dep't of Social Services*, 50 F.3d 1168, 1174-75 (2d Cir. 1995) (noting that Society's litigation was to pursue a public purpose of ensuring adequate rates so that providers did not "drop out of the Medicaid program"). Plaintiffs have brought this suit to protect the interests of nursing home residents, and to ensure that their member LTC Pharmacies are appropriately treated by Defendant so that they can continue to provide optimal care for nursing facility residents. Further, this suit seeks to enjoin Defendant from violating federal law and policy. Any financial loss to Defendant is not irreversible -- indeed, no harm exists, in that Defendant will be disbursing the funds one way or the other. As such, this suit is in the public interest, falling well within the exception to the bond requirement.

<u>C<small>ONCLUSION</small></u>

All four factors weigh heavily in favor of injunctive relief.  Therefore, for the reasons set forth above, Plaintiffs LTCPA and ASCP respectfully request that the Court issue a temporary restraining order and preliminary injunction enjoining Defendant from sending out the improperly withheld co-payments to nursing home residents, pending resolution on the merits directing Defendant to comply with CMS direction and directly reimburse the LTC Pharmacies for the improperly withheld amounts.

Respectfully submitted,

_____

David Farber (D.C. Bar No. 415899)
Harry R. Silver (D.C. Bar No.168104)
PATTON BOGGS LLP
2550 M Street, N.W.
Washington, D.C.  20037
Telephone:  (202) 457-6000
Facsimile:  (202) 457-6315

Counsel for Plaintiffs

Dated:  July 6, 2006

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| LONG TERM CARE PHARMACY ALLIANCE, *et al.,*  )<br><br>Plaintiffs,  )<br><br>v.  )<br><br>UNITEDHEALTH GROUP, INC.  )<br><br>Defendant.  ) | Civil Action No. _____ |

## PLAINTIFFS' CERTIFICATION AND REQUEST FOR EXPEDITED HEARING

Pursuant to Local Civil Rule 65.1, Plaintiffs, by and through its undersigned counsel, hereby certifies that actual notice of the time of making the application and copies of all pleadings and papers filed in the action to date or to be presented to the court at hearing have been furnished to Defendant's counsel.

Plaintiffs further request expedited hearing on its motion for preliminary injunction, filed herewith. Expedition in this case is essential as a result of the direct and explicit representations by Defendant that it will not entertain any further requests from the long term care pharmacies to have the improperly withheld co-payments paid directly to the pharmacies, but will instead begin on July 7, 2006 to disburse such funds directly to the nursing home residents. As set forth in Plaintiffs' motion, that event would have devastating and irreparable consequences, thus it is imperative that an injunction be issued immediately.

4815310

Respectfully submitted,

_____
David Farber (D.C. Bar No. 415899)
Harry R. Silver (D.C. Bar No. 168104)
PATTON BOGGS LLP
2550 M Street, N.W.
Washington, D.C.  20037
Telephone:  (202) 457-6000
Facsimile:  (202) 457-6315

Counsel for Plaintiffs

Dated:  July 6, 2006

4815310

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

LONG TERM CARE PHARMACY )
   ALLIANCE, *et al.,* )
 )
       Plaintiffs, )
 )
v. )   Civil Action No. _____
 )
UNITEDHEALTH GROUP, INC. )
 )
       Defendant. )
 )

### ORDER

Upon consideration of Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction, memorandum of points and authorities in support thereof, and any opposition thereto, and being fully advised, it is, this ___ day of July 2006, hereby ORDERED as follows:

The Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction is GRANTED, and Defendant is hereby ENJOINED from disbursing directly to nursing home or other institutional residents any co-payment amounts previously improperly withheld from any long term care pharmacy reimbursement that are associated with full benefit dual eligible Medicare beneficiaries participating in the Medicare Prescription Drug Benefit, known as "Part D," pending further order of this Court.

_____
United States District Judge

Date: _____

4815310

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

LONG TERM CARE PHARMACY          )
   ALLIANCE, *et al.,*              )
        Plaintiffs,              )
                     )
v.                               )  Civil Action No. _____
                     )
UNITEDHEALTH GROUP, INC., et al. )
        Defendants.                 )

## PLAINTIFF'S RULE 7.1 DISCLOSURE CERTIFICATE

I, the undersigned, counsel of record for Plaintiffs Long Term Care Pharmacy Alliance ("LTCPA") and American Society of Consultant Pharmacists ("ASCP") certify that to the best of my knowledge and belief, both Plaintiffs are trade associations, and neither has any parent companies, subsidiaries or affiliates other than their member companies which have any outstanding securities in the hands of the public. The LTCPA is a national trade association organized as a Delaware Limited Liability Corporation. LTCPA's members include: Omnicare, Inc.; Kindred Pharmacy Services, Inc.; and PharMerica, Inc. LTCPA has not issued shares to the public, although some of LTCPA's individual members have done so. Omnicare is a publicly held traded corporation (NYSE: OCR); Kindred Pharmacy Services is a separate operating division of Kindred Healthcare, Inc.; and PharMerica is a wholly-owned subsidiary of AmerisourceBergen Corporation (NYSE: ABC). ASCP is also a national trade association incorporated with its principle place of business in Alexandria, Virginia, with thousands of members throughout the United States.

These representations are made in order that judges of this Court may determine the need for recusal.

4815310

Respectfully submitted,

_____
David J. Farber (D.C. Bar No. 415899)
Harry Silver (D.C. Bar No. 168104)
PATTON BOGGS LLP
2550 M Street, N.W.
Washington, D.C. 20037
Telephone: (202) 457-6000
Facsimile: (202) 457-6315

Counsel for Plaintiffs

Dated: July 6, 2006

4815310

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 6th day of July, 2006, a true and correct copy of the foregoing (i) Plaintiffs' Motion for Preliminary Injunction, (ii) Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction, (iii) Request for Expedited Hearing, (iv) proposed Order, and (v) Rule 7.1 Disclosure Certificate were served by email, facsimile transmission and U.S. mail upon:

> Jackie Albright
> Deputy General Counsel
> United Health Group
> 9900 Bren Road East
> Minnetonka, MN 55343
> Jackie_albright@uhc.com
> Fax: 952-936-1745

David J. Farber (D.C. Bar No. 415899)
PATTON BOGGS LLP
2550 M Street, N.W.
Washington, D.C. 20037
Telephone: (202) 457-6000
Facsimile: (202) 457-6315

Counsel for Plaintiffs

Dated: July 6, 2006

4815310