## DECLARATION

I hereby declare, pursuant to 28 U.S.C. § 1746, the following:

1. My name is Paul Baldwin, and I am Executive Director of the Long Term Care Pharmacy Alliance ("LTCPA"). I have held this position since 2003. I currently reside at 208 Old Mill Rd., Royersford, PA. I hold a Bachelor's Degree in Science from Virginia Commonwealth University, which I received in 1984.

## MY BACKGROUND

2. I have worked in the health care industry for the past 21 years. I have particularly worked with long term care pharmacies and nursing home residents for the past four and a half years, including working in the Congress, with individual pharmacies and nursing homes, and before my work with LTCPA, with NeighborCare, a long term care pharmacy affiliated with Genesis Health Ventures, a nursing home company. In my work at LTCPA, I have worked, and continue to work, extremely closely with the Centers for Medicare and Medicaid Services ("CMS"), the Agency within the Department of Health and Human Services ("HHS") responsible for implementation of the new Prescription Drug Benefit, known as Part D.

3. In that capacity, I have been representing the long term care pharmacy industry before CMS for the past two and a half years since implementation of the Part D program. I also work closely with many of the new Part D "Prescription Drug Plans," ("PDP") including UnitedHealth Group, on resolving the dozens of systemic PDP errors and mistakes that have occurred in connection with nursing home residents since the Part D Program became effective on January 1, 2006.

## WHAT IS LONG TERM CARE PHARMACY

4. In general, it is not economic for nursing homes to own or operate their own in-house pharmacies. Thus, almost all nursing homes contract with a Long Term Care ("LTC") Pharmacy to

4815326                                1

provide the specialized drug services to nursing home residents. This is particularly important because today's nursing home residents tend to be older and sicker than in the past. Thus, they have far greater medication needs than a typical elderly person, or a typical non-elderly Medicaid beneficiary. In fact, studies have indicated that the average nursing home patient requires eight or more prescriptions at any one time.

     5. Services provided by LTC Pharmacies include some form of unit dose packaging where each dose of medication is specifically labeled for a specific patient. This packaging is critical to ensure that the right patient gets the correct medication. LTC Pharmacies also provide 24-hour delivery to the nursing homes, which is very important for those patients, who require the prompt initiation of a therapy including an intravenous ("IV") medication. If LTC pharmacies did not deliver IVs on demand, the nursing home resident would likely have to be transported to a hospital for IV administration, resulting in discomfort and delay for the patient, and significant increased costs for the health care system.

     6. Importantly, LTC Pharmacies come to the nursing home resident, unlike the retail setting where the beneficiary comes to the pharmacy. Also unlike retail pharmacy, LTC Pharmacy dispenses the drugs to the resident and then collects payment from the appropriate source – in this case the appropriate PDP. In contrast, for example, if the ambulatory "retail" beneficiary were not able to pay for a drug at the drug store counter, that beneficiary would not receive their drugs. Indeed, the Court may be familiar with the press reports of Medicare beneficiaries who were denied access to their drugs in January and February 2006 due to confusion around the Part D implementation. That simply does not happen with LTC Pharmacies. Nursing home residents are generally too frail and elderly to go without their medications. Thus, LTC Pharmacies dispense first, and get paid later. Thus, Long Term Care pharmacy plays a critical role in nursing home care, and the quality of that care.

4815326          2

## THE COST SHARING ISSUE

7. The Medicare Prescription Drug Improvement and Modernization Act ("Act") was enacted in 2003 to create a voluntary program providing prescription drug coverage for all Medicare beneficiaries. The benefit, also known as "Part D," was effective on January 1, 2006, and currently accounts for over half of the revenues received by LTC Pharmacies.

8. Under Part D, pharmaceutical services provided to seniors are paid by private, at-risk companies under coverage plans – the PDPs referenced above. The currently participating PDPs are generally established, well-known parties in the health insurance and managed care sector, such as Aetna, Cigna, and Defendant UnitedHealth Group ("Defendant" or "UnitedHealth").

9. In addition to all Medicare beneficiaries, the Part D benefit also serves individuals who are eligible under both the Medicare and Medicaid programs, commonly referred to as "dual eligibles." These individuals, many of who previously received prescription drug coverage through their respective state Medicaid programs, were not voluntary participants in Part D but, by statute, were forced out of Medicaid and into Medicare on January 1, when they were automatically enrolled in the program.

10. One of the features of the traditional Medicare and Medicaid programs is the inclusion of cost sharing, or "co-payments," by beneficiaries in the structure of the benefit. Co-payments are flat, pre-determined payment amounts assigned to specific services that are the responsibility of the beneficiary when he or she receives that particular service. Prior to January 1, almost all Medicaid "dual eligible" beneficiaries had co-payments. However, under all state Medicaid programs, the "institutionalized dual eligibles," those living in nursing homes, had no co-payment requirement, and received each prescription for free.

11. In implementing the Part D benefit, Congress carried over the assessment of co-payments for almost all of the dual eligible (and other) beneficiaries. Consistent with the prior

4815326                                3

Medicaid regime, however, both the Act and the CMS Part D implementing regulations prohibited the assessment of Part D co-payments for "institutionalized full-benefit dual-eligibles." Thus, as it had been in the past, dual eligibles residing in a long term care facility should not have been assessed any co-payment amount for drugs received through the PDP of their choice.

12. In its discussion of Congress' explicit elimination of the Part D co-payment obligation for institutionalized dual-eligibles, CMS noted that for these patients in particular, assessment of even a small cost sharing amount would be a hardship.

13. Due to the tight timeframe and a number of technical difficulties, data provided to PDPs by CMS and state Medicaid agencies in the initial months of operation of the Part D program did not accurately identify all beneficiaries that qualified as institutionalized dual-eligibles who were exempt from co-payment obligations. Based upon the data I have reviewed, beginning the first day of the benefit, on January 1, 2006, for some enrollees PDPs failed to recognize the co-payment exemption and in turn the PDPs reduced a LTC Pharmacy's reimbursement rate by the standard amounts, assuming incorrectly that the pharmacies had collected the co-payment amounts. For many other enrollees, the PDPs had the correct data, but simply failed to account for it, and instead wrongfully withheld a "co-payment" amount when reimbursing the pharmacy. The PDPs also failed in many instances to recognize the "locator codes" which identified beneficiaries as residing in a nursing home.

14. I personally brought this issue to the attention of CMS, as well as to the PDPs with which I was in contact, as early as January and February 2006. Ironically, the LTC Pharmacies had the correct data and had submitted that data to the PDPs in seeking payment for the drugs the pharmacies had dispensed to each PDP's institutionalized dual benefit enrollees. Yet, the PDPs steadfastly refused to accept the correct pharmacy data, and continued to withhold from LTC Pharmacies, including LTCPA and ASCP members, co-payment amounts for tens of thousands of

Medicare institutionalized full benefit dual eligibles. As a result, the LTC Pharmacies were reimbursed at a rate less than the rates prescribed in their contracts with PDPs.

15. More recently, in April through June, I continued to personally discuss the issue with PDP representatives, as well as with CMS, on behalf of the LTC Pharmacy industry. I know that both the PDPs and CMS were aware that the amounts were not collected by the LTC Pharmacies from the incorrectly identified patients. As a result of these discussions, CMS issued numerous guidance documents to the PDPs in March, April and May 2006, instructing the PDPs not to automatically reimburse beneficiaries residing in long term care facilities, but instead to reimburse the LTC Pharmacies, who were owed the improperly withheld amounts.

16. Subsequent to this instruction by CMS, I, on behalf of the LTCPA and the LTC Pharmacies, contacted defendant UnitedHealth to make arrangements to retroactively receive payments for claims where they had been underpaid due to the failure to properly identify institutionalized dual-eligibles. In response, UnitedHealth began to set an artificial deadline of June 16, 2006, after which it was going to reimburse the improperly withheld co-payment amounts directly to the beneficiaries. (UnitedHealth claimed that it would pay correct amounts if the LTC Pharmacies "reversed and rebilled" the transactions. However, when LTCPA member companies attempted this procedure, the result was the entirety of the claim was denied, rather than just the co-payment proportion). After one "extension," on June 23, 2006, UnitedHealth refused to extend its so-called "deadline" any further.

17. In a later call on June 30, UnitedHealth informed me that beginning July 7, 2006 it was going to instead begin to send the "co-payment" checks directly to nursing home residents. This was so even though UnitedHealth knew that the residents had never been charged the co-payment amounts by the pharmacies, and UnitedHealth knew that the pharmacies were holding the debt created by UnitedHealth's failure to properly pay the reimbursement in the first instance. In that

same conversation, I was told that PacifiCare, UnitedHealth's subsidiary, would begin issuing checks to beneficiaries on July 14, and that RxSolutions would do the same.

18. On behalf of the LTCPA members and nursing home residents, I advised CMS from January 2006 until as recently as July 3, 2006, of the ongoing difficulties with correctly identifying beneficiaries and processing retroactive adjustments. As noted above, several times in April 2006 and most recently May 2006, CMS had advised PDPs to use the best information available to them when data are not available from CMS and state Medicaid agencies, and to reimburse LTC Pharmacies directly when making retroactive adjustments.

19. My last conversation with CMS was on July 3, 2006, with the CMS Chief Medical Officer, who advised me that he too believed that Defendant should not be sending checks to nursing home residents, and asked for the same information the pharmacies had previously submitted to Defendant so that he could submit it again. LTCPA member companies continued to work with Defendant to resolve the issues, having their final discussions with Defendant UHC on July 5, 2006, to no avail.

20. I expect that this coming Friday, July 7, 2006, tens of thousands of checks will be issued to nursing home residents in amounts ranging from $1 to $3, and in some instances in greater amounts as well. I anticipate beneficiaries may get dozens of checks – one for each prescription for each month since January (as noted above, nursing home residents take an average of 8 prescriptions each month, meaning through April the average nursing home residents will get 32 different $1 or $3 checks, or in some instances checks in greater amounts representing so-called "doughnut hole co-payments"). Over half of these residents are cognitively impaired, and many do not even have bank accounts. Thus, I fully expect that the vast majority of these checks will never be cashed. Based upon my extensive experience working with nursing home residents, I anticipate that this flood of

4815326                                6

checks will confuse, frighten, and upset those residents, many of whom already are confused and fearful of the Part D program.

21. Of course, the LTC Pharmacies will have no way to "chase" these tens of thousands of small checks, and certainly will be unable to do so without sending "bills" to the residents, further upsetting and frightening them. As noted above, institutionalized full benefit duals have never received "bills" for their drugs – Defendant's actions will force the LTC Pharmacies to send such bills if they want to recover the funds. Further, the LTC Pharmacies will have no way of knowing how many checks each resident will have been sent, so there will be no way to know what the right amount to "bill" might be. Again, it is the nursing home residents and pharmacies that will suffer due to Defendant's capricious and irresponsible actions.

22. I am asking the Court to enjoin Defendant from sending checks to nursing homes and, instead, to pay the LTC Pharmacies who are owed the funds. If the Court does not issue an injunction before UnitedHealth begins sending checks, Defendant's actions will lead to horrible results. Elderly cognitively impaired nursing home residents will not understand why they are receiving dozens of small checks from their drug plans, and then why they are being asked for money (likely a mismatched sum) from their pharmacies. Residents and their families will strongly resent the confusion created by Defendant PDPs, as well as the unprecedented pharmacy "collection efforts" forced by Defendant's actions. No matter how diplomatically it is done, the beneficiaries and their families will not understand how the pharmacy was forced into this position and will look upon the pharmacy as an intrusive bother. This will certainly destroy the bonds of trust between patient and pharmacist. In addition, the nursing home will be angry at the pharmacy for these collection efforts and may even look upon them as a breach of the contract between the nursing home and the pharmacy. Thus, I urge the Court to enjoin the distribution of the checks, which indisputably are owed to the LTC pharmacies.

I hereby declare, under penalty of perjury, that the foregoing is true and correct.


Dated July 6, 2006                                  */s/ Paul Bleck*