## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **Long Term Care Pharmacy Alliance and** | ) |
| **American Society of Consultant Pharmacists** | ) |
| | ) |
| **Plaintiffs** | ) |
| | ) |
| **v.** | ) **Case No.: 1:06-CV-01221 (ESH)** |
| | ) |
| **UnitedHealth Group Inc.** | ) |
| | ) |
| **Defendant** | ) |
| | ) |

### Motion to Dismiss Complaint

Defendant UnitedHealth Group Incorporated, pursuant to Fed. R. Civ. P. 12(b)(1), (2), and (6), and for the reasons stated in the accompanying Memorandum of Points and Authorities, respectfully moves this Court to dismiss Plaintiffs' Complaint for lack of subject matter jurisdiction, lack of personal jurisdiction, and failure to state a claim upon which relief can be granted.

September 11, 2006

Respectfully submitted,

   /s/ Mark C. Nielsen
Thomas F. Fitzgerald (Bar No. 358232)
Michael J. Prame (Bar No. 451017)
Mark C. Nielsen (Bar No. 465220)
Groom Law Group, Chartered
1701 Pennsylvania Avenue, NW
Washington, DC  20006
Telephone:    202.857.0620
Facsimile:    202.659.4503
Email:    tff@groom.com
       mjp@groom.com
       mcn@groom.com

**Counsel for Defendant**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

| | |
|---|---|
| **Long Term Care Pharmacy Alliance and** | ) |
| **American Society of Consultant Pharmacists** | ) |
| | ) |
| **Plaintiffs** | ) |
| | ) |
| **v.** | )    **Case No.:  1:06-CV-01221 (ESH)** |
| | ) |
| **UnitedHealth Group Inc.** | ) |
| | ) |
| **Defendant** | ) |

_____)

**Memorandum of Points and Authorities in Support of**
**Defendant's Motion to Dismiss Complaint**

Defendant UnitedHealth Group Incorporated ("UHG"), by and through its undersigned

counsel, respectfully submits this Memorandum of Points and Authorities in Support of its

Motion to Dismiss Plaintiffs' Complaint pursuant to Fed. R. Civ. P. 12(b)(1), (2), and (6).  As

discussed below, the Complaint should be dismissed with prejudice as Plaintiffs lack standing to

bring this action; the Court does not have personal jurisdiction over UHG; and the Complaint

fails to state either a statutory or contractual claim against UHG.

**I.    Introduction**

Plaintiffs, the Long Term Care Pharmacy Alliance ("LTCPA") and the American Society

of Consultant Pharmacists ("ASCP"), allege in their Complaint that UHG has violated federal

Medicare laws and breached its contracts with long-term care ("LTC") pharmacies by failing to

fully reimburse the pharmacies for the negotiated price of prescription drugs dispensed to

residents of nursing homes who are enrolled in both Medicaid and Medicare Part D

("Institutionalized Dual Eligibles").  (Compl. ¶¶ 22, 34, 35, 38(a)).  Specifically, Plaintiffs allege

that since Institutionalized Dual Eligibles are exempt from co-payments otherwise required by

Medicare Part D, Prescription Drug Plans ("PDPs")[1] providing Part D coverage with respect to such individuals must remit the full negotiated price of covered drugs to LTC pharmacies, rather than the negotiated price *less* the otherwise required co-payment.

While Plaintiffs' Complaint alleges that UHG has ignored statutory, regulatory, and contractual provisions that allegedly require remittance of co-payments to LTC pharmacies, the reality is that UHG did not cause the LTC pharmacies' reimbursement problems. The reimbursement problems primarily have been caused by data problems involving the Centers for Medicare and Medicaid Services ("CMS")[2] relating to the start up of Medicare Part D on January 1, 2006, and, in particular, data problems associated with the enrollment of Medicaid beneficiaries into the Medicare Part D program. (*See* Compl. ¶ 22, noting that LTC pharmacies were "assured by CMS that these [data] issues would be retroactively resolved.").

CMS's data problems involved more than just the Institutionalized Dual Eligibles at issue in Plaintiffs' Complaint, and included a number of other Medicare Part D beneficiaries who were eligible for government subsidies that defray the out-of-pocket drug expenditures of beneficiaries with low incomes.[3] Put simply, CMS provided incorrect data to PDPs sponsored by UHG subsidiaries regarding the extent to which Medicare Part D beneficiaries qualified for the varying levels of low-income subsidies. In processing Medicare Part D claims, the PDPs applied the co-payment levels associated with the low-income subsidy classifications of beneficiaries reported to the PDPs by CMS. Because network pharmacies are contractually obligated to collect required co-payments from Medicare Part D beneficiaries, the payments PDPs made to

---

[1] As described in greater detail below, PDPs are commercial entities that contract with the federal government to provide prescription drug coverage to Medicare Part D beneficiaries.

[2] CMS is the agency within the Department of Health and Human Services that is responsible for administering the Medicare Part D program.

[3] The low-income subsidies are described in greater detail in Part II.D of this Memorandum.

pharmacies were reduced by the amount of the co-payment corresponding to the low-income subsidy classifications reported to the PDPs by CMS.

CMS, over time, has been correcting the data problems, although the problems still have not been resolved. After receiving revised data from CMS, the PDPs sponsored by UHG subsidiaries began preparing reimbursement checks for affected beneficiaries. These PDPs were prepared to mail the checks to such beneficiaries consistent with CMS regulations that require PDPs to reimburse low-income subsidy-eligible beneficiaries for the amount of incorrect cost-sharing payments. (42 C.F.R. § 423.800(c)). LTC pharmacies then asserted that they were owed the co-payment reimbursements with respect to Institutionalized Dual Eligibles, but generally refused to resubmit their claims to the PDPs sponsored by UHG subsidiaries. These PDPs requested that the LTC pharmacies resubmit claims so the PDPs could accurately track, among other things, the beneficiaries' prescription drug expenditures and create a record trail that could be audited by CMS.

Unwilling to follow the PDPs' procedures for reprocessing claims, Plaintiff LTCPA responded by heavily lobbying CMS and then filing this lawsuit. Plaintiffs' Complaint details LTCPA's efforts to lobby CMS to issue guidance requiring PDPs to remit co-payments directly to LTC pharmacies, without the pharmacies having to resubmit claims or to work through the systemic data problems plaguing CMS's information systems. (Compl. ¶¶ 24, 26, 27). In response, CMS issued guidance that permits PDPs to remit co-payments for Institutionalized Dual Eligibles directly to LTC pharmacies, but with the caveat that "[b]efore reimbursement is made, Part D plans should ensure that [1] LTC pharmacies have not collected the cost sharing amounts, [2] otherwise waived the cost sharing charges, and [3] in fact, are carrying a debt" for

the cost sharing amounts.[4]  CMS further advised that "[f]or auditing purposes, plans should

ensure that pharmacies certify that the amounts reimbursed are appropriate, owed, and payable."[5]

Additionally, CMS's guidance reminded LTC pharmacies that the reimbursement process varies

among PDPs,[6] and advised that PDPs have flexibility in developing procedures for changing or

updating their systems to reflect the appropriate cost-sharing for Institutionalized Dual

Eligibles.[7]

Unhappy with CMS's refusal to simply require PDPs to cut a check to LTC pharmacies,

Plaintiffs filed this action—not against CMS—but against a private entity, UHG.[8]  The

Complaint contains dire predictions of harm to the nation's nursing home population if the PDPs

send checks to Institutionalized Dual Eligibles.  (Compl. ¶¶ 2, 32, 36(b), and 37)).  The reality,

---

[4] CMS Frequently Asked Question, "Reimbursement to LTC Pharmacies, for Retroactive Subsidy-level Cost Sharing Changes," ID Number 7043 (April 20, 2006), a copy of which is attached hereto as Exhibit ("Ex.") 1.  In deciding the Motion to Dismiss, the Court may consider documents referred to in the Complaint and matters of public record without converting the Motion into one for summary judgment.  Green v. Small, Slip Copy, 2006 WL 148740, at *6, n.4 (D.D.C. 2006) (attached as Ex. 2) ("'[E]xhibits . . . may be considered in deciding the motion to dismiss because 'matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, items appearing in the record of the case . . . may be considered by the district court without converting the motion into one for summary judgment'") (internal citations omitted)).

[5] Id.

[6] CMS "Tip Sheet" dated April 18, 2006, a copy of which is attached as Ex. 3.

[7] CMS Frequently Asked Question regarding "Best Available Data" for PDPs to Change Computer Systems, ID Number 7346 (May 26, 2006), a copy of which is attached as Ex. 4.

[8] This is not the first time that LTCPA has filed suit when dissatisfied with the outcome of a regulatory process.  In Long Term Care Pharmacy Alliance v. Ferguson, 362 F.3d 50 (1st Cir. 2004), the First Circuit Court of Appeals sharply criticized LTCPA for suing the State of Massachusetts for a reduction in Medicaid prescription drug reimbursement rates.  In vacating the lower court's grant of a preliminary injunction in favor of LTCPA, the First Circuit characterized LTCPA's action as "little short of remarkable."  Id. at 59.  There, as here, LTCPA offered "dire predictions of disaster."  Id.

however, is that Plaintiffs' lawsuit has nothing to do with protecting nursing home residents, but instead is an effort to obtain faster and higher levels of reimbursement for LTC pharmacies by circumventing the PDPs' claims procedures.

The Complaint should be dismissed for the following reasons:

1.    LTCPA and ASCP lack standing to sue on their own behalf, since they have not alleged any injury to themselves as organizations, let alone any injury that is attributable to UHG.

2.    ASCP lacks associational standing to bring this action on behalf of its members, since the Complaint does not allege that ASCP's members have suffered any injury-in-fact and this action is not germane to ASCP's purpose.

3.    Both ASCP and LTCPA lack associational standing to maintain this action on behalf of their members, inasmuch as the Complaint seeks monetary damages for potentially hundreds (or even thousands) of LTC pharmacies, which will require individualized proof as to the nature and amount of purported injury.

4.    The Court lacks personal jurisdiction over UHG, since UHG is a Minnesota holding company and UHG is not "doing business" within the District of Columbia.

5.    There is no statutory or regulatory requirement that PDPs remit co-payments with respect to Institutionalized Dual Eligibles directly to LTC pharmacies.  While 42 U.S.C. § 1395w-114D(a)(1)(D)(i) and CMS regulation 42 C.F.R. § 423.782(a)(2)(ii) prohibit the collection of co-payments from Institutionalized Dual Eligibles, nothing in the statute or regulation can be read to impose an affirmative duty upon PDPs to remit co-payments directly to

LTC pharmacies, or to prohibit the remittance of co-payments to individual enrollees.[9]  Indeed, if CMS assigned a Medicare Part D beneficiary to an incorrect income subsidy classification, the beneficiary likely would have been charged an incorrect co-payment by a pharmacy (unless the co-payment was waived), which would have to be refunded by the PDP to the beneficiary.  (42 C.F.R. § 423.800(c)).

6.    UHG cannot be liable for breach of contract, since it is not a party to any contract with any LTC pharmacy.

## II.    Background

In 2003, Congress enacted the Medicare Prescription Drug, Improvement, and Modernization Act (the "MMA"), Pub. L. 108-173, 117 Stat. 2066 (December 8, 2003), which created a new voluntary benefit program ("Part D") to cover outpatient prescription drugs, beginning January 1, 2006.  According to CMS, "[Medicare Part D] provides seniors and people with disabilities with the first comprehensive prescription drug benefit ever offered under the Medicare program, the most significant improvement to senior health care in nearly 40 years." (http://www.cms.hhs.gov/PrescriptionDrugCovGenIn) (last visited September 11, 2006)).

### A.    Prescription Drug Plans

Medicare Part D benefits, as applicable to this action, are administered by PDPs that contract with CMS.  PDPs must be state licensed as risk-bearing entities or satisfy federal solvency standards.  (42 U.S.C. §§ 1395w-112(a)(1)-(3)(A); 42 C.F.R. § 423.504(b)(2)).  PDPs

---

[9] Although the Court must construe the Complaint in Plaintiffs favor for purposes of a Motion to Dismiss pursuant to Fed. R. Civ. P. 12(b)(6), it "'need not accept inferences drawn by the [Plaintiffs] if such inferences are not supported by the facts set out it in the [C]omplaint.'" Alicke v. MCI Communications Corp., 111 F.3d 909, 912 (D.C. Cir. 1997) (quoting Kowal v. MCI, 16 F.3d 1271, 1276 (D.C. Cir. 1994)).  Moreover, the Court need not consider conclusory legal and factual allegations.  Domen v. Nat'l Rehabilitation Hosp., 925 F. Supp. 830, 837 (D.D.C. 1996) (citing Papasan v. Allain, 478 U.S. 265, 286 (1986)).

generally collect monthly premiums from enrolled beneficiaries, which are described below. Additionally, PDPs receive advance monthly payments from CMS, as well as subsidies with respect to low-income beneficiaries and reinsurance for "catastrophic" coverage. (42 C.F.R. §§ 423.315(b)-(e), 423.329(a)-(d) (describing the payments to PDPs from CMS)).

### B.    PDPs Contract with Network Pharmacies for Negotiated Drug Prices.

PDPs are offered in specific geographic areas. (See 42 C.F.R. § 423.112). PDPs contract—directly or indirectly—with "network" pharmacies that agree to dispense prescription drugs covered by the PDP to Medicare Part D beneficiaries for agreed-upon prices.[10] (42 C.F.R. § 423.120(a)). CMS regulations require PDPs to provide beneficiaries with "convenient access" to retail pharmacies, and CMS has established guidelines requiring that a defined percentage of urban, suburban, and rural beneficiaries live within a specified number of miles of network pharmacies. (42 C.F.R. § 423.120(a)(1)).

PDPs also are required to "offer standard contracting terms and conditions, including performance and service criteria, to all [LTC] pharmacies in [their] service area." (42 C.F.R. § 423.120(a)(5)). Network contracts with retail and LTC pharmacies detail the circumstances in which pharmacies will be paid for dispensing drugs to plan beneficiaries, the amount to be paid for such drugs, and whether the pharmacies must collect co-payments from beneficiaries. (See generally, 42 C.F.R. § 423.120(a)(8) (detailing contracting requirements with network pharmacies)).

---

[10] PDPs often retain "pharmacy benefit managers" ("PBMs") to establish pharmacy networks in specific geographic areas, and to provide claims processing services. Under such arrangements, it is generally the PBM that contracts with retail and LTC pharmacies, although the contracts usually provide that the PDP is responsible for actually funding the payment of claims.

Pharmacies that participate in networks associated with PDPs sponsored by UHG

subsidiaries (whether retail or LTC) have entered into contracts that establish the price to be paid

for prescription drugs dispensed to Medicare Part D beneficiaries.  Such contracts typically

provide that the price for a drug covered by the PDP is the amount specified in the agreement,

less any required co-payment.

   **C.    The Part D Benefit Design**

   To be eligible for Medicare Part D benefits, an individual must be entitled to benefits

under Medicare Part A (relating to inpatient hospital coverage) or enrolled in Medicare Part B

(relating to coverage of outpatient services) (42 C.F.R. § 423.30(a)(1)).  A Medicare Part D

beneficiary generally must pay a monthly premium (averaging $37 per month in 2006) for Part D

coverage.  (See 42 C.F.R. § 423.44(d)(1)).  In addition to the monthly premium, Medicare Part D

generally requires a beneficiary to share in the cost of prescription drugs, by paying a specified

amount of coinsurance (a percentage of the drug cost), or co-payments (a pre-determined flat

dollar amount assessed on each drug, regardless of cost).  (42 C.F.R. §§ 423.104(d)(2) and (5)).

These cost-sharing requirements are described below.

   The Medicare Part D standard benefit design is as follows: beneficiaries pay a $250

annual deductible, after which the PDP pays for 75 percent of allowable prescription drug costs

up to $2,250.  Beneficiaries pay the remaining 25 percent of the cost as co-insurance or co-

payments.  (42 C.F.R. §§ 423.104(d)(1)-(3)).

   After hitting the $2,250 threshold, the beneficiary pays all costs for prescription drugs,

until he or she has incurred $3,600 in out-of-pocket expenses for allowable prescription drugs.

(42 C.F.R. §§ 423.104(d)(4) and (d)(5)(iii)).  After incurring $3,600 in out-of-pocket expenses,

"catastrophic" Medicare Part D coverage kicks in, under which the PDP covers all allowable

prescription drugs costs except the greater of: (i) coinsurance equal to five percent of a drug's actual cost (as defined in CMS regulations), or (ii) co-payments of $2 for generic drugs and $5 for brand name drugs.[11]  (42 C.F.R. § 423.104(d)(5)(i)).

### D.    Medicare Part D Coverage of Low Income Beneficiaries

Prior to Medicare Part D's effective date, Medicare generally did not cover outpatient prescription drugs.  However, state Medicaid programs—which cover very low-income individuals—did provide coverage for outpatient prescription drugs.  Medicaid programs required beneficiaries to share in the cost of prescription drug coverage, usually by requiring co-payments of $1 for generic drugs and $3 for brand name drugs.  Medicaid beneficiaries in nursing homes, however, were exempt from co-payments.[12]

Effective January 1, 2006, the federal government assumed responsibility for providing outpatient prescription drug coverage to Medicaid beneficiaries who were also eligible for Medicare Part A, or enrolled in Medicare Part B ("dual eligibles"), and required such beneficiaries to enroll in Medicare Part D.  (42 C.F.R. § 423.34(a)).  To ease the transition from Medicaid coverage of prescription drugs to Medicare Part D coverage, CMS established an open enrollment period that began on November 15, 2005, during which dual eligibles were permitted to choose a PDP through which Medicare Part D benefits would be administered.  (42 C.F.R. § 423.38(a)(1)).  For those dual eligibles who did not choose a PDP during the transition period, CMS automatically enrolled them in a PDP, effective January 1, 2006.  (42 C.F.R. § 423.34(d)).

---

[11] Catastrophic coverage is subject to a reinsurance subsidy under which CMS pays 80 percent of the costs.  42 C.F.R. § 423.322(c).

[12] See 70 Fed. Reg. 4194, 4372 (January 28, 2005), noting that Medicaid residents living in institutional settings were usually allowed only small personal needs allowances, severely limiting such residents' ability to satisfy otherwise applicable co-payment requirements.

Dual eligibles are permitted to enroll in another PDP at any time.  (42 C.F.R. §§ 423.34(e)(2) and 423.38(c)(4)).

     1.     **Institutionalized Dual Eligibles Are Exempt from Cost-Sharing**.

In enacting Medicare Part D, Congress approved a subsidy for certain low income beneficiaries—known as "subsidy eligible individuals"—through which the various cost-sharing provisions described above that are otherwise applicable under Medicare Part D would be waived or reduced on a sliding-scale, based upon income level.[13]  Congress also provided that in

---

[13]A "subsidy eligible individual" is defined as a  person who is enrolled (or is seeking to enroll) in a PDP, who has an income below 150 percent of the federal poverty level ("FPL") applicable to his or her family size, and who has financial resources at or below guidelines set forth in CMS regulations.  (42 C.F.R. § 423.773(a)).   There are several classifications of subsidies for low-income beneficiaries under Part D.   "Full-benefit dual eligible" beneficiaries, who have income levels below 135 percent of the FPL or are enrolled in state Medicaid programs, are entitled to a waiver of the monthly Part D premiums and the $250 annual deductible, and pay maximum co-payments of $3 for generic drugs and $5 for brand name drugs up to the out-of-pocket limit (except for those with incomes below 100 percent of the FPL, in which case co-payments are reduced to $1 for generic drugs and $3 for brand name drugs).  (42 C.F.R. §§ 423.780(a), 423.782(a)).  Full-benefit dual eligibles do not have any cost-sharing for expenditures above the out-of-pocket limit.  42 U.S.C. 1395w-114(a)(1)(E).

For those Medicare Part D beneficiaries with low-incomes—but who do not qualify for full-benefit dual eligible status—the annual deductible is reduced to $50, coinsurance is capped at 15 percent for drugs up to the out-of-pocket limit, and co-payments are set at $2 for generic drugs and $5 for brand name drugs.  Additionally, premium subsidies are available as follows:

    a.    For beneficiaries with incomes greater than 135 percent, but at or below 140 percent of the FPL, a subsidy equal to 75 percent of the Medicare Part D premium;

    b.    For beneficiaries with incomes greater than 140 percent, but at or below 145 percent of the FPL, a subsidy equal to 50 percent of the Medicare Part D premium;

    c.    For beneficiaries with incomes greater than 145 percent, but at or below 150 percent of the FPL, a subsidy equal to 25 percent of the Medicare Part D premium.

See 42 C.F.R. §§ 423.780(d), 423.782(b).

the case of Institutionalized Dual Eligibles, the beneficiary coinsurance otherwise required under Medicare Part D is eliminated.  (42 U.S.C. § 1395w-114(a)(1)(D)(i)).  Regulations issued by CMS provide that "[f]ull-benefit dual eligible individuals who are institutionalized have no cost-sharing for covered Part D drugs covered under their PDP . . . ."  (42 C.F.R. § 423.782(a)(2)(ii)).[14]  Consequently, Institutionalized Dual Eligibles are not required to pay co-insurance or co-payments for prescription drugs covered by Part D, provided such individuals reside in a LTC facility throughout an entire month.

Accordingly, the amount of any required co-payment varies based upon a beneficiary's eligibility for the low income subsidy—and the level of subsidy.  CMS reports to PDPs whether Medicare Part D beneficiaries qualify for subsidies, and, if so, what subsidy level applies.  (42 C.F.R. § 423.800(a)).  If CMS reports to a PDP that a beneficiary is an Institutionalized Dual Eligible, the PDP will pay the LTC pharmacy dispensing the drug the full price specified in the network participation agreement, without reduction for any co-payment.  However, if CMS data indicates that the beneficiary is <u>not</u> an Institutionalized Dual Eligible, the PDP treats such person as owing co-insurance or a co-payment, and reimbursement to the LTC pharmacy is reduced by the amount of the required co-insurance or co-payment.[15]

---

[14] The statute defines an institutionalized full-benefit dual eligible individual as an "individual . . . who is an inpatient in a medical institution or nursing facility for which payment is made  . . . <u>throughout a month</u> and who is . . . . determined to be eligible for medical assistance under the State [Medicaid] plan."  42 U.S.C. § 1396a(q)(1)(B) (emphasis added).

[15] A PDP is required to provide CMS with information concerning the amount of cost-sharing that is reduced with respect to individuals eligible for the low-income subsidies (42 C.F.R. § 423.800(b)), and CMS may terminate its contract with a PDP if the PDP "fail[s] substantially to carry out the terms of its contract with CMS" or engages in "false, fraudulent, or abusive activities affecting the Medicare program, including submission of false or fraudulent data."  42 C.F.R. §§ 423.509(a)(1) and (4).

2.    **Confusion Regarding Classification and Treatment of
Institutionalized Dual Eligibles.**

As noted above, effective January 1, 2006, beneficiaries eligible for both Medicare and

Medicaid—including the Institutionalized Dual Eligibles at issue in this action—began receiving

prescription drug coverage under Medicare Part D, as administered by the PDP in which such

beneficiaries were enrolled.  The transition of prescription drug coverage from individual state

Medicaid plans to Medicare Part D with respect to Institutionalized Dual Eligibles and other

subsidy-eligible individuals was not seamless, which is not entirely surprising given the volume

and complexity of data exchanged between nursing homes and other long-term care facilities,

LTC pharmacies, state Medicaid agencies, CMS, and PDPs.

Specifically, nursing homes and other long-term care facilities were to provide admission

and income information concerning their patients to the respective state Medicaid agencies.

State Medicaid agencies were then to transmit data to CMS, identifying their respective

Medicaid populations, those eligible for the Medicare Part D low income subsidy, and the level

of subsidy to which such individuals were entitled.  (42 C.F.R. § 423.904(a)).  Based upon the

states' Medicaid data, CMS provided PDPs with information as to which Part D beneficiaries

were eligible for the low income subsidy and the level of such subsidy.  (42 C.F.R.

§ 423.800(a)).

CMS has acknowledged that data transmission and data accuracy problems have caused

significant problems in terms of calculating reimbursement amounts with respect to

Institutionalized Dual Eligibles:

> We are aware that a number of factors are contributing to the incorrect cost
> sharing for full-benefit dual eligible individuals, including the lags associated
> with the scheduled reporting of data from the State[s] to CMS, delays in Part D
> plans updating their systems, CMS's prior instructions to States to report only
> current or prospective changes to beneficiary institutional status, and confusion in

the long-term care provider community regarding when an institutionalized beneficiary qualifies for a zero copayment.

(CMS Memorandum dated May 5, 2006, a copy of which is attached as Ex. 5).

### 3. Reimbursing Retroactively Adjusted Institutional Dual Eligibles Is Reasonable Since LTC Pharmacies Have Refused to Provide Required Data.

In their Complaint, Plaintiffs ignore the data problems caused by state Medicaid programs and CMS that have resulted in incorrect reimbursements with respect to Institutionalized Dual Eligibles, and Plaintiffs also ignore that PDPs can only pay claims in accordance with the data available to them, which is provided by CMS.

In recent months, CMS has updated its data with respect to certain Medicare Part D beneficiaries. As discussed above, if CMS data indicates that a beneficiary has a co-payment obligation, the PDP must reduce the pharmacy's reimbursement by the amount of the co-payment, consistent with the Medicare statute and the terms of the pharmacy's network contract. If CMS later retroactively adjusts the beneficiary's status to indicate that he or she was eligible for the low-income subsidy—and thus had a different co-payment obligation than previously reported (or no co-payment obligation at all)—CMS regulations require the PDP to reimburse the beneficiary for any co-payments that he or she paid incorrectly. (42 C.F.R. § 423.800(c)).

Consistent with this approach, PDPs sponsored by UHG subsidiaries, upon receipt of updated data from CMS, determined that money was owed to certain Institutionalized Dual Eligibles and other low-income Medicare Part D beneficiaries, and prepared to send reimbursement checks to the affected beneficiaries. LTC pharmacies objected, however, claiming that the reimbursements should be paid directly to the pharmacies. The PDPs sponsored by UHG subsidiaries advised the LTC pharmacies that to remit the reimbursements to them, the pharmacies had to re-submit claims data. Such re-submission was required so that the

13

PDPs could track prescription drug expenditures and create an audit trail showing, among other things, that: (1) the Institutionalized Dual Eligible on whose behalf a claim was submitted was a resident of the LTC facility for an entire month; (2) the prescription drug was covered by Part D and otherwise available through the PDP (e.g., included on the PDP's formulary); (3) the LTC pharmacy did not collect or waive a co-payment from the Institutionalized Dual Eligible; and (4) the LTC pharmacy was carrying the co-payment on its books as a debt. (See CMS Frequently Asked Question, "Reimbursement to LTC Pharmacies, for Retroactive Subsidy-level Cost Sharing Changes," ID Number 7043 (April 20, 2006), a copy of which is attached as Ex. 1).

Rather than working with PDPs to resubmit claims that were allegedly processed incorrectly based upon erroneous CMS data, Plaintiffs lobbied CMS to mandate that PDPs be forced to accept spreadsheets detailing just the names of beneficiaries who were allegedly Institutionalized Dual Eligibles, and the amount of purportedly erroneous reimbursements. CMS refused to issue such a command, and instead issued a series of guidance that provided PDPs with flexibility in designing retroactive reimbursement programs. Instead of working with the PDPs, Plaintiffs—consistent with their past practice—filed this lawsuit.[16]

## III.    Argument

### A.    Plaintiffs Lack Standing to Bring This Action, and the Court Therefore Lacks Subject Matter Jurisdiction.

ASCP and LTCPA lack standing to bring this action on their own behalf, or on behalf of their members. Lack of standing is a defect in subject matter jurisdiction requiring the Court to dismiss the Complaint pursuant to Fed. R. Civ. P. 12(b)(1). Haase v. Sessions, 835 F.2d 902, 906 (D.C. Cir. 1987) (concluding that when a plaintiff fails to establish standing, the complaint must be dismissed); Harrison v. Norton, 429 F. Supp.2d 83, 87 (D.D.C. 2006) (noting that in

---

[16] See n. 8, supra, and accompanying text.

spite of favorable inferences that a plaintiff receives on a motion to dismiss, the plaintiff bears the burden of establishing standing by a preponderance of the evidence, and that in the absence of such evidence, the court must dismiss the complaint).  As Plaintiffs' lack of standing deprives the Court of subject matter jurisdiction, the Complaint must be dismissed.

### 1.    ASCP and LTCPA Lack Standing to Sue on Their Own Behalf.

In the opening paragraph of their Complaint, Plaintiffs allege that they have brought this action "for themselves and on behalf of their members."  For ASCP and LTCPA to sue on their own behalf they must allege a direct injury to themselves as organizations.  Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992).  Specifically, ASCP and LTCPA must demonstrate, at an "irreducible constitutional minimum," that: (1) they have suffered a concrete and particularized "injury in fact" which is an invasion of a legally protected interest; (2) there is a "causal connection between the injury and the conduct complained of" that is attributable to the action challenged in the Complaint; and (3) there is a likelihood that their injury will be "redressed by a favorable decision."  Id.

Plaintiffs' Complaint does not detail any definable, discernable, or specific injury to ASCP or LTCPA as organizations.  While Plaintiffs allege that "Part D beneficiaries, Plaintiffs and their members, all have an interest to be free from the adverse impact of co-payment refund checks distributed to Part D beneficiaries . . ." (Compl. ¶ 36(d)), Plaintiffs fail to allege how remittance of co-payments to beneficiaries would injure ASCP or LTCPA *as organizations*.  Further, the relief sought in the Complaint would not benefit ASCP or LTCPA, but instead would (if granted) require money to be paid to individual pharmacies.[17]

---

[17] The remedy that Plaintiffs seek is limited to the "reimbursement of copayments to LTC pharmacies . . ." (Compl. ¶ 35), and an order declaring that [UHG] owes Plaintiffs' member

Put simply, ASCP and LTCPA have not pled a concrete and particularized injury-in-fact sufficient to establish their standing to maintain this action. In the absence of a cognizable injury-in-fact, ASCP and LTCPA lack standing to sue on their own behalf. <u>Lujan</u>, 504 U.S. at 560-61.

**2.    ASCP and LTCPA Lack Standing to Sue on Behalf of Their Members.**

An association has standing to sue on behalf of its members only when: (1) its members would have standing to sue in their own right; (2) the interests it seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. <u>Friends of the Earth, Inc. v. Laidlaw Envtl. Services</u>, 528 U.S. 167, 181 (2000); <u>Hunt v. Washington State Apple Advertising Commission</u>, 432 U.S. 333, 343 (1977). As detailed below, Plaintiffs lack associational standing to sue on behalf of their members.

**a.    ASCP Has Failed to Establish Injury-In-Fact or Germaneness.**

Plaintiff ASCP fails the first two prongs of the associational standing test. With respect to the first prong, Plaintiff ASCP fails to allege an injury to its members. Specifically, the Complaint only alleges that ASCP represents "senior care and consultant pharmacists . . . by providing leadership, education, advocacy, and resources to advance the practice of senior care pharmacy," and that its member pharmacists "play a vital role in reviewing optimal drug therapy for millions of senior citizens and individuals with chronic illnesses living in [LTC] facilities and other community settings . . . ." (Compl. ¶ 9). The Complaint does not allege (or even imply) that any ASCP-member pharmacist has suffered injury as a result of UHG's purported actions at

---

pharmacies and pharmacists the copayments amounts, in an amount to be determined . . . ." (Compl. ¶ 38(a) (emphasis added)).

16

issue in the Complaint, thus causing ASCP to fail the first prong of the associational standing test.

With respect to the second prong of the associational standing test, Plaintiff ASCP fails to allege that this action is germane to ASCP's organizational purpose.  The germaneness requirement "ensures a modicum of concrete adverseness by reconciling membership concerns and litigation topics by preventing associations from being merely law firms with standing." Humane Society of U.S. v. Hodel, 840 F.2d 45, 58 (D.C. 1988).  Adopting Hodel's reasoning concerning the "germaneness" prong of the associational standing test, the Second Circuit recently stated that the "proper inquiry at the pleading stage" is "whether an association's lawsuit would, if successful, reasonably tend to further the general interests that individual members sought to vindicate in joining the association and whether the lawsuit bears a reasonable connection to the association's knowledge and experience."  Building and Construction Trades Council of Buffalo, New York and Vicinity v. Downtown Development, Inc., 448 F.3d 138, 149 (2d Cir. 2006).

ASCP's representation of pharmacists who work at LTC pharmacies is far too remote and tenuous a connection to confer standing upon ASCP. [18]  The reimbursement of LTC pharmacies

---

[18] ASCP's Bylaws, attached as Ex. 6 and available at ASCP's website (www.ascp.com), reveal that membership is not limited to "senior care pharmacists," but is instead open to "any pharmacist who is eligible to practice and who is of good moral character."  (Article V, § 2 (emphasis added)).  Contrary to what is set forth in Compl. ¶ 9, ASCP's mission is far broader than the representation of pharmacists practicing "senior care."  Article III, § 1 of the Bylaws provides that ASCP's first principal objective is:

> To promote and improve consultant pharmacy practices in health care institutions, long-term care facilities, managed care organizations, hospitals, hospices, home healthcare programs, industry programs and any other area in which consultant pharmacists are needed to advise patients and other health care professionals on drug therapy management.

for co-payments associated with Institutionalized Dual Eligibles is unrelated to ASCP's mission as alleged in the Complaint (which alleges only that ASCP members play a "vital role in reviewing optimal drug therapy for millions of senior citizens and individuals with chronic illnesses living in [LTC] facilities . . . ."  (Compl. ¶ 9), or as described in its Bylaws. Consequently, ASCP fails the first two prongs of the associational standing test.[19]

### b.    Plaintiffs Seek Monetary Damages Requiring Individualized Proof on Behalf of Their Members.

Both ASCP and LTCPA fail the third prong of the associational standing test because they seek monetary relief for LTC pharmacies that are not parties to this lawsuit, which will require individualized proof of injuries purportedly sustained by such pharmacies.  It is well established that when monetary damages are sought by an association, members of the association must participate in the action.  Warth v. Seldin, 422 U.S. 490, 515-16 (1975); Air Transport Ass'n of America v. Reno, 80 F.3d 477, 483 (D.C. Cir. 1996); Ass'n of Merger Dealers, LLC v. Tosco Corp., 167 F. Supp.2d 65, 70-71 (D.D.C. 2001).

---

Moreover, it should be noted that another district court has already rejected attempts by ASCP to assert claims as a provider of "nursing facility services."  See Am. Soc. Consultant Pharmacists v. Concannon, 214 F. Supp.2d 23, 31 (D. Me. 2002) (rejecting ASCP's request for a preliminary injunction to enjoin an emergency Medicaid rule in Maine that reduced reimbursement rates for prescription drugs, noting that ASCP's members did not provide "nursing facility services").

[19] It should be noted that LTCPA does not allege that it represents all of the LTC pharmacies to whom co-payments are allegedly owed, but asserts only that it represents the three largest LTC pharmacy companies in the United States—Kindred Pharmacy Services, OmniCare, Inc., and Pharmerica.  (Compl. ¶ 8).  There is no allegation in the Complaint, however, that these companies are owed the co-payments at issue.

Also, while LTCPA alleges that it "speak[s] for the nation's nursing home residents," (Compl. ¶ 8), its mission statement makes clear—in its opening sentence—that LTCPA "advocates for the interests of the long-term pharmacy community . . . ."  LTCPA's stated mission is hardly synonymous with the interests of senior citizens in nursing homes.  (LTCPA Mission Statement (emphasis added), a copy of which is attached as Ex. 7, and is available at www.ltcpa.org/mission).

While Plaintiffs nominally allege that they are seeking declaratory and injunctive relief (Compl. ¶¶ 1, 35), the Complaint is clear that Plaintiffs want money damages, and it explicitly states that Plaintiffs want the Court to "re-direct [the co-payment] amounts to the entities to whom the funds are properly owed—Plaintiffs' member LTC Pharmacies."  (Compl. ¶ 8).  Further, the Complaint's *ad damnum* clause unequivocally makes Plaintiffs' demand for individualized monetary damages clear, by seeking:

> [A] judgment declaring that the Defendant owes Plaintiffs' member LTC pharmacies and pharmacists the co-payment amounts, in an amount to be determined consistent with CMS policy and procedure . . . .

In Air Transport Ass'n, 80 F.3d 477 (D.C. Cir. 1996) the plaintiff association sought not only a judgment declaring the defendant's transit without visa policy illegal, but also "an order allowing its members to make individualized showings of damages and receive compensation for amounts they . . . expended . . . since 1986."  Id. at 483.  The D.C. Circuit held that the plaintiff had associational standing to seek declaratory relief, but lacked standing to assert a monetary claim on behalf of its members, since "any award of monetary compensation would require the participation of individual members in the lawsuit."  Id.  The court noted that the "damages claims are not common to the entire membership, nor shared by all in equal degree, and consequently there is simply no way the extent of harm to the [plaintiff's] members can be determined without individualized proof."  Id. at 483-84 (citing Telecommunications Research v. Allnet Communication Services, 806 F.2d 1093, 1095 (D.C. Cir. 1986)).

Similar to the judgment sought by plaintiffs in Air Transport Ass'n, a judgment declaring that UHG owes the co-payments at issue would not end this matter, since Plaintiffs want money to be distributed to each of its affected members (Compl. ¶ 8).  Even if the Court were to enter the judgment Plaintiffs seek, the determination of *how much* money UHG would owe to *which*

19

LTC pharmacies would necessarily require individualized proof from each LTC pharmacy.[20]

"Whatever injury may have been suffered is peculiar to the individual member concerned, and

both the fact and extent of injury would require individualized proof."  Warth, 422 U.S. at 515-

16.  Therefore, to obtain the damages Plaintiffs seek, each member LTC pharmacy must be a

party to this suit.  Id. ("Thus, to obtain relief in damages, each member of [the association] who

claims injury as a result of [defendants'] practices must be a party to the suit, and [the

association] has no standing to claim damages on his behalf.").

Accordingly, ASCP and LTCPA lack standing to maintain an action seeking additional

monetary payments for their members.  As Plaintiffs fail the test for associational standing, the

Court lacks subject matter jurisdiction and the action should be dismissed.

      **B.**      **The Court Lacks Personal Jurisdiction Because UHG Is Not Doing Business in the District of Columbia.**

The Complaint also should be dismissed because the Court lacks personal jurisdiction

over UHG.  Personal jurisdiction in this diversity action turns on District of Columbia law.

Helmer v. Doletskaya, 393 F.3d 201, 205 (D.C. Cir. 2004); Gorman v. Ameritrade Holding

Corp., 293 F.3d 506, 509 (D.C. Cir. 2002); Crane v. Carr, 814 F.2d 758, 762 (D.C. Cir. 1987).

Under District of Columbia law, a plaintiff may establish general jurisdiction based on a

defendant's activity or location in the District.  D.C. Code § 13-334; D.C. Code § 13-422.

Specifically, if a nonresident corporate defendant is "doing business" in the District, "a court may

exercise general jurisdiction over [it] as to claims not arising from [its] conduct in the District."

---

[20] The Complaint, at ¶ 34, alleges that "Defendant was, and remains obligated to reimburse the improperly withheld co-payment amounts directly to Plaintiffs' member pharmacies."  (Emphasis added).  Exactly how much money UHG allegedly is "obligated to reimburse" each LTC pharmacy can only be determined by the participation of such pharmacies in this action.  Since complete relief cannot be accorded among ASCP and LTCPA, the LTC pharmacies to whom the co-payments at issue are purportedly owed are indispensable parties who should be joined pursuant to Fed. R. Civ. P. 19(a).

Gorman, 293 F.3d at 509.  A nonresident corporate defendant is "doing business" in the District of Columbia only if its contacts with the District are continuous and systematic.  Id.

Plaintiffs' Complaint baldly alleges, upon information and belief, that UHG "is doing business in the District of Columbia."  (Compl. ¶ 10).  The Court need not treat Plaintiffs' allegations as true when determining whether personal jurisdiction exists over UHG.  Instead, the Court "may receive and weigh affidavits and any other relevant matter to assist it in determining the jurisdictional facts." United States v. Philip Morris, Inc., 116 F.Supp.2d 116, 120, n. 4 (D.D.C.2000) (citing 5A Charles A. Wright and Arthur R. Miller, Federal Practice and Procedure § 1351 (1990)).

Contrary to Plaintiffs' allegation, UHG is not doing business in the District of Columbia. UHG is a Minnesota holding company that is licensed to do business (and operates) only in Minnesota.  (Declaration of Juanita B. Luis ("Luis Dec."), attached as Ex. 8, ¶¶ 5-6).  While UHG owns subsidiaries that operate nationwide, including the District of Columbia (id. at ¶ 8), a subsidiary's presence in the District of Columbia cannot be attributed to the parent for purposes of establishing personal jurisdiction over UHG.  Martin-Trigona v. Acton Corp., 600 F. Supp. 1193, 1197-98, aff'd 818 F.2d 95 (table decision), 1987 U.S. App. LEXIS 9492, at *4 (D.C. Cir. May 20, 1987); Diamond Chemical Co., Inc. v. Atofina Chemicals, Inc., 268 F. Supp.2d 1, 7 (D.D.C. 2003).  As UHG is not doing business in the District of Columbia (Luis Dec., Ex. 8, ¶ 7), the Court lacks personal jurisdiction over UHG. [21]

---

[21] UHG has a governmental affairs office in the District of Columbia.  However, it is well-settled that a nonresident corporate defendant is not subject to personal jurisdiction simply because it has offices in the District of Columbia for the purpose of monitoring legislative and regulatory matters and maintaining official contacts with Congress and the executive branch.  Fandel v. Arabian Am. Oil Co., 345 F.2d 87, 89 (D.C. Cir. 1965); AGS Int'l Services v. Newmont USA Limited, 346 F. Supp.2d 64, 75-76 (D.D.C. 2004).

C.    **The Complaint Fails To State A Claim Upon Which Relief Can Be Granted.**

    1.    **Plaintiffs Misconstrue the Statute and CMS Regulations**.

Contrary to Plaintiffs' assertions, neither the MMA nor regulations issued by CMS require PDPs to remit co-payments directly to LTC pharmacies with respect to Institutionalized Dual Eligibles.  The provisions of the MMA and Medicare Part D regulations cited in the Complaint only address *whether* Institutionalized Dual Eligibles can be charged co-insurance or co-payments; they do <u>not</u> address to whom the PDPs must pay the co-insurance or co-payment amounts (<u>i.e.</u>, to an Institutionalized Dual Eligible or a LTC pharmacy).  As there is no affirmative requirement to pay LTC pharmacies directly, the Complaint fails as a matter of law, warranting dismissal of the Complaint for failure to state a claim upon which relief can be granted.

    a.    **The Medicare Statute Does Not Require Direct Payment to LTC Pharmacies.**

The only statutory provision cited in Plaintiffs' Complaint (42 U.S.C. § 1395w-114(a)(1)(D)(i)) provides that individuals with incomes below 135 percent of the federal poverty level are entitled to specific subsidies, including:

> In the case of an individual who is a full-benefit dual eligible individual and who is an institutionalized individual or couple (as defined in section 1396a(q)(1)(B) of this title), the elimination of any beneficiary coinsurance described in section 1395w-102(b)(2) of this title (for all amounts through the total amount of expenditures at which benefits are available under section 1395w-102(b)(4) of this tile).

Nothing in this statute—or in any other provision of the MMA—provides that co-payments with respect to Institutionalized Dual Eligibles must be remitted directly to LTC pharmacies.  Nor does the statute prohibit PDPs from remitting the co-payments at issue directly to Institutionalized Dual Eligibles.  Indeed, as noted above, CMS regulations (42 C.F.R.

§ 423.800(c)) require PDPs to reimburse <u>beneficiaries</u> for co-payments that are incorrectly assessed.  As the statute does not require direct payment to LTC pharmacies, the statutory claim asserted by Plaintiffs fails as a matter of law.

**b.    CMS Regulations and Guidance Do Not Require Direct Payment to LTC Pharmacies, and Only Permit Such Payments Upon Submission of Appropriate Data.**

The Complaint's assertion that UHG violated CMS regulations similarly fails to state a claim upon which relief can be granted.  Neither the Medicare Part D regulations nor the informal guidance issued by CMS requires PDPs to remit co-payments with respect to Institutionalized Dual Eligibles directly to LTC pharmacies.

CMS's regulations simply provide that "full benefit dual eligibles who are institutionalized have no cost sharing for covered Part D drugs covered under their PDP . . . ." (42 C.F.R. § 423.782(a)(2)(ii)).   The plain language of the regulation does not impose an affirmative duty upon PDPs to remit co-payment amounts associated with Institutionalized Dual Eligibles directly to LTC pharmacies.  Plaintiffs instead ask the Court to "read into" the regulation such a duty, based on a series of informal guidance issued by CMS.   (<u>See</u> Compl. ¶¶ 24-25, 27-28, 34).  As shown below, however, CMS's informal guidance similarly does not require the remittance of co-payments directly to LTC pharmacies, but instead merely provides that PDPs are <u>permitted</u> to remit co-payments to LTC pharmacies if such pharmacies satisfy the claims processes established by the PDPs, which the LTC pharmacies have failed to do.

Specifically, CMS issued three pieces of related guidance in April and May 2006, in which it attempted to address the concerns of LTC pharmacies, with each piece of subsequent guidance more specific as to the reimbursement process.  When read together, it is clear that

CMS does not require PDPs simply to cut checks to LTC pharmacies upon the submission of spreadsheets.

### i.    CMS's "Tip Sheet"

In Complaint ¶ 24, Plaintiffs quote a "Tip Sheet" issued by CMS on April 18, 2006, which, Plaintiffs assert, require PDPs to remit co-payments to LTC pharmacies in a single lump-sum payment.  The Tip Sheet, attached as Ex. 3, provides, in pertinent part, that:

> Dual eligibles who reside in [LTC] facilities _may_ not have to pay co-payments for their prescription drugs.  Pharmacies will receive a one-time payment for the amount of any underlined uncollected co-payments for the people who were mistakenly identified as having to pay co-payment amounts.  The pharmacy will need to submit a spreadsheet with claim information to the prescription drug plan.
>
> **Note:**  Processes may vary between plans.  Following the drug plan's directions may ensure timely reimbursements.  (Emphasis added).

Plaintiffs' Complaint omits the above-emphasized paragraph, which clearly reflects CMS's recognition that the processes by which reimbursements (if any) are to be made depends upon the PDP with whom the LTC pharmacy is dealing.[22]  Thus, rather than supporting Plaintiffs' argument, the CMS Tip Sheet makes clear that PDPs are not required to remit co-payments directly to LTC pharmacies, as subsequent CMS guidance demonstrates.

---

[22] The Complaint suggests that all Institutionalized Dual Eligibles are exempt from co-payments, but such individuals are exempt from co-payments only if they reside in a LTC facility for a full calendar month under a covered Medicaid stay.  See 42 C.F.R. § 423.782(a)(2)(ii).  CMS's regulation defines an institutionalized full-benefit dual eligible individual as an "individual who is an inpatient in a medical institution or nursing facility for which payment is made under Medicaid throughout a month . . . ."  42 C.F.R. § 423.772 (emphasis added).   Until a PDP receives confirmation that an individual qualifies as an Institutionalized Dual Eligible residing at a LTC facility for a full month, there is no basis to waive Part D's otherwise applicable co-insurance or co-payment.

## ii.    <u>CMS's April 20, 2006 FAQ</u>

In Complaint ¶ 25, Plaintiffs quote CMS's April 20, 2006 response to a "Frequently

Asked Question" ("FAQ"), which provides only that, when implementing retroactive subsidy

level changes for Institutionalized Dual Eligibles *based upon PDPs receiving corrected data*

*from CMS*:

> [PDPs] should not <u>automatically</u> reimburse beneficiaries residing in [LTC]
> facilities.  In such situations, it is <u>unlikely</u> that LTC pharmacies have collected the
> applicable cost-sharing from beneficiaries due to the <u>expectation</u> that the plan
> eventually would reimburse the pharmacy retroactively for such amounts.  In such
> situations, Part D plans should work with their pharmacies to provide them with
> direct reimbursement for any cost-sharing amount <u>not collected from</u>
> <u>institutionalized individuals</u>. . . . Providing direct reimbursements to LTC
> pharmacies for excess cost sharing charges <u>that have not been paid by Part D</u>
> <u>enrollees or waived by the pharmacy</u> does not conflict with [the PDP's obligation
> to reimburse Institutionalized Dual Eligibles for incorrectly assessed co-
> payments].

(CMS Frequently Asked Question, "Reimbursement to LTC Pharmacies, for Retroactive
Subsidy-level Cost Sharing Changes," ID Number 7043 (April 20, 2006) a copy of which is
attached as Ex. 1, (emphasis added)).

Plaintiffs, in their Complaint, simply gloss over (or ignore) the above-emphasized caveats

in the FAQ, which make clear that that remittance of co-payments directly to a LTC pharmacy is

permissible (but not required), provided that the pharmacy did not:  (1) collect co-payments from

Institutionalized Dual Eligibles, or (2) waive the co-payments.

## iii.    <u>CMS's May 5, 2006 Guidance</u>

In Complaint ¶ 27, Plaintiffs refer to guidance issued by CMS on May 5, 2006, which

simply provides, in pertinent part, that:

> Part D plans are <u>encouraged</u> to reimburse LTC pharmacies directly when
> implementing retroactive subsidy level changes.  Plans should not <u>automatically</u>
> reimburse beneficiaries residing in LTC facilities because it is <u>unlikely</u> that the
> LTC pharmacies have billed the beneficiaries for their copayments."

(Ex. 5, (emphasis added)).  The plain language of the Memorandum indicates, similar to previous CMS guidance, that direct payments to LTC pharmacies is an option, not an affirmative obligation.

Accordingly, neither the MMA, CMS regulations, nor CMS's regulatory guidance requires remittance of co-payments with respect to Institutionalized Dual Eligibles directly to LTC pharmacies.  Therefore, Plaintiffs' Complaint, which is premised upon the finding of such a requirement, fails to state a claim upon which relief can be granted.

### 2.   UHG Is Not a Party to Contracts With LTC Pharmacies, and Thus Cannot Be Liable for An Alleged Breach of Contract.

Plaintiffs, in Complaint ¶ 34, allege that UHG "has a 'network pharmacy contract' with each of Plaintiffs' members . . .," and that UHG has violated "[its] contractual obligations" by not directly reimbursing LTC pharmacies for the co-payments at issue.  In Complaint ¶ 35, Plaintiffs seek a declaration that UHG "must direct the reimbursement of [the co-payments at issue] to LTC pharmacies consistent with . . . the network contracts."

Plaintiffs do not cite any provisions of the "network contracts" in support of their allegations, and they do not attach copies of the contracts to their Complaint, despite repeated references to them.  Such an omission might otherwise be curious, but in Plaintiffs' case, it was necessary, since UHG is not a party to any contract with any LTC pharmacy.  Nor is UHG a party to contracts with individual pharmacists represented by ASCP.

It bears repeating that LTC pharmacies could have obtained reimbursement for incorrectly processed claims by simply submitting the information required by PDPs concerning the claims at issue.  In their attempt to circumvent such claims processing procedures, Plaintiffs rushed to the courthouse and apparently confused UHG—a holding company—with certain wholly owned subsidiaries of UHG that sponsor PDPs:  UnitedHeathcare Insurance Company;

26

UnitedHealthcare of New York, Inc.; PacifiCare Life and Health Insurance Company; and PacifiCare Insurance Company.[23]   Although UHG owns these subsidiaries, the contractual obligations of such subsidiaries are not attributable to UHG.  It is well-established that "under ordinary circumstances a contract in terms and in name with one corporation cannot be treated as that of [another], and a parent will not be liable for the obligations of its subsidiaries."  T & S Products, Inc. v. U.S., 48 Fed. Cl. 100, 111 (Ct. Clms. 2000) (quoting BLH, Inc. v. U.S., 13 Cl. Ct. 265, 272 (1987)).  See also, U.S. v. Bestfoods, 524 U.S. 51, 61 (1998) ("It is a general principle of corporate law deeply 'ingrained in our economic and legal systems' that a parent corporation (so-called because of control through ownership of another corporation's stock) is not liable for the acts of its subsidiaries"); Tennessee Valley Auth. v. Exxon Nuclear Co., Inc., 753 F.2d 493, 497 (6th Cir. 1985) (under ordinary circumstances, a parent corporation is not liable for the contractual obligations of its subsidiaries) (citing 1 W. Fletcher Cyclopedia Corporations, § 43 (1983)).

In sum, UHG is not a party to any contract with a member of LTCPA or ASCP. Therefore, Plaintiffs' contractual claim against UHG must be dismissed.  See  Moeckel v. Caremark Rx Inc., 385 F. Supp.2d 668, 674 (M.D. Tenn. 2005) (when a parent corporation is not party to a contract, dismissal of the parent from a breach of contract lawsuit is warranted).

---

[23] Even these subsidiaries do not directly contract with LTC pharmacies for purposes of providing Medicare Part D benefits.  Rather, the subsidiaries contract with PBMs (including PBMs operated by UHG affiliates).  Among other things, the PBMs enter into contracts with LTC pharmacies.

**IV.**    <u>**Conclusion**</u>

For the foregoing reasons, UHG respectfully moves the Court to dismiss Plaintiffs'

Complaint for lack of subject matter jurisdiction, lack of personal jurisdiction, and failure to state

a claim upon which relief can be granted.


September 11, 2006                                    Respectfully submitted,



                                    ___/s/ Mark C. Nielsen_____
                                    Thomas F. Fitzgerald (Bar No. 358232)
                                    Michael J. Prame (Bar No. 451017)
                                    Mark C. Nielsen (Bar No. 465220)
                                    Groom Law Group, Chartered
                                    1701 Pennsylvania Avenue, NW
                                    Washington, DC  20006
                                    Telephone:    202.857.0620
                                    Facsimile:     202.659.4503
                                    Email:         tff@groom.com
                                                   mjp@groom.com
                                                   mcn@groom.com

                                    **Attorneys for Defendant**

**<u>CERTIFICATE OF SERVICE</u>**

The undersigned certifies that a copy of UnitedHealth Group Incorporated's Motion to

Dismiss Plaintiffs' Complaint (the "Motion to Dismiss"), Memorandum of Points and Authorities

in Support of the Motion to Dismiss, and Proposed Order was served, via electronic delivery and

First-Class Mail, on the 11th day of September 2006, upon the following:

> David Farber, Esq.
> Harry Silver, Esq.
> Patton Boggs
> 2550 M Street, NW
> Washington, DC  20037
> dfarber@pattonboggs.com
> hsilver@pattonboggs.com
>
> Counsel for Plaintiffs

September 11, 2006                                    _____/s/ Mark C. Nielsen_____
                                                     Mark C. Nielsen (Bar No. 465220)
                                                     Groom Law Group, Chartered
                                                     1701 Pennsylvania Avenue, NW
                                                     Washington, DC  20006
                                                     Telephone:    202.857.0620
                                                     Facsimile:    202.659.4503
                                                     Email:        mcn@groom.com

                                                     **Counsel for Defendant**