IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Long Term Care Pharmacy Alliance )
    and )
American Society Of )
Consultant Pharmacists, )
              Plaintiffs, )
                 )
         v. )       Case No.: 01:06-CV-01221
            )       (ESH)
UnitedHealth Group Incorporated, )
           Defendant. )

## MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS COMPLAINT

### INTRODUCTION

For more than one year, Defendant UnitedHealth Group Incorporated ("UHG") has been wrongfully withholding substantial Medicare Part D reimbursement "co-payments" that are properly owed to long term care pharmacy members of Plaintiffs Long Term Care Pharmacy Alliance ("LTCPA") and American Society of Consultant Pharmacists ("ASCP"). By now, these improperly withheld amounts total in the millions of dollars. Yet, while the Federal Government has provided UHG with the necessary data to properly process the claims, UHG improperly continues to sit on the funds, flouting not only contracts with long term care pharmacies, but also government regulations and four separate governmental policy memoranda on the issue.

In a further attempt to delay this proceeding, and payment, UHG now argues that it is beyond this Court's reach, claiming that the Plaintiffs do not have the necessary standing to pursue their claim, that it is the wrong Defendant, and that this Court has no jurisdiction over it notwithstanding its maintaining an office in the District of Columbia and having stipulated in at least

one other case that it is doing business in this District. Each of UHG's arguments fails. As set out below, LTCPA and ASCP have associational standing in this case, Defendant is the correct party to be in this action, and its multiple contacts with this jurisdiction and its submission to jurisdiction outside Minnesota negate its suggested immunity in this District. Thus, UHG's Motion should be denied in toto.

## STATEMENT OF FACTS

Plaintiff LTCPA is a Delaware corporation that has its headquarters and principal place of business at 1776 Massachusetts Avenue, N.W., Washington, D.C. Compl., ¶ 7. Plaintiff ASCP is a Massachusetts corporation that has its principal place of business in Alexandria, Virginia. Id., ¶ 8.

Defendant UHG is a Minnesota corporation with its headquarters at 9900 Bren Road East, Minnetonka, Minnesota. See Declaration of Juanita B. Luis ("Luis Dec."), ¶ 5; Exhibit 1 to Declaration of George M. Borababy ("Borababy Dec."). UHG also maintains an office at 701 Pennsylvania Avenue, N.W., in Washington, D.C. See Memorandum of Points and Authorities in Support of Defendant's Motion to Dismiss Complaint ("Def. Mem.") at 21 n.21; Exhibit 2 to Borababy Dec. UHG owns (and has claimed to be the third party beneficiary of contracts entered into by) subsidiaries that do business in the District of Columbia, including subsidiaries that are Medicare Part D prescription drug plans serving beneficiaries in the District of Columbia. Luis Dec., ¶ 8; Exhibit 3 to Borababy Dec.

### The Medicare Prescription Drug Program

In December 2003, Congress enacted the Medicare Prescription Drug Improvement and Modernization Act ("Act" or the "MMA") to provide prescription drug coverage for all Medicare beneficiaries. Compl., ¶ 14. The benefit, a publicly-funded but privately marketed program commonly known as "Part D," became effective on January 1, 2006. Compl., ¶ 3. Under Part D, pharmaceutical services are provided to seniors by private companies known as prescription drug

plans, or "PDPs." Compl., ¶ 15.  The currently participating PDPs all contract with the federal agency responsible for administering the Part D benefit, the Centers for Medicare and Medicaid Services ("CMS"), in a series of private (not governmental) contracts.  Compl., ¶ 15. Generally, PDPs are operated by large insurers, such as Aetna, Cigna, and defendant UnitedHealth ("UHG"). Compl., ¶ 15.  In fact, Defendant owns the largest group of PDPs, accounting for approximately 27 percent of the market, including tens (if not hundreds) of thousands of "institutionalized full benefit dual eligibles" -- dual Medicare and Medicaid beneficiaries residing in nursing homes. Compl., ¶ 10. Long term care ("LTC") pharmacies, including members of LTCPA and ASCP, participate in the Part D program by privately contracting with the PDPs, including those sponsored by Defendant UHG. Compl., ¶ 14.

In 2006, the "institutionalized dual eligibles" enrolled (or were auto-enrolled) into various PDP plans, including Defendant's PDPs, and they receive their drugs from the PDPs' network LTC pharmacies.  Compl., ¶ 3.[1]  Once the pharmacy dispenses a drug to a Plan enrollee (the nursing home resident, in this case), the pharmacy bills the PDP for reimbursement at its network contract rate. Compl., ¶ 22.  However, since January 1, 2006, various PDPs, including Defendant's PDPs, have failed to honor their contracts with Plaintiffs' member LTC pharmacies, and have been "shorting" the reimbursement payments made to the LTC pharmacies by an amount known as the "co-payment." Compl., ¶ 14.

---

[1] LTC pharmacies are not typical retail pharmacies such as CVS.  These specialized pharmacies serve the needs of nursing home residents, who, on average, are 83 years of age, suffer from approximately 8 different medical diagnoses, and require 8 medications at any given time.  In order to serve this frail and fragile population, these pharmacies provide a multitude of additional services beyond those provided by retail pharmacies.  Examples of the additional services that LTC pharmacies provide include specialized medication packaging in "unit dose packages" (referred to as "blister packs"), specialized drug regimen reviews, chart reviews, and consultant pharmacy services. Unlike most retail pharmacies, LTC pharmacies deliver medications to long term care residents and are available on a 24-hour a day, 7-day a week basis each and every day of the year.  These extra services not only provide effective and efficient care for nursing home residents, but also save the poor and frail from possible medication errors or the need to be transported from their homes to hospitals for more intensive care.  As a result, the federal health care programs, Medicare and Medicaid, save billions of dollars through the avoidance of medication errors and additional health care costs. *See generally* Compl., ¶ 13.

<u>Part D Cost Sharing For Institutionalized Dual Eligibles And The Co-Payments</u>

Within the class of all Medicare beneficiaries eligible for Part D, there exists a special class of beneficiaries who are both Medicare and Medicaid eligible, commonly referred to as "dual eligibles." Compl., ¶ 16. Those residing in nursing homes are referred to as "institutionalized." By law, institutionalized dual eligibles are supposed to have no premium or co-payment obligations.[2] MMA Section 1860D-14(a)(1)(D)(i), 42 U.S.C. § 1395w-114D-14(a)(1)(D)(i) ("in the case of an individual who is a full-benefit dual eligible and who is an institutionalized individual ... [for] the elimination of any beneficiary coinsurance described [in the Act]"). 42 C.F.R. §423.782(a)(2)(ii). Compl., ¶¶ 17, 20.[3] Thus, PDPs are barred from charging dual eligibles residing in long-term care facilities, including nursing homes, co-payment amounts for drugs received through their PDPs. Compl., ¶ 20. As CMS noted: "[w]e believe that the Congress intended this provision to address the fact that dual-eligible persons residing as inpatients in medical institutions are permitted to retain only a small personal needs allowance, which preclude payment of even nominal co-payments." 70 Fed. Reg. 4372 (Jan. 28, 2005); Compl., ¶ 21.

<u>Defendant Improperly Withholds Co-Payment Amounts From Payments<br>Made To LTC Pharmacies</u>

As noted above, on January 1, 2006, LTC pharmacies started providing prescription drugs to institutionalized dual-eligibles under their network contracts with the PDPs, and began billing the PDPs, including Defendant's PDPs, for reimbursement. Compl., ¶ 22. Because the beneficiaries at issue were institutionalized full benefit dual eligibles, Plaintiffs' member pharmacies did not collect

---

[2] Typically, Medicare and Medicaid programs include cost sharing, or "co-payments," by beneficiaries in the structure of the benefit. Co-payments are flat, pre-determined payment amounts assigned to specific services that are paid by the beneficiary to contribute to cost coverage and prevent over-utilization. In order to ensure that beneficiary access to essential health care is not impeded, however, it is imperative that co-payments be appropriately calculated and assessed. Compl., ¶ 18.

[3] The regulatory definition of "institutionalized" found in Section 1902(q)(1)(B) of the Act and 42 C.F.R §423.772 specifically includes residents of a nursing facility whose services are being covered by Medicaid.

any co-payments from the beneficiaries, and, in turn, billed Defendant's PDPs for the entire price of the drugs. Compl., ¶ 5. Defendant's PDPs (and all PDPs) were supposed to begin immediately reimbursing LTC pharmacies for each prescription dispensed at the full rates determined by their network contracts, without any deductions for co-payments. Compl., ¶ 22. Unfortunately, due initially in part to erroneous information provided to them by CMS, Defendant's PDPs (along with other PDPs) inappropriately reduced LTC pharmacy reimbursement by withholding the co-payment amount. This left LTCPA's member pharmacies and pharmacies owned and operated by ASCP's members, all of which had properly recognized the beneficiaries' "institutionalized full benefit dual status," under-reimbursed. Compl., ¶ 22.

Along with other interested groups, Plaintiffs immediately brought this issue to the attention of the PDPs and CMS. Compl., ¶ 23. Nonetheless, the PDPs took months to recognize that these co-payments were improperly being withheld and, even today, many PDPs, including Defendant's PDPs, still have not reimbursed the LTC pharmacies for the shortfall. Compl., ¶ 22; Second Declaration of Paul Baldwin ("Baldwin Sec. Dec."), ¶ 14. In fact, Defendant and its PDPs have withheld such payments while never disputing the fact that they owe the amount of these improper withholdings. Compl., ¶ 1.

Throughout February, March and April 2006, Plaintiffs also worked with CMS to address this issue. Compl., ¶ 24. By the end of March 2006, the magnitude of the problem was enormous, with millions of dollars of improperly withheld co-payments accumulating on the PDP books, and with a corresponding amount of debt for these unpaid amounts accumulating at the LTC pharmacies. Compl., ¶ 24. In an effort to address the improperly assessed co-payment amounts for institutionalized dual eligibles and the unique situation of LTC pharmacies, CMS issued guidance documents in April and May 2006 clearly directing PDPs to reimburse the LTC pharmacies the

amounts in question.[4]  Compl., ¶¶ 24-26.  As recent as December 22, 2006, CMS put out yet a fourth notice.  *See* Exhibit 4 to Borababy Dec.  Still, Defendant and its PDPs have failed to reimburse the co-payments due to Plaintiffs' member pharmacies.  Baldwin Sec. Dec., ¶ 14.

Compounding the problem, in June 2006, Defendant UHG communicated to Paul Baldwin of Plaintiff LTCPA that, effective June 16, 2006, UHG would begin distributing checks for each improperly withheld co-payment directly to the individual beneficiaries, rather than to the LTC pharmacies to which the funds are owed , unless the pharmacies "reversed and rebilled" each of the tens of thousands of transactions at issue. Compl., ¶¶ 28-29.  At least one of Mr. Baldwin's conversations with UHG on the issue were with a representative in UHG's offices located in the District of Columbia.  Baldwin Sec. Dec. ¶ 9.  Following repeated requests by both Mr. Baldwin and CMS, Defendant UHG agreed to extend its "deadline" until June 23, 2006. Compl., ¶ 30.  Compl., ¶ 29.

On June 23, however, Defendant UHG refused to extend its deadline further, despite the fact that the parties were still holding discussions on the issue.  Compl., ¶ 30.  Rather, UHG threatened to begin issuing individual checks to thousands of dual eligible nursing home residents across the country for hundreds of thousands of improperly withheld co-payment amounts. *Id.* UHG informed Plaintiff LTCPA that payments directly to nursing home residents would be issued beginning July 7, 2006, and that its subsidiary, PacifiCare, would begin issuing payments directly to nursing home residents the following week, July 14, 2006. Compl., ¶ 31.  After Plaintiffs filed this suit and a Motion For Temporary Restraining Order, Defendant withdrew its threat, and agreed to

---

[4] By May 2006, following these three CMS guidance documents, many PDPs began to work with LTC pharmacies and reimburse the backlog of inappropriately withheld co-payments directly to these pharmacies.  Compl., ¶ 28.  In contrast, Defendant refused to take such action and insisted that rather than submitting a 'bulk claim" for the amounts of improperly withheld co-payments (supported by specific claim information), each LTC pharmacy needed to reverse the original transactions and re-bill them.  When Plaintiffs' members followed Defendant's direction, however, they quickly learned that Defendant was rejecting the entirety of the claim, rather than withholding only the co-payment.  *Id.*

defer sending checks to nursing home residents. *See* Docket No. 4, Exhibit 1, in this case.

Defendant UHG continues to retain that money today.

<u>Defendant Maintains Systematic And Continuous Contacts With This District, Including<br>Negotiations Related To The Co-Payment Issue</u>

Despite its contentions to the contrary, Defendant UHG does operate in this District. *See* Def. Mem. at 20-21. First, Defendant concedes that it maintains an office in the District of Columbia, which is more than sufficient to establish jurisdiction. *Id.* at 21 n. 21. While Defendant blithely contends that its office is used solely for governmental monitoring and contact, it proffers no support for that proposition. As established by Mr. Baldwin, Plaintiff LTCPA had at least one direct telephone conversation about the co-payment issues with a representative from UHG's <u>D.C.</u> <u>office</u>. Baldwin Sec. Dec., ¶ 9. Beyond that, virtually every discussion between Plaintiffs and Defendant UHG on this matter has involved UHG representatives speaking on behalf of each of UHG's so-called "individual" subsidiaries and affiliated PDPs. Baldwin Sec. Dec., ¶ 10. Defendant UHG, through personnel in the District of Columbia, as well as in Minnesota, California and other locations, has acted on behalf of, and has made decisions for, each of its PDPs. *Id.* Given this coordinated activity, Defendant should not be permitted to hide behind the corporate veil of a so-called "holding company" shell. It is quite clear that the holding company is engaged in much more than just "holding" its subsidiaries.

Significantly, Defendant UHG has, in other cases and matters, without objection, submitted to the jurisdiction of this Court and to that of other Federal Courts outside of Minnesota. For example, UHG is still subject to the jurisdiction of this Court under Judge Urbina's Final Judgment in *United States of America v. UnitedHealth Group Incorporated,* Civil Action No. 1:05CV0246 (D.D.C., May 23, 2006). *See* Exhibit 5 to Borababy Dec. Further, UnitedHealth Group affirmatively advocated a transfer of venue to the Northern District of Illinois in an unrelated litigation currently

pending in that district. *See* Exhibit 6 to Borababy Dec. These activities are hardly consistent with Defendant's claim that it is a holding company operating only in Minnesota.

Moreover, it is extremely doubtful that Defendant's Washington office is used solely for governmental monitoring and contacts, as UHG suggests. It is public knowledge that Defendant belongs to multiple trade associations, such as the Americas Health Insurance Plans, that engage in industry public relations campaigns from their offices in this District. Baldwin Sec. Dec., ¶ 11. It is virtually certain that Defendant's employees in this District participate in such public relations efforts and campaigns, thus immediately taking them out of the "governmental contacts" category. In addition, there is little question that Defendant's employees in this District have negotiated with CMS, not for lobbying purposes, but for commercial contractual reasons associated with the PDP contracts. *Id.,* ¶ 12. Further, Defendant's employees in this District have almost certainly participated in discussions with AARP, a District-based private entity that has "branded" Medicare prescription drug plans and other health insurance programs that Defendant's PDPs administer. *Id;* Exhibit 3 to Borababy Dec. In short, Defendant's unsupported claims that its Washington office is solely a "governmental affairs office" is likely untrue.

## ARGUMENT

Defendant attempts to mount three distinct attacks on this case. First, it challenges Plaintiffs' standing. Second, it brings a Rule 12(b)(6) "failure to state a claim" challenge. And third, it challenges this Court's personal jurisdiction over it. As Plaintiffs demonstrate below, none of Defendant's arguments has merit.

### I.    Each Plaintiff Possesses The Requisite Standing To Bring This Action.

Defendant UHG first claims that this Court lacks subject matter jurisdiction because Plaintiffs lack standing to bring this action. *See* Def. Mem. at 14-20. It is clear, however, that Plaintiffs LTCPA and ASCP each possesses more than the required standing to bring this action on behalf of its members as well as itself. Plaintiffs seek injunctive and declaratory relief that will protect both their interests and those of their members regarding the improperly withheld co-payment amounts and prevent further injury and burdens that are imminent as a result of Defendant UHG's threatened actions. As such, they are the ideal plaintiffs in a case such as this.

### A.    LTCPA and ASCP each satisfies the requirements for associational standing.

Under the familiar standard, an association has standing to sue on behalf of its members where (a) association members would have standing to sue in their own rights; (b) the interests that the association seeks to protect are germane to its organizational purpose; and (c) neither the claim asserted not the relief requested requires the participation of individual association members. *See Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977). Both LTCPA and ASCP satisfy these requirements.

### i.    Both Plaintiffs' members have standing to sue in their own right.

An association satisfies the first element of this test when a defendant's improper conduct has caused "traceable 'concrete and particularized' harm" to its members that is "'actual or

imminent'" and that will be redressed by a favorable result. *See Sierra Club v. EPA*, 292 F.3d 895, 898 (D.C. Cir. 2002).[5]  With regard to Plaintiff LTCPA, UHG does not even attempt to assert that it does not satisfy this element, and thus concedes that it does, as it is clear that LTCPA's members have been injured by UHG's failure to pay them millions of dollars.[6]

As to ASCP, Defendant contends that the Complaint does not allege that any ASCP-member pharmacist has suffered injury as a result of UHG's actions. *See* Def. Mem. at 16. Defendant is simply wrong.  Defendant ignores the fact that, like LTCPA's members, a number of ASCP's members own and operate pharmacies that have had significant payments withheld by UHG, a fact that is alleged clearly in the Complaint: "LTCPA and ASCP members operate LTC pharmacies..." Compl., ¶ 12. Further, the allegations of the Complaint refer repeatedly to "*Plaintiffs'* member LTC Pharmacies" as the parties who are affected by Defendant's improper conduct. *See, e.g.*, Compl., ¶ 14 (emphasis added).  To eliminate any doubt, ASCP's Director of Policy and Advocacy has verified that ASCP has pharmacist members who are also the owners and operators of LTC pharmacies that have had co-payments improperly withheld. *See* Declaration of Thomas Clark ("Clark Dec."), ¶ 6.[7]

---

[5]    The Court of Appeals for the District of Columbia Circuit has held that an "impending threat of injury" is sufficiently "imminent" to constitute an injury-in-fact. *See, e.g., Vill. Of Bensenville v. FAA*, 376 F.3d 114, 118-19 (D.C. Cir. 2004); *Nuclear Energy Inst. v. EPA*, 373 F.3d 1251, 1257 (D.C. Cir. 2004).

[6]    Oddly, despite conceding the injury-in-fact issue as to LTCPA, Defendant erroneously contends that there are no allegations in the Complaint that LTCPA member companies are owed the co-payments at issue. *See* Def. Mem. at 18 n.19. The Complaint is, however, replete with references to how "LTC Pharmacies," a defined term that includes LTCPA's members, Compl. at 1, have not been paid for improperly withheld co-payments. *See* Compl., ¶¶ 22, 25, 28-30. That the individual companies identified in the Complaint as members of LTCPA (*see* Compl., ¶ 8) are referred to by a defined term rather than by name is of no moment to the standing analysis. *See also* Baldwin Sec. Dec., ¶ 6 (each of the three main members of LTCPA is owed co-payments by UHG).

[7]    Since Defendant poses a Rule 12(b)(1) challenge in its Motion to Dismiss, this Court has broad discretion to "rely on documents beyond the pleadings to assure that it has jurisdiction." *Hudert v. Alion Science & Technology Corp.*, 429 F. Supp. 2d 99, 105 (D.D.C. 2006); *Haase v. Sessions*, 835 F.2d 902, 906 (D.D.C. 1987).  While Plaintiffs believe that the allegations of the Complaint are sufficient to support standing in this matter, they are submitting this Declaration for additional support.

ii.    <u>This action is germane to each Plaintiff's organizational purposes</u>.

With regard to the "germaneness" element of associational standing, again, Defendant does not dispute that LTCPA satisfies this element, and thus concedes that it does. Regarding ASCP, the interests that it seeks to protect here are certainly germane to its organizational purpose. Among the stated objectives of ASCP, as set forth in its Bylaws, are (1) "[t]o promote and improve consultant pharmacy practice in... long-term care facilities" and (2) "[t]o represent the interest of consultant pharmacy practice before legislative, judicial and administrative branches of the government." *See* Exhibit 1 to Clark Dec. Included within these purposes is the objective of advancing the practice of senior care pharmacy, which includes serving the large population of institutionalized dual eligible senior citizens and chronically ill patients served by Medicare Part D. *See* Compl., ¶¶ 8-9; Clark Dec., ¶ 7. Matters concerning the administration and program integrity of the Part D benefit are an important part of the everyday work of individual pharmacists and institutional LTC pharmacies. Clark Dec., ¶ 8. Put simply, the actions taken by UHG violate the program integrity of Part D benefits to institutionalized dual eligible patients, which in turn threatens the efficient provision of essential pharmacy services to this fragile population. *Id.*

While UHG attempts to read the germaness requirement very narrowly, *see* Def. Mem. at 17-18, its construction is expressly disavowed by the very cases it cites. For example, in *Humane Society of the United States v. Hodel*, 840 F.2d 45 (D.C. Cir. 1988), cited in Def. Mem. at 17, the D.C. Circuit rejected a narrow reading of the germaneness requirement and instead held that it requires only "that an organization's litigation goals be <u>pertinent to its special expertise and the grounds that bring its membership together</u>." *Id.* at 56 (emphasis added). *See also American Insurance Association v. Selby*, 624 F. Supp. 267, 271 (D.D.C. 1985) (holding that "[a]n association's litigation interests must be truly unrelated to its organizational objectives before a court will declare that those interests are not germane"). The more recent Second Circuit decision cited by Defendant, *see* Def. Mem. at 17, also

rejected a similarly narrower approach to germaneness: "We think it significant that the *Hunt* Court used the word 'germane,' rather than the phrase 'at the core of' or 'central to,' or some word or phrase indicating the need for a closer nexus between the interests sought to be protected by the suit in question and the organization's dominant purpose." *Building Construction and Trades Council of Buffalo v. Downtown Development, Inc.*, 448 F.3d 138, 148 (2nd Cir. 2006). Because the interests raised in Plaintiffs' Complaint are clearly germane to both LTCPA's and ASCP's organizational purposes, Defendant's challenge on this prong of the *Hunt* test must be rejected.

    iii.    <u>Participation of Plaintiffs' individual members is not required here.</u>

ASCP and LTCPA both easily satisfy the third element of the test, as the actual relief sought in the Complaint (as opposed to Defendant's misleading characterization) does not require the individual participation of either association's members. Defendant's argument to the contrary rests upon the contention that Plaintiffs here are seeking damages. Def. Mem. at 18-20. However, that argument relies upon Defendant's selective mis-quotation of Plaintiffs' prayer for relief, in that Defendant neglects to quote Plaintiffs' request for a "judgment declaring… that Defendant is improperly retaining those amounts in violation of law and contract." *Compare* Def. Mem. at 19 *with* Compl. at 15. The Complaint is clear – it does not seek damages, but only declaratory and injunctive relief. *See also* Baldwin Sec. Dec., ¶ 6; Clark Dec., ¶ 6.

More precisely, Plaintiffs seek an injunction against Defendant's distribution of thousands of small checks to individual Part D beneficiaries, and declarations that Defendant's threatened "distribution of refund checks to misidentified institutionalized dual-eligible Part D beneficiaries is illegal and contrary to law and contract," that the co-payment amounts are owed to Plaintiffs' members and pharmacists, and that Defendant is improperly retaining those amounts in violation of law and contract. Compl., ¶ 35, Prayer ¶¶ a, b. These are precise requests for injunctive and declaratory relief that do not require the participation of individual ASCP or LTCPA members.

Defendant also fails to acknowledge Plaintiffs' allegation that "Defendant's network contract is virtually uniform in all relevant aspects." Compl., ¶ 34. The law is clear that the individual participation of members is not required when an association is seeking prospective injunctive-style or declaratory relief, even in cases involving underlying contracts. *See Union Food & Commercial Workers Union Local 751 v. Brown Group*, 517 U.S. 544, 546-47 (1996); *Int'l Union, United Automobile & Agricultural Workers of America v. Brock*, 477 U.S. 274, 287-288 (1986). Significantly, in *Brock*, the Supreme Court held that it could determine that workers were entitled to the benefits that they claimed even though the workers would subsequently need to prove their individual facts as to individual liability and amount through a separate proceeding. *See UAW*, 477 U.S. at 287-288. That is precisely the case here. Plaintiffs' request that this Court grant declaratory relief based upon the uniformly applied regulations and the network contracts with pharmacies and enjoin Defendant from distributing the funds to individual beneficiaries is the very type of claim for which Plaintiffs have standing.

**B.      ASCP and LTCPA have standing to sue in their own rights.**

In addition to vindicating the rights of their members, both ASCP and LTCPA have suffered concrete and particularized injuries as a result of Defendant's wrongful withholding of co-payment amounts. *See Abigail Alliance for Better Access to Developmental Drugs v. Eschenbach*, 469 F.3d 129, 132-133 (D.C. Cir. 2006); *Nat'l Fair Housing Alliance v. Prudential*, 208 F. Supp. 2d at 46, 52-53 (D.D.C. 2002). Associations show injury-in-fact if they demonstrate that a defendant's conduct conflicts directly with organizational activities such as advocacy and educational services, and have caused the association to divert resources from existing programs to defend against the conduct. *See Abigail's Alliance*, 469 F.3d at 133.

Defendant's conduct has interfered with the core mission of both organizations to protect and promote the profession of long term care pharmacy.[8]  Both associations regularly advocate to improve federal statutes and regulations as well as to ensure the efficient flow of information essential to the day-to-day provision of long term care pharmacy services.  *See* Clark Dec., ¶ 8; Baldwin Sec. Dec., ¶ 5.  UHG's conduct is impeding progress in these areas, as both associations have found themselves in a year-long struggle with UHG that has detracted from their focus on obtaining legislative and policy advances for their members.  LTCPA staff has devoted significant time and resources to co-payment issues arising out UHG's conduct -- time and resources that would otherwise have been devoted to pursuing specific policy objectives such as addressing how pharmacy providers communicate with long term care beneficiaries about plan and network selections.  *See* Baldwin Sec. Dec., ¶¶ 13-15.  Moreover, LTCPA's organizational and political goals, such as finalizing a comprehensive 2007 legislative agenda, grassroots organizing among pharmacy entities, and membership development have suffered measurably under the strain of negotiating and fighting for an end to UHG's withholding.  *Id.*

Similarly, ASCP has seen its operations adversely impacted in specific ways.  For example, advocacy efforts related to Medicare Part B payments for medication therapy management in clinical situations have been largely sidelined to allow more time to deal with UHG's improper withholding of co-payments.  *See* Clark Dec., ¶ 10.  And, like LTCPA, ASCP has been distracted from pursing its legislative goals.  *Id.*, ¶¶ 9-10.

---

[8]    ASCP's web site contains the organization's mission statement that it "provides leadership, education, advocacy, and resources to advance the practice of consultant and senior care pharmacy."  *See* www.ascp.com/about (last accessed February 21, 2007), Exhibit 22 to Borababy Dec.  Further, the mission statement found on the LTCPA web site notes that "LTCPA advocates for the interests of the long-term care pharmacy community" and that the organization "highlights the critical issues of concern surrounding the pharmacy needs for more than 60 percent of the nation's long term care residents."  *See* www.ltcpa.org/mission/default.asp (last accessed on February 21, 2007), Exhibit 2 to Baldwin Sec. Dec.  *See also* Compl., ¶¶ 7-9.

In short, combating UHG's ongoing threat to disburse checks to beneficiaries instead of to LTCPA and ASCP members who are bearing the costs of the improperly withheld co-payments is draining financial, staff and programmatic resources from both associations -- an injury-in-fact that is sufficient to establish direct standing. *Abigail Alliance*, 469 F.3d at 132-133; *Nat'l Fair Housing Alliance*, 208 F. Supp. 2d at 53.

## II.    Defendant's Motion To Dismiss For Failure To State A Claim Should Be Denied.

Knowing the weakness of its standing challenge, Defendant UHG also tries to attack the Complaint for failure to state a claim.  More specifically, UHG advances two arguments:  first, it claims that Plaintiffs have sued the wrong defendant, arguing that, while certain of UHG's wholly-owned subsidiaries have network contracts with Plaintiffs' members, UHG is merely a "holding company" that is not itself a party to these contracts.  *See* Def. Mem. at 26-27.  Second, UHG claims that the Medicare Part D statute, regulations and guidelines "permit," but do not "require," that PDPs reimburse LTC pharmacies directly.  *See* Def. Mem. at 22-26.  Defendant's arguments ignore the facts that Defendant UHG, not its subsidiaries, made the decision not to reimburse, and to continue to withhold,  the improperly deducted co-payments to Plaintiffs' members LTC pharmacies, and that, in doing so, it is flouting the pharmacies' contracts as well as federal law and CMS' clear guidance to the contrary.

In addition, in making these arguments, Defendant UHG loses sight of the fact that a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of the allegations of the Complaint and is not an adjudication on the merits. *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002).  Dismissal of a claim is inappropriate unless "plaintiffs can prove no set of facts in support of their claim which would entitle them to relief." *Kowal, et al. v. MCI Communications Corp., et al.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994).  When deciding a Rule 12(b)(6) motion, the Court must accept the plaintiffs' factual allegations as true and construe the complaint

liberally, granting the plaintiffs the benefit of all inferences that can be derived from the facts alleged. *Id*; *Browning v. Clinton*, 292 F.3d at 242. As the Supreme Court has repeatedly noted, the Federal Rules of Civil Procedure require only that a complaint provide "a short and plain statement of the claim that will give the defendant fair notice of what the plaintiff's claim is and the ground upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47 (1957); *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512 (2002)(quoting *Conley*). As discussed below, Plaintiffs have sufficiently alleged facts that would entitle them to relief. Defendant's Motion should therefore be denied.

**A.    UHG is the proper Defendant here, since it is responsible for the breach of the network pharmacy contracts with Plaintiffs' members.**

Under the Part D network contracts between Plaintiffs' members and Defendant UHG and its subsidiaries, LTC pharmacies are to be reimbursed based upon rates stipulated in the contracts. Compl., ¶ 22. Defendant UHG and its PDPs, however, failed to pay the LTC pharmacies the contracted amounts for claims associated with dual-eligible residents of long term care facilities. Instead, they improperly reduced LTC pharmacies' reimbursement by the standard Part D co-payment amount. Compl., ¶ 22. They did so despite the fact that, under the Part D statute and regulations, these beneficiaries had no cost sharing obligation. Compl., ¶¶ 19, 20.

Significantly, Defendant UHG does not deny that Plaintiffs' members have been underpaid under their respective network contracts, including their contracts with UHG's affiliates. Instead, knowing that the contracts are clear, Defendant UHG tries to wriggle out of the claim by asserting that UHG is not itself a party to any contract with Plaintiffs' members and therefore cannot be held liable for breach of contract. *See* Def. Mem. at 26-27. Notably, UHG has provided no affidavit or documentary support for its position. Rather, it has relied entirely on argument. As such, these arguments should be given no weight by this Court in its consideration of this Motion. Indeed, in considering a motion to dismiss under Rule 12(b)(6), consideration of such materials would be

inappropriate, since, as shown above, such a motion is addressed to the sufficiency of the Complaint.

Even if UHG were permitted to submit such evidentiary support, UHG's argument is untenable. UHG would have Plaintiffs' members bring myriad individual lawsuits against UHG's various subsidiaries and PDPs for reimbursement. Yet it is UHG, not its subsidiaries or PDPs, who is dictating the reimbursement policy. See Compl., ¶¶ 28-31; Baldwin Sec. Dec., ¶ 10. In such a circumstance, the absence of a direct contract with a parent corporation is not automatically fatal to an action against the parent for breach of contract. Where the behavior of the parent corporation is so intertwined with that of its subsidiary, the usual separation enjoyed by a parent and its subsidiary no longer applies. See, e.g., Penick v. Frank E. Basil, Inc. of Delaware, 579 F. Supp. 160, 165 (D.D.C. 1984) (noting that in some circumstances a corporation can be held liable for a contract made by its subsidiary). See also Scandinavian Satellite System v. Prime TV Limited, 291 F.3d 839, 846 (D.C. Cir. 2002) (explaining that a court may disregard the separate corporate forms of a parent and subsidiary to hold one accountable for the acts of the other). Plaintiffs have clearly alleged facts that, when proven, will obligate UHG to fulfill, and to cause its subsidiaries to fulfill, the responsibilities set forth in the network pharmacy contracts and subsequent CMS guidance on this issue.

In any event, the Complaint states that UHG "directly and through its subsidiaries, owns and operates" the largest PDP (and other PDPs) providing prescription drugs to tens of thousands of full benefit, dual eligible beneficiaries. Compl., ¶ 10. The Complaint alleges that Plaintiffs' discussions regarding the co-payment reimbursement issue were held with UHG representatives. Compl., ¶¶ 29, 30. See also Baldwin Sec. Dec., ¶¶ 9, 10. Plaintiffs also allege that they contacted Defendant with regard to the reimbursement of improperly assessed co-payments and that Defendant refused to provide the requested payment. Compl., ¶ 26. The Complaint details the specific contacts with regard to issues under the PDP contracts between Plaintiffs' members and

Defendant, ultimately ending with Defendant's refusal to issue payments for the cost sharing amounts to LTC pharmacies. Compl., ¶¶ 29, 30. Plaintiffs allege that it was UHG that informed Plaintiff LTCPA that UHG and at least one of its subsidiaries was intending to mail reimbursement check directly to beneficiaries. Compl., ¶ 31.[9] And the Complaint states that the network pharmacy contracts are nearly uniform in all relevant parts, and that Defendant is obligated under those contracts to reimburse LTC pharmacies for improperly withheld co-payments. Compl., ¶ 34. If UHG disputes those allegations, it can litigate those claims following discovery on the merits. It cannot, however, resolve them at this motion to dismiss stage.

It is significant that in a case that had recently been brought against Defendant UHG (not one of its subsidiaries) in the U.S. District Court for the Eastern District of Kentucky and that, after transfer, is now pending in the U.S. District Court for the Northern District of Illinois, UHG argued that it is a third-party beneficiary of a network contract with one of LTCPA's members, Omnicare, Inc., and thus had the right to enforce the forum selection clause of that contract. *See* Defendant's Reply Memorandum in *Omnicare, Inc. v. UnitedHealth Group, Inc., et al.*, 2:06-CV-00103-WOB (E.D.Ky.), Exhibit 6 to Borababy Dec., at 3. In transferring venue, the Court in that case found that "Omnicare's obligations under this Agreement – to provide certain products and services to Plan Enrollees – clearly flow to United's benefit as a Plan Sponsor." *Id.*, Memorandum Opinion and Order (E.D. Ky., November 9, 2006), Exhibit 7 to Borababy Dec., at 3. Defendant UHG cannot have it both ways, by claiming the benefit of its network pharmacy contracts yet denying any responsibility under those contracts.

The allegations of the Complaint sufficiently set forth facts that would subject Defendant UHG to liability for a breach of the contracts in question. As discussed above, a case should be

---

[9] A specific account of Plaintiff LTCPA's continued discussion of the cost sharing issues arising under network pharmacy contracts with Defendant is set forth in the Declaration of Paul Baldwin, Ex. 1 to Baldwin Sec. Dec., ¶¶ 16, 17, 19.

dismissed under FRCP 12(b)(6) only where "plaintiffs can prove no set of facts in support of their claim which would entitle them to relief." *Kowal v MCI Communications*, 16 F.3d at 1276. As the Court explained in *Satellite Broadcasting Cable, Inc. v Telefonica De Espana*, 789 F. Supp. 1089 (Dist. P.R. 1992), the

> Court is not concerned with who may ultimately bear the burden of proof, nor is it preoccupied with the evidence that must be established at trial... This Court merely determines whether, at this point in the litigation and based on the allegations in the complaint, plaintiffs are unable to establish any set of facts that may entitle them to relief.

*Id.* at 1100. In that case, the plaintiff asserted a claim against a parent corporation under a contract that was signed by the corporation's subsidiary. The plaintiff alleged that because the contract had been negotiated directly with the parent corporation, the parent's behavior was such that the Court could subject the parent corporation to the obligations of the contract. *Id.* at 1098-1100. The Court denied the defendant's motion to dismiss under Rule 12(b)(6), explaining that "where pleadings allege that all negotiations leading to a[n]... agreement are carried with a parent corporation, but the agreement is signed by a subsidiary, sufficient facts are alleged to defeat a motion to dismiss by the parent." *Id.* at 1100.

So, too, here, the Complaint alleges that Defendant UHG made the decision to withhold the amounts at issue, that UHG decided not to reimburse Plaintiffs' members, and that UHG has violated CMS guidance and the network contracts. Since Defendant UHG is clearly calling the shots in this matter, the declaratory and injunctive relief sought is most appropriately directed toward it.

**B.    The Medicare statute, CMS regulations and CMS guidance compel UHG to direct payment to LTC pharmacies that did not charge a co-payment amount and submitted data adequately demonstrating that fact.**

In addition to arguing that it was not a party to the network contracts, Defendant UHG argues that the relevant statute, regulations and guidance issued by CMS do not require it to remit the wrongfully withheld co-payments for dual eligible beneficiaries to LTC pharmacies. *See* Def.

Mem. at 22-26.  As set forth in the Complaint, however, CMS has clearly articulated that remittance of these co-payment amounts to LTC pharmacies rather than to individual beneficiaries is the necessary course of action where an LTC pharmacy has not charged the co-payment amount to the beneficiary. *See* Compl., ¶¶ 24, 25, 27.  Furthermore, additional guidance recently published by CMS reiterates that remittance of such payments to LTC pharmacies is the necessary course of action for PDPs under these circumstances.

      1.    <u>Medicare Statute and Regulations</u>

The relevant section of the Medicare statute, 42 U.S.C. § 1395w-114D-14(a)(1)(D)(i), and its implementing regulation, 42 C.F.R. § 423.782(a)(2)(ii), clearly articulate that full benefit, dual eligible beneficiaries residing in a LTC facility for at least one month should not have any cost sharing obligations under the Medicare Part D program.  Nonetheless, in violation of these provisions, Defendant UHG improperly withheld co-payment amounts for such beneficiaries' drugs from the contractual reimbursements made to Plaintiffs' members with whom it has network pharmacy contracts. Compl., ¶ 22.   Even after being informed that it had done so improperly and inappropriately, Defendant has persisted in refusing to reimburse the LTC pharmacies that, in an effort to avoid disrupting the lives of tens of thousands vulnerable Medicaid beneficiaries, had absorbed the costs of UHG's mistake.  Compl., ¶¶ 23, 24, 26, 28, 29.  Instead, despite frequent guidance from CMS, Defendant has retained the improperly-assessed co-payment amounts. Compl., ¶¶ 24-27.

      2.    <u>CMS FAQ of April 20, 2006</u>

On April 20, 2006, CMS issued a FAQ regarding the co-payment reimbursement issues. Compl., ¶ 25.  While Defendant alleges that Plaintiffs "gloss over" portions of the FAQ, *see* Def. Mem. at 25, Defendant concedes that the FAQ directs PDPs to reimburse LTC pharmacies for cost sharing amounts because "it is unlikely that LTC pharmacies have collected the applicable cost-

sharing from beneficiaries due to the expectation that the plan eventually would reimburse the pharmacy retroactively for such amounts." *Id.* Moreover, CMS states in the FAQ that plans "should work with their pharmacies to provide them with direct reimbursement for any cost sharing amount not collected from institutionalized individuals." *Id.*

Plaintiffs have sufficiently alleged that Defendant has failed to comply with the guidance provided by CMS in this FAQ. In their Complaint, Plaintiffs allege that their affected members have not collected the cost-sharing amounts from beneficiaries, that they submitted claims data to Defendant demonstrating that such amounts were not collected and that Defendant has refused to acknowledge CMS' guidance and has insisted that it intends to mail refund checks to beneficiaries. Compl., ¶¶ 22, 27, 28, 29.

3.    CMS Guidance of May 5, 2006

Like the April 20, 2006 FAQ, the guidance issued by CMS on May 5, 2006 clearly contemplates that where the LTC pharmacy has not collected cost sharing amounts from a dual eligible beneficiary, the proper course of action for a PDP is to reimburse the LTC pharmacy. As Plaintiffs describe in the Complaint, CMS provided that "plans should not automatically reimburse beneficiaries residing in LTC facilities because it is unlikely that the LTC pharmacies have billed the beneficiaries for their co-payments." Compl., ¶ 27. Rather, plans were "encouraged to reimburse LTC pharmacies when implementing retroactive subsidy level changes." *Id.* Plaintiffs allege that even after this guidance was issued and Plaintiffs' members submitted adequate documentation of claims as to which cost sharing amounts were not collected for beneficiaries, Defendant intended to issues checks to dual eligible beneficiaries and refused to reimburse LTC pharmacies, as CMS had directed. Compl., ¶¶ 28, 29.

4.    <u>CMS "Tip Sheet"</u>

Again, despite Defendant's argument to the contrary, the facts alleged by Plaintiffs clearly demonstrate that UHG failed to follow the CMS Tip Sheet of April 18, 2006 on its obligations as a Medicare PDP.  As Defendant acknowledges, the Tip Sheet stated that "pharmacies will receive a one-time payment for the amount of any uncollected co-payments for people who were mistakenly identified as having co-payment amounts." *See* Def. Mem. at 24.  In order to get this refund, CMS instructed that pharmacies "will need to submit a spreadsheet with claim information to the prescription drug plan."  The Tip Sheet also noted that "[f]ollowing the drug plan's directions may ensure timely reimbursements."  As the language indicates, LTC pharmacies were to be reimbursed for cost-sharing amounts not collected from beneficiaries once they submitted a spreadsheet with claim information to a PDP.  Yet, as Plaintiffs explain in their Complaint, Defendant refused to issue a refund to LTC pharmacies and instead planned to send the refunds directly to beneficiaries.  Compl., ¶¶ 28, 29.  Moreover, when UHG requested additional data from Plaintiffs' members and Plaintiffs' members attempted to comply, Defendant rejected the claims in their entireties, so that not only would the LTC pharmacy not be reimbursed the cost sharing amount, it would not get paid <u>at all</u>.  Compl., ¶¶ 28, 29, 30.

5.    <u>CMS Guidance of December 22, 2006</u>

Because the repayment issues related to LTC pharmacies and dual eligible coinsurance amounts remained unresolved throughout all of 2006 (and are still unresolved), CMS issued additional guidance on the matter on December 22, 2006.  *See* Exhibit 4 to Borababy Dec.  This document was published on the CMS website and was distributed via a public email listserve.  In this guidance, CMS reminded "Part D plan sponsors that they are <u>obligated</u> to reconcile any claims that may have resulted in incorrect cost sharing" for beneficiaries eligible for a low income subsidy (including dual eligible LTC residents).  *Id.* (emphasis added). In addition, CMS recognized that

"problems with cost sharing have disproportionately impacted beneficiaries who are residents of nursing homes, and for whom LTC pharmacies are holding receivable balances rather than charging beneficiaries incorrect cost sharing amounts." *Id.*

Recognizing that, in many cases, money was owed to LTC pharmacies rather than to the dual eligible beneficiaries themselves, CMS emphasized the PDPs' obligation to remit payment to these pharmacies. While noting its general policy that overpayments are refunded to beneficiaries, CMS explained that

> it is important that Part D plans be aware of the role LTC pharmacies have played with respect to cost sharing amounts overcharged to LTC residents. Many LTC pharmacies did not collect the cost sharing amounts that were incorrectly charged...Part D plans need to work with [LTC pharmacies] to ensure appropriate reconciliation of amounts owed... .[P]lan sponsors should not automatically reimburse beneficiaries for cost sharing amounts that were not collected by their LTC pharmacies. Rather, <u>plan sponsors need to work with their network pharmacies to provide them with direct reimbursement for any cost sharing amounts that were not collected from [low income subsidy]-eligible beneficiaries.</u>

*Id.* (emphasis added). Thus, once "appropriate documentation and attestations are provided to justify payment," the guidance informs PDPs that reimbursement for cost sharing overpayments should be made directly to LTC pharmacies.

Plaintiffs' Complaint alleges that UHG is improperly insisting on directly reimbursing dual eligible beneficiaries for the payment problems caused by its inaccurate assessment of co-payment amounts for dual eligible LTC residents. Compl., ¶ 6. Plaintiffs also allege that even after their members submitted to UHG detailed information on each claim for which a co-payment was not collected, UHG refused to reimburse LTC pharmacies and insisted that each claim be individually submitted for reprocessing. Compl., ¶¶ 6, 28. Plaintiffs explain that their members attempted to follow Defendant's direction but found that, rather than reprocessing a claim to correct the cost sharing amount, Defendant's PDPs rejected the claim outright, causing the entire claim to go

unpaid. Compl., ¶¶ 6, 28.   Taking all these allegations as true, which the Court should do at this stage, it is clear that Defendant's actions violate the law, CMS regulations and its policy guidance. As such, Plaintiffs have made out a sufficient claim for which injunctive and declaratory relief can be issued.

### III.    Defendant's Motion To Dismiss For Lack Of Personal Jurisdiction Should Be Denied.

Defendant UHG also seeks to avoid this Court's authority by claiming that it is not doing business in the District of Columbia and operates only as a "holding company" and only in Minnesota. *See* Def. Mem. at 21.   While admitting that it has an office in, and owns subsidiaries that operate in, the District of Columbia, UHG nonetheless argues that this Court lacks personal jurisdiction over it. *Id.*   Like Defendant's arguments regarding standing and failure to state a claim, this part of Defendant's Motion should also be denied.

Under District of Columbia law, personal jurisdiction may be of two types: "general" jurisdiction under D.C. Code § 13-334(a), or "specific" jurisdiction under D.C. Code § 13-423.[10] Broadly speaking, general jurisdiction means that a defendant may be sued in the District of Columbia whether or not the cause of action arises out of that defendant's activity in the District of Columbia. *See Gorman v. Ameritrade Holding Corp.*, 293 F.3d 506, 509 (D.C. Cir. 2002).   In contrast, specific jurisdiction requires that the cause of action arise out of certain activities that either occur in, or have effects that are felt in, the District of Columbia, as enumerated in D.C. Code § 13-423. *Id.* Here, this Court has general jurisdiction over Defendant UHG.[11]

---

[10] District of Columbia law governs the issue of personal jurisdiction. *Johnson-Tanner v. First Cash Financial Services, Inc.*, 239 F. Supp. 2d 34, 37 (D.D.C. 2003).

[11] If discovery is to be taken on the issue of personal jurisdiction, *see infra*, such discovery may disclose that this Court has specific jurisdiction over Defendant UHG as well.

A.    **This Court has general jurisdiction over Defendant UHG.**

The District of Columbia's general jurisdiction statute, Section 13-334(a) of the District of

Columbia Code, "permits courts to exercise 'general jurisdiction' over a foreign corporation as to

claims not arising from the corporation's conduct in the District, if the corporation is 'doing

business' in the District." *Gorman v. Ameritrade Holding Corp.*, 293 F.3d at 509 (citations omitted).

"[S]uch general jurisdiction over a foreign corporation is only permissible if the defendant's business

contacts with the forum district are 'continuous and systematic.'" *Id.* at 510 (citations omitted). It is

enough, however, that such "continuous and systematic" contacts be only a limited part of the

defendant's more general business. *Id.* (citations omitted).

          i.       UHG has continuous and systematic contacts with the District of
                    Columbia.

As Defendant UHG concedes in its Brief, *see* Def. Mem. at 21 n.21, UHG maintains an

office in the District of Columbia, which is located at 701 Pennsylvania Avenue, N.W. *See* Exhibit 2

to Borababy Dec. Maintenance of an office in a forum is the quintessential indicium that a foreign

entity is "doing business" within that forum for purposes of establishing personal jurisdiction.

In addition, at least one of Defendant UHG's subsidiaries, United HealthCare Services, Inc.,

a Minnesota corporation, is qualified to do business as a foreign corporation in the District of

Columbia. *See* Exhibit 8 to Borababy Dec.; Luis Dec., ¶ 3 (United HealthCare Services, Inc. is a

wholly-owned subsidiary of Defendant UHG). Another subsidiary of Defendant UHG, United

HealthCare Insurance Company, a Connecticut corporation, is party to at least one contract with

AARP Services, Inc. to provide health insurance to members of AARP. *See* Exhibits 9 and 10 to

Borababy Dec. United HealthCare Insurance Company's address for notices in that contract is

UHG's headquarters. *Compare* Exhibit 9 to Borababy Dec., § 14.5 *with* Exhibit 1 to Borababy Dec.

United HealthCare Insurance Company also provides, through its subsidiary, United HealthCare

Products, LLC, pharmacy services to AARP members. *See* Exhibit 11 to Borababy Dec.  AARP

Services, Inc. is a Delaware corporation, but it is qualified to do business in the District of

Columbia, *see* Exhibit 12 to Borababy Dec., and, according to its agreement with United HealthCare

Insurance, has its office in the District of Columbia. *See* Exhibit 10 to Borababy Dec., § 7.   And

the Agreement between United HealthCare Insurance and AARP Services provides that disputes are

to be resolved by arbitration in the District of Columbia and that the parties consent to personal

jurisdiction over them in the federal courts of the District of Columbia. *See* Exhibit 9 to Borababy

Dec., §§ 11.2 and 11.5.

Furthermore, UHG PDPs serve Medicare Part D beneficiaries in the District of Columbia,

both through AARP and under their own names. See Exhibit 3 to Borababy Dec.  Defendant UHG

admits that certain of its subsidiaries operate in the District of Columbia. *See* Luis Dec., ¶ 8.  The

UHG PDPs participate in the Medicare Part D program by virtue of contracts with CMS, which is

located in the District of Columbia and in Baltimore. *See, e.g.,* Def. Mem. at 6; Baldwin Sec. Dec.,

¶ 9.  UHG, itself and through its subsidiaries, likely participates in other Medicare-related programs

through other contracts with CMS as well. *See* Baldwin Sec. Dec., ¶ 12; Exhibit 3 to Borababy Dec.

It is highly likely that UHG's Washington, D.C.'s office is involved with such contracts. *See* Baldwin

Sec. Dec., ¶ 12.

Significantly, representatives of UHG have been negotiating with CMS in the District of

Columbia concerning the very issue at bar -- proper reimbursement to LTC pharmacies of the

wrongfully-withheld co-payments. *See* Baldwin Sec. Dec., ¶ 9.  And Plaintiff LTCPA's Executive

Director had at least one discussion with a representative of UHG from UHG's Washington, D.C.

office concerning this issue. *Id.*

In determining a motion to dismiss for lack of personal jurisdiction, " '[a]ll factual disputes

concerning jurisdiction must be resolved in favor of the plaintiffs,... and plaintiffs need only make a

*prima facie* showing of personal jurisdiction in order to defeat [a] defendant['s] motion.' ... The plaintiffs' assertions of fact are 'presumed to be true unless directly contradicted by affidavit,' or other evidence." *A GS Intern. Services S.A. v. Newmont USA Ltd.*, 346 F. Supp. 2d 64, 73 (D.D.C. 2004) (citations omitted). "[F]actual discrepancies in the record must be resolved in the plaintiff's favor." *Johnson-Tanner v. First Cash Financial Services*, 239 F. Supp. 2d at 37 (citation omitted).

Through its activities in this District, UHG has maintained sufficient systematic contact with this forum to subject it to personal jurisdiction here. Further, in an appropriate case, a court will ascribe a subsidiary's activities in the forum to its parent and find jurisdiction over the parent. This is particularly true where the parent dominates, and acts in the forum through, its subsidiary, as UHG appears to have done here. *See, e.g., Chrysler Corp. v. General Motors Corp.,* 589 F.Supp. 1182, 1203 (D.D.C. 1984).

> ii.     UHG has submitted to personal jurisdiction in this Court in at least one other matter.

Defendant's claim to be beyond the reach of this Court is also contradicted by its submission to jurisdiction in this District in at least one other case. UHG was very recently the subject of a Final Judgment entered by Judge Urbina. *See United States v. UnitedHealth Group Incorporated, et al.,* 2006 U.S. Dist. LEXIS 45938 (D.D.C., May 23, 2006), Exhibit 5 to Borababy Dec. The Complaint in that matter recited that venue was based on the fact that Defendant UHG "is a corporation that transacts business and is found in the District of Columbia." *See* Exhibit 13 to Borababy Dec., ¶ 10. There is no indication in the record of that case that UHG disputed that claim, objected to venue or claimed that this Court did not have personal jurisdiction over it. *See* Exhibit 14 to Borababy Dec. (Docket Sheet). Indeed, UHG stipulated, and the Final Judgment in that case holds, that "[t]his Court has jurisdiction over the subject matter of, <u>and each of the parties to,</u> this action." *See* Exhibits 5 and 15 to Borababy Dec. (emphasis added). Since UHG agreed before Judge Urbina that it is "a corporation that transacts business and is found in the District of Columbia" and that

personal jurisdiction and venue were proper in this District, it is truly hard to understand its argument to the contrary here.

              iii.     <u>Defendant UHG does not operate only in Minnesota.</u>

UHG has submitted nothing in support of its personal jurisdiction motion other than argument and Ms. Luis's conclusory statement that "UHG is not qualified in and does not conduct business in the District of Columbia." *See* Luis Dec., ¶ 7. Such argument and conclusory assertions are not sufficient to overcome Plaintiffs' showing. In fact, in a Fact Sheet published by Defendant UHG and available on its website, UHG states that "UnitedHealth Group operates in all 50 states and internationally." *See* Exhibit 16 to Borababy Dec. That statement belies Ms. Luis's claim that UHG operates only in Minnesota. *See* Luis Dec., ¶ 6.

Further, Defendant UHG has faced legal actions outside the State of Minnesota on numerous occasions, has been alleged to have operated in various states in which suits have been filed, and has failed to object to personal jurisdiction in at least several such cases. As stated above, UHG is a defendant in a pending civil action that was initially filed in the U.S. District Court for the Eastern District of Kentucky and, at UHG's instance, was transferred to the U.S. District Court for the Northern District of Illinois. *Omnicare, Inc. v. UnitedHealth Group, Inc., et al.*, Civil Action No. 1:06-cv-6253 (N.D. Ill.). The Amended Complaint in that action, as filed in Kentucky, asserts that "[p]ersonal jurisdiction exists over defendants by and through their general presence in Kentucky. By and through UHG, defendants maintain offices and sell products and services in Kentucky." *See* Exhibit 17 to Borababy Dec., ¶ 19. It further asserts that "UHG... operates in all 50 states." *Id*., ¶ 23. Defendant UHG successfully moved to transfer venue from Kentucky to Illinois and has moved to dismiss certain Federal antitrust claims in that action under Fed. R. Civ. P. 12(b)(6). It did not, however, move to dismiss for lack of personal jurisdiction over it in Kentucky, and has not done so in Illinois. *See* Exhibits 18 and 19 to Borababy Dec. (Docket Sheets).

Similarly, in *Dew Glassburn v. United Health Group*, Civil Action No. 4:05-cv-57, UHG was sued in the United States District Court for the Eastern District of Texas for unlawful employment practices violating Title VII, the Americans with Disabilities Act ("ADA"), and the Family Medical Leave Act. The plaintiff alleged that she was an employee of "defendant's Plano, Texas location" where the violations occurred. *See* Exhibit 20 to Borababy Dec., ¶ 3. UHG filed a partial motion to dismiss the ADA and Title VII claims as untimely, but did not contest personal jurisdiction or otherwise argue that it was not doing business in Texas. *See Dew Glassburn v. United Health Group*, 2005 WL 994755 (E.D. Tex. 2005), Exhibit 21 to Borababy Dec. These cases further serve to contradict Ms. Luis's claim that Defendant UHG operates only in Minnesota. *See* Luis Dec., ¶ 6.

> iv.    UHG's "government contacts" argument does not apply here.

As stated, Defendant UHG asserts that its District of Columbia office is only a "governmental affairs office." *See* Def. Mem. at 21 n.21. Again, that claim can be given no credence, as it is simply a bare assertion set out in its Brief, without any support in the form of documentation or affidavit testimony. Indeed, it is both telling and significant that, in her Declaration in support of Defendant's Motion, Ms. Luis fails even to mention UHG's Washington, D.C. office, much less to state that it is purely a "governmental affairs office." *See* Luis Dec. This glaring failure casts substantial doubt on Defendant's personal jurisdiction argument.

Furthermore, the "government contacts" exception to personal jurisdiction on which Defendant UHG purports to rely applies only to "a non-resident whose <u>only</u> contact with the District of Columbia is with Congress or a Federal agency." *A GS Intern. Services S.A.*, 346 F. Supp. at 79 (emphasis added) (citation omitted). Where the non-resident's contacts "involve substantial commercial relations with the federal government acting in its proprietary capacity," the exception does not apply. *Ramamurti v. Rolls-Royce Ltd.*, 454 F. Supp. 407, 411 (D.D.C. 1978), *aff'd*, 612 F. 2d

587 (D.C. Cir. 1980) (general jurisdiction found over foreign defendant based on commercial contracts with government as purchaser of products).

Defendant UHG has submitted no evidence that the only activities conducted out of its Washington, D.C. office involve non-commercial contacts with the Federal Government, and Plaintiffs believe precisely the contrary. *See* Baldwin Sec. Dec., ¶¶ 11, 12. Given the facts that various affiliates of UHG have contracts with AARP, are qualified to do business in the District and serve as Medicare Part D providers in the District, it is likely that Defendant UHG's Washington, D.C. office is used for more than simply "monitoring legislative and regulatory matters and maintaining official contacts with Congress and the executive branch," as UHG implies. *See* Def. Mem. at 21 n.21.

The "government contacts" cases cited by Defendant UHG are inapposite. In *Fandel v. Arabian American Oil Company*, 345 F.2d 87 (D.C. Cir. 1965), the defendant, a Delaware corporation, was engaged in the business of "producing, refining and selling oil and gas, all of which are done in Saudi Arabia. All deliveries by appellee are made in Saudi Arabia," except for some deliveries made in Lebanon. *Id.* at 88. The cause of action arose out of personal injuries sustained by one of the plaintiffs, a resident of California, in Saudi Arabia. *Id.* at 87. While the defendant had a governmental affairs office in Washington, the defendant conducted no business, either itself or through affiliates, and certainly had no business connected to the case, in the District of Columbia. The Court noted that "[t]his is not quite like the company whose agents in Washington are seeking contracts, either with our own Government or with other governments represented in Washington." *Id.* at 89 (citation omitted).

Similarly, in *AGS Intern. Services S.A. v. Newmont USA Ltd.*, *supra*, the defendant maintained a very small one-person government liaison and lobbying office in Washington. The case arose out of various alleged breaches of contract and other activities that took place in Peru. The plaintiffs were

residents of Peru. The Court found that the defendant's small District of Columbia office was used "solely for the purpose of maintaining relationships with the United States government and foreign embassies, not for the sale or marketing of [the defendant's] services." 346 F. Supp. 20 at 75-76 (emphasis added).

Here, Defendant UHG's contacts with the District of Columbia are far more substantial than those of the defendants in those cases, and its Washington office is likely used for more than solely maintaining government relations. UHG owns wholly-owned subsidiaries that do business in the District of Columbia, including through their contracts with Washington-based AARP. This action is directly connected with UHG's and its subsidiaries' status as PDPs under essentially private contracts with CMS. It is likely that UHG's Washington, D.C. office is used in carrying out both those contracts and the AARP contracts. And UHG's Washington office was involved in at least one discussion with LTCPA -- which is headquartered in Washington, D.C. -- involving the co-payment matters at issue in this case. Baldwin Sec. Dec., ¶ 9.

On facts similar to those here, Courts have concluded that a defendant's presence in the District of Columbia was not for the sole purpose of interacting with a government agency and have found jurisdiction appropriate. For instance, in *Chrysler Corp. v. General Motors Corp.*, *supra*, the Court found that the District of Columbia office operated by the defendant in that case was engaged in commercial activities with parties other than government agencies and that the defendant's participation in national and local private organizations through that office should not be excluded from consideration as a contact with the District. 589 F.Supp. at 1199. Similarly, in *Dooley v. United Technologies Corp.*, 786 F.Supp. 65 (D.D.C. 1992), the Court found that the activities of a defendant's District of Columbia office fell outside the bounds of the government contacts exception. First, where corporate executives visiting the District of Columbia used the office to conduct business not directly related to government agencies, the Court found that such business may not fall within the

government contacts exception. *Id.* at 75. Additionally, because the defendant carried out business with parties other than federal government agencies from its District of Columbia office, those activities could be considered as contacts with the forum for purposes of jurisdiction. *Id.* As such, the Court held that the defendant's activities were not protected by the government contacts exception and denied its motion to dismiss for lack of personal jurisdiction. *Id.* at 82. As described above, Plaintiffs have reason to believe that UHG is conducting activities outside the scope of the government contacts exception through its District of Columbia office and, therefore, has subjected itself to jurisdiction in this forum.

**b.**    **In the alternative, Plaintiffs should be allowed to take discovery on the issue of personal jurisdiction.**

If this Court is not able on the record before it to find that it has personal jurisdiction over Defendant UHG, Plaintiffs should be permitted to take discovery concerning UHG's contacts with this forum, including the activities conducted through UHG's Washington, D.C. office, UHG's involvement with the AARP contracts, UHG's involvement with contracts with CMS and its participation in the Medicare Part D program, as well as concerning any other activities conducted by UHG, itself or through its subsidiaries and agents, in the District of Columbia.

"A plaintiff faced with a motion to dismiss for lack of personal jurisdiction is entitled to reasonable discovery, lest the defendant defeat the jurisdiction of a federal court by withholding information on its contacts with the forum." *El-Fadl v. Central Bank of Jordan*, 75 F.3d 668, 676 (D.C. Cir. 1996). *See also Gorman v. Ameritrade Holding Corp.*, 293 F.3d at 510 (discovery "should be freely permitted and this is no less true when discovery is directed to personal jurisdiction."); *GTE NewMedia Services Inc. v. Bellsouth Corp.*, 199 F.3d 1343, 1351 (D.C. Cir. 2000) ("if a party demonstrates that it can supplement its jurisdictional allegations through discovery, then jurisdictional discovery is justified." (citation omitted)). "This Circuit's standard for permitting jurisdictional discovery is quite liberal.... *Diamond Chemical Co. v. Atofina Chemicals*, 268 F. Supp. 2d

1, 15 (D.D.C. 2003) (citations omitted). Indeed, as this Court has indicated, "[t]his Court finds it hard to imagine a situation where a plaintiff could not 'demonstrate[ ] that it can supplement its jurisdictional allegations through discovery.'" *Id*

Plaintiffs believe that, in light of Defendant UHG's many contacts with the District of Columbia, it will be able through discovery to shed light on the nature and extent of UHG's business in this forum and to establish that this Court has personal jurisdiction over UHG.

## CONCLUSION

WHEREFORE, for the foregoing reasons, Plaintiffs LTCPA and ASCP respectfully request that this Court deny Defendant's Motion To Dismiss Complaint, award Plaintiffs their fees, costs and expenses, and grant such other and further relief as this Court may deem just and proper.

Respectfully submitted,

_____/s/ David Farber_____
David Farber (D.C. Bar No. 415899)
PATTON BOGGS LLP
2550 M Street, N.W.
Washington, D.C. 20037
Telephone: (202) 457-6000
Facsimile: (202) 457-6315

Dated: February 21, 2007