# Declaration of George M. Borababy

## Exhibit # 9

---

# SECURITIES AND EXCHANGE COMMISSION

## WASHINGTON, D.C. 20549

---

# FORM 10-K/A-1

[X] ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934 FOR THE FISCAL YEAR ENDED DECEMBER 31, 1996

**Commission file number: 1-10864**

---

**UNITED HEALTHCARE CORPORATION**

(Exact name of registrant as specified in its charter)

| MINNESOTA<br>(State or other jurisdiction of incorporation or organization) | 41-1321939<br>(I.R.S. Employer Identification No.) |
|---|---|
| 300 OPUS CENTER<br>9900 BREN ROAD EAST<br>MINNETONKA, MINNESOTA<br>(Address of principal executive offices) | 55343<br>(Zip Code) |

Registrant's telephone number, including area code: (612) 936-1300

---

Securities registered pursuant to Section 12(b) of the Act:

| COMMON STOCK, $.01 PAR VALUE<br>(Title of each class) | NEW YORK STOCK EXCHANGE, INC.<br>(Name of each exchange on which registered) |
|---|---|

Securities registered pursuant to Section 12(g) of the Act: NONE

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. YES _X_ NO __

\+ Pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended, confidential portions of these Exhibits have been deleted and filed separately with the Securities and Exchange Commission pursuant to a request for confidential treatment.

<original-page 24 >

**AARP HEALTH INSURANCE AGREEMENT**

**BY AND AMONG**

AMERICAN ASSOCIATION OF RETIRED PERSONS,

**TRUSTEES OF THE AARP INSURANCE PLAN**

**AND**

**UNITED HEALTHCARE INSURANCE COMPANY**

**DATED AS OF FEBRUARY 26, 1997**

Pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended, confidential portions of this Exhibit have been deleted and filed separately with the Securities and Exchange Commission pursuant to a request for confidential treatment.

The omitted material in the body of this Exhibit has been replaced by three asterisks.

**TABLE OF CONTENTS**

| | | Page |
|---|---|---|
| | ARTICLE 1 | |
| | DESCRIPTION OF AGREEMENT. . . . . . . . . . . | 2 |
| 1.1 | CONTRACT DOCUMENTS . . . . . . . . . . . . . . . . . . . . . . . | 2 |
| 1.2 | ENTIRE AGREEMENT; AMENDMENT. . . . . . . . . . . . . . . . . . . | 2 |
| 1.3 | CORRELATION AND INTENT . . . . . . . . . . . . . . . . . . . . . | 2 |
| 1.4 | SCOPE OF SERVICES. . . . . . . . . . . . . . . . . . . . . . . . | 2 |
| | ARTICLE 2 | |
| | DEFINITIONS . . . . . . . . . . . . . . | 3 |
| 2.1 | AARP . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 3 |
| 2.2 | AARP MARKS . . . . . . . . . . . . . . . . . . . . . . . . . . . | 3 |
| 2.3 | AARP TRUST . . . . . . . . . . . . . . . . . . . . . . . . . . . | 3 |

2.4 AARP'S REPRESENTATIVE. . . . . . . . . . . . . . . . . . . . 3
2.5 ACTIVE LIFE RESERVES . . . . . . . . . . . . . . . . . . . . 3
2.6 ADMINISTRATIVE SERVICE FEE . . . . . . . . . . . . . . . . . 3
2.7 AMORTIZATION INTEREST RATE . . . . . . . . . . . . . . . . . 3
2.8 APPLICABLE LAWS. . . . . . . . . . . . . . . . . . . . . . . 3
2.9 ASSOCIATED AGREEMENTS. . . . . . . . . . . . . . . . . . . . 3
2.10 BASIC PERCENTAGE . . . . . . . . . . . . . . . . . . . . . 4
2.11 BUSINESS DAY . . . . . . . . . . . . . . . . . . . . . . . 4
2.12 CHANGE OF LAW. . . . . . . . . . . . . . . . . . . . . . . 4
2.13 CLAIMS DATABASES . . . . . . . . . . . . . . . . . . . . . 4
2.14 CODE . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
2.15 COMMENCEMENT DATE. . . . . . . . . . . . . . . . . . . . . 4
2.16 COMPENSATION PERCENTAGE. . . . . . . . . . . . . . . . . . 4
2.17 CONTRACT DOCUMENTS . . . . . . . . . . . . . . . . . . . . 4
2.18 CPI. . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
2.19 CPR MODEL. . . . . . . . . . . . . . . . . . . . . . . . . 5
2.20 CPR RULES. . . . . . . . . . . . . . . . . . . . . . . . . 5
2.21 DAC TAX. . . . . . . . . . . . . . . . . . . . . . . . . . 5
2.22 DATABASES. . . . . . . . . . . . . . . . . . . . . . . . . 5
2.23 DEFICIT CARRYFORWARD . . . . . . . . . . . . . . . . . . . 5
2.24 DEFICIT CARRYFORWARD ACCOUNT . . . . . . . . . . . . . . . 5
2.25 DEVELOPED MARKS. . . . . . . . . . . . . . . . . . . . . . 5
2.26 DEVELOPED SYSTEMS. . . . . . . . . . . . . . . . . . . . . 5
2.27 DISCLOSER. . . . . . . . . . . . . . . . . . . . . . . . . 5
2.28 EVENT OF FORCE MAJEURE . . . . . . . . . . . . . . . . . . 5
2.29 EXISTING PROGRAM . . . . . . . . . . . . . . . . . . . . . 5

2.30 EXPENSE INCURRED TYPE PLAN . . . . . . . . . . . . . . . . 5
2.31 FIXED OVERHEAD COSTS . . . . . . . . . . . . . . . . . . . 5
2.32 FUTURE PRODUCTS. . . . . . . . . . . . . . . . . . . . . . 5
2.33 GHIP . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
2.34 GHIP VENDORS . . . . . . . . . . . . . . . . . . . . . . . 5
2.35 GROSS UP . . . . . . . . . . . . . . . . . . . . . . . . . 6
2.36 GROWTH FACTOR. . . . . . . . . . . . . . . . . . . . . . . 6
2.37 GROWTH INCENTIVE PERCENTAGE. . . . . . . . . . . . . . . . 6
2.38 INCENTIVE PERCENTAGE . . . . . . . . . . . . . . . . . . . 6
2.39 INCURRED CLAIMS. . . . . . . . . . . . . . . . . . . . . . 6
2.40 INCURRED PREMIUM REFUNDS . . . . . . . . . . . . . . . . . 6
2.41 INCURRED TAX ITEMS . . . . . . . . . . . . . . . . . . . . 6
2.42 INDEMNITY TYPE PLAN. . . . . . . . . . . . . . . . . . . . 6
2.43 INVESTMENT INCOME CREDIT . . . . . . . . . . . . . . . . . 6
2.44 INVESTMENT INCOME CREDIT RATE. . . . . . . . . . . . . . . 6
2.45 LOSS ADJUSTMENT EXPENSE RESERVE. . . . . . . . . . . . . . 7
2.46 LOSS RATIO . . . . . . . . . . . . . . . . . . . . . . . . 7
2.47 MANAGING REPRESENTATIVE. . . . . . . . . . . . . . . . . . 7
2.48 MEMBER CONTRIBUTIONS . . . . . . . . . . . . . . . . . . . 7
2.49 MEMBER SERVICES AGREEMENT. . . . . . . . . . . . . . . . . 7
2.50 MEMBER SERVICES VENDOR . . . . . . . . . . . . . . . . . . 7
2.51 OPERATING EXPENSES . . . . . . . . . . . . . . . . . . . . 7
2.52 OPERATING PLAN . . . . . . . . . . . . . . . . . . . . . . 7
2.53 OPERATIONAL ISSUE. . . . . . . . . . . . . . . . . . . . . 7
2.54 PASS-THROUGH EXPENSES. . . . . . . . . . . . . . . . . . . 7
2.55 PERFORMANCE EXPERIENCE . . . . . . . . . . . . . . . . . . 9
2.56 POLICY YEAR. . . . . . . . . . . . . . . . . . . . . . . . 9
2.57 PROCEDURES . . . . . . . . . . . . . . . . . . . . . . . . 9
2.58 PROGRAM AGREEMENT. . . . . . . . . . . . . . . . . . . . . 9
2.59 PROGRAM ISSUE. . . . . . . . . . . . . . . . . . . . . . . 9
2.60 PROJECTED MEMBERSHIP . . . . . . . . . . . . . . . . . . . 9
2.61 PROPRIETARY INFORMATION. . . . . . . . . . . . . . . . . . 9

2.62 PROPRIETARY SYSTEMS. . . . . . . . . . . . . . . . . . . . . . 9
2.63 PRUDENTIAL . . . . . . . . . . . . . . . . . . . . . . . . . 9
2.64 PRUDENTIAL AGREEMENT . . . . . . . . . . . . . . . . . . . . 9
2.65 PRUDENTIAL'S AARP OPERATIONS . . . . . . . . . . . . . . . . 9
2.66 RECIPIENT. . . . . . . . . . . . . . . . . . . . . . . . . . 9
2.67 REINSURANCE AGREEMENT. . . . . . . . . . . . . . . . . . . . 9
2.68 RECORDS. . . . . . . . . . . . . . . . . . . . . . . . . . . 9
2.69 RELATED PLAN . . . . . . . . . . . . . . . . . . . . . . . . 9
2.70 REPRESENTATIVES. . . . . . . . . . . . . . . . . . . . . . . 9
2.71 RESOLUTION PROCEDURE . . . . . . . . . . . . . . . . . . . . 10

2.72 RETENTION. . . . . . . . . . . . . . . . . . . . . . . . . . 10
2.73 RSF. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
2.74 RSF BALANCE. . . . . . . . . . . . . . . . . . . . . . . . . 10
2.75 RSF BALANCE PERCENTAGE . . . . . . . . . . . . . . . . . . . 10
2.76 SALES AND MARKETING AGREEMENT. . . . . . . . . . . . . . . . 10
2.77 SALES AND MARKETING VENDOR . . . . . . . . . . . . . . . . . 10
2.78 SERVICE ENHANCEMENT. . . . . . . . . . . . . . . . . . . . . 10
2.79 SERVICES . . . . . . . . . . . . . . . . . . . . . . . . . . 10
2.80 SHIP . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
2.81 SHIP DATABASES . . . . . . . . . . . . . . . . . . . . . . . 10
2.82 SHIP EMPLOYEES . . . . . . . . . . . . . . . . . . . . . . . 11
2.83 SHIP GROSS PREMIUMS. . . . . . . . . . . . . . . . . . . . . 11
2.84 SHIP INSURED . . . . . . . . . . . . . . . . . . . . . . . . 11
2.85 SHIP NET PREMIUMS. . . . . . . . . . . . . . . . . . . . . . 11
2.86 SHIP PLAN. . . . . . . . . . . . . . . . . . . . . . . . . . 11
2.87 SHIP PORTFOLIO . . . . . . . . . . . . . . . . . . . . . . . 11
2.88 SHIP PRODUCTS. . . . . . . . . . . . . . . . . . . . . . . . 11
2.89 START-UP COSTS . . . . . . . . . . . . . . . . . . . . . . . 11
2.90 TARGET AARP ALLOWANCE. . . . . . . . . . . . . . . . . . . . 12
2.91 TARGET INCURRED CLAIMS . . . . . . . . . . . . . . . . . . . 12
2.92 TARGET LOSS RATIO. . . . . . . . . . . . . . . . . . . . . . 12
2.93 TARGET MEMBER CONTRIBUTIONS. . . . . . . . . . . . . . . . . 12
2.94 TARGET PREMIUM REFUNDS . . . . . . . . . . . . . . . . . . . 12
2.95 TARGET RETENTION . . . . . . . . . . . . . . . . . . . . . . 12
2.96 TARGET RSF FUNDING . . . . . . . . . . . . . . . . . . . . . 12
2.97 TAX BASE . . . . . . . . . . . . . . . . . . . . . . . . . . 12
2.98 TAX BENEFIT. . . . . . . . . . . . . . . . . . . . . . . . . 12
2.99 TAX REIMBURSEMENT. . . . . . . . . . . . . . . . . . . . . . 12
2.100 TAX RETURN . . . . . . . . . . . . . . . . . . . . . . . . . 12
2.101 TAX TIMING EXPENSES. . . . . . . . . . . . . . . . . . . . . 12
2.102 TAXES. . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
2.103 TERMINATION COSTS. . . . . . . . . . . . . . . . . . . . . . 13
2.104 TRANSFER AGREEMENT . . . . . . . . . . . . . . . . . . . . . 14
2.105 TRANSFERRED ASSETS . . . . . . . . . . . . . . . . . . . . . 14
2.106 TRANSFERRED ASSETS GROSS UP. . . . . . . . . . . . . . . . . 14
2.107 TRANSFERRED EQUIPMENT. . . . . . . . . . . . . . . . . . . . 14
2.108 TRANSFERRED EMPLOYEES. . . . . . . . . . . . . . . . . . . . 14
2.109 TRUE-UP INTEREST RATE. . . . . . . . . . . . . . . . . . . . 14
2.110 UNITED . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
2.111 UNITED'S AARP OPERATIONS . . . . . . . . . . . . . . . . . . 14
2.112 UNITED'S MARKS . . . . . . . . . . . . . . . . . . . . . . . 14
2.113 UNITED'S REPRESENTATIVE. . . . . . . . . . . . . . . . . . . 14

2.114 UNITED'S TAX RATE. . . . . . . . . . . . . . . . . . . . . . 14
2.115 VENDOR OPERATING EXPENSES. . . . . . . . . . . . . . . . . . 15
2.116 VENDOR PASS-THROUGH EXPENSES . . . . . . . . . . . . . . . . 15

ARTICLE 3
RESPONSIBILITIES OF UNITED . . . . . . . . . . 15
3.1 SERVICES PRIOR TO THE COMMENCEMENT DATE. . . . . . . . . . . . 15
3.1.1 DESIGNATION OF UNITED'S REPRESENTATIVE . . . . . . . . . 15
3.1.2 PROCEDURES . . . . . . . . . . . . . . . . . . . . . . . 16

3.1.3 DEDICATED STAFF. . . . . . . . . . . . . . . . . . . . . . 16
3.1.4 ACCEPTANCE AND ENHANCEMENT OF SYSTEMS AND DATABASES, ETC. . . . . . . . . . . . . . . . . . . . . . . . . . 18
3.1.5 ACCEPTANCE TESTING . . . . . . . . . . . . . . . . . . . 18
3.1.6 EQUIPMENT AND SUPPLIES . . . . . . . . . . . . . . . . 18
3.1.7 PRUDENTIAL AGREEMENTS. . . . . . . . . . . . . . . . . 18
3.1.8 TRANSFER OF EXISTING BUSINESS. . . . . . . . . . . . . 19
3.2 SERVICES AFTER THE COMMENCEMENT DATE.. . . . . . . . . . . . 20
3.2.1 COMPLETION AND CONTINUATION OF INITIAL SERVICES. . . . 20
3.2.2 UNDERWRITING OF SHIP . . . . . . . . . . . . . . . . . 20
3.2.3 PRODUCT DEVELOPMENT. . . . . . . . . . . . . . . . . . 21
3.2.4 FUTURE PRODUCTS. . . . . . . . . . . . . . . . . . . . 22
3.2.5 SERVICE STANDARDS. . . . . . . . . . . . . . . . . . . 22
3.2.6 OPERATING PLAN . . . . . . . . . . . . . . . . . . . . 23
3.2.7 FINANCIAL BOOKS AND RECORDS. . . . . . . . . . . . . . 23
3.2.8 REPORTS. . . . . . . . . . . . . . . . . . . . . . . . 24
3.2.9 AUDITS AND INSPECTION. . . . . . . . . . . . . . . . . 24
3.3 MEMBER CONTRIBUTION RATE ADJUSTMENTS . . . . . . . . . . . . . 25
3.3.1 PROJECTED MEMBERSHIP; TARGET AARP ALLOWANCE. . . . . . 25
3.3.2 TARGET OPERATING EXPENSES. . . . . . . . . . . . . . . 25
3.3.3 TARGET INCURRED CLAIMS . . . . . . . . . . . . . . . . 26
3.3.4 TARGET PREMIUM REFUNDS . . . . . . . . . . . . . . . . 26
3.3.5 TARGET RSF FUNDING . . . . . . . . . . . . . . . . . . 27
3.3.6 TARGET RETENTION . . . . . . . . . . . . . . . . . . . 27
3.3.7 DETERMINATION OF MEMBER CONTRIBUTION RATES . . . . . . 27
3.3.8 RATE APPROVAL AND IMPLEMENTATION . . . . . . . . . . . 28
3.3.9 SPECIFICATION OF TARGET LOSS RATIO . . . . . . . . . . 28
3.3.10 STATE MANDATED RATE ADJUSTMENTS. . . . . . . . . . . . 29
3.4 COMPLIANCE WITH LAW. . . . . . . . . . . . . . . . . . . . . . 29
3.4.1 GENERAL. . . . . . . . . . . . . . . . . . . . . . . . 29
3.4.2 NOTICE . . . . . . . . . . . . . . . . . . . . . . . . 29
3.5 SALE OF ASSETS; SUBCONTRACTS, ETC. . . . . . . . . . . . . . . 29
3.5.1 ASSET SALES. . . . . . . . . . . . . . . . . . . . . . 29

3.5.2 SUBCONTRACTS . . . . . . . . . . . . . . . . . . . . . 29
3.6 TAXES . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
3.6.1 GENERAL. . . . . . . . . . . . . . . . . . . . . . . . 30
3.6.2 TAX REIMBURSEMENT. . . . . . . . . . . . . . . . . . . 30
3.6.3 TAX BENEFIT FROM DEPRECIATION AND AMORTIZATION . . . . 31
3.6.4 TAX EFFECT OF DISPOSAL OF TRANSFERRED ASSETS . . . . . 31
3.7 EXCLUSIVITY. . . . . . . . . . . . . . . . . . . . . . . . . . 31
3.8 CONFLICTING APPROVALS. . . . . . . . . . . . . . . . . . . . . 31
3.9 AARP EVALUATIONS . . . . . . . . . . . . . . . . . . . . . . . 32
3.10 CESSATION OF BUSINESS. . . . . . . . . . . . . . . . . . . . . 32
3.10.1 GENERAL . . . . . . . . . . . . . . . . . . . . . . . . 32
3.10.2 PROCEDURE . . . . . . . . . . . . . . . . . . . . . . . 32
3.11 RELATED PLANS. . . . . . . . . . . . . . . . . . . . . . . . . 32

ARTICLE 4

RESPONSIBILITIES OF AARP AND AARP TRUST . . . . . . 33
4.1 AARP'S REPRESENTATIVE. . . . . . . . . . . . . . . . . . . . . 33
4.2 GRANT OF RIGHT TO USE AARP MARKS . . . . . . . . . . . . . . . 33
4.2.1 GRANT. . . . . . . . . . . . . . . . . . . . . . . . . 33
4.2.2 NOTATIONS. . . . . . . . . . . . . . . . . . . . . . . 33
4.2.3 APPROVAL RIGHTS. . . . . . . . . . . . . . . . . . . . 33
4.2.4 OWNERSHIP OF MARKS . . . . . . . . . . . . . . . . . . 34
4.2.5 PROTECTION OF AARP MARKS . . . . . . . . . . . . . . . 34
4.2.6 INFRINGEMENTS. . . . . . . . . . . . . . . . . . . . . 34
4.3 EQUIPMENT TRANSFER . . . . . . . . . . . . . . . . . . . . . . 34
4.4 DATABASE AND SYSTEMS TRANSFER. . . . . . . . . . . . . . . . . 34
4.5 EMPLOYEE HIRE. . . . . . . . . . . . . . . . . . . . . . . . . 34
4.6 OTHER ASSETS AND INFORMATION . . . . . . . . . . . . . . . . . 35
4.7 PRUDENTIAL AGREEMENTS. . . . . . . . . . . . . . . . . . . . . 35
4.8 COOPERATION OF THIRD PARTIES . . . . . . . . . . . . . . . . . 35
4.9 OVERSIGHT. . . . . . . . . . . . . . . . . . . . . . . . . . . 35
4.10 AARP EVALUATIONS . . . . . . . . . . . . . . . . . . . . . . . 35

4.11 OTHER PROGRAMS . . . . . . . . . . . . . . . . . . . . . . . . 35
4.12 INSPECTION . . . . . . . . . . . . . . . . . . . . . . . . . . 35

ARTICLE 5
REPRESENTATIONS AND WARRANTIES . . . . . . 36
5.1 REPRESENTATIONS AND WARRANTIES OF UNITED . . . . . . . . . . . 36
5.1.1 ORGANIZATION AND OUTSTANDING . . . . . . . . . . . . . 36
5.1.2 AUTHORIZATION. . . . . . . . . . . . . . . . . . . . 36
5.1.3 CONSENTS AND APPROVALS . . . . . . . . . . . . . . . 36
5.1.4 ACTIONS PENDING. . . . . . . . . . . . . . . . . . . 36

5.1.5 NO CONFLICT OR VIOLATION . . . . . . . . . . . . . . 36
5.1.6 LICENSES AND PERMITS . . . . . . . . . . . . . . . . 37
5.1.7 COMPLIANCE WITH LAWS . . . . . . . . . . . . . . . . 37
5.1.8 DISCLOSURE . . . . . . . . . . . . . . . . . . . . . 38
5.1.9 FINANCIAL CONDITION. . . . . . . . . . . . . . . . . 38
5.2 REPRESENTATIONS AND WARRANTIES OF AARP AND AARP TRUST. . . . . 38
5.2.1 ORGANIZATION AND STANDING. . . . . . . . . . . . . . 38
5.2.2 AUTHORIZATION. . . . . . . . . . . . . . . . . . . . 38
5.2.3 CONSENTS AND APPROVALS . . . . . . . . . . . . . . . 39
5.2.4 ACTIONS PENDING. . . . . . . . . . . . . . . . . . . 39
5.2.5 NO CONFLICT OR VIOLATION . . . . . . . . . . . . . . 39
5.2.6 COMPLIANCE WITH LAWS . . . . . . . . . . . . . . . . 40
5.2.7 FINANCIAL CONDITION. . . . . . . . . . . . . . . . . 40
5.3 SURVIVAL OF REPRESENTATIONS AND WARRANTIES . . . . . . . . . . 40

ARTICLE 6
ALLOWANCES AND COMPENSATION . . . . . . . . . 40
6.1 AARP ALLOWANCE . . . . . . . . . . . . . . . . . . . . . . . . 40
6.2 UNITED ADMINISTRATION CHARGES. . . . . . . . . . . . . . . . . 40
6.2.1 ADMINISTRATIVE SERVICE FEE . . . . . . . . . . . . . 40
6.2.2 CHANGES IN ADMINISTRATIVE SERVICE FEE. . . . . . . . 41
6.2.3 PASS-THROUGH EXPENSES. . . . . . . . . . . . . . . . 42
6.2.4 START-UP COSTS . . . . . . . . . . . . . . . . . . . 42
6.2.5 PERFORMANCE CHARGES. . . . . . . . . . . . . . . . . 42
6.3 UNITED RISK AND PROFIT CHARGES . . . . . . . . . . . . . . . . 43
6.3.1 BASIC PERCENTAGE . . . . . . . . . . . . . . . . . . 43
6.3.2 INCENTIVE PERCENTAGE . . . . . . . . . . . . . . . . 44
6.3.3 TAX CHANGES. . . . . . . . . . . . . . . . . . . . . 45
6.4 INVESTMENT INCOME CREDITS. . . . . . . . . . . . . . . . . . . 45
6.4.1 SHIP PORTFOLIO . . . . . . . . . . . . . . . . . . . 45
6.4.2 CASH TRANSFERS . . . . . . . . . . . . . . . . . . . 45
6.4.3 INVESTMENT INCOME CREDIT CALCULATION . . . . . . . . 46
6.4.4 INVESTMENT INCOME CREDIT RATE. . . . . . . . . . . . 46
6.4.5 INVESTMENT STRATEGY. . . . . . . . . . . . . . . . . 47
6.4.6 INVESTMENT MANAGER . . . . . . . . . . . . . . . . . 47
6.4.7 INVESTMENT PERFORMANCE; OWNERSHIP. . . . . . . . . . 47
6.5 TAX-TIMING EXPENSE . . . . . . . . . . . . . . . . . . . . . . 47
6.6 TAX REIMBURSEMENT. . . . . . . . . . . . . . . . . . . . . . . 47
6.6.1 IN ORDINARY COURSE . . . . . . . . . . . . . . . . . 47
6.6.2 AUDIT ADJUSTMENTS. . . . . . . . . . . . . . . . . . 48
6.6.3 GROSS UP . . . . . . . . . . . . . . . . . . . . . . 48
6.6.4 VALUATION OF TRANSFERRED ASSETS. . . . . . . . . . . 48

6.6.5 UPON TERMINATION . . . . . . . . . . . . . . . . . . 48
6.7 PAYMENT OF ALLOWANCES AND COMPENSATION . . . . . . . . . . . . 49
6.8 REGULATORY IMPACT. . . . . . . . . . . . . . . . . . . . . . . 49
6.9 OWNERSHIP OF FUNDS . . . . . . . . . . . . . . . . . . . . . . 49

ARTICLE 7
PROPERTY RIGHTS IN AND CONFIDENTIALITY OF INFORMATION. . . 49

7.1 MEMBER INFORMATION . . . . . . . . . . . . . . . . . . . . . . . 49
7.1.1 CLAIMS DATABASES . . . . . . . . . . . . . . . . . . . . 49
7.1.2 OTHER INFORMATION. . . . . . . . . . . . . . . . . . . . 49
7.2 MEMBER COMMUNICATIONS. . . . . . . . . . . . . . . . . . . . . 50
7.2.1 AARP OWNERSHIP.. . . . . . . . . . . . . . . . . . . . 50
7.2.2 AARP APPROVAL. . . . . . . . . . . . . . . . . . . . . 50
7.3 RETURN UPON TERMINATION. . . . . . . . . . . . . . . . . . . . 50
7.4 UNITED MARKS AND MARKS DEVELOPED FOR THE SHIP. . . . . . . . . 51
7.4.1 UNITED MARKS . . . . . . . . . . . . . . . . . . . . . 51
7.4.2 DEVELOPED MARKS. . . . . . . . . . . . . . . . . . . . 51
7.5 SECURITY ARRANGEMENTS. . . . . . . . . . . . . . . . . . . . . 52
7.6 PROPRIETARY INFORMATION. . . . . . . . . . . . . . . . . . . . 52
7.6.1 PROPRIETARY INFORMATION. . . . . . . . . . . . . . . . 52
7.6.2 COVENANTS. . . . . . . . . . . . . . . . . . . . . . . 53
7.7 PROPRIETARY AND DEVELOPED SYSTEMS. . . . . . . . . . . . . . . 54
7.7.1 PROPRIETARY SYSTEMS. . . . . . . . . . . . . . . . . . . . . . 54
7.7.2 DEVELOPED SYSTEMS. . . . . . . . . . . . . . . . . . . . . . . 54

ARTICLE 8
RESERVE REQUIREMENTS;
RATE STABILIZATION FUND . . . . . . . . . . 55
8.1 PURPOSE OF RESERVES. . . . . . . . . . . . . . . . . . . . . . 55
8.2 RATE STABILIZATION FUND. . . . . . . . . . . . . . . . . . . . 55
8.3 EXPERIENCE RATING. . . . . . . . . . . . . . . . . . . . . . . 55
8.3.1 EXPERIENCE RATING DEFICIT. . . . . . . . . . . . . . . 55
8.3.2 EXPERIENCE RATING GAIN . . . . . . . . . . . . . . . . 56
8.4 MONTHLY REVIEW AND INTERIM ADJUSTMENT. . . . . . . . . . . . . 56
8.5 ANNUAL REVIEW AND RECONCILIATION . . . . . . . . . . . . . . . 56
8.6 DISPOSITION UPON TERMINATION . . . . . . . . . . . . . . . . . 56

ARTICLE 9
INTERACTION WITH OTHER GHIP VENDORS . . . . . . . 56
9.1 GENERAL. . . . . . . . . . . . . . . . . . . . . . . . . . . . 56
9.2 MEMBER SERVICES VENDOR . . . . . . . . . . . . . . . . . . . . 57
9.2.1 RESPONSIBILITIES . . . . . . . . . . . . . . . . . . . 57

9.2.2 AGREEMENT. . . . . . . . . . . . . . . . . . . . . . . 57
9.3 SALES AND MARKETING VENDOR . . . . . . . . . . . . . . . . . . 57
9.3.1 RESPONSIBILITIES . . . . . . . . . . . . . . . . . . . 57
9.3.2 AGREEMENT. . . . . . . . . . . . . . . . . . . . . . . 58
9.3.3 AARP APPROVAL RIGHTS . . . . . . . . . . . . . . . . . 58
9.4 VENDOR INTERACTION . . . . . . . . . . . . . . . . . . . . . . 58
9.4.1 DEFAULTS BY OTHER GHIP VENDORS . . . . . . . . . . . . 58
9.4.2 ACCESS TO INFORMATION. . . . . . . . . . . . . . . . . 59
9.5 GOVERNANCE OF INTERVENDOR DISPUTES . . . . . . . . . . . . . . 59
9.5.1 GENERAL. . . . . . . . . . . . . . . . . . . . . . . . 59
9.5.2 VENDOR REPRESENTATIVES . . . . . . . . . . . . . . . . 59
9.5.3 INFORMAL DISPUTE RESOLUTION. . . . . . . . . . . . . . 60
9.5.4 MEDIATION. . . . . . . . . . . . . . . . . . . . . . . 60
9.5.5 ARBITRATION. . . . . . . . . . . . . . . . . . . . . . 61
9.5.6 MISCELLANEOUS. . . . . . . . . . . . . . . . . . . . . 63
9.6 TERMINATION OF OTHER GHIP VENDORS. . . . . . . . . . . . . . . 63
9.7 COMPENSATION OF OTHER GHIP VENDORS . . . . . . . . . . . . . . 63
9.7.1 VENDOR OPERATING EXPENSES. . . . . . . . . . . . . . . 63
9.7.2 VENDOR PASS-THROUGH EXPENSES . . . . . . . . . . . . . 63

ARTICLE 10
TERM AND TERMINATION. . . . . . . . . . . 64
10.1 TERM . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64
10.2 TERMINATION. . . . . . . . . . . . . . . . . . . . . . . . . 64
10.3 NOTICES AND EFFORTS TO CURE. . . . . . . . . . . . . . . . . 66
10.4 TERMINATION WITH SUCCESSOR CARRIER . . . . . . . . . . . . . 66
10.4.1 TRANSFER OF SHIP PLANS . . . . . . . . . . . . . . . . 66
10.4.2 CLAIMS LIABILITY . . . . . . . . . . . . . . . . . . . 66

10.4.3 TRANSFER OF RESERVES . . . . . . . . . . . . . . . . . . 67
10.4.3.1 TRANSFER OF RESERVES . . . . . . . . . . . . 67
10.4.3.2 PROVISIONAL SETTLEMENT . . . . . . . . . . . 67
10.4.3.3 FINAL SETTLEMENT . . . . . . . . . . . . . . 67
10.4.3.4 UNSCHEDULED TERMINATION. . . . . . . . . . . 68
10.4.3.5 VENDOR EXPENSES. . . . . . . . . . . . . . . 69
10.4.3.6 BENEFITS EXPECTATION . . . . . . . . . . . . 69
10.4.3.7 REQUIRED RSF BALANCE . . . . . . . . . . . . 69
10.4.4 PERMITTED PARTIAL TRANSFERS. . . . . . . . . . . . . . . 70
10.4.5 TRANSFER OF DATABASES. . . . . . . . . . . . . . . . . . 70
10.4.6 TRANSFER OF APPLICATIONS SYSTEMS . . . . . . . . . . . 70
10.4.7 TRANSFER OF DEVELOPED SYSTEMS. . . . . . . . . . . . . 70
10.4.8 OBLIGATIONS OF UNITED PRIOR TO TERMINATION . . . . . . 71
10.4.9 COOPERATION. . . . . . . . . . . . . . . . . . . . . . . 71

10.4.10 REMOVAL OF CERTAIN UNITED MARKS. . . . . . . . . . . . 71
10.5 TERMINATION WITHOUT SUCCESSOR CARRIER. . . . . . . . . . . . . 71
10.5.1 RSF BALANCE. . . . . . . . . . . . . . . . . . . . . . . 72
10.5.2 PAYMENT. . . . . . . . . . . . . . . . . . . . . . . . . 72
10.5.3 RATE ACTIVITY. . . . . . . . . . . . . . . . . . . . . . 72
10.5.4 SALE PROHIBITED. . . . . . . . . . . . . . . . . . . . . 72
10.5.5 PROVISIONAL AND FINAL SETTLEMENT . . . . . . . . . . . 72
10.6 RIGHTS AND OBLIGATIONS OF PARTIES UPON TERMINATION . . . . . . 73
10.6.1 TERMINATION COSTS. . . . . . . . . . . . . . . . . . . . 73
10.6.2 POST-TERMINATION REPORTS . . . . . . . . . . . . . . . 73
10.6.3 DISPOSITION OF EMPLOYEES . . . . . . . . . . . . . . . 73

ARTICLE 11
DISPUTE RESOLUTION . . . . . . . . . . . . 73
11.1 INFORMAL PROCEDURES. . . . . . . . . . . . . . . . . . . . . . 73
11.2 FORMAL PROCEDURES. . . . . . . . . . . . . . . . . . . . . . . 74
11.2.1 MEDIATION. . . . . . . . . . . . . . . . . . . . . . . . 74
11.2.2 ARBITRATION. . . . . . . . . . . . . . . . . . . . . . . 74
11.3 COSTS AND FEES . . . . . . . . . . . . . . . . . . . . . . . . 75
11.4 SPECIFIC PERFORMANCE . . . . . . . . . . . . . . . . . . . . . 75
11.5 JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . . 75
11.6 LIABILITY LIMITATION . . . . . . . . . . . . . . . . . . . . . 75

ARTICLE 12
RELATIONSHIP OF THE PARTIES . . . . . . . . . . 75
12.1 INDEPENDENT CONTRACTORS. . . . . . . . . . . . . . . . . . . . 75
12.2 NOT LEGAL REPRESENTATIVES. . . . . . . . . . . . . . . . . . . 76
12.2.1 UNITED. . . . . . . . . . . . . . . . . . . . . . . . . . 76
12.2.2 AARP AND AARP TRUST . . . . . . . . . . . . . . . . . . . 76

ARTICLE 13
INDEMNIFICATION . . . . . . . . . . . . . 76
13.1 INDEMNIFICATION BY UNITED. . . . . . . . . . . . . . . . . . . 76
13.2 INDEMNIFICATION BY AARP. . . . . . . . . . . . . . . . . . . . 77
13.3 NOTICE; DEFENSE OF CLAIM . . . . . . . . . . . . . . . . . . . 77
13.4 FAILURE TO DEFEND ACTION . . . . . . . . . . . . . . . . . . . 78
13.5 SURVIVAL OF INDEMNITIES. . . . . . . . . . . . . . . . . . . . 78
13.6 INSURANCE. . . . . . . . . . . . . . . . . . . . . . . . . . . 78

ARTICLE 14
GENERAL PROVISIONS . . . . . . . . . . . . 79
14.1 FORCE MAJEURE. . . . . . . . . . . . . . . . . . . . . . . . . 79
14.1.1 EVENTS . . . . . . . . . . . . . . . . . . . . . . . . . 79
14.1.2 NOTICE AND CURE. . . . . . . . . . . . . . . . . . . . . 79
14.1.3 TERMINATION. . . . . . . . . . . . . . . . . . . . . . . 80
14.2 FURTHER ASSURANCES . . . . . . . . . . . . . . . . . . . . . . 80

14.3 NO THIRD PARTY BENEFICIARIES . . . . . . . . . . . . . . . . . . 80
14.4 GOVERNING LAW. . . . . . . . . . . . . . . . . . . . . . . . 80
14.5 NOTICES. . . . . . . . . . . . . . . . . . . . . . . . . . . 80
14.6 NO WAIVER, ETC.. . . . . . . . . . . . . . . . . . . . . . . 81
14.7 AMENDMENT. . . . . . . . . . . . . . . . . . . . . . . . . . 82
14.7.1 GENERAL. . . . . . . . . . . . . . . . . . . . . . . 82
14.7.2 ANCILLARY AGREEMENTS . . . . . . . . . . . . . . . . . 82
14.7.3 RENEGOTIATION. . . . . . . . . . . . . . . . . . . . 82
14.7.4 CONFLICTS AMONG AGREEMENTS . . . . . . . . . . . . . . 82
14.8 EXPERIENCE/RESERVE ACCOUNTING. . . . . . . . . . . . . . . . 82
14.9 HEADINGS . . . . . . . . . . . . . . . . . . . . . . . . . . 82
14.10 BINDING EFFECT . . . . . . . . . . . . . . . . . . . . . . . 82
14.11 ASSIGNMENT . . . . . . . . . . . . . . . . . . . . . . . . . 82
14.12 COUNTERPARTS . . . . . . . . . . . . . . . . . . . . . . . . 83
14.13 CERTAIN CALCULATIONS . . . . . . . . . . . . . . . . . . . . 83
14.14 ACKNOWLEDGEMENT. . . . . . . . . . . . . . . . . . . . . . . 83
14.15 RELATED PLANS. . . . . . . . . . . . . . . . . . . . . . . . 83

## AARP HEALTH INSURANCE AGREEMENT

This AARP HEALTH INSURANCE AGREEMENT (this "Agreement") dated as of February 26, 1997, by and among the American Association of Retired Persons, a District of Columbia not-for-profit corporation ("AARP"), the Trustees of the AARP Insurance Plan ("AARP Trust," as hereinafter more fully defined), and United HealthCare Insurance Company, a Connecticut stock insurance company ("United").

W I T N E S S E T H:

WHEREAS, AARP is a nonprofit, nonpartisan membership corporation for persons of age 50 and over whose goals include the advancement of the education, well-being and social welfare of its members and older persons generally;

WHEREAS, AARP, through extensive research, has determined that the social welfare of its members will benefit from access to a group health insurance program (the "GHIP," as hereinafter more fully defined) sponsored by AARP and provided by independent insurers and other contractors;

WHEREAS, AARP is the sole and exclusive owner of all proprietary and other property rights and interest in the name, acronym and symbol "AARP" under which services to its membership are known and identified;

WHEREAS, AARP and its independent consultants have determined that United is qualified to offer the health insurance program component of the GHIP comprised of group Medicare supplement, hospital indemnity and certain other medical insurance coverages and other products as agreed to by the parties (the "SHIP," as hereinafter more fully defined) and certain related services described herein (the "Services," as hereinafter more fully defined) to participants in the GHIP and other AARP members; and

WHEREAS, United desires to offer the SHIP and related Services to participants in the GHIP and other AARP members;

NOW, THEREFORE, in consideration of the premises and the material representations, warranties, conditions, covenants and agreements herein contained and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

## ARTICLE 1
## DESCRIPTION OF AGREEMENT

1.1 CONTRACT DOCUMENTS. As used herein, "Contract Documents" means this Agreement, written modifications of this Agreement and the following exhibits and schedules, which are attached hereto and are specifically made a part of this Agreement:

| | | |
|---|---|---|
| Exhibit 2.90 | - | United's Start-Up Personnel |
| Exhibit 3.1.3(a) | - | Dedicated United Personnel |
| Exhibit 3.1.5 | - | Software Acceptance Test Standards |
| Exhibit 3.2.4 | - | Future Products |
| Exhibit 3.2.5 | - | Administrative Services Performance Standards |
| Exhibit 3.2.8(a) | - | Reporting Standards |
| Exhibit 4.2.1 | - | AARP Marks |
| Exhibit 5.1 | - | United Disclosure Schedule |
| Exhibit 5.1.9 | - | Agency Ratings of United |
| Exhibit 5.2 | - | AARP/AARP Trust Disclosure Schedule |
| Exhibit 6.2.1(b) | - | Analysis for Administrative Functions |
| Exhibit 6.5 | - | Tax Timing Expense |
| Exhibit 7.4.2 | - | Developed Marks |
| Exhibit 7.7.2 | - | Developed Systems |
| Exhibit 9.5.2 | - | Vendor Managing Representatives |

1.2 ENTIRE AGREEMENT; AMENDMENT. The Contract Documents collectively set forth the full and complete understanding of the parties with respect to the subject matter thereof, and supersede any and all negotiations, agreements or representations made or dated prior thereto. Each of the Contract Documents may only be amended by written instruments executed by each party to such Contract Document.

1.3 CORRELATION AND INTENT. It is the intent of the Contract Documents that United undertake to provide the SHIP and the Services. If there is any inconsistency among this Agreement and the Exhibits hereto, the terms of this Agreement, as and if amended, shall govern.

1.4 SCOPE OF SERVICES. The description of the SHIP and the Services set forth herein and in the Exhibits hereto is not intended to list every element and detail to be provided by United, AARP and AARP Trust. If necessary, United, AARP and AARP Trust shall propose and implement modifications to the Contract Documents as are reasonably necessary to reflect additional elements and details.

**ARTICLE 2**
**DEFINITIONS**

Words and abbreviations that have well-known technical or trade meanings are used in the Contract Documents in accordance with such recognized meanings. The following terms are used in the Contract Documents with the following respective meanings.

2.1 AARP has the meaning set forth in the first paragraph of this Agreement.

2.2 AARP MARKS has the meaning set forth in Section 4.2.1 hereof.

2.3 AARP TRUST means the trust created and existing under the laws of the District of Columbia pursuant to that certain Restatement of Agreement and Declaration of Trust dated as of February, 1980 among AARP and the several trustees named therein, as amended.

2.4 AARP'S REPRESENTATIVE means the person designated by AARP and AARP Trust from time to time in accordance with Section 4.1 hereof.

2.5 ACTIVE LIFE RESERVES means, for any SHIP Plan, the reserves established to cover the excess in the value of future benefits and expenses over the value of future premiums.

2.6 ADMINISTRATIVE SERVICE FEE has the meaning set forth in Section 6.2.1(a) hereof.

2.7 AMORTIZATION INTEREST RATE means the yield on the three-year Treasury securities at constant maturity, as published in Federal Reserve Statistical Release H.15 (or any successor publication), for the month in which an expense would have been charged in the absence of amortization, plus fifty hundredths of one percent. The rate so defined is a semiannually compounded rate that will be converted to an effective annual rate for the purpose of any calculation.

following the termination of this Agreement. A provisional settlement shall be made by making the requisite calculations under Article 8 hereof for the last Policy Year of this Agreement (or any extension thereof) within six months after the end of such Policy Year, and completing the RSF credit or withdrawal, as the case may be, resulting therefrom. Within 18 months

<original-page 72 >

following the termination of this Agreement, appropriate adjustments shall be made to the RSF and a final settlement made for the last Policy Year of this Agreement (or any extension hereof).

10.6 RIGHTS AND OBLIGATIONS OF PARTIES UPON TERMINATION. Upon the termination of this Agreement for any reason, the parties shall have the rights and obligations set forth in this Section 10.6.

10.6.1 TERMINATION COSTS. United shall be entitled to recover its Termination Costs as part of the final settlement pursuant to Section 10.6.2 hereof; provided, however, that United shall not be entitled to recover its Termination Costs (other than any losses realized on liquidation of the SHIP Portfolio and any Taxes payable by United with regard to the SHIP in respect of the period ending upon the termination date of this Agreement) if AARP or AARP Trust terminates this Agreement as a result of a breach by United of its obligations hereunder and an arbitrator confirms that such termination was permitted by this Agreement except to the extent that such Costs exceed (***).

10.6.2 POST-TERMINATION REPORTS. Until United has delivered the final accounting required pursuant to Section 10.6.2 hereof, completed the processing and disposition of all claims for which United retains liability following the date of termination and paid all amounts due to AARP pursuant to Section 10.5.2 hereof, United shall continue to provide all of the reports that would be required to be provided pursuant to Section 3.2.8 hereof, and AARP and AARP Trust shall continue to have the audit and inspection rights accorded thereto pursuant to Section 3.2.9 hereof, as if such termination had not occurred.

10.6.3 DISPOSITION OF EMPLOYEES. United shall be compensated for all employment related expenses arising from the termination of this Agreement and the termination of United's employees engaged primarily in its AARP operations, including but not limited to COBRA, long term disability, short term disability and severance; provided, however, that United shall not be entitled to receive any compensation in respect of any United employee who is offered employment by any successor employer.

## ARTICLE 11
## DISPUTE RESOLUTION

11.1 INFORMAL PROCEDURES. United shall follow the procedure described in this Section 11.1 (the "Resolution Procedure") to remedy any material failure by United to meet applicable standards set forth in the Contract Documents or to remedy the objections of AARP or

*** Denotes confidential information that has been omitted from the exhibit and filed separately accompanied by a confidential treatment request with the SEC pursuant to Rule 24b-2 of the Exchange Act.

<original-page 73 >

AARP Trust to United's performance of the Services or provision of the SHIP. The Resolution Procedure shall include United's design and implementation of a plan, satisfactory to AARP, to reach a standard or to remedy an objection, in as timely a manner as possible, and shall also include the utilization of the resources reasonably needed to meet the standard or to remedy an objection. United may suggest for consideration by AARP and/or AARP Trust the amendment of a standard or a timetable for meeting a standard or remedying an objection. Should United and AARP or AARP Trust, as applicable, fail to agree on the course of action necessary to meet or modify a standard or to remedy an objection, the Resolution Procedure requires the retention by and at the expense of United of a neutral expert, acceptable to AARP, to recommend a range of options to achieve the standard or remedy the objection. Notwithstanding any other provision hereof, the Resolution Procedure shall not obligate United to (i) assume or undertake any responsibilities or obligations assigned to any other GHIP Vendor pursuant to any Associated Agreement or otherwise, (ii) incur substantial out-of-pocket expenses, (iii) incur substantial indebtedness or (iv) except as expressly provided herein, institute litigation or consent generally to service of process in any jurisdiction.

11.2 FORMAL PROCEDURES. Any dispute arising out of or relating to this Agreement, any other Contract Document or the GHIP including, but not limited to, the interpretation, validity or breach thereof that is not resolved pursuant to the Resolution Procedure shall be resolved in accordance with the procedures set forth in this Article 11.

11.2.1 MEDIATION. If the parties are unable to resolve a dispute or claim pursuant to the Resolution Procedure within thirty 30 days after the dispute arises (or such longer period as to which the parties may agree) the parties shall attempt in good faith to

resolve the dispute by mediation pursuant to the CPR Model. If the parties are unable to agree on a mediator, the mediator shall be selected pursuant to the CPR Rules.

11.2.2 ARBITRATION. If the dispute or claim has not been resolved by mediation within 30 days of the initiation thereof, the dispute shall be resolved by binding arbitration conducted in Washington, D.C. by a single arbitrator pursuant to the CPR Rules or such other rules as mutually agreed upon by the parties. The arbitrator shall be disinterested in the subject matter of the dispute, shall not have been employed at any time within the past five years by AARP, AARP Trust or United, shall have appropriate qualifications and experience with respect to arbitration of business disputes and shall possess relevant industry expertise. The arbitration shall be governed by the United States Arbitration Act, 9 U.S.C. SECTIONS 1-16. Judgment upon the award rendered by the arbitrator may be entered in any court having jurisdiction thereof.

<original-page 74 >

11.3 COSTS AND FEES. Each party shall bear its own costs and attorneys' fees incurred in connection with mediation or arbitration.

11.4 SPECIFIC PERFORMANCE. The parties recognize that damages at law would not be an adequate remedy for the breach of many provisions of the Agreement and that prompt, equitable relief, prohibitory or mandatory, may be appropriate in many circumstances. In the event of any arbitration arising out of or relating to this Agreement or the Contract Documents, the arbitrators are encouraged to take account of this recognition and seek to fashion appropriate relief when the circumstances warrant. When consistent herewith and in the best interests of the AARP members and GHIP participants, the arbitrators may fashion equitable relief in a manner that directly addresses a breach, but allows for the continuation of this Agreement.

11.5 JURISDICTION. The parties hereto consent to personal jurisdiction over them in the federal courts of the District of Columbia in connection with any application to compel arbitration pursuant to this Article 11 or for the entry of judgment upon any arbitration award. Service of process upon any party shall be sufficient if made in accordance with the laws of the District of Columbia or in accordance with the notice provision of Section 14.5 hereof.

11.6 LIABILITY LIMITATION. In no event shall the arbitrators in any arbitration pursuant to Section 11.2.2 hereof be authorized to award any punitive damages or to award consequential or special damages in excess of $35 million in the aggregate.

**ARTICLE 12**
**RELATIONSHIP OF THE PARTIES**

12.1 INDEPENDENT CONTRACTORS. The parties hereto are independent contractors and are not joint venturers or partners. Neither AARP and AARP Trust nor United are now, nor shall they become or be considered as, principal or agent of the other in connection with the provisions of the SHIP or the performance of the related Services by United hereunder. United does not have, nor will it become or be considered to have, an ownership interest in AARP or AARP Trust. AARP and AARP Trust do not, nor will they become or be considered to have, an ownership interest in the SHIP or United (except that AARP is, and shall be, the sole and exclusive owner of the AARP Name), and AARP and AARP Trust shall not be liable or responsible in any such capacity or capacities. AARP and AARP Trust are not, nor will they become or be considered to be, providers of insurance services. Accordingly, AARP, AARP Trust and United shall at no time and in no medium or manner state or imply that (i) United is the agent of AARP or AARP Trust, (ii) AARP or AARP Trust is the agent of United, (iii) AARP or AARP Trust has any

<original-page 75 >

such ownership interest in United or the SHIP or (iv) United has an ownership interest in AARP or AARP Trust.

12.2.1 UNITED. United is not and shall not be the legal representative, agent, partner or joint venturer of AARP or AARP Trust and does not and shall not have any authority to enter into, amend, modify, terminate, settle, compromise or otherwise deal with any agreements or disputes on behalf of AARP or AARP Trust. All agreements, whether written or oral, express or implied, entered into by United in connection with performance of the Services and the provision of the SHIP shall not in any way bind or purport to bind AARP or AARP Trust or any of their respective properties.

12.2.2 AARP AND AARP TRUST. Neither AARP nor AARP Trust is or shall be the legal representative, agent, partner or joint venture of United, and AARP and AARP Trust do not and shall not have any authority to enter into, amend, modify, terminate,

shall have the right to select separate counsel to participate in the defense of such action on its own behalf at the indemnifying party's expense. The indemnifying party shall not agree to settle any matter without the prior written consent of the indemnified party, which consent shall not be unreasonably withheld.

13.4 FAILURE TO DEFEND ACTION. If any claim, action, proceeding or investigation arises s to which the indemnity provided for in Sections 13.1 or 13.2 hereof may apply, nd the indemnifying party fails to assume the defense of such claims within 30 days, hen the indemnified party may at the indemnifying party's expense contest such laim; provided, that no such contest need be made and settlement in full payment of ny such claim may be made without the indemnifying party's consent (with the ndemnifying party remaining obligated to indemnify the indemnified party under ection 13.1 or 13.2 hereof) if, in the written opinion of the indemnified party's utside counsel, such claim is meritorious.

13.5 SURVIVAL OF INDEMNITIES. The obligations of the parties to indemnify each other and other persons identified in this Agreement shall survive the termination of this Agreement for a period of two years.

(a) United shall maintain professional (errors and omissions) liability insurance, standard commercial general liability insurance (or a combination of commercial general liability insurance and excess liability insurance) including contractual liability, and crime/fidelity insurance, with insurance companies rated at least A-1X by A.M. Best. Such insurance shall contain at least the minimum limits and deductibles or retentions as reasonably necessary for United to meet the most stringent coverage requirements applicable to it under any Associated Agreement to which it is a party. Except as expressly provided in paragraph (b) below, the premiums for all such insurance coverage shall constitute Pass-Through Expenses.

(b) United shall be able to charge as Pass-Through Expenses any unreimbursed expenses which are within the deductibles or retention of either its insurance

<original-page 78 >

policies delineated in Section 13.6(a) above or those of any other GHIP Vendor, subject to a maximum to be agreed by United, AARP, AARP Trust, the Member Services Vendor and the Sales and Marketing Vendor, provided, however, that United shall not be able to charge as a Pass-Through Expense any (i) liabilities for which United provides indemnification under Section 13.1 hereof, or (ii) insurance premiums for insurance pertaining to such liabilities as referred to in the preceding (i), all of which shall be at the sole cost of United. Upon termination of this Agreement, no such costs shall be recoverable as Pass-Through Expenses to the extent that the expense would cause the RSF Balance to fall below the minimum RSF Balance requirement identified in Section 10.4.3.7 hereof.

## ARTICLE 14
## GENERAL PROVISIONS

14.1.1 EVENTS. Any delay in or failure of performance by any party hereto, other than the obligations to pay monies hereunder shall not constitute a default hereunder and shall not give rise to an entitlement to monetary damages or equitable relief hereunder, if and to the extent such delays or failures of performance are caused by occurrences which are beyond the control of and the effects of which in the exercise of reasonable care could not have been prevented by the affected party, including, but not limited to: expropriation or confiscation of facilities; act of public enemy; act of war; rebellion or sabotage or damage resulting therefrom; flood; fire; lightning; riots or strikes; Change of Law having a material adverse effect on any party's ability to perform its obligations under the Contract Documents; order of a court, arbitrator or governmental authority; or any causes other than those specified above which are not within the control of, and which are without fault or negligence on the part of a party, and which by the exercise of due diligence the affected Party is unable to overcome (each an "Event of Force Majeure").

14.1.2 NOTICE AND CURE. Any party claiming that an Event of Force Majeure has arisen shall immediately notify the other party of the same and shall act diligently to overcome and remove the effects of the Event of Force Majeure, shall notify the other party on a continuing basis of its efforts to overcome the Event of Force Majeure and shall notify the other party immediately when said condition has ceased.

<original-page 79 >

14.1.3 TERMINATION. If an Event of Force Majeure continues for more than three months after notice of the Event of Force Majeure is given under Section 14.1.2 above, and the parties are unable to agree upon other remedies, then either AARP or United may terminate this Agreement, in its sole discretion, at any time thereafter prior to any remedying of the adverse effect of the Event of Force Majeure, by giving at least seven calendar days' prior written notice to the other.

14.2 FURTHER ASSURANCES. The parties shall keep each other informed about legal or any other developments affecting the Services and the GHIP, shall cooperate with one another to carry out and implement the terms and objectives of this Agreement and the Exhibits hereto, and shall perform such further acts, execute such further documents and enter into such further agreements as may be necessary or appropriate to these ends.

14.3 NO THIRD PARTY BENEFICIARIES. This Agreement confers no rights whatsoever upon any person (including without limitation any AARP members or employees of Prudential or of United) other than the parties hereto.

14.4 GOVERNING LAW. The Agreement shall be governed by and interpreted in accordance with the laws of the District of Columbia applicable to agreements made and to be performed wholly within the District of Columbia.

14.5 NOTICES. Notices required or appropriate to be given under the Agreement shall be given by hand delivery or facsimile and by certified mail return receipt requested, as follows or in such other manner as shall be agreed to in writing by the parties:

To AARP:
American Association of Retired Persons
601 E Street, N.W.
Washington, DC 20049
Attention: Executive Director
Facsimile Number: (202) 434-2320

With copies to both:

The Director, Membership Division
Facsimile Number: (202) 434-3443

The General Counsel
Facsimile Number: (202) 434-2339

<original-page 80 >

To AARP Trust:
Trustees of the AARP Insurance Plan
American Association of Retired Persons
601 E Street, N.W.
Washington, DC 20049
Attention: Executive Director
Facsimile Number: (202) 434-2320

With copy to:

The General Counsel
Facsimile Number: (202) 434-2339

To United:
United HealthCare Insurance Company
300 Opus Center
9900 Bren Road East
Minnetonka, MN 55343
Attention: Chief Executive Officer, AARP Operations
Facsimile Number: (612) 936-1396

With copies to:

The General Counsel, United HealthCare Insurance Company
Facsimile Number: (612) 936-0044

14.6 NO WAIVER, ETC. Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under the applicable law set forth in Section 14.4 hereof, but if any provision of this Agreement shall be held

to be prohibited or invalid under such applicable law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement. No failure on the part of any party to exercise, and no delay in exercising, any right hereunder shall operate as waiver thereof, nor shall any single or partial exercise of any right hereunder by any party preclude any other or further exercise of any other right and no waiver whatever shall be valid unless in a signed writing, and then only to the extent specifically set forth in such writing. No waiver of any right hereunder shall operate as a waiver of any other or of the same or similar right on another occasion.

<original-page 81 >

14.7.1 GENERAL. Except as expressly provided in Sections 2.90, 4.2.1, 7.4.2, 7.7.2 and 9.5.2 hereof with respect to the amendment of EXHIBIT 2.90, EXHIBIT 4.2.1, EXHIBIT 7.4.2, EXHIBIT 7.7.2 and EXHIBIT 9.5.2 hereto, respectively, this Agreement may not be amended except in a writing executed on behalf of each of the parties hereto.

14.7.2 ANCILLARY AGREEMENTS. The parties are currently negotiating with Prudential and other GHIP Vendors the Transfer Agreement, the Reinsurance Agreement and other agreements related to the GHIP. The parties will negotiate in good faith with a view to amending this Agreement as appropriate to incorporate any changes necessitated by such agreements, amendments thereto or agreements ancillary thereto.

14.7.3 RENEGOTIATION. If prior to the Commencement Date there occurs any unanticipated fact or circumstance that has a material consequence for the rights and obligations of the parties hereunder, then the parties will negotiate with a view to amend the Contract Documents so as to maintain their respective rights and obligations as presently envisioned.

14.7.4 CONFLICTS AMONG AGREEMENTS. In the event of any conflict between the terms of the Contract Documents and the Transfer Agreement or the Reinsurance Agreement, the terms of the Transfer Agreement or the Reinsurance Agreement, as applicable, shall be controlling. In the event of any conflict between the terms of the Contract Documents and any Associated Agreement, the terms of the Contract Documents shall be controlling.

14.8 EXPERIENCE/RESERVE ACCOUNTING. The parties acknowledge and agree that United will account for the SHIP experience rating and the reserves on a policy-by-policy basis. All accounting provided by United pursuant to this Agreement, however, will be on an aggregate basis for the entire SHIP.

14.9 HEADINGS. The Section headings contained in this Agreement are not part of this Agreement, are for the convenience of reference only and shall not affect the meaning, construction or interpretation of this Agreement.

14.10 BINDING EFFECT. This Agreement shall be binding upon and shall inure to the benefit of each of the parties hereto and their respective successors and assigns.

14.11 ASSIGNMENT. This Agreement may not be assigned by any party hereto without the prior written permission of the other parties hereto.

<original-page 82 >

14.12 COUNTERPARTS. This Agreement may be executed in counterparts, each of which shall be deemed to be an original.

14.13 CERTAIN CALCULATIONS. In the event that a SHIP Insured shall no longer be a member of AARP, unless and until coverage is terminated, his or her premium and loss experience shall be included in all computations required to be made hereunder, as if he or she had continued to be an AARP member.

14.14 ACKNOWLEDGEMENT. The parties acknowledge that United is not licensed to conduct insurance business in the State of New York and that it intends to use its affiliate, United Healthcare Insurance Company of New York, as underwriter of the SHIP in the State of New York. The parties shall cooperate and adjust the provisions of this Agreement and the Associated Agreements, as appropriate, to accommodate United's use of this affiliate to underwrite the SHIP in the State of New York and otherwise to effect the purposes and objectives of this Agreement and any Associated Agreement.

14.15 RELATED PLANS. The parties will take reasonable steps and conform this Agreement or execute additional agreements to address the terms of United's undertaking of any Related Plan.

<original-page 83 >

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their duly authorized officers as of the date first written above.

AMERICAN ASSOCIATION OF RETIRED PERSONS

By: /s/ Margaret A. Dixon

Print Name: Margaret A. Dixon, Ed.D.

Print Title: President

TRUSTEES OF THE AARP INSURANCE PLAN

By: /s/ C. Keith Campbell

Print Name: C. Keith Campbell

Print Title: Chair

**UNITED HEALTHCARE INSURANCE COMPANY**

By: /s/ William W. McGuire

Print Name: William W. McGuire

Print Title: President

<original-page 84 >

EXECUTION COPY

EXHIBIT 2.89

**UNITED'S START-UP PERSONNEL**

The following are the United employees whose time may be charged as Start-Up Costs and their respective PER DIEM rates. This list may be amended from time to time by United.

**NAME**

**DEDICATED START-UP PERSONNEL**

Alicki, Joe
Anthony, Bill
Brenn, Janine
Hatting, Kit
King, Robert
Landau, Peter
Metz, Carol
Tersteeg, Terri
Zienta, Yvonne

**PARTIALLY DEDICATED START-UP PERSONNEL**