Declaration of George M. Borababy

Exhibit # 13

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**FILED**

DEC 20 2005

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

UNITED STATES OF AMERICA )
   1401 H Street, NW )
   Suite 4000 )
   Washington, D.C. 20036, )

   Plaintiff,

   v.

UNITEDHEALTH GROUP INCORPORATED )
   9900 Bren Road East )
   Minnetonka, MN 55343, )

PACIFICARE HEALTH SYSTEMS, INC. )
   5995 Plaza Drive )
   Cypress, CA 90630, )

   Defendants. )

CASE NUMBER 1:05CV02436

JUDGE: Ricardo M. Urbina

DECK TYPE: Antitrust

DATE STAMP: 12/20/2005

## COMPLAINT

The United States of America, acting under the direction of the Attorney General of the United States, brings this civil action to enjoin defendant UnitedHealth Group Incorporated ("United") from acquiring certain health insurance-related assets of its competitor, defendant PacifiCare Health Systems, Inc. ("PacifiCare"), in violation of Section 7 of the Clayton Act, as amended, 15 U.S.C. § 18.

1. United is one of the nation's largest health insurers, providing health and wellness insurance and other services to more than 55 million people nationwide. PacifiCare has approximately 13 million health insurance members in Arizona, California, Colorado, Nevada, Oklahoma, Oregon, Texas, and Washington.

2. United and PacifiCare offer a variety of commercial health insurance products, such as health maintenance organizations ("HMOs") and preferred provider organizations ("PPOs").

3. Small businesses, to help recruit and retain good workers, seek to offer health insurance benefits for their employees by sponsoring a commercial health insurance plan. Health insurance benefits are frequently one of the largest costs facing small businesses, who are thus very price sensitive in purchasing health insurance. Small businesses rely upon vigorous competition among commercial health insurers to keep prices affordable. Small businesses' options for providing health care benefits are often more limited than those available to other employers; in many markets, there are commercial health insurers selling health plans to larger employers that do not sell to small-group employers.

4. United and PacifiCare compete against one another in the sale of commercial health insurance plans to small-group employers in the Tucson, Arizona Metropolitan Statistical Area ("MSA"), where the sales of health insurance plans to all small-group employers is estimated to exceed $250 million. United's acquisition of PacifiCare will eliminate direct competition between them, and may permit United to increase prices and reduce the quality of commercial health insurance plans to small-group employers in Tucson.

5. In addition, United and PacifiCare purchase health care services from physicians and other providers for their employer members. United's acquisition of PacifiCare will eliminate direct competition between them in the purchase of physician services in Tucson, Arizona, and Boulder, Colorado, will consolidate their purchasing power, and may permit United to acquire physician services at lower rates. Such lower rates would likely to lead to a reduction in the quantity or a degradation in the quality of physician services provided to patients in those areas. Total annual expenditures for physician services is estimated to exceed $1.5 billion in the Tucson MSA and $375 million in the Boulder MSA.

6. In addition, PacifiCare competes directly with Blue Shield of California, both for the purchase of health care provider services and for the sale of commercial health insurance in the State of California. United rents the provider networks of CareTrust Networks, a wholly-owned subsidiary of Blue Shield of California. Under a network access agreement, United has access to certain information about the CareTrust networks and power to confer with Blue Shield about United's product development to the extent it affects the CareTrust networks. As a result of this merger, United will compete directly with Blue Shield. The continuation of the United/CareTrust network access agreement in its current form after the merger may substantially reduce competition in the markets for the purchase of health care provider services and for the sale of commercial health insurance in one or more MSAs in California. In these markets, billions of dollars are spent annually on both the purchase of commercial health insurance, and the provision of health care provider services for members of health care benefit plans.

### I. Jurisdiction and Venue

7. The United States files this Complaint pursuant to Sections 15 and 16 of the Clayton Act, as amended, 15 U.S.C. §§ 25 and 26, to prevent and restrain the defendants' violation of Section 7 of the Clayton, as amended, 15 U.S.C. § 18.

8. United and PacifiCare are engaged in interstate commerce, and their activities substantially affect interstate commerce.

9. The Court has subject matter jurisdiction over this action and jurisdiction over the parties pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. §§ 1331 and 1337(a).

10. Venue is proper in this District under 15 U.S.C. § 22 and 28 U.S.C. § 1391(c), in that each of the defendants is a corporation that transacts business and is found in the District of Columbia.

## II. The Defendants

11. United is a corporation organized under the laws of Minnesota, and has its principal place of business in Minnetonka, Minnesota. United is one of the country's leading commercial health insurers, offering a variety of HMO, PPO, Point-of-Service ("POS"), Self-Directed Health Plans ("SDHP"), and other products. United contracts with over 460,000 physicians and other health care professionals, and 4,200 hospitals, nationwide. United reported in excess of $37 billion in revenues for 2004.

12. PacifiCare is a corporation organized under Delaware law. Its primary place of business is Cypress, California. PacifiCare offers group health insurance products, such as HMOs, PPOs, Exclusive Provider Organizations ("EPOs"), SDHP, and Medicare HMOs under the Secure Horizons name, throughout the United States. PacifiCare reported $12.2 billion in revenues for 2004.

## III. United Proposes to Merge with PacifiCare

13. United entered into an Agreement and Plan of Merger (the "Transaction") with PacifiCare dated July 6, 2005.

14. The Transaction provides that PacifiCare shall merge into United. PacifiCare shareholders will receive 1.1 shares of United stock, and $21.50 cash, for each PacifiCare share owned. The acquisition price is $8.15 billion, based on closing share prices for the day of the Transaction.

### IV. Violations Alleged

**Count 1: Anti-Competitive Effects in the Sale of Commercial Health Insurance to Small-Group Employers in Tucson, Arizona**

15. Plaintiff incorporates herein paragraphs 1-14.

*A. Relevant Product Market*

16. The relevant product market affected by the proposed Transaction is the sale of commercial health insurance to small-group employers. Commercial health insurers, brokers who assist employers in purchasing health plans, and state insurance commissions view the market for the sale of commercial health to small-group employers as distinct from the large-group employer market. Commercial health insurers, such as United and PacifiCare, employ staff dedicated to marketing and sales of commercial health insurance plans to small-group employers, and develop and implement separate strategic plans directed to such sales. Brokers frequently specialize in working with small-group employers. Many state insurance commissions, including Arizona's, have regulations applying exclusively to the sale of commercial health insurance to small employers. Arizona defines small employers as those having between 2-50 employees. Arizona regulations, for example, require that commercial health insurers selling to small employers guarantee basic group health insurance coverage. Arizona also limits the variance among premium rates that a commercial health insurer can charge to its small employer customers.

17. For some employers, an effective alternative to purchasing commercial health insurance is self-funding. An employer self-funds its health benefits when it assumes responsibility for paying the covered health care expenses incurred by employees or their families, minus any co-payment or co-insurance payment an employee may pay for a given health care service.

-5-

Employers that self-fund their health benefit plans frequently retain a company to provide administrative services for the plan (known as "administrative services only" or "ASO"). Many commercial health insurance companies also sell ASO to self-funded employers.

18. Because most small employers do not have a sufficient employee population across which they can spread the financial risk, and do not have multiple locations to obtain geographic diversity for risk reduction, self-funding is not a viable option for them.

19. Smaller employers are substantially less likely to have dedicated benefit administrators. Smaller employers place principal reliance upon brokers to assist in various aspects of their sponsorship of a health benefit plan, such as plan design consultation, and assistance with the bidding process.

20. Commercial health insurance contracts typically renew annually. Small employers, through their brokers, will solicit competing bids from various commercial insurers. Bidding occurs on an employer-by-employer basis, with commercial health insurers able to conform their bids to the characteristics of the employer and its employee population. Because self-funding is not a viable option for most small employers, they have a substantial stake in competition among commercial health insurers to produce the best available plan at the most affordable price.

21. An insufficient number of small-group employers would drop sponsorship of commercial health insurance plans to make a small but significant price increase to all small-group employers unprofitable. Sale of commercial health insurance to small-group employers is a relevant product market, and a line of commerce under Section 7 of the Clayton Act.

*B. Relevant Geographic Market*

22. Health care primarily occurs on an in-person basis. Employees seek relationships with physicians and other health care professionals and institutions that are located in the metropolitan area in which they live and work.

23. Commercial health insurers and brokers consider the area in and around Tucson, Arizona, to be a separate and distinct area for the sale of health plans to small-group employers.

24. The United States Department of Commerce has defined the area in and around Tucson, Arizona as a MSA. The Tucson MSA is comprised of Pima County.

25. An insufficient number of small-group employers would purchase commercial health insurance outside the Tucson MSA to make a small but significant price increase to all small-group employers in Tucson unprofitable. The Tucson MSA is a relevant geographic market, and a section of the country under Section 7 of the Clayton Act.

*C. Effects of the Proposed Transaction*

26. United and PacifiCare are among the principal competitors in the market for the sale of commercial health insurance to small-group employers in Tucson, and they are among each other's principal competitors. Besides United and PacifiCare, there are few other substantial competitors. Many small-group employers have only one, or in some cases two, additional competitive options.

27. United and PacifiCare are the second and third largest sellers of commercial health insurance to small-group employers in Tucson. United currently has an approximate 16% share of the small-group employer commercial health insurance lives in Tucson; PacifiCare's market share is approximately 17%. If the proposed Transaction were consummated, United would have

-7-

an approximate 33% share, roughly equal to the market share of the largest commercial health insurer in Tucson. The market for the sale of commercial health insurance to small-group employers in Tucson is highly concentrated. If the proposed Transaction were consummated, the Herfindahl-Hirschman Index ("HHI"), which is commonly employed in merger analysis and is defined and explained in Appendix A to this Complaint, would be greater than 2,500, and the change in the HHI resulting from the proposed Transaction would be in excess of 500.

28. The market shares of other competitors are substantially smaller than the shares of the top three firms. United and PacifiCare are consistently competitive bidders to retain and obtain small-group employer business.

29. PacifiCare is a particularly aggressive, low-price competitor in the small-group employer market in Tucson. These are important qualities to small-group employers, who are sensitive to price and particularly reliant on competition to keep health benefit plans affordable. Absent the proposed Transaction, PacifiCare would likely take small-group employer business away from United and other competitors in Tucson.

30. In Tucson, small-group employers and their employees benefit from competition between United and PacifiCare, through better products and lower prices. The proposed Transaction will eliminate this competition, and may permit United to increase price and reduce quality of commercial health insurance plans to small-group employers in Tucson. The effect of the proposed Transaction may be substantially to lessen competition in violation of Section 7 of the Clayton Act.

### Count 2: Anti-Competitive Effects in the Purchase of Physician Services in Tucson, Arizona, and Boulder, Colorado

31. Plaintiff incorporates herein Paragraphs 1-14.

32. One component of a commercial health insurance product is its provider networks. Commercial health insurers contract with an array of health care professionals and facilities in the various locations in which they sell insurance products to form provider networks. Physicians offer discounts from their usual fee schedule in order to obtain access to a commercial health insurer's substantial volume of members in need of health care services.

*A. Relevant Product Market*

33. There are no purchasers to whom physicians can sell their services other than individual patients or the commercial and governmental health insurers that purchase physician services on behalf of their patients. A small but significant decrease in the price paid to physicians would not cause physicians to seek other purchasers of their services or to otherwise change their activities (away from providing physician services) in numbers sufficient to make such a price reduction unprofitable. Thus, the purchase of physician services is a relevant product market, and a line of commerce under Section 7 of the Clayton Act.

*B. Relevant Geographic Markets*

34. The patient preferences that result in localized geographic markets for the sale of commercial health insurance also produce local markets for the purchase of physician services. Physicians expend considerable efforts to build a practice in a particular geographic area. A physician cultivates relationships with patients, and gains referrals in large part through a favorable reputation among peer physicians and others in the community. These assets, which a physician compiles over time, are not easily transportable.

-9-

35. The number of physicians who would sell their services outside Boulder and Tucson, respectively (by relocation, attracting patients from outside the physician's home MSA, or otherwise), would not be sufficient to make a small but significant price decrease to all physicians in those MSAs unprofitable. Similarly, a reduction in the quantity or quality of physician services resulting from the price decrease would not prompt a sufficient number of patients to obtain physician services outside those areas to overcome such a price decrease. Thus, the Boulder MSA and Tucson MSA are relevant geographic markets, and sections of the country under Section 7 of the Clayton Act.

*C. Effects of the Proposed Transaction*

36. The contract rates and other terms that a physician can obtain from a commercial health insurer depend on the physician's ability to terminate (or credibly threaten to terminate) the relationship if the insurer demands lower rates or other disfavored contract terms. A physician's ability to terminate a relationship with a commercial health insurer depends on his or her ability to replace the amount of business lost from the termination, and the time it would take to do so. Failing to replace lost business expeditiously is costly.

37. Physicians have a limited ability to maintain the business of patients enrolled in a health plan once the physician terminates. Physicians could retain patients by encouraging them to switch to another health plan in which the physician participates. This is particularly difficult for patients employed by companies that sponsor only one plan because the patient would need to persuade the employer to sponsor an additional plan with the desired physician in the plan's network. Alternatively, the patient may remain in the plan, visiting the physician on an out-of-network basis. The patient would be faced with the prospect of higher out-of-pocket costs, either

-10-

in the form of increased co-payments for use of an out-of-network physician, or by absorbing the full cost of the physician care.

38. The difficulty of timely replacing the business lost from terminating a plan increases as the plan's share of the physician's total practice increases. The difficulty is even greater where the insurer accounts for a large share of all physicians' business in a given locality because of the effect on referrals from other physicians.

39. In Tucson, the combined membership of United and PacifiCare would comprise a significant percentage of physician revenues. PacifiCare's membership in Tucson includes substantial commercial health insurance members and managed care Medicare enrollees, which are marketed under the name Secured Horizons. Many physicians and physician groups derive a substantial percentage of their revenue from PacifiCare's managed care Medicare plans.

40. In Boulder, PacifiCare's membership consists of a small number of very large accounts, the largest of which is its contract with the University of Colorado for the provision of commercial HMO coverage to approximately 6,000 members residing in the Boulder area (the "Boulder Contract"). The Boulder Contract alone constitutes nearly half of PacifiCare's entire commercial health insurance membership in Boulder. Thus, PacifiCare's strong bargaining position in physician negotiations results largely from the members it derives from the Boulder Contract.

41. As a result of the proposed Transaction, United will account for a large share of total payments to all physicians in the Boulder and Tucson areas, and a particularly large share of revenue, in excess of 35% in the Tucson MSA and in excess of 30% in the Boulder MSA, for a substantial number of physicians in those areas. These revenue shares understate the importance

-11-

to physicians of payments from commercial health insurance plans. The total payments made to physicians include revenue earned by treating patients covered by Medicare and Medicaid, which account for a substantial amount of revenue for many physicians. Physicians typically consider commercial health insurance business more profitable than Medicare and Medicaid business. Many physicians use their commercial health insurance business to compensate for the lower revenue earned from Medicare and Medicaid business.

42. The markets for the purchase of physician services in the Tucson and Boulder MSAs are highly concentrated. If the proposed Transaction were consummated, the HHI would exceed 1,800 for Tucson and Boulder, and the change in HHI resulting from the proposed Transaction would exceed 700 for Tucson and 400 for Boulder.

43. The proposed Transaction may enable United to pay lower rates for physician services in Tucson and Boulder, which would likely lead to a reduction in quantity or degradation in quality of physician services provided to patients in these areas. Thus, the effect of the Transaction may be substantially to lessen competition in violation of Section 7 of the Clayton Act.

**Count 3: Anti-Competitive Effects in the State of California**

44. Plaintiff incorporates herein paragraphs 1-14.

45. United currently does not actively sell commercial health insurance in California. Its California membership consists of employees of large, national or regional employers that self-fund their health benefit plans and use United for ASO.

46. To serve its California-based commercial members, United does not contract with health care providers directly. Since July 2000, United has rented the provider networks of CareTrust Networks. Blue Shield of California, which owns CareTrust Networks, is one of the largest

-12-

commercial health insurers in California, with substantial membership throughout the State. In exchange for access to the CareTrust provider networks, which permits United to remain a competitive option for large self-funded employers with California-based employees, United pays a substantial fee to Blue Shield.

47. Pursuant to the network access agreement between United and CareTrust, United has access to certain information about the CareTrust provider network. The two hold regular meetings to review provider contract negotiations and terminations, reimbursement and claims processing issues, and network development. Through these meetings, United has gained access to information about the discounts that CareTrust has negotiated with physicians, hospitals, and other health care providers throughout California. On occasion, United has also disclosed to CareTrust its plans to introduce new commercial health insurance products in California to ensure that those new products would not breach the terms of any CareTrust network provider contract.

48. PacifiCare is one of the largest health insurers in the State of California, with substantial membership in its commercial and Secure Horizons products throughout the State.

*A. Relevant Product Markets*

49. PacifiCare competes with Blue Shield of California to sell commercial health insurance to groups of all sizes. The sale of commercial health insurance comprises one or more relevant product markets and lines of commerce under Section 7 of the Clayton Act.

50. Similarly, PacifiCare competes with Blue Shield of California to acquire health care provider services. The purchase of health care provider services, such as physician and hospital

services, comprises one or more relevant product markets, and lines of commerce under Section 7 of the Clayton Act.

*B. Relevant Geographic Markets*

51. PacifiCare and Blue Shield of California compete in several MSAs throughout the State of California both to sell commercial insurance and to purchase physician and hospital services. Thus, various MSAs within the State of California are relevant geographic markets, and sections of the country under Section 7 of the Clayton Act.

*C. Effects of the Proposed Transaction*

52. PacifiCare and Blue Shield of California are among each other's principal competitors for the sale of commercial health insurance, and for the purchase of physician and hospital services. In several areas, PacifiCare and Blue Shield account for a substantial percentage of the commercial health insurance business.

53. Under the proposed Transaction, United will acquire PacifiCare's California membership, and thereby become one of Blue Shield's principal competitors for the sale of commercial health insurance and the purchase of provider services. The CareTrust alliance requires that United and Blue Shield exchange information about provider discounts and United's new products. The alliance also creates opportunities and incentives for United and Blue Shield to coordinate their competitive activities and for each to discipline the other by, among other things, terminating the network access agreement in response to competitive actions. The proposed Transaction, in light of the CareTrust alliance, may reduce competition between United and Blue Shield following the merger. Thus, the effect of the Transaction may be substantially to lessen competition for the

sale of commercial health insurance and the purchase of provider services in California in violation of Section 7 of the Clayton Act.

### V. Prayer for Relief

54. To remedy the violations of Section 7 of the Clayton Act alleged herein, the United States requests that the Court:

    (a) adjudge the proposed Transaction to violate Clayton Act Section 7, as amended, 15 U.S.C. § 18;

    (b) permanently enjoin and restrain defendants from consummating the proposed Transaction, or from entering into or carrying out any agreement, understanding, or endeavor, the purpose of which would be to combine the health insurance businesses or assets of United and PacifiCare; and

    (c) award to plaintiff its costs of this action and such other and further relief as may be appropriate and as the Court may deem equitable, just, and proper.

DATED: DECEMBER 20, 2005

FOR PLAINTIFF UNITED STATES OF AMERICA:

_____
THOMAS O. BARNETT
Acting Assistant Attorney General
Antitrust Division

_____
MARK J. BOTTI (D.C. Bar # 416948)
Chief, Litigation I Section
Antitrust Division

_____
J. BRUCE McDONALD
Deputy Assistant Attorney General
Antitrust Division

_____
JOSEPH MILLER
Assistant Chief, Litigation I Section
Antitrust Division

_____
DOROTHY B. FOUNTAIN
Deputy Director of Operations
Antitrust Division

_____
JON B. JACOBS (D.C. Bar # 412249)
STEVEN BRODSKY
RICHARD S. MARTIN
PAUL J. TORZILLI
NICOLE S. GORDON

Litigation I Section
Antitrust Division
United States Department of Justice
City Center Building
1401 H Street, N.W. Suite 4000
Washington, D.C. 20530
(p) 202.514.8349
(f) 202.307.5802

APPENDIX A

Herfindahl-Hirschman Index

"HHI" means the Herfindahl-Hirschman Index, a commonly accepted measure of market concentration. It is calculated by squaring the market share of each firm competing in the market and then summing the resulting numbers. For example, for a market consisting of four firms with shares of 30, 30, 20, and 20 percent, the HHI is 2600 ($30^2 + 30^2 + 20^2 + 20^2 = 2600$). (Note: Throughout the Complaint, market share percentages have been rounded to the nearest whole number, but HHIs have been estimated using unrounded percentages in order to accurately reflect the concentration of the various markets.) The HHI takes into account the relative size distribution of the firms in a market and approaches zero when a market consists of a large number of small firms. The HHI increases both as the number of firms in the market decreases and as the disparity in size between those firms increases.

Markets in which the HHI is between 1000 and 1800 points are considered to be moderately concentrated, and those in which the HHI is in excess of 1800 points are considered to be highly concentrated. *See Horizontal Merger Guidelines* ¶ 1.51 (revised Apr. 8, 1997). Transactions that increase the HHI by more than 100 points in concentrated markets presumptively raise antitrust concerns under the guidelines issued by the U.S. Department of Justice and Federal Trade Commission. *See id.*