Declaration of George M. Borababy

Exhibit #  17

## UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF KENTUCKY

| | |
|---|---|
| ----------------------------------------------------------- ) | |
| ) | |
| OMNICARE, INC. ) | |
| ) | |
| Plaintiff, ) | |
| - v - ) | |
| ) | |
| UNITEDHEALTH GROUP, INC., ) | CIVIL ACTION NO. 06-103-WOB |
| PACIFICARE HEALTH SYSTEMS, INC., and ) | |
| RxSOLUTIONS, INC. d/b/a ) | |
| PRESCRIPTION SOLUTIONS, ) | |
| ) | |
| Defendants. ) | |
| ) | |
| ----------------------------------------------------------- ) | |

### FIRST SUPPLEMENTAL AND AMENDED COMPLAINT

Plaintiff Omnicare, Inc. ("Omnicare"), by and through its attorneys, for its First Supplemental and Amended Complaint against UnitedHealth Group, Inc. ("UHG"), PacifiCare Health Systems, Inc. ("PHS") and RxSolutions, Inc. d/b/a Prescriptions Solutions ("PS," collectively with PHS, "PHS"), alleges, upon knowledge as to its own actions and upon information and belief as to all other matters, as follows:

### NATURE OF THE ACTION

1.      Omnicare brings this action pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, seeking damages and injunctive relief to redress the substantial injuries that have been and continue to be inflicted upon it by the *per se* illegal and unreasonable antitrust conspiracy of UHG and PHS.  The UHG-PHS conspiracy violates Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, and the Kentucky Consumer Protection Act, KRS § 367.175. Omnicare also brings this action seeking damages, injunctive relief and other redress for

defendants' fraud, conspiracy to commit fraud and other conduct actionable under Kentucky common law.

<div align="center">

**SUMMARY OF ALLEGATIONS**

</div>

2.    Institutional Pharmacies ("IPs"), such as plaintiff Omnicare, deliver drugs and related products and services to Long Term Care facilities ("LTCs"), including Skilled Nursing Facilities ("SNFs," collectively with LTCs, "LTCs"), and are reimbursed for those services by companies such as UHG and PHS.  Defendants' conspiracy occurred in the context of the 2005 rollout of Medicare Part D ("Part D") by the Centers for Medicare and Medicaid Services ("CMS"), a part of the federal government within the United States Department of Health and Human Services.  Part D created new and radically different prescription drug coverage for Medicare beneficiaries in which private at-risk Prescription Drug Plans ("PDPs") function as payors.

3.    Under Part D, a healthcare insurance company must apply to CMS in order to be certified as a PDP, and must meet certain minimum requirements, such as showing that they have adequate networks of pharmacies.  Omnicare is the largest IP in the United States with broader geographic coverage than any other IP or IP network.  Omnicare also has contracts to serve as the IP for thousands of LTCs across the country.  Because of the broad geographic diversity of its pharmacy locations and its excellent relationships with LTCs, Omnicare provides a network that is unmatched in the industry.

4.    To be certified by CMS, a PDP also must offer a contract meeting CMS's minimum terms of service available to any willing pharmacy that meets CMS's standards.  Omnicare routinely negotiates higher levels of patient care and service in contracts with PDPs than is provided by these so-called "Any Willing Provider" contracts.  In particular, Omnicare

<div align="center">

2

</div>

has designed a contract that includes 18 long-term care patient protections, including ensuring 90 to 180 days transitional coverage for drugs not included in a PDP's formulary and coverage for non-scheduled refills required because an elderly patient expels his or her medication or has had to be hospitalized for a short duration.

5.      During the rollout of Part D in July 2005, two directly competing PDPs, defendants UHG and PHS, agreed to merge. At the time, Omnicare was attempting to negotiate separate Part D contracts with both UHG and PHS. UHG and PHS consummated the merger transaction in December 2005.

6.      From at least July 2005 through the December 20, 2005 consummation of their merger, UHG and PHS conspired to coordinate their negotiations with Omnicare in order to avoid the contractual patient protections provided for in the agreements Omnicare was negotiating with PDPs and, accordingly, to fix and depress the prices paid by defendants to Omnicare for providing those services.

7.      Before consummating the acquisition of PHS, UHG through its agent, Walgreens Health Initiatives, Inc. ("WHI"), a pharmacy benefits manager or "PBM", negotiated with Omnicare to obtain access to Omnicare's extensive network of IPs, thus ensuring UHG would obtain the necessary certification from CMS to offer a Part D plan. These negotiations culminated with the execution of a contract between UHG (through WHI) and Omnicare on July 29, 2005 (the "UHG Agreement"), covering all UHG Part D plans that included both the 18 contractual long-term care patient protections and a competitive reimbursement rate. This was a substantial contract representing about one-third of Omnicare's Part D patients.

8.      Prior to closing its acquisition of PHS, UHG and PHS agreed that PHS would not enter into a contract with Omnicare that included either the 18 contractual long-term care patient

3

protections or a competitive and non-collusive reimbursement rate to compensate Omnicare for providing the patient protections. PHS, in turn, refused to negotiate with Omnicare.

9.     Given PHS's refusal to negotiate, Omnicare attempted to learn from UHG in an October 17, 2005 email whether the announced acquisition of PHS by UHG would eliminate Omnicare's need to contract directly with PHS because PHS would, thereafter, be covered by Omnicare's contract with UHG after the acquisition of PHS closed.

10.     UHG's e-mail response on October 31, 2005 stated as follows:

> Pacificare's Part D offering for 2006 is a unique contract with CMS. If and when the deal closes, Pacificare will follow their own Part D product strategy throughout the 2006 calendar year.

This left Omnicare with the unmistakable impression that after the acquisition, PHS and UHG would operate under separate Part D contracts with Omnicare.

11.     UHG and PHS intended for this e-mail to provide Omnicare with the impression that UHG would not attempt to transfer its Part D plans to PHS after the merger and that only PHS's plans would be handled under PHS's separate contract with Omnicare. However, both UHG and PHS knew that this would not be the case. UHG and PHS deliberately misled Omnicare in order to induce Omnicare to enter into an unfavorable Any Willing Provider contract with PHS, to which UHG would then switch all of its Part D plans after the acquisition of PHS closed.

12.     The conspiracy to have PHS refuse to deal with Omnicare was critical to accomplishing the scheme to defraud, because PHS and UHG knew, based upon the fraudulent October 31st e-mail, that Omnicare had been led to believe that unless it agreed to the terms of the Any Willing Provider contract furnished by PHS (the "PHS Any Willing Provider Contract"), it would be denied reimbursement for all of the drugs required by the PHS enrollees in LTCs serviced by Omnicare.

13.    In reliance upon UHG's fraudulent misrepresentation, and in order to ensure that patients who were enrolled in PHS plans and were patients in LTCs under contract with Omnicare for IP services continued to receive uninterrupted service, Omnicare signed the PHS Any Willing Provider Contract on December 6, 2005. The PHS Any Willing Provider Contract has a reduced, noncompetitive reimbursement rate and omitted the 18 contractual long-term care patient protections found in the UHG Agreement.

14.    Just two days after Omnicare signed the PHS Any Willing Provider Contract, UHG suddenly informed Omnicare for the first time that it objected to certain patient protections in the UHG Agreement. Although Omnicare expressly informed UHG that it was willing to negotiate amendments to the UHG Agreement in order to address any of UHG's legitimate concerns, UHG soon thereafter did what it had plotted to do all along, and, in contradiction to its October 31st representation to Omnicare, UHG switched all of its Part D patients to the PHS Any Willing Provider Contract that it had deceived Omnicare into signing. This switch has caused and continues to cause substantial damage to Omnicare and UHG's insureds.

15.    UHG's scheme to avoid its contract with Omnicare conferred an additional benefit upon UHG and additional harm to UHG's insureds. By eliminating the UHG Agreement, UHG was no longer contractually obligated to provide enrollees the 18 contractual long-term patient care protections, whether or not Omnicare served the enrollee's LTC.

16.    But for the conspiracy by UHG and PHS, Omnicare would not have been willing to enter into the PHS Any Willing Provider Contract because it was far less advantageous to patients and Omnicare than the UHG Agreement. The elimination of the 18 contractual long-term care patient protections and the reduced reimbursement rate received by Omnicare under

5

the PHS Any Willing Provider Contract were the direct result of the conspiracy between UHG and PHS.

17.    Omnicare brings this action to void the PHS Any Willing Provider Contract in its present form and to reform it so that it contains the patient protections and reimbursement provisions of the UHG Agreement and to recover three times the actual damages caused by UHG's conspiracy in restraint of trade, and further seeks actual and punitive damages, and injunctive and equitable relief for its state and common law claims.

<u>**JURISDICTION AND VENUE**</u>

18.    This Court has federal question jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 1337, in that a claim is brought under Section 1 of the Sherman Act, 15 U.S.C. § 1. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332, in that the amount in controversy exceeds $75,000 and there is complete diversity among the parties.  Furthermore, this Court has supplemental jurisdiction over plaintiff's state and common law claims under 28 U.S.C. § 1367(a).

19.    Venue is proper in this jurisdiction under 15 U.S.C. § 22 and 28 U.S.C. §§ 1391(b) and (c) based upon defendants' residing, transacting business and/or being found in this District, and because a substantial part of the events giving rise to the claims alleged occurred in this jurisdiction.  Personal jurisdiction exists over the defendants by and through their general presence in Kentucky.  By and through UHG, defendants maintain offices and sell products and services in Kentucky.  Personal jurisdiction also exists over the defendants pursuant to Ken. Rev. Stat. §454.210 because defendants injured Omnicare in Kentucky by the illegal and tortious conduct alleged herein.

### INTERSTATE COMMERCE

20. At all times relevant hereto, the alleged anticompetitive conduct and effects thereof giving rise to this Complaint occurred within the flow of, and substantially affected, interstate commerce. UHG's and PHS's Medicare Part D plans cover approximately 150,000 patients serviced by Omnicare in different states. Furthermore, actions undertaken in furtherance of the conspiracy were carried out by the use of interstate mail and wires.

### PLAINTIFF

21. Plaintiff Omnicare is a corporation organized and existing under the laws of the State of Delaware, maintaining, at all relevant times, a principal place of business and headquarters in Covington, Kentucky. Omnicare's county of residence is Kenton County, Kentucky. Omnicare provides IP services to LTCs in 47 states in the United States and Canada. Omnicare provides an array of services designed to meet the specialized needs of the LTC population and especially those patients in SNFs, including specialty unit-dose packaging, delivery, 24-hour/7-day availability, pharmacist consulting, medical records, infusion and respiratory therapy and medical supplies. Omnicare's extensive clinical expertise provides its LTC clients with opportunities to improve the quality of care for the residents they serve while reducing overall healthcare costs. Omnicare is not engaged in the business of insurance as that term is used in the McCarran-Ferguson exemption to the antitrust laws of the United States, 15 U.S.C. §§ 1011-15, and for that reason, among others, that exemption is not applicable to the antitrust claims set forth herein.

22. Over the years, Omnicare has adopted very specific policies to protect the frail elderly population in LTC facilities that it serves. One example is the 18 contractual long-term care patient protections that Omnicare seeks to incorporate in all of its negotiated PDP contracts.

By way of example, Omnicare asks PDPs to provide transitional coverage of non-formulary medications for 90 to 180 days in order to allow all new PDP plan enrollees in LTC facilities more time to adjust from non-formulary prescription medications on which they were maintained prior to entry into the LTC facility to appropriate approved formulary alternatives or for a medical exception to the formulary to be obtained.

### DEFENDANTS

23.     Defendant UHG is a corporation organized and existing under the laws of the State of Minnesota, with its headquarters and principal place of business in Minnetonka, Minnesota. UHG's county of residence is Hennepin County, Minnesota. UHG is a major health insurance and managed care company, which operates in all 50 states, including within the Eastern District of Kentucky, and holds a dominant position in many parts of the country. UHG accounts for about 27 percent of all PDP enrollees nationwide and has a market share in many CMS-designated regions of the country in which it does business in excess of what would become 40 percent of all Part D enrollees. Among other things, UHG administers all the PDP plans that it co-brands with the American Association of Retired Persons ("AARP"), an organization with nearly two million members who rely on it for prescription drug services.

24.     Defendant PHS is a corporation organized and existing under the laws of the State of Delaware, with its headquarters and principal place of business in Cypress, California. PHS's county of residence is Orange County, California. Today, PHS is a wholly owned subsidiary of UHG. At the time the conspiracy was formed, PHS was still an independent company, which had agreed to be acquired by UHG. PHS is a significant managed care company with three million health plan members and approximately ten million prescription drug and other specialty plan members nationwide. PHS was formerly a significant competitor of UHG in the market for

8

the purchase of IP services for Part D plans and their beneficiaries. On December 20, 2005, PHS was acquired by UHG, but only after agreeing to conditions to overcome the objections of the Antitrust Division of the Department of Justice to that merger of competitors. Prior to its merger with UHG, PHS represented what would become approximately 5 percent of Omnicare's PDP enrollees.

25.    PS, a wholly-owned subsidiary of PHS and UHG, is a corporation organized and existing under the laws of the State of California, with its headquarters and principal place of business in Costa Mesa, California. PS's county of residence is Orange County, California. PS offers pharmacy benefits management services to PHS and other managed care organizations, as well as unions, employers and third party administrators. PS was acquired by UHG along with PHS on December 20, 2005.

### MEDICARE PART D

26.    The Medicare Prescription Drug Improvement and Modernization Act of 2003 created voluntary prescription drug coverage for all Medicare beneficiaries. This program, which is commonly known as Part D, took effect on January 1, 2006. Part D now accounts for an estimated 50 percent of the revenues received by IPs and has greatly reduced the revenues from other government programs, such as Medicaid, as well as private payment by patients (many of whom are now covered by Part D).

27.    Under Medicare Part D, the payors for pharmaceutical products and services to seniors are private, at-risk companies, known as PDPs. PDPs are frequently large and established players in the managed care and health insurance industry, such as Aetna, Cigna, HealthNet, Sierra Health Services, Inc. and defendants UHG and PHS. PDPs negotiate pharmacy reimbursement rates with IPs, either directly or indirectly (through PBMs, such as

WHI or PS). As insurers, it is in the PDP's self-interest to seek to provide the services to insureds at the lowest possible cost to the PDP. Thus, certain PDPs, such as UHG and PHS, seek to avoid the expense of providing certain patient protections to insureds.

28.    A significant Congressional purpose behind Part D was to introduce competition into the Medicare program. PDPs – like UHG and PHS – are supposed to vie with one another to build the most extensive networks with the best geographic coverage and most extensive drug benefits so that their prescription drug plans will attract the enrollment of the most Part D beneficiaries. Once approved by CMS, PDPs are then supposed to compete with each other to sign up the nation's 42 million potential Part D beneficiaries nationwide.

29.    For most SNF residents, the most important criteria in selecting Part D plans are service and formulary coverage – not price. This is true because 90 percent of the SNF residents that are in Part D are "dual eligibles," meaning that they are also eligible for Medicaid, and, thus, do not pay premiums under Part D for any PDP that has a premium at or below the average Part D premium in the given PDP region. In fact, PDPs compete in part on the basis of whether they have Omnicare IPs in their network and have agreed to abide by contractual long-term care patient protections such as those offered by Omnicare. Many LTC patients and LTCs have a strong preference for PDPs that do provide these value-added services and protections.

### THE CRITICAL CMS DEADLINES THAT HAD TO BE MET

30.    Congress mandated an extremely ambitious schedule for the creation of PDPs and the rollout of Part D, effectively requiring a sea-change in the Medicare program within months. To implement this Congressional plan, CMS required prospective PDPs to submit their proposed IP networks by July 31, 2005. Then, on September 14, 2005, CMS approved bids and certified the successful bidders to become PDPs. Prior to that date, Omnicare and other pharmacies did

not know for sure the identity of the PDPs who would assume the payor function effective January 1, 2006. Approved PDPs began marketing their plans to the public on October 1, 2005.

31.    Thus, PDPs and IPs had only a few short months to negotiate contracts. PDPs were required to assemble networks of institutional and retail pharmacies that would provide "adequate" or "convenient" LTC coverage to Part D enrollees. CMS's regulations stated only that a "plan must provide convenient access to long-term care pharmacies consistent with written policy guidelines and other CMS instructions." Although CMS's definition was never clarified, at a minimum PDPs were required to enter into agreements with IPs that could service all LTCs in any region that the PDP wished to serve.

32.    The stakes were high both for PDPs, like UHG and PHS, and IPs, like Omnicare. Fundamental to PDPs' economic interest was securing agreements with significant IP networks such as Omnicare. Omnicare, on the other hand, needed to negotiate contracts with dozens of PDPs across the country so that it could continue to service patients and would be reimbursed for its drugs and services.

33.    After extensive negotiations, on July 29, 2005, Omnicare entered into a Part D Agreement with UHG, by and through its agent, WHI, which represented that it possessed full authority to contract with Omnicare on UHG's behalf.

34.    Omnicare reached similar agreements with PDPs representing 80 percent of Omnicare's current Part D business, but not with PHS.

## UHG'S ACQUISITION OF PHS

35.    While PDPs and IPs were negotiating agreements, UHG negotiated to acquire PHS. Preliminary discussions between UHG and PHS had begun as early as December 2004, and UHG and PHS continued to hold discussions through the early part of 2005, which included

11

a due diligence review in May 2005.  Prior to and during the due diligence stage, UHG and PHS exchanged competitively sensitive information concerning their continuing strategies and dealings with Omnicare and other prospective pharmacy members in their prospective PDP networks.

36.    UHG and PHS entered into a definitive Merger Agreement on July 6, 2005.  Soon after signing the Merger Agreement (if not before), UHG was privy to information concerning Omnicare's negotiations with PHS.

37.    Indeed, the parties' Merger Agreement by its terms compelled PHS to divulge any information concerning its negotiations with Omnicare to UHG and to obtain UHG's consent prior to entering into any Part D agreement with Omnicare.  Section 5.01(a) ("Conduct of Business by [PHS]") of the Merger Agreement provided that from signing the Merger Agreement to closing of the acquisition, PHS was prohibited from entering into "any Contract which if in effect as of the date hereof would be required to be disclosed pursuant to Section 3.10(b) hereof."  Among those contracts listed in Section 3.10 (b) were:

> all Contracts pursuant to which any indebtedness of [PHS] or any of its Subsidiaries is outstanding or may be incurred . . . exceed[ing] $750,000 on an annual basis . . . (xiv) (i) . . . the Largest Provider Contracts . . . (xv) . . . the Largest Customer Contracts . . . (xvi) the Largest Broker Contracts . . . (xvii) any Contract with respect to any risk sharing or risk transfer arrangement or that provides for a retroactive premium or similar adjustment or withholding arrangement, pursuant to the terms of which an adjustment, premium, payment or arrangement is reasonably expected to result therefrom in an amount of $750,000 or more . . . any demonstration or pilot or other material Contract with the Centers for Medicare and Medicaid Services . . . .

Moreover, Section 5.01(a) also prohibited PHS from modifying any such contracts without UHG's consent:

> PHS "shall not, and shall not permit any of its Subsidiaries to,
> without [UHG's] prior written consent . . . . (x) (A) modify, amend
> or terminate any of the Largest Customer Contracts, the Largest
> Provider Contracts, the Largest Broker Contracts or any of the
> Medicare Advantage Contracts. . . (B) enter into, modify, amend or
> terminate . . . .that involves the Company or
> any of its Subsidiaries incurring a liability in excess of three
> million dollars ($3,000,000) individually or seven million five
> hundred thousand dollars ($7,500,000) in the aggregate . . . enter
> into any Contract which if in effect as of the date hereof would be
> required to be disclosed pursuant to Section 3.10(b) hereof . . . .

38.     An agreement between PHS and Omnicare surely fell into a number of these

categories.  For instance, the PHS contract with Omnicare involved annual revenues to PHS of

approximately $180 million, well in excess of both the $750,000 and the $3 million thresholds

set forth in the Merger Agreement.  Thus, PHS would be required to get UHG's consent before

entering into any such agreement with Omnicare.

39.     On December 20, 2005, UHG and PHS consummated their merger in a

transaction valued at $8.8 billion upon entering a consent agreement with the Antitrust Division

of the United States Department of Justice.  The operations of PHS now reside primarily within

UHG's Health Care Services and Specialized Care Services segments.

### THE CONSPIRACY

40.     At the same time UHG and PHS were negotiating their merger and conducting

due diligence, Omnicare was beginning to negotiate Part D agreements with each of UHG and

PHS.

41.     Omnicare's negotiations with UHG commenced on March 31, 2005 and increased

in intensity in May of 2005, with a series of weekly phone calls and information exchanges,

including on June 3, 2005, when UHG sent Omnicare a copy of its formulary, and on June 21,

2005, when Omnicare sent UHG a copy of its contract.

42.    On July 14, 2005, just one week after agreeing to its acquisition by UHG, PHS informed Omnicare that it was not willing to negotiate a contract with Omnicare, which meant that if Omnicare wanted to receive any compensation for providing drugs to patients in LTC facilities that it served who were PHS enrollees, it would have to sign PHS's standard Any Willing Provider contract, which included a noncompetitive reimbursement rate and did not include the 18 contractual long-term care patient protections specific to long-term care, which were included in Omnicare's Part D Agreement, as well as the UHG Agreement.

43.    Unbeknownst to Omnicare, despite the fact that UHG and PHS were legally bound to operate as separate entities in the period between signing and closing their merger (and, in fact, held themselves out as separate entities), PHS consulted with UHG as to the UHG Agreement and UHG and PHS agreed that PHS would boycott and otherwise refuse to negotiate a Part D contract with Omnicare, which would have included the vital 18 contractual long-term care patient care protections and the reimbursement rates to pay for them.

44.    Until the closing of the acquisition, UHG and PHS were separate corporations and were legally obligated to act as competitors, and would have acted as such but for the conspiracy. PHS's refusal to negotiate with Omnicare was not rational conduct because given that Omnicare was the largest IP, PHS was taking a substantial risk that if it did not include Omnicare in its network it would have been at a competitive disadvantage vis-à-vis competing PDPs if the PHS and UHG merger did not close or was delayed past January 1, 2006.

45.    Further, UHG was made aware of the status of PHS's negotiations with Omnicare, reviewed the Omnicare Part D contract and directed PHS to refuse to negotiate with Omnicare.  Given its soon-to-be-closed acquisition of PHS, UHG had nothing to lose with this strategy, because, at worst, it could fold the PHS plans into the UHG Agreement once the merger

was completed or, at best, Omnicare would capitulate to the threat by accepting PHS's Any Willing Provider contract.

46.    The CMS-mandated Any Willing Provider contract is a statutory protection intended by Congress and CMS to prevent large managed care companies, like UHG and PHS, from excluding pharmacies from their networks.  To be approved as a PDP, an applicant must attest that it will offer contracts to any willing pharmacy that meets the performance and service criteria established by CMS.  These are bare minimum standards, which do not include many appropriate protections for LTC patients, such as the 18 contractual long-term care patient protections which UHG and PHS sought to avoid contracting to provide to their insureds, and which Omnicare routinely negotiates with PDPs to include for their patients.

47.    Seeking to understand PHS's reluctance to enter into a negotiated Part D deal with Omnicare as UHG had done, Timothy Bien, Senior Vice President of Professional Services and Purchasing at Omnicare, sent an e-mail to Craig Stephens, Vice President of Industry Relations and Networks at UHG, on October 17, 2005, seeking UHG's view as to whether the UHG acquisition was playing any role in Omnicare's dealings with PHS.

48.    Specifically, the e-mail asked:

> Is there a sense of when United will close the acquisition of PacifiCare?  When the deal closes, will PacifiCare be contracted with Omnicare as a result of the acquisition?  Thanks for your help on this.

49.    Getting no response from UHG, Bien (Omnicare) sent a follow-up e-mail to Stephens (UHG) on October 25, 2005, asking "Can you give me anything on this?"

50.    Two weeks after the initial e-mail request, Stephens (UHG) sent Bien (Omnicare) an e-mail on October 31, 2005, stating that:

> Pacificare's Part D offering for 2006 is a unique contract with
> CMS. If and when the deal closes, Pacificare will follow their own
> Part D product strategy throughout the 2006 calendar year.

51.     This e-mail was intended by UHG to, and in fact did, give Omnicare the clear impression that it was the intent and plan of UHG and PHS that, after the merger, UHG and PHS would still have two distinct Medicare Part D strategies for 2006 and Omnicare would thus need to contract with each company separately.

52.     Because of UHG's fraudulent misrepresentation, Omnicare again attempted to negotiate in good faith with PHS, not knowing that UHG's representation was fundamentally misleading and that UHG had failed to disclose its intent and plan to evade the Part D contract that was carefully negotiated by Omnicare and UHG.

53.     As the January 1, 2006 commencement of Part D was drawing near, on or about November 8, 2005, CMS advised: "In the interest of assisting Part D plans in discharging their requirements under the convenient access standard, we believe it is imperative that LTC pharmacies not withhold contracts with Part D plans to limit the number of plans to which a facility's beneficiaries have access. Ultimately, we believe all beneficiaries – including those who reside in LTC facilities – should have available to them the full array of plans operating in their area."

54.     In light of CMS's urging, and with the January 1 Part D commencement fast approaching, Omnicare was induced to enter into PHS's Any Willing Provider Contract on December 6, 2005, in order to prevent any disruption of services to PHS beneficiaries, premised on UHG's assurance that the PHS Any Willing Provider Contract was completely separate from the UHG Agreement, and that the UHG plans were not going to be covered by the PHS Any Willing Provider Contract.

55.    Not only did the PHS Any Willing Provider Contract provide for Omnicare to be reimbursed for pharmacy services at significantly below-market rates, it drastically reduced the required quality of service contractually provided to consumers of Part D Medicare plans.  The PHS Any Willing Provider Contract did not include any of the 18 contractual long-term care patient protections Omnicare believes are important to responsibly and effectively serve LTC patients and to which UHG had previously agreed.  The reimbursement rates were also wholly unrealistic for the high-service IP business and insufficient to cover the vital patient protections.

## UHG MULTIPLIES THE HARM TO CONSUMERS AND TO OMNICARE

56.    Had UHG not fraudulently misrepresented to Omnicare that after the acquisition UHG and PHS would maintain separate Part D product strategies and operate under separate Medicare Part D contracts with Omnicare, and had PHS not refused to negotiate an appropriate patient care protection agreement with Omnicare as per its agreement with UHG, Omnicare would never have entered into the PHS Any Willing Provider Contract, which had below market reimbursement rates, and pharmaceutical coverage and service levels substantially inferior to those established in the UHG Agreement.

57.    While Omnicare acted in reliance upon the statements made by UHG in agreeing to those significantly lower rates, UHG and PHS viewed the PHS Any Willing Provider Contract as a means of getting out of the UHG Agreement and reducing the contractually obligated services provided not only to the five percent of Omnicare Part D enrollees in PHS plans, but also to the 33 percent of Omnicare Part D enrollees in UHG plans.

58.    Thus, it was not until immediately after the PHS Any Willing Provider Contract was signed that UHG first raised its purported concern that the UHG Agreement it had signed six months earlier was in violation of certain CMS requirements.  UHG's specious complaint that

the contractual patient care protections were somehow in violation of CMS guidance were but a pretext for its final move to secure the additional benefits of its anticompetitive scheme: the switch of all UHG business to the more favorable PHS Any Willing Provider Contract.

59.    In response to UHG's vague assertions, Omnicare requested that UHG specify exactly what provisions of the UHG Agreement were allegedly contrary to the CMS Part D requirements.  Further, Omnicare indicated that it would work with UHG to resolve any and all legitimate CMS compliance concerns.  UHG never responded with suggestions for alternative contract terms.

60.    UHG notified Omnicare in February 2006 that it was withdrawing the UHG plans from the UHG Agreement and switching them to the PHS Any Willing Provider Contract – eliminating the contractual patient protections at Omnicare's and its patients' expense.

61.    UHG's decision to withdraw from the UHG Agreement was motivated by its desire to avoid its obligations under that agreement to provide its insureds with the benefits of the 18 contractual long-term care patient protections built into that contract and not because of any CMS requirements.  Indeed, in a conversation on March 16, 2006 between Bien (Omnicare) and Robert Pfotenhauer, President of Ovations, UHG's Medicare Part D division, Pfotenhauer conceded that UHG's actions were motivated entirely by money.

## THE HARM TO COMPETITION AND CONSUMERS

62.    The relevant product markets in which to evaluate the competitive harm caused by defendants' conspiracy are (i) the market for the contractual reimbursement of LTC institutional pharmacy services for Part D insured LTC residents and, within that market, (ii) the market for the contractual reimbursement of SNF institutional pharmacy services for Part D

18

insured SNF residents. There are no reasonably interchangeable substitutes for such institutional pharmacy services.

63. The geographic markets in which to evaluate this competitive harm are (i) the United States and (ii) the 34 CMS-designated PDP regions or localities within the United States. PDPs contract for IP service nationally or in the individual CMS-designated PDP regions in which they do business. PDPs can only turn to IPs able to deliver services in the LTCs located in geographic areas in which the PDP expects to enroll Part D beneficiaries.

64. Competition in the relevant markets was harmed by the practices described above. As a result, Omnicare has been and is directly and immediately harmed by the conspiracy. Collusion between UHG and PHS, two purchasers in the market for institutional pharmacy services for their Part D plans, resulted in a reduction in services Omnicare could provide under their Part D plans and reimbursement rates well below the levels that would have prevailed in a competitive market in which UHG and PHS acted independently in competition with each other.

65. Omnicare's patients enrolled in the UHG and PHS PDPs also are and will be directly and immediately harmed by the conspiracy. Because enrollees in the PHS plan do not have a contractual right to the 18 long-term care patient protections, it can be expected that PHS PDP enrollees will receive substantially inferior pharmaceutical coverage and services than they would have had, had PHS negotiated with Omnicare. UHG enrollees lost the superior pharmaceutical coverage and services that UHG actually contracted to purchase from Omnicare before UHG terminated that free-market agreement in favor of the agreement that PHS collusively obtained. Such reductions in output and quality of service are the typical result of a cartel agreement among purchasers of goods and services, such as UHG and PHS.

19

66.    UHG's scheme to eliminate the UHG Agreement from UHG's network conferred an additional benefit upon UHG and additional harm to UHG's insureds.  Omnicare's 18 contractual long-term care patient protections extended to all enrollees in any plan where Omnicare negotiated for the protections to be included.  Thus, when the UHG Agreement was eliminated from UHG's network, all UHG enrollees lost the 18 contractual long-term care patient care protections, whether or not Omnicare served the patient's LTC.

**DEVELOPMENTS SUBSEQUENT TO THE FILING OF THE ORIGINAL COMPLAINT**

67.    On May 23, 2006 CMS posted a Question and Answer on its website's "Frequently Asked Questions" section.  A copy of such Question and Answer is attached as Exhibit A.

68.    On June 5, 2006, Omnicare submitted to the United States Department of Health and Human Services a response to CMS's website posting.  A copy of such response is attached as Exhibit B.

**COUNT I**
**VIOLATION OF SECTION 1 OF THE SHERMAN ACT**
**(15 U.S.C. § 1)**
***PER SE* ILLEGAL AND UNREASONABLE CONSPIRACY**
**NOT TO NEGOTIATE AND TO FIX PRICES**

69.    Omnicare incorporates by reference each and every allegation contained in paragraphs 1 through 68 above as if set forth here in full.

70.    Up and until the date that they formally merged, December 20, 2005, UHG and PHS were separate entities and direct competitors with market power in the relevant markets.

71.    From until at least July 2005 and continuing through December 20, 2005, UHG and PHS engaged in a *per se* illegal and unreasonable contract, combination or conspiracy in restraint of trade in interstate commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

72.    During that time, UHG and PHS maintained a conscious commitment to a common scheme to fix and stabilize prices, to boycott and otherwise to refuse to negotiate with Omnicare that was designed to achieve the unlawful objective of coercing Omnicare into entering into an unfavorable Any Willing Provider contract with PHS in order to limit the quality of care provided by them to their covered lives and depress the rate of reimbursement paid to Omnicare.

73.    UHG and PHS committed overt acts in furtherance of this conspiracy, including, but not limited to:

a.    Agreeing that PHS would boycott and otherwise refuse to negotiate with Omnicare at rates more favorable than the rates UHG negotiated with Omnicare;

b.    Sharing competitively sensitive information concerning their respective negotiations and dealings with Omnicare relative to Part D reimbursement;

c.    Making misleading statements and hiding their collusive scheme from Omnicare; and

d.    Entering into the PHS Any Willing Provider Contract with Omnicare.

74.    After the acquisition of PHS by UHG, UHG continued to commit acts in furtherance of the conspiracy, including, but not limited to:

a.    Offering pretextual reasons for seeking to switch its lives into the PHS Plan;

21

    b.  Terminating WHI's authority to contract with Omnicare on its behalf;

    c.  Seeking reimbursement under the terms of the PHS Any Willing Provider Contract that were properly reimbursable only under the terms of the UHG Agreement; and

    d.  Attempting to interfere with Omnicare's efforts to inform its customers of the effect of the withdrawal of UHG from its obligations under the UHG Agreement.

75.    The conspiracy had demonstrable anticompetitive effects in that it restricted the output of patient benefits and depressed the rates paid by UHG and PHS to Omnicare to levels that never would have been possible in a truly competitive market.

76.    The conspiracy was anticompetitive and has no legitimate pro-competitive justification.

77.    Omnicare has suffered antitrust injury because, for example:

    a.  Omnicare has been injured in its business or property by reason of defendants' violation of the antitrust laws;

    b.  Omnicare's injuries are of the type the antitrust laws were designed to prevent in that competition in the relevant markets has been reduced or eliminated by defendants' conspiracy;

    c.  Defendants' conspiracy and acts in furtherance thereof were a necessary predicate to the harm suffered by Omnicare and complained of herein; and

d.  By reason of defendants' conspiracy and acts in furtherance thereof, Omnicare is being reimbursed at a rate less than would prevail in a competitive market and is being deprived of the competitive advantage that its 18 long-term care patient protections provide it in seeking LTC and SNF customers.

78.    As a direct and proximate result of defendants' unlawful conspiracy, Omnicare has suffered monetary damages in an amount to be determined at trial.

## COUNT II
## VIOLATION OF KENTUCKY CONSUMER PROTECTION ACT
### (KRS § 367.175)
### *PER SE* ILLEGAL AND UNREASONABLE CONSPIRACY
### NOT TO NEGOTIATE AND TO FIX PRICES

79.    Omnicare incorporates by reference each and every allegation contained in paragraphs 1 through 78 above as if set forth here in full.

80.    Up and until the date that they formally merged, December 20, 2005, UHG and PHS were separate entities and direct competitors with market power in the relevant markets.

81.    For the reasons set forth above, from at least July 2005 and continuing through December 20, 2005, UHG and PHS engaged in a *per se* illegal and unreasonable contract, combination, or conspiracy in restraint of trade in violation of the Kentucky Consumer Protection Act, Ken. Rev. Stat. § 367.175.

82.    For the reasons set forth above, Omnicare has suffered antitrust injury.

83.    As a direct and proximate result of defendants' unlawful conspiracy, Omnicare has suffered monetary damages in an amount to be determined at trial.

<u>**COUNT III**</u>
<u>**FRAUD**</u>
**(Fraudulent Inducement & Detrimental Reliance)**

84.    Omnicare incorporates by reference each and every allegation contained in paragraphs 1 through 83 above as if set forth here in full.

85.    In connection with  the 2005 rollout of Medicare Part D program, Omnicare attempted but was unable to reach an agreement to be included in PHS's Medicare Part D pharmacy network.

86.    Having been able to reach a Medicare Part D agreement with UHG, which was in the process of acquiring PHS, Omnicare specifically asked UHG whether Omnicare's PHS plans would be covered under the Medicare Part D contract it had with UHG once the pending acquisition of PHS was completed.  Omnicare posed this question in Timothy Bien's October 17, 2005 e-mail to Craig Stephens at UHG.

87.    Stephens responded on UHG's behalf in an October 31, 2005 e-mail.  In that e-mail, UHG made the false representation that it was UHG's and PHS's intention and plan that post-acquisition, "Pacificare will follow their own Part D product strategy throughout the 2006 calendar year."

88.    As UHG and PHS no doubt intended, Omnicare understood this to mean that UHG and PHS would operate under separate Medicare Part D contracts with Omnicare in 2006.

89.    As a result of UHG's false representation that post-acquisition UHG and PHS would operate under separate Medicare Plan D contracts, Omnicare was induced to execute the PHS Any Willing Provider Contract, which contained a noncompetitive reimbursement rate for Omnicare and none of the patient protections contained in the UHG Agreement.

24

90.     Of course, as Omnicare would discover only a few months after execution of the PHS Any Willing Provider Contract, UHG's representation in the Stephen's October 31st e-mail was false because when the acquisition was completed, UHG informed Omnicare that UHG and PHS would operate under the <u>same</u> Medicare Part D contract with Omnicare - the PHS Any Willing Provider Contract.

91.     UHG knowingly made the false representation to Omnicare on October 31st as part of a scheme by UHG and PHS to induce Omnicare to enter the inadequate PHS Any Willing Provider Contract with Omnicare and then shift the UHG plans to that contract after completion of the acquisition.

92.     This reliance was to Omnicare's detriment, because after the acquisition UHG utilized the terms of the PHS Any Willing Provider Contract, which included a much lower reimbursement rate schedule and none of the 18 contractual long-term care patient protections.

93.     Had Omnicare not relied on UHG's false representation, it never would have executed the PHS Any Willing Provider Contract and UHG and PHS would not have been able to improperly utilize the noncompetitive reimbursement rates contained therein.

94.     As a result of this fraud, Omnicare has been damaged in an amount to be proven at trial due to UHG's and PHS's utilization of the noncompetitive reimbursement rate schedule contained in the PHS Any Willing Provider contract.

<div align="center"><b><u>COUNT IV</u><br><u>FRAUD</u><br>(Unjust Enrichment)</b></div>

95.     Omnicare incorporates by reference each and every allegation contained in paragraphs 1 through 94 above as if set forth here in full.

96.     As a result of the illegal conspiracy between UHG and PHS, including, in particular, UHG's fraudulent misrepresentation in its October 31st e-mail, and the scheme to devise a fraudulent strategy for PHS to refuse to negotiate with Omnicare, UHG and PSH have been unjustly enriched in an amount to be proven at trial on account of the improper utilization by UHG and PHS of the noncompetitive reimbursement rate schedule contained within the PHS Any Willing Provider Contract.

<u>COUNT V</u>
<u>CONSPIRACY TO COMMIT FRAUD</u>

97.     Omnicare incorporates by reference each and every allegation contained in paragraphs 1 through 96 above as if set forth here in full.

98.     In connection with the 2005 rollout of Medicare Part D program, Omnicare attempted but was unable to reach an agreement to be included in PHS's Medicare Part D network.

99.     Omnicare was unable to reach agreement with PHS because during the course of a pending acquisition of PHS by UHG, the Defendants agreed that PHS would refuse to negotiate at all in hopes of inducing Omnicare to enter an inadequate Any Willing Provider Contract with PHS, which would have noncompetitive reimbursement rates and none of the patient care protections contained in the agreement that Omnicare had previously executed with UHG.

100.    The conspiracy between UHG and PHS also contemplated that after the conclusion of the acquisition, UHG would then shift its enrollees from the UHG Agreement to the PHS Any Willing Provider Contract and take advantage of its noncompetitive reimbursement rates.

101.    In furtherance of the conspiracy, PHS refused to negotiate in good faith with Omnicare.

102.    In furtherance of the conspiracy, UHG made a material misrepresentation to Omnicare that it was the intent and plan of UHG and PHS that, at the conclusion of the acquisition of PHS by UHG, Omnicare would operate under separate contracts with UHG and PHS.

103.    In furtherance of the conspiracy, at the conclusion of the PHS acquisition, UHG did in fact illegally shift its enrollees from the UHG Agreement to the PHS Any Willing Provider Contract.

104.    As a result of the fraud, Omnicare has been damaged in an amount to be proven at trial due to UHG's utilization of the noncompetitive reimbursement rate schedule contained in the PHS Any Willing Provider Contract.

**WHEREFORE,** Plaintiff respectfully requests that this Court enter judgment:

I.    As to Count I (Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1):

    A.    Declaring that defendants have engaged in a *per se* illegal and unreasonable conspiracy in restraint of trade in violation of the Sherman Act, 15 U.S.C. § 1;

    B.    Declaring that the PHS Any Willing Provider Contract is null and void in its present form and reforming it so that it contains the patient protections and reimbursement provisions of the UHG Agreement;

    C.    Declaring that the UHG Agreement is effective and that UHG must honor the terms of that agreement for all of its covered lives;

    D.    Awarding damages caused by UHG's illegal acts, in an amount to be determined at trial, plus interest;

    E.    Awarding treble damages;

    F.    Awarding attorneys' fees and costs; and

    G.    Granting any other relief the Court deems just and equitable.

II.    As to Count II (Violation of the Kentucky Consumer Protection Act, KRS § 367.175):

    A.    Declaring that defendants have engaged in a *per se* illegal and unreasonable conspiracy in restraint of trade in violation of the Kentucky Consumer Protection Act, KRS § 367.175;

    B.    Declaring that the PHS Any Willing Provider Contract is null and void in its present form and reforming it so that it contains the patient protections and reimbursement provisions of the UHG Agreement;

C.    Declaring that the UHG Agreement is effective and that UHG must honor the terms of that agreement for all of its covered lives;

D.    Awarding damages caused by UHG's illegal acts, in an amount to be determined at trial, plus interest;

E.    Awarding treble damages;

F.    Awarding attorneys' fees and costs; and

G.    Granting any other relief the Court deems just and equitable.

III.    As to Count III (Fraud – Fraudulent Inducement & Detrimental Reliance):

A.    Awarding damages caused by UHG's and PHS's illegal acts, in an amount to be determined at trial, plus interest;

B.    An injunction preventing UHG and PHS from utilizing the ill-begotten terms of the PHS Any Willing Provider Contract and compelling them to utilize the terms of the UHG Agreement;

C.    Awarding punitive damages; and

D.    Granting any other relief the Court deems just and equitable.

IV.    As to Count IV (Fraud – Unjust Enrichment):

A.    Granting equitable, just, and proper relief to redress the unjust enrichment enjoyed by UHG and PHS as a result of their illegal acts, including, but not limited to disgorgement of defendants' ill-begotten gains and restitution to plaintiff; and

B.    Granting any other relief the Court deems just and equitable.

V.    As to Count V (Conspiracy to Commit Fraud):

A.    Awarding damages caused by UHG's and PHS's illegal acts, in an amount to be determined at trial, plus interest;

B.    An injunction preventing UHG and PHS from utilizing the ill begotten terms of the PHS Any Willing Provider Contract and compelling them to utilize the terms of the UHG Agreement;

C.    Awarding punitive damages; and

D.    Granting any other relief the Court deems just and equitable.

Dated: June 5, 2006                                    Respectfully submitted,


s/ Wm. T. Robinson III
Wm. T. Robinson III (No. 59330)
Carrie A. Shufflebarger (No. 90705)
GREENEBAUM DOLL & MCDONALD PLLC
50 East RiverCenter Blvd., Suite 1800
Covington, KY 41012-2673
Tel: 859-655-4210
Fax: 859-655-4239

Harvey Kurzweil (Admitted *Pro Hac Vice*)
Brian S. McGrath (Admitted *Pro Hac Vice*)
DEWEY BALLANTINE LLP
1301 Avenue of the Americas
New York, NY 10019-6092
Tel: 212-259-8000
Fax: 212-259-6333

*Attorneys for Omnicare, Inc.*

*Of Counsel*

Aldo A. Badini                                    Stephen M. Axinn
DEWEY BALLANTINE LLP                               John D. Harkrider
1301 Avenue of the Americas                        AXINN, VELTROP & HARKRIDER LLP
New York, NY 10019-6092                            1370 Avenue of the Americas
Tel: 212-259-8000                                  New York, NY 10019
Fax: 212-259-6333                                  Tel: 212-728-2200
                                                   Fax: 212-728-2201

**JURY DEMAND**

Pursuant to Fed. R. Civ. P. 38(a), Plaintiff hereby demands a trial by jury of all issues so triable.

Dated: June 5, 2006

<div style="margin-left:40%">

s/ Wm. T. Robinson III
Wm. T. Robinson III (No. 59330)
Carrie A. Shufflebarger (No. 90705)
GREENEBAUM DOLL & McDONALD PLLC
50 East RiverCenter Blvd., Suite 1800
Covington, KY 41012-2673
Tel: 859-655-4210
Fax: 859-655-4239

Harvey Kurzweil (Admitted *Pro Hac Vice*)
Brian S. McGrath (Admitted *Pro Hac Vice*)
DEWEY BALLANTINE LLP
1301 Avenue of the Americas
New York, NY 10019-6092
Tel: 212-259-8000
Fax: 212-259-6333

*Attorneys for Omnicare, Inc.*

</div>

*Of Counsel*

Aldo A. Badini
DEWEY BALLANTINE LLP
1301 Avenue of the Americas
New York, NY 10019-6092
Tel: 212-259-8000
Fax: 212-259-6333

Stephen M. Axinn
John D. Harkrider
AXINN, VELTROP & HARKRIDER LLP
1370 Avenue of the Americas
New York, NY 10019
Tel: 212-728-2200
Fax: 212-728-2201

31

## CERTIFICATE OF SERVICE

I hereby certify that on June 5, 2006, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to the following:

Frederick M. Erny (90061)
DINSMORE & SHOHL LLP
255 E. Fifth Street, Suite 1900
Cincinnati, OH 45202
fred.erny@dinslaw.com

*Counsel for Defendants*

I further certify that I mailed the foregoing document and the notice of electronic filing by first class mail to the following non-CM/ECF participants:

Mark A. Vander Laan
DINSMORE & SHOHL LLP
255 E. Fifth Street, Suite 1900
Cincinnati, OH 45202
mark.vanderlaan@dinslaw.com

Michael V. Ciresi
Thomas J. Undlin
ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
2800 LaSalle Plaza
800 LaSalle Avenue
Minneapolis, MN 55402-2015

*Counsel for Defendants*

s/ Wm. T. Robinson III

654197_1

32