## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Long Term Care Pharmacy Alliance and American Society of Consultant Pharmacists,<br><br>    Plaintiffs<br><br>v.<br><br>UnitedHealth Group Inc.,<br><br>    Defendant | )<br>)<br>)<br>)<br>)<br>) Case No.: 1:06-CV-01221 (ESH)<br>)<br>)<br>)<br>)<br>) |

### Defendant's Memorandum of Points and Authorities In Opposition to Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction

Defendant, UnitedHealth Group, Inc. ("UHG"), by and through its undersigned counsel, respectfully submits this Memorandum of Points and Authorities in Opposition to Plaintiffs' Motion for a Temporary Restraining Order and a Preliminary Injunction (the "Motion").

## I.    Background

### A.    The Regulatory Framework and Parties

In 2003, Congress enacted Medicare Part D, which provides for the delivery of prescription drug benefits to certain categories of Medicare-eligible individuals through managed care networks, beginning January 1, 2006.  Pub. L. 108-173, 117 Stat. 2066 (December 8, 2003).  These networks operate through private-sector prescription drug plans ("PDPs") that provide the required drug coverage to the individual Medicare beneficiaries assigned to them.  42 U.S.C. §§ 1395w-112(a)(1)-(3)(a); 42 C.F.R. § 423.504(b)(2).

As noted at pp. 26-27 of UHG's Motion to Dismiss Plaintiffs' Complaint ("Motion to Dismiss") [Docket No. 7], UHG is a holding company. A number of UHG's subsidiary corporations – none of which are parties to this action – sponsor Medicare Part D PDPs. Id.

Every Medicare PDP contracts, either directly or indirectly, with retail and long-term care ("LTC") pharmacies that agree to dispense covered drugs at specified rates and terms. When the pharmacy fills a prescription for a beneficiary covered by a PDP with which the pharmacy has a contract, the pharmacy may submit a claim for payment to that PDP, and the PDP pays the claim pursuant to the terms of its contract with the pharmacy and the federal Medicare regulations. The PDP, in turn, then obtains reimbursement directly from the federal Centers for Medicare and Medicaid Services ("CMS") – the ultimate payer under the Part D insurance program.

Plaintiffs, the Long Term Care Pharmacy Alliance ("LTCPA") and the American Society of Consultant Pharmacies ("ASCP"), allege that they are associations whose members comprise or own LTC pharmacies that have entered into network contracts with PDPs sponsored by UHG subsidiaries. Complaint ¶¶ 8-9, 11-12, and 34. Plaintiffs are not themselves pharmacies. Nor do plaintiffs allege that they themselves have any form of reimbursement contract with those UHG subsidiaries.

**B.**    **Source of the Parties' Dispute**

The parties' dispute arises from errors in the Medicare beneficiary data files that CMS originally provided to Medicare Part D PDPs. The incorrect data consisted of the array of codes used to define the extent (if any) to which a portion of the cost of covered

drugs is to be borne by the individual beneficiary through co-payments and other cost sharing mechanisms.

Under Medicare Part D, beneficiaries generally are required to pay a co-payment (and other forms of cost-sharing such as deductibles) for their prescription drugs. However, certain low-income beneficiaries are eligible for subsidies that reduce or eliminate the cost-sharing.[1] Among those eligible for the low-income subsidy are individuals who are covered by both Medicare and a state Medicaid program (so-called "dual eligibles") and who continuously reside in nursing homes (or other LTC facilities) for a full calendar month. These "Institutionalized Dual Eligibles" are not required to pay any co-payments for prescription drugs covered by their PDPs. See 42 U.S.C. § 1395w-114(a)(1)(D)(i); 42 C.F.R. § 423.782(a)(2)(ii) ("[f]ull-benefit dual eligible individuals who are institutionalized have no cost-sharing for covered Part D drugs covered under their PDP . . . )." CMS reports to PDPs whether Medicare Part D beneficiaries qualify for the low-income subsidy, and, if so, what co-payment (if any) is required. 42 C.F.R. § 423.800(a). If CMS data indicates that a beneficiary is not an Institutionalized Dual Eligible, the PDP treats such person as owing a co-payment, and reimbursement to the LTC pharmacy is reduced by the amount of the required co-payment.[2]

---

[1]  A detailed description of the Medicare Part D benefit design and the low-income subsidy is set forth in UHG's Motion to Dismiss at pp. 8-11, which are incorporated herein by reference.

[2]  A PDP is required to provide CMS with information concerning the amount of cost-sharing that is reduced with respect to individuals eligible for the low income subsidy (42 C.F.R. § 423.800(b)), and CMS may terminate its contract with a PDP if the PDP "fail[s] substantially to carry out the terms of its contract with CMS" or engages in "false, fraudulent, or abusive activities affecting the Medicare program, including submission of false or fraudulent data." 42 C.F.R. §§ 423.509(a)(1) and (4).

As a result of CMS's data errors, LTPCA and ASCP allege that their member pharmacies received less than the full amount of the payments to which they are entitled under the pharmacies' network contracts with the UHG-affiliated PDPs.

UHG agrees that CMS made the data errors. CMS has been in the process of retroactively correcting the data supplied to PDPs. As the corrected data has arrived, it became apparent that some prescription drug claims submitted by LTC pharmacies would have to be adjusted to reflect a beneficiary's corrected status as an Institutionalized Dual Eligible with no co-payment obligation.

As the evidence will show, from the start, UHG-affiliated PDPs advised LTC pharmacies that if they believed they were owed additional amounts, they should resubmit the claims for which they believed adjustments were required, so that the PDPs could reprocess those claims and make all associated adjustments. In the absence of such resubmission, however, the PDPs are obligated by CMS regulations to pay co-payment adjustments directly to the Medicare Part D beneficiaries. 42 C.F.R. § 423.800(c) ("The Part D sponsor offering the Part D plan must reimburse subsidy eligible individuals . . . any excess premiums and cost-sharing paid by such individual . . . ").

As the evidence will show, many pharmacies have accepted the UHG-affiliated PDPs' invitation to resubmit their claims. The PDPs are reprocessing those claims and issuing corrected payments to a number of those pharmacies. LTPCA-member pharmacies, however, generally have refused to resubmit their claims. Instead, these members have demanded that the PDPs simply "cut a check" in the amount claimed by

the pharmacies, without regard to any underlying claims data.[3]  See Motion to Dismiss at pp. 3-4, 13-14, and 26.

The PDPs, however, insist that all claims be resubmitted for processing through the contractual mechanism.  As the evidence will show, this is more than a technical formality.  From the PDPs perspective, following the contractual mechanism is required to ensure that an adequate informational or "audit" trail exists to support the PDPs' own request for reimbursement from CMS, and to allow the PDPs to track beneficiaires' claims data on a going-forward basis.  Put another way, if "true up" payments are made outside of the contractual mechanism, as proposed by Plaintiffs, the PDPs run the risk of potentially forfeiting their owns rights to reimbursement from CMS.

Faced with this position by the PDPs, LTCPA vigorously lobbied CMS to issue an order requiring PDPs to simply cut a check to the LTC pharmacies (see Compl. ¶¶ 24, 26, 27), but CMS refused to do so.  In fact, CMS issued written guidance that instructed LTC pharmacies to comply with the PDPs' claims procedures,[4] and reminded pharmacies that the reimbursement process varies among PDPs, and that PDPs have flexibility in

_____

[3]  UHG believes that the refusal of Plaintiffs' members to resubmit their claims stems from the incorrect enrollment of certain Part D beneficiaries in UHG-affiliated PDPs. Specifically, CMS data initially reflected certain beneficiaries as being enrolled in UHG-affiliated PDPs, and when claims were submitted by LTC pharmacies, the PDPs paid the claims less any co-payment obligations reported by CMS.  As CMS has corrected its data, however, it has retroactively "dis-enrolled" some beneficiaries from the PDPs, meaning that the PDPs were not responsible for paying any portion of the claim in the first place.  If LTC pharmacies resubmit such claims for processing, the PDPs will reverse the transactions, and the pharmacies will be shown as having received an overpayment for which reimbursement to the PDPs is required.

[4]  See CMS "Tip Sheet" dated April 18, 2006, a copy of which is attached as Ex. 1, and which is discussed *infra* at pp. 20-21.

developing procedures for changing or updating their systems to reflect the appropriate cost-sharing for Institutionalized Dual Eligibles.[5]

**C.     Plaintiffs' Claims for Relief**

Failing to obtain the regulatory relief they wanted, Plaintiffs filed this lawsuit. Plaintiffs' core claim is for money damages resulting from an alleged breach of contract. More specifically, Plaintiffs claim that their *members* are owed additional reimbursements under the terms of their PDP network contracts, in the form of co-payments that were allegedly withheld by UHG-affiliated PDPs.  In addition to money damages, Plaintiffs seek injunctive relief against UHG.  Specifically, Plaintiffs seek a temporary restraining order ("TRO") and a preliminary injunction that would bar UHG from issuing co-payment reimbursement checks to Institutionalized Dual Eligibles who are enrolled in UHG-affiliated PDPs.

Why such an injunction?  Forbidding UHG (or UHG-affiliated PDPs) from sending checks directly to the individual beneficiaries does not put one additional cent into Plaintiffs' pockets or into the pockets of Plaintiffs' members.  But such an injunction could, nonetheless, have a devastating impact on the PDPs' reimbursement rights from CMS.  As the evidence will show, CMS has imposed a May 31, 2007 deadline for PDPs to submit reports concerning all 2006 claims for which reimbursement is claimed by PDPs.  To substantiate such claims, the PDPs must document to CMS that they have, in fact, paid the co-payment adjustments at issue in this lawsuit either to a network pharmacy or directly to the Institutionalized Dual Eligible.  Absent such documentation,

---

[5] CMS Frequently Asked Question regarding "Best Available Data" for PDPs to Change Computer Systems, ID Number 7346 (May 26, 2006), a copy of which is attached as Ex. 2.

CMS may not credit the PDPs for any portion of the prescription drug claim—even that portion of the claim that the PDP paid.

Non-payment by CMS, however, would not necessarily extinguish the PDPs' own contractual obligations to its network pharmacies. Nor would it necessarily excuse the PDPs from liability to pay unclaimed reimbursements directly to the Institutional Dual Eligibles. As a result, PDPs would be exposed to new payment obligations that go completely unreimbursed by CMS. This exposure, in turn, could drastically shift the economic risks otherwise associated with Plaintiffs' core breach-of-contract claim. Absent the injunction, Plaintiffs' maximum potential recovery is precisely equal to UHG's maximum potential loss – both measured within the statutory framework where CMS is the ultimate payer. But if the injunction is granted, UHG is put at double jeopardy. UHG faces the risk that it will be required to pay substantial additional sums to the pharmacies (through the contractual claims-processing mechanism if not through this litigation) or later to the Institutional Dual Eligibles following dissolution of the injunction, yet the PDPs will be completely foreclosed by operation of CMS's May 31, 2007 deadline from obtaining reimbursement from CMS.

Plaintiffs' cynical attempt to extract such negotiating leverage by injunction should be rejected. As shown below, there is no basis for the entry of a TRO or a preliminary injunction.

II.    **Argument**

    A.    **Plaintiffs Must Satisfy a High Burden to Obtain Injunctive Relief.**

A TRO or preliminary injunction is "an extraordinary remedy that should be granted only when the party seeking the relief, by a clear showing, carries the burden of

persuasion." *See* <u>Chaplaincy of Full Gospel Churches,</u> 454 F.3d at 297 (quoting <u>Cobell v. Norton,</u> 391 F.3d 251, 258 (D.C. Cir. 2004)). The Court is vested with discretion as to whether injunctive relief should be granted. <u>Hecht Co. v. Bowles,</u> 321 U.S. 321, 329 (1944) ("An appeal to the equity jurisdiction conferred on federal district courts is an appeal to the sound discretion which guides the courts of equity.").

To prevail on their Motion, Plaintiffs must demonstrate: (1) a substantial likelihood of success on the merits; (2) that they would suffer irreparable injury if the injunction is not granted; (3) that an injunction would not substantially injure other interested parties; and (4) that the injunction would further the public interest. <u>CSX Transportation, Inc. v. Williams,</u> 406 F.3d 667, 670 (D.C. Cir. 2005). These four factors "interrelate on a sliding scale and must be balanced against each other." <u>Davenport v. International Brotherhood of Teamsters, AFL-CIO,</u> 166 F.3d 356, 361 (D.C. Cir.1999). In determining whether injunctive relief is appropriate, the Court must evaluate and balance the strengths of Plaintiffs' arguments as to <u>each</u> of the four factors. <u>Chaplaincy of Full Gospel Churches,</u> 454 F.3d at 304 ("We stress that a finding of irreparable injury is but one of four elements that comprise the preliminary injunction framework . . . . [A] preliminary injunction will not issue unless the moving party also shows, on the same facts, a substantial likelihood of success on the merits, that the injunction would not substantially injure other interested parties, and that the public interest would be furthered by the injunction."). As explained below, Plaintiffs fail to satisfy any of the four elements.

**B.    Plaintiffs Cannot Establish Irreparable Injury.**

Injunctive relief in the form of a TRO or preliminary injunction may be obtained

only if another adequate remedy at law is unavailable.  Northern Cal. Power Agency v.

Grace Geothermal Corp., 469 U.S. 1306, 1306 (1984) ("A party seeking an injunction

from a federal court must invariably show that it does not have an adequate remedy at

law.").  Plaintiffs bear the "burden of showing sufficient irreparable harm to command a

preliminary injunction from the district court." Sea Containers Ltd. v. Stena AB, 890

F.2d 1205, 1210-11 (D.C. Cir. 1989).  And Plaintiffs further bear the burden of showing

that the supposedly irreparable injury is "likely" to occur.  Nat'l Wildlife Fed'n v.

Burford, 835 F.2d 305, 325 (D.C. Cir. 1987); *see also* Amoco Prod. Co. v. Village of

Gambell, Alaska, 480 U.S. 531, 545 (1987).

The D.C. Circuit recently explained the very "high standard for irreparable injury"

that Plaintiffs must satisfy if they are to obtain injunctive relief:

> First, the injury 'must be both certain and great; it must be actual and not
> theoretical.'  *Wisc. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985
> (per curium)).  The moving party must show '[t]he injury complained of is
> of such *imminence* that there is a 'clear and present' need for equitable
> relief to prevent irreparable harm.  Second, the injury must be beyond
> remediation.  As we have stated: 'The key word is *irreparable*.  Mere
> injuries, however substantial, in terms of money, time and energy
> necessarily expended in the absence of a stay are not enough.  The
> possibility that adequate compensatory or other corrective relief will be
> available at a later date, in the ordinary course of litigation weighs heavily
> against a claim of irreparable harm.

Chaplaincy of Full Gospel Churches, 454 F.3d at 297-98 (quoting Va. Petroleum Jobbers

Ass'n v. FPC, 259 F.2d 921, 925 (D.C. Cir. 1958) (italics in original, underline added for

emphasis)).

The purportedly "irreparable harm" that Plaintiffs argue in their Motion boils down to the loss of an unspecified amount of money that LTC pharmacies will allegedly experience if checks are issued to Institutionalized Dual Eligibles who are enrolled in UHG-affiliated PDPs.[6]  (Plfs' Memo. in Support of Motion for Preliminary Injunction ("Plfs' Memo. in Supp."), at pp. 2, 12, 14 and 17).  It is well-settled, however, that lost income and other economic loss that is compensable by monetary damages does not constitute irreparable injury.  Chaplaincy of Full Gospel Churches, 454 F.3d at 297-98. See also Borey v. Natl. Union Fire Ins. Co., 934 F.2d 30, 34 (2d Cir. 1991) (mere monetary loss generally will not constitute an irreparable injury); Instant Air Freight Co. v. C.F. Air Freight Co., 882 F.2d 797, 801-802 (3d Cir. 1989) (harm not deemed irreparable even though nature of action involved loss of majority of business revenue). Indeed, "monetary loss can only constitute the irreparable harm necessary for injunctive relief when the loss 'threatens the very existence of the movant's business.'"  Woerner v. U.S. Small Business Admin., 739 F. Supp. 641, 650 (D.D.C. 1990) (emphasis added) (quoting Wisconsin Gas Co., 758 F.2d at 674).

Plaintiffs' assertion that simple economic injury can constitute irreparable harm is based upon cases that presented facts far different that those before the Court.  (See Plfs' Memo. in Supp. at p 19).  In World Duty Free Americas, Inc. v. Summers, 94 F. Supp. 2d 61 (D.D.C. 2000), the court issued a preliminary injunction enjoining enforcement of temporary government regulations concerning the importation of cigarettes.  The court found that plaintiffs had demonstrated a substantial likelihood of success on their claim

---

[6] Plaintiffs incorrectly allege that UHG will be issuing such checks, but this is not the case.  Checks would be issued by PDPs sponsored by UHG subsidiaries, who are not parties to this action.

that the regulations were issued in violation of the Administrative Procedure Act. The court further found that plaintiffs' economic damages were severe enough to constitute irreparable injury <u>only</u> because plaintiffs had established that the regulations caused plaintiffs' revenues to decline by 30 percent <u>and</u> because there was no way for plaintiffs to recoup such losses from either the government or their customers. <u>Id.</u> at 67. Similarly, in <u>Bracco Diagnostics, Inc. v. Shalala</u>, 963 F. Supp. 20 (D.D.C. 1997), the court found that a small drug manufacturer's loss of millions of dollars on additional research and development attributable to the Food and Drug Administration's disparate treatment of its products constituted irreparable harm <u>because</u> there was "'no adequate compensatory or other corrective relief' that [could] be provided at a later date . . . ". <u>Id</u>. at 28-29 (*quoting* <u>Hoffmann-Laroche Inc. v. Califano</u>, 453 F. Supp. 900, 903 (D.D.C. 1978)).

In contrast to <u>World Duty Free Americas</u> and <u>Bracco Diagnostics</u>, Plaintiffs have not made <u>any</u> factual representation that issuing the co-payment reimbursement checks at issue poses an actual and imminent threat to the existence of their members' pharmacies—or even that the amounts at issue represent a substantial portion of their members' revenue. In fact, Plaintiffs make no effort to quantify the amount of their alleged losses, or the percentage of revenue that the co-payments represent to their members. Plaintiffs' alleged injuries are speculative, at best. However, "[s]peculative injury does not constitute irreparable injury sufficient to warrant granting a preliminary injunction." <u>Caribbean Marine Srvs Co. v. Baldrige</u>, 844 F.2d 668, 674 (9th Cir. 1998) (citation omitted).

Moreover, Plaintiffs' lawsuit is predicated upon an alleged breach of contract. Because Plaintiffs can litigate their contract claim and obtain damages for their alleged

injuries if they prevail on the merits, they have not suffered an irreparable injury that warrants emergency injunctive relief.  <u>Chaplaincy of Full Gospel Churches</u>, 454 F.3d at 297-98 (lost income and other economic loss that is compensable by monetary damages generally will not be considered an irreparable injury).

Further, the economic injury that Plaintiffs argue their members will experience if the Motion is not granted is unsubstantiated, and entirely of their members' own making.  In their Complaint (¶ 32) and Motion (Memo. in Supp. at pp. 1 and 20), Plaintiffs argue that nursing home residents will suffer confusion, anxiety and distress if they <u>receive</u> checks from UHG-affiliated PDPs.  Plaintiffs fail to offer any support for this argument, and it is difficult to fathom how the receipt of money will cause confusion, anxiety or distress—especially since CMS's own regulation <u>requires</u> the direct reimbursement of beneficiaries who are charged co-payments in error.  (42 C.F.R. § 423.800(c)).

Plaintiffs then shift gears and argue that their member pharmacies (rather than the nursing home residents) will suffer irreparable injury by having to expend time and resources chasing down reimbursement checks from nursing home residents.  (Plfs' Memo. in Supp. at pp. 20-21).  Putting aside the entirely unsupported nature of this claim, this argument is akin to the proverbial child who kills his parents and then begs for the court's mercy, claiming he is an orphan.  Any injury that Plaintiffs' members *may* experience following issuance of the reimbursement checks at issue is entirely of the pharmacies' own making, since they refused to resubmit their claims to UHG-affiliated PDPs for processing despite months of opportunity to do so.  Rather than resubmitting their claims like many other LTC pharmacies have done, Plaintiffs played a game of "chicken" and held out for a lump-sum payment—which forced UHG-affiliated PDPs to

be in a position of issuing checks to comply with CMS's May 31, 2007 deadline.  Now that the checks are about to be issued, Plaintiffs try to shift the blame for their purported injuries to UHG and its affiliated PDPs, even though the pharmacies could have avoided such claimed injuries entirely.

Moreover, Plaintiffs cannot establish that their members' alleged (and speculative) injuries were caused by UHG or would be redressed by entry of injunctive relief.  By Plaintiffs' own admission, the co-payment reimbursement matter at issue affected "virtually every" PDP in the United States, and "many PDPs . . . *still* have not reimbursed [long term care ("LTC")] pharmacies for the shortfall."  (*See* Compl. ¶ 22; Plfs' Opposition to Motion to Dismiss [Docket No. 13] at pp. 3 and 5).

Perhaps recognizing that they have an adequate remedy at law which precludes the issuance of a preliminary injunction, Plaintiffs assert that "[t]he calculus is different in this case [because UHG's] actions are a clear violation of federal law," and that "irreparable injury must be presumed in a statutory enforcement action."  (Plfs' Memo. in Supp., at p. 18) (citing U.S. v. Richlyn Labs., Inc., 827 F. Supp. 1145, 1150 (E.D. Pa. 1992), and Government of the Virgin Islands v. Virgin Islands Paving, Inc., 714 F.2d 283, 286 (3d Cir. 1983)).  Plaintiffs' argument is devoid of merit.

As a threshold matter, Plaintiffs are simply wrong, as a matter of law, that the Medicare Modernization Act (the "MMA") or CMS regulations or guidance require the remittance of adjusted co-payment amounts directly to LTC pharmacies.  To the contrary, as explained below, the MMA, Medicare Part D regulations, and CMS guidance do not impose an obligation on PDPs to pay LTC pharmacies for co-payment adjustments where the pharmacies refuse to resubmit claims after updated CMS data is received.

Accordingly, Plaintiffs cannot establish even a *prima facie* case that UHG is violating federal Medicare statutes and regulations.

Further, the cases cited in Plaintiffs' Motion are inapposite to the facts at issue. Both Richlyn Labs and Virgin Island Paving involved statutes that specifically authorized issuance of preliminary injunctions upon a showing of probable cause that the respective statutes were being violated. In Richlyn Labs, the United States sought an injunction pursuant to a provision in the Federal Food, Drug and Cosmetic Act, to enjoin a drug manufacturer's violations of FDA safety guidelines. In granting the injunction, the court noted that "where . . . an injunction is being sought pursuant to a statutory provision," the traditional four-part framework for evaluating injunctive relief is replaced, and that a plaintiff need show only probable cause that the statute is being violated and is likely to be violated in the future. Richlyn, 827 F. Supp. at 1150 (emphasis added). In Virgin Islands Paving, the Third Circuit ruled that because an environmental statute specifically authorized injunctive relief upon the government's showing of a *prima facie* violation of the law, the legislature had intervened through the statute to control the district court's exercise of its traditional discretion with respect to injunctive relief. 714 F.2d at 286. Thus, contrary to Plaintiffs' argument, both Richlyn Labs and Virgin Island Paving stand for the proposition that in the absence of a statutory provision specifically authorizing injunctive relief as an enforcement mechanism, a district court may issue a preliminary injunction only after all four prongs of the traditional test are satisfied. Indeed, the Supreme Court has ruled:

> [T]he basis for injunctive relief in the federal courts has always been
> irreparable injury and the inadequacy of legal remedies. . . . The grant of
> jurisdiction to ensure compliance with a statute hardly suggests an
> absolute duty to do so under any and all circumstances, and a federal judge

> sitting as chancellor is not mechanically obligated to grant an injunction for every violation of the law.

Weinberger v. Romero-Barcelo, 456 U.S. 305, 313 (1982).

Plaintiffs do *not* allege that they are suing UHG pursuant to any provision of the MMA or other applicable federal law governing Medicare, and they do not cite any provision of the MMA or other statute authorizing them to seek a preliminary injunction to enforce Medicare laws and regulations. Accordingly, Plaintiffs cannot escape the traditional four-part test that governs when the Court, in its discretion, may issue a TRO or a preliminary injunction.

**C.     Plaintiffs Cannot Show a Substantial Likelihood that They Will Prevail on the Merits.**

Separate and apart from the lack of irreparable injury, Plaintiffs fail to satisfy their burden of establishing a substantial likelihood of prevailing on the merits. Plaintiffs assert that their members have contractual claims against UHG, but they have not even submitted the network contracts to the Court or established that they have submitted the claims on a timely basis, and otherwise in accordance with contracts' terms. Moreover, the regulations and CMS guidance on which Plaintiffs rely do *not* support their claim of entitlement to a direct reimbursement of the co-payment amounts at issue. At most, Plaintiffs have established that they have a potential claim for the co-payments at issue, but such a claim does not satisfy their burden of proof of establishing a *likelihood* of success on the merits.

**1.     Plaintiffs' Breach of Contract Claim Fails Since UHG Does Not Contract with Any LTC Pharmacy**

In Complaint ¶ 34, Plaintiffs allege that UHG "has a 'network pharmacy contract' with each of Plaintiffs' members . . .," and that UHG has violated "[its] contractual

obligations" by not directly reimbursing LTC pharmacies for the co-payments at issue.
*See also* Plfs' Memo. in Supp. at pp. 2, 16, 17, 19, and 24.  However, Plaintiffs do not
have a substantial likelihood of prevailing on their breach of contract claim since UHG is
not a party to any contract with any LTC pharmacy.  As described in UHG's Motion to
Dismiss (at pp. 26-27) and in UHG's Reply in Support of its Motion to Dismiss [Docket
No. 15] (at pp. 19-21), incorporated herein by reference, Plaintiffs rushed to the
courthouse and sued UHG, a holding company, instead of UHG's wholly owned
subsidiaries with whom its members have entered into contracts regarding the provision
of drugs under Medicare Part D.[7]  Although UHG owns subsidiaries that sponsor PDPs,
and which contract with LTC pharmacies, the contractual obligations of such subsidiaries
are not attributable to UHG.  It is well-established that "under ordinary circumstances a
contract in terms and in name with one corporation cannot be treated as that of [another],
and a parent will not be liable for the obligations of its subsidiaries."  T & S Products,
Inc. v. U.S., 48 Fed. Cl. 100, 111 (Ct. Clms. 2000) (quoting BLH, Inc. v. U.S., 13 Cl. Ct.
265, 272 (1987)).  *See also* U.S. v. Bestfoods, 524 U.S. 51, 61 (1998) ("It is a general
principle of corporate law deeply 'ingrained in our economic and legal systems' that a
parent corporation (so-called because of control through ownership of another
corporation's stock) is not liable for the acts of its subsidiaries"); Tennessee Valley Auth.
v. Exxon Nuclear Co., Inc., 753 F.2d 493, 497 (6th Cir. 1985) (under ordinary

---

[7] As explained in the Motion to Dismiss, at pp. 26-27, UHG owns the following
subsidiaries that sponsor PDPs:  UnitedHeathcare Insurance Company; UnitedHealthcare
of New York, Inc.; PacifiCare Life and Health Insurance Company; and PacifiCare
Insurance Company.  Even these subsidiaries do not directly contract with LTC
pharmacies for purposes of providing Medicare Part D benefits.  Rather, the subsidiaries
contract with Pharmacy Benefit Managers ("PBMs"), and, among other things, the PBMs
enter into contracts with LTC pharmacies.  Id. at p. 27, n. 23.

circumstances, a parent corporation is not liable for the contractual obligations of its

subsidiaries) (citing 1 *W. Fletcher Cyclopedia Corporations*, § 43 (1983)).

Even if it is assumed, *arguendo*, that UHG-affiliated PDPs breached their

contracts with LTC pharmacies with respect to the reimbursement of co-payments for

Institutionalized Dual Eligibles, Plaintiffs have not alleged any facts that would support

holding UHG—the parent company—liable for the actions of its subsidiaries. "The law

in the District of Columbia is that 'the acts and obligations of the corporate entity will <u>not</u>

be recognized as those of [another] until the person seeking to disregard the corporate

entity has proved by affirmative evidence that there is (1) unity of ownership and interest

<u>and</u> (2) <u>use of the corporate form to perpetrate fraud or wrong</u>." <u>Smith v. Washington</u>

<u>Sheraton Corp.</u>, 135 F.3d 779, 786 (D.C. Cir. 1998) (emphasis added) (holding that a

parent company could not be held liable for harm caused by a condition on a subsidiary's

property) (quoting <u>Vuitch v. Furr</u>, 482 A.2d 811, 815 (D.C. 1984)).

While Plaintiffs, in their Opposition to UHG's Motion to Dismiss [Docket No. 13]

(at p. 17), argue that UHG is dictating the co-payment reimbursement policy of its

subsidiaries, this conclusory accusation fails to satisfy the criteria necessary to even

allege entitlement to pierce the corporate veil in the D.C. Circuit. Rather, Plaintiffs must

not only allege (and establish) that UHG "exercise[d] such control over the subsidiar[ies]

that the subsidiar[ies] ha[ve] become mere instrumentalit[ies]," but <u>also</u> that the

subsidiaries "[were] created or used *for the purpose* of perpetrating fraud or wrongdoing."

<u>Penick v. Frank E. Basil, Inc. of Delaware</u>, 579 F. Supp. 160, 165 (D.D.C. 1984).

Plaintiffs have not, and cannot, allege the subsidiaries with whom LTC pharmacies

entered into network contracts were mere instrumentalities of UHG, or that they were

established or maintained to perpetrate fraud or wrongdoing against LTC pharmacies. Accordingly, their argument that UHG can be held liable for contracts entered into by its subsidiaries is without merit.

Given that UHG is not a party to any contract with a member of LTCPA or ASCP, and that there is no factual basis to pierce UHG's corporate veil, Plaintiffs' do not have a substantial likelihood of prevailing on their breach of contract claim and thus cannot obtain emergency injunctive relief in the form of a TRO and preliminary injunction.

### 2.    Plaintiffs Do Not Have a Substantial Likelihood of Prevailing On Their Statutory and Regulatory Claim.

Contrary to Plaintiffs' assertions, neither the Medicare Modernization Act (the "MMA") nor regulations issued by CMS require PDPs to remit co-payments directly to LTC pharmacies with respect to Institutionalized Dual Eligibles. The provisions of the MMA and Medicare Part D regulations cited in the Complaint and Plaintiffs' Motion only address *whether* Institutionalized Dual Eligibles can be charged co-insurance or co-payments; they do not address whether any adjusted amounts must be paid to pharmacies following the PDPs' receipt of corrected cost-sharing data from CMS.

### a.    The Medicare Statute Does Not Require Direct Payment to LTC Pharmacies.

The only statutory provision cited in Plaintiffs' Complaint and Motion (42 U.S.C. § 1395w-114(a)(1)(D)(i)) provides that individuals with incomes below 135 percent of the federal poverty level are entitled to specific subsidies, including:

> In the case of an individual who is a full-benefit dual eligible individual and who is an institutionalized individual or couple (as defined in section 1396a(q)(1)(B) of this title), the elimination of any beneficiary coinsurance described in section 1395w-102(b)(2) of this title (for all

amounts through the total amount of expenditures at which benefits are available under section 1395w-102(b)(4) of this tile).

Nothing in this statute—or in any other provision of the MMA—provides that co-payments with respect to Institutionalized Dual Eligibles must be remitted directly to LTC pharmacies. Nor does the statute prohibit PDPs from remitting the co-payments at issue directly to Institutionalized Dual Eligibles. Indeed, CMS regulations (42 C.F.R. § 423.800(c)) require PDPs to reimburse <u>beneficiaries</u> for co-payments that are incorrectly assessed. As the statute does not require direct payment to LTC pharmacies, Plaintiffs do not have a substantial likelihood of prevailing on their statutory claim.

        **b.**    **CMS Regulations and Guidance Do Not Require Direct Payment to LTC Pharmacies, and Only Permit Such <u>Payments Upon Submission of Appropriate Data</u>.**

Plaintiffs' argument that UHG violated CMS regulations similarly fails. Neither the Medicare Part D regulations nor the informal guidance issued by CMS requires PDPs to remit co-payments with respect to low-income subsidy eligible individuals directly to pharmacies. CMS's regulations simply provide that "full benefit dual eligibles who are institutionalized have no cost sharing for covered Part D drugs covered under their PDP . . . ." (42 C.F.R. § 423.782(a)(2)(ii)), and that when a PDP is made aware that a low-income subsidy eligible individual has been assigned a co-payment incorrectly, the PDP must remit the co-payment directly to the beneficiary. 42 C.F.R. § 423.800(c) ("The Part D sponsor offering the Part D plan must reimburse subsidy eligible <u>individuals</u> . . . any excess premiums and cost-sharing paid by such individual . . . ."). The plain language of the regulation does not impose an affirmative duty upon PDPs to remit co-payment amounts associated with Institutionalized Dual Eligibles directly to LTC pharmacies. Plaintiffs instead ask the Court to "read into" the regulation such a duty, based on a series

of informal guidance issued by CMS.  (*See* Compl. ¶¶ 24-25, 27-28, 34).  As shown below, however, CMS's informal guidance does not require the remittance of co-payments directly to LTC pharmacies, but instead merely provides that PDPs are permitted to remit co-payments to LTC pharmacies *if* such pharmacies satisfy the claims processes established by the PDPs, which Plaintiffs' members generally have refused to do.

Specifically, CMS issued four pieces of related guidance in 2006, in which it attempted to address the concerns of LTC pharmacies, with each piece of subsequent guidance more specific as to the reimbursement process.  When read together, it is clear that CMS does not require PDPs simply to cut checks to LTC pharmacies upon the submission of spreadsheets.

### i.    <u>CMS's "Tip Sheet"</u>

In Complaint ¶ 24, and in their Memo. in Supp. (at p. 10), Plaintiffs quote a "Tip Sheet" issued by CMS on April 18, 2006, which, Plaintiffs assert, requires PDPs to remit co-payments to LTC pharmacies in a single lump-sum payment.  The Tip Sheet, attached as Ex. 1, provides, in pertinent part, that:

> Dual eligibles who reside in [LTC] facilities *may* not have to pay co-payments for their prescription drugs.  Pharmacies will receive a one-time payment for the amount of any <u>uncollected</u> co-payments for the people who were mistakenly identified as having to pay co-payment amounts. The pharmacy will need to submit a spreadsheet with claim information to the prescription drug plan.
>
> **Note:**  <u>Processes may vary between plans.  Following the drug plan's directions may ensure timely reimbursements</u>.  (Emphasis added).

Plaintiffs' Complaint and Motion omit the above-emphasized paragraph, which clearly reflects CMS's recognition that the processes by which reimbursements (if any)

are to be made depends upon the PDP with whom the LTC pharmacy is dealing.[8]  Thus, rather than supporting Plaintiffs' argument, the CMS Tip Sheet makes clear that PDPs are not required to remit co-payments directly to LTC pharmacies upon demand, as subsequent CMS guidance demonstrates.

### ii.    CMS's April 20, 2006 FAQ

In Complaint ¶ 25, and Plfs' Memo. in Supp. (at p. 11), Plaintiffs quote CMS's April 20, 2006 response to a "Frequently Asked Question" ("FAQ"), which provides only that, when implementing retroactive subsidy level changes for Institutionalized Dual Eligibles *based upon PDPs receiving corrected data from CMS*:

> [PDPs] should not <u>automatically</u> reimburse beneficiaries residing in [LTC] facilities.  In such situations, it is <u>unlikely</u> that LTC pharmacies have collected the applicable cost-sharing from beneficiaries due to the <u>expectation</u> that the plan eventually would reimburse the pharmacy retroactively for such amounts.  In such situations, Part D plans should work with their pharmacies to provide them with direct reimbursement for any cost-sharing amount <u>not collected from institutionalized individuals</u>. . . . Providing direct reimbursements to LTC pharmacies for excess cost sharing charges <u>that have not been paid by Part D enrollees or waived by the pharmacy</u> does not conflict with [the PDP's obligation to reimburse Institutionalized Dual Eligibles for incorrectly assessed co-payments].

(CMS Frequently Asked Question, "Reimbursement to LTC Pharmacies, for Retroactive Subsidy-level Cost Sharing Changes," ID Number 7043 (April 20, 2006) a copy of which is attached as Ex. 3, (emphasis added)).

Plaintiffs ask the Court to ignore the above-emphasized caveats in the FAQ, which make clear that that remittance of co-payments directly to a LTC pharmacy is

---

[8] The Complaint suggests that all Institutionalized Dual Eligibles are exempt from co-payments, but such individuals are exempt from co-payments <u>only</u> if they reside in a LTC facility for a full calendar month under a covered Medicaid stay.  42 C.F.R. § 423.782(a)(2)(ii).  Until a PDP receives confirmation that an individual qualifies as an Institutionalized Dual Eligible residing at a LTC facility for a full month, there is no basis to waive Part D's otherwise applicable co-insurance or co-payment.

permissible, *provided that* the pharmacy did not: (1) collect co-payments from Institutionalized Dual Eligibles, or (2) waive the co-payments.

### iii.    CMS's May 5, 2006 Guidance

In Complaint ¶ 27, and Plfs' Memo. in Supp. (at p. 11), Plaintiffs refer to guidance issued by CMS on May 5, 2006, which simply provides, in pertinent part, that:

> Part D plans are <u>encouraged</u> to reimburse LTC pharmacies directly when implementing retroactive subsidy level changes. Plans should not <u>automatically</u> reimburse beneficiaries residing in LTC facilities because it is <u>unlikely</u> that the LTC pharmacies have billed the beneficiaries for their copayments.

(Ex. 2, emphasis added). The plain language of the May 2006 guidance indicates, similar to previous CMS guidance, that direct payments to LTC pharmacies is an option, not an affirmative obligation, and it goes on to provide that plans have flexibility in developing their reimbursement procedures. Accordingly, neither the MMA, CMS regulations, nor CMS's guidance requires remittance of co-payments with respect to Institutionalized Dual Eligibles directly to LTC pharmacies.

### iv.    CMS's December 22, 2006 Guidance

Plaintiffs, in their Opposition to UHG's Motion to Dismiss, rely upon CMS guidance issued on December 22, 2006, attached as Ex. 4, which essentially repeats CMS's earlier guidance, and provides, in pertinent part, that:

> In accordance with our rules at 42 CFR 423.800(c), plan sponsors have an obligation to make the [low-income subsidy]-eligible individual whole by refunding any improperly collected cost sharing. . . . [However,] [m]any LTC pharmacies did not collect the cost sharing amounts that were incorrectly charged. As many LTC pharmacies continue to hold receivable balances for cost sharing amounts that should have been subsidized by the plan, Part D plan sponsors need to work with them to ensure appropriate reconciliation of amounts owed. . . . <u>Before reimbursement is made directly to LTC pharmacies</u>, plan sponsors need to <u>ensure</u> that the pharmacies in question have <u>not</u> collected or otherwise

waived the cost sharing charges, and, in fact, are carrying a debt for the amounts owed.  Plan sponsors may accomplish this by working with their network LTC pharmacies to ensure <u>appropriate documentation and attestations</u> are provided to justify payment to the LTC pharmacy for excess cost sharing amounts that should have been paid by the plan under the low income subsidy.  (Emphasis added).

Under CMS's December 22, 2006 guidance, a PDP is allowed to reimburse a LTC pharmacy <u>only</u> if the pharmacy has provided "appropriate documentation and attestations" establishing that the LTC pharmacy:  (1) did not collect the cost sharing amounts; (2) did not waive the cost sharing charges, and (3) is carrying a debt on its books for the cost sharing amounts.  Plaintiffs' member pharmacies have generally refused to provide UHG-affiliated PDPs with the information required by the plans to satisfy CMS.  Accordingly, Plaintiffs' assertion that UHG has violated CMS guidance is without merit.  Given that Plaintiffs cannot establish a likelihood of succeeding on the merits of their claim against UHG, the Court should deny Plaintiffs' Motion for a TRO and a preliminary injunction.

**C.    The Public Interest Would Not Be Served by the Issuance of a <u>Preliminary Injunction.</u>**

Public interest would not be served by the issuance of a preliminary injunction. In defining the relevant "public interest" in the context of a preliminary injunction motion, courts often look to the regulations and guidance issued by the government agency with regulatory authority.  <u>Nat'l Conf. on Ministry to the Armed Forces v. James</u>, 278 F. Supp. 2d 37, 53 (D.D.C. 2003) ("'Of substantial importance . . . is the public's interest in relying on an agency's strict adherence to its own regulations'") (*quoting* <u>DRG Funding Corp. v. Secretary of Housing & Urban Dev.</u>, 1998 WL 90107, at *7 (D.D.C. August 12, 1988)).  *See also* <u>Independence Fed. Sav. Bank v. Bender</u>, 326 F. Supp. 2d

36, 49 (D.D.C. 2004) (the public interest lies in compliance with federal regulations and government oversight; plaintiff's aim to advance a personal interest does not satisfy the third prong of the preliminary injunction framework); Moore's Federal Practice (3rd Ed.) § 65.22[3] ("In deciding what issues are imbued with 'public interest,' courts have given considerable weight to the policies of Congress, the executive branch, and local governments.").

Here, CMS has promulgated regulations that generally require PDPs to reimburse the individual Medicare Part D beneficiaries directly when there has been a change in their low-income subsidy status. Specifically, 42 CFR § 423.800, entitled "Administration of subsidy program" provides, in relevant part:

> (a)  Notification of eligibility for low-income subsidy. CMS notifies the Part D sponsor offering the Part D plan, in which a subsidy eligible individual is enrolled, of the individual's eligibility for a subsidy under this section and the amount of the subsidy.
>
> (b)  Reduction of premium or cost-sharing by PDP sponsor or organization. The Part D sponsor offering the Part D plan, in which a subsidy eligible individual is enrolled must reduce the individual's premiums and cost-sharing as applicable, and provide information to CMS on the amount of those reductions, in a manner determined by CMS. The Part D sponsor must track the application of the subsidies under this subpart to be applied to the out-of-pocket threshold.
>
> (c)  Reimbursement for cost-sharing paid before notification of eligibility for low-income subsidy. The Part D sponsor offering the Part D plan must reimburse subsidy eligible individuals, and organizations paying cost-sharing on behalf of such individuals, any excess premiums and cost-sharing paid by such individual or organization after the effective date of the individual's eligibility for a subsidy under this subpart.

In sum, the regulation expressly provides that:  (1) CMS determines the Part D beneficiaries' low-income subsidy status; (2) a PDP is required to follow CMS's determination of low-income subsidy status when calculating the applicable cost sharing

subsidies; and (3) a PDP "must reimburse subsidy eligible *individuals*" for any excess cost sharing paid before the PDP was notified of the beneficiaries' eligibility for the low income subsidy. Id. Accordingly, the public interest, as articulated by CMS, supports issuing payment to individual Medicare Part D beneficiaries whose low-income subsidy status was changed.

The informal guidance issued by CMS further supports this conclusion, as the guidance only permits PDPs to cut checks to LTC pharmacies in limited circumstances. Specifically, a PDP is allowed under CMS guidance to reimburse a LTC pharmacy only if the pharmacy has provided "appropriate documentation and attestations" establishing that the LTC pharmacy: (1) did not collect the cost sharing amounts; (2) did not waive the cost sharing charges, and (3) is carrying a debt on its books for the cost sharing amounts. *See* December 22, 2006 CMS Guidance, attached as Ex. 4.

As noted above, CMS's April 2006 guidance specifically recognizes that, to support their right to payment, LTC pharmacies must resubmit their claims to the PDP in accordance with procedures established by the PDP. *See* CMS Tip Sheet, Ex. 1 ("The pharmacy will need to submit a spreadsheet with claim information to the prescription drug plan. **Note:** Processes may vary between plans. Following the drug plan's directions may ensure timely reimbursements."). As described in the Motion to Dismiss at pp. 13-14, and as the evidence will show, the resubmission of claims by LTC Pharmacies following the correction of CMS data is required so that PDPs can track prescription drug expenditures and create a trail for CMS to follow when auditing payments to PDPs.

As the evidence will show, LTC pharmacies across the country have followed CMS's guidance and complied with the procedures established by UHG-affiliated PDPs,

with such pharmacies resubmitting their claims with respect to low-income subsidy individuals along with attestations that they: (1) did not collect any co-payment; (2) did not waive the co-payment; and (3) are carrying a debt on their records for the amount of the co-payments at issue. And, with respect to those eligible claims that were reprocessed when corrected CMS data was available reflecting a change in low-income subsidy status, UHG-affiliated PDPs have remitted the co-payment amounts to the LTC pharmacies, in accordance with CMS's guidance.

In their Motion, Plaintiffs offer dire predictions that a parade of horribles will arise if UHG-affiliated PDPs issue checks to Institutionalized Dual Eligibles, and LTC pharmacies thereafter attempt to recover such sums from the individuals. Plfs' Memo. in Supp. at pp. 1-2, 20-21. As an initial matter, Plaintiffs' predictions are completely unsupported. Second, any disruptions that may arise would be of the LTC pharmacies own making. Plaintiffs' members have had plenty of opportunity to timely resubmit their claims in accordance with CMS guidance and the procedures established by UHG-affiliated PDPs. Plaintiffs and their members chose instead to seek reimbursement only through this lawsuit, claiming that UHG has an obligation to pay them without any further action on their part. Accordingly, the LTC pharmacies' purported need to pursue repayment from nursing home residents who receive checks from UHG-affiliated PDPs would not arise because of any action taken by UHG (or a subsidiary), but rather would arise because the LTC pharmacies failed to timely pursue the payment options available to them under the CMS guidance and the PDPs' procedures.

**D.**     **An Injunction Would Substantially Injure Other Interested Parties.**

Issuance of an injunction that prevents payment to the individual Medicare Part D beneficiaries would substantially injure these individuals.  Having qualified for Medicaid, the individual Medicare Part D beneficiaries whose claims are at issue are undisputedly persons with very limited income and financial resources.  Issuance of an injunction would delay the payment of money due under CMS's regulations to these individuals of limited means.

And, contrary to Plaintiffs' argument, issuance of an injunction would substantially injure PDPs sponsored by subsidiaries of UHG.  As the evidence will show, in order to be credited by CMS for 2006 claims, PDPs must issue payment with respect to the claims and thereafter fully and appropriately complete CMS's reimbursement submission process by May 31, 2007.  To meet CMS's May 31 deadline, UHG-affiliated PDPs must begin the process of issuing checks related to the claims at issue by no later than April 1, 2007.  Failure to pay the co-payments at issue and to submit the required reports to CMS by the May 31 deadline puts UHG at risk of not being credited by CMS for tens of millions of dollars in claims, which is exponentially more the amount of co-payments allegedly owed to Plaintiffs' member pharmacies.  Accordingly, an injunction preventing UHG-affiliated PDPs from issuing the checks at issue would significantly harm the PDPs.

This stands is stark contrast to the absence of any irreparable harm to Plaintiffs if a preliminary injunction is not issued.  The absence of a preliminary injunction causes no harm to Plaintiffs, and any valid claim they have to the co-payments at issue may be pursued by litigating this case.  Further, denial of Plaintiffs' Motion is warranted because,

as discussed above, any harm that the Plaintiffs' members arguably may suffer is of their own making, having chosen not to timely pursue the payment options available to them under the CMS guidance and the resubmission procedures adopted by UHG-affiliated PDPs.

**IV.**    **Conclusion**

     For the foregoing reasons, Plaintiffs' Motion for a Temporary Restraining order and a Preliminary Injunction should be denied.

                     Respectfully submitted,

                           /s/Mark C. Nielsen_____

Date:  March 22, 2007         Thomas F. Fitzgerald (Bar No. 358232)
                        Michael J. Prame (Bar No. 451017)
                        Mark C. Nielsen (Bar No. 465220)
                        Groom Law Group, Chartered
                        1701 Pennsylvania Avenue, NW
                        Washington, DC  20006
                        Telephone:   202.857.0620
                        Facsimile:    202.659.4503
                        Email:         tff@groom.com
                                        mjp@groom.com
                                        mcn@groom.com

                     **Attorneys for Defendant**

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that a copy of UnitedHealth Group Incorporated's

Memorandum of Points and Authorities in Opposition to Plaintiffs' Motion for a

Temporary Restraining Order and a Preliminary Injunction, and a Proposed Order , as

served, via electronic delivery, on the 22 day of March 2007, upon the following:

David Farber, Esq.
Harry Silver, Esq.
Patton Boggs
2550 M Street, NW
Washington, DC  20037
dfarber@pattonboggs.com
hsilver@pattonboggs.com

Counsel for Plaintiffs


March 22, 2007                                        _____/s/ Mark C. Nielsen_____
                                                     Mark C. Nielsen (Bar No. 465220)
                                                     Groom Law Group, Chartered
                                                     1701 Pennsylvania Avenue, NW
                                                     Washington, DC  20006
                                                     Telephone:    202.857.0620
                                                     Facsimile:    202.659.4503
                                                     Email:        mcn@groom.com

                                                     **Counsel for Defendant**