IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| LONG TERM CARE PHARMACY ALLIANCE, 1776 Massachusetts Avenue, N.W., Suite 410 Washington, D.C. 20036, and<br><br>AMERICAN SOCIETY OF CONSULTANT PHARMACISTS, 1321 Duke Street, Alexandria, VA 22314,<br>       Plaintiffs,<br><br>v.<br><br>UNITEDHEALTH GROUP, INC.,<br>       Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) Case No: 1:06-CV-01221-ESH-JMF<br>)<br>)<br>)<br>) |

## VERIFIED AMENDED COMPLAINT

Plaintiffs Long Term Care Pharmacy Alliance ("LTCPA") and American Society of Consultant Pharmacists ("ASCP"), for themselves and on behalf of their members (collectively the "Long Term Care Pharmacies" or "LTC Pharmacies"), bring this Amended Complaint, and state as follows:

## NATURE OF THE DISPUTE

1. Plaintiffs bring this action to obtain a declaratory judgment that Defendant UnitedHealth Group, Inc. ("Defendant" or "UnitedHealth"), the largest Medicare Prescription Drug Plan ("PDP"), is violating Federal law, its contract with the Federal Government, and contracts with Plaintiffs' member LTC Pharmacies by (a) failing to reimburse to LTC Pharmacies "co-payment" amounts that Defendant has wrongfully withheld or caused to be withheld from the reimbursement paid to LTC Pharmacies for "dual eligible" nursing home residents' prescription drugs and (b) instead disbursing millions of dollars of checks, many for $1 and $3, to the residents themselves. In accordance with Federal law, the LTC Pharmacies did not collect, and

4882397

the residents did not pay, the co-payment amounts when the pharmacies dispensed the residents' medications. Nonetheless, the co-payments were deducted from the reimbursement Defendant paid or caused to be paid to the LTC Pharmacies for those medications. There is no dispute that the amounts at issue are owed by Defendant and its sponsored PDPs.

2. Unfortunately, although: (a) Defendant is on specific notice that the amounts are actually owed to the LTC Pharmacies, not the residents; (b) Federal law, regulation and policy all require Defendant and its sponsored PDPs to pay the LTC Pharmacies, not the residents; (c) Defendant's and its PDPs' contract with the Federal Government requires it to abide by those laws; and (d) the Federal Government has directed Defendant (and all other PDPs) to reimburse the LTC Pharmacies directly, Defendant continues to insist that it will disburse the funds to nursing home residents rather than to the LTC Pharmacies. Defendant's excuse is that its computer systems are incapable of any other action.

3. Further, and most egregious, Defendant has now announced that it will undertake no further processing of outstanding 2006 co-payment claims. Thus, Plaintiffs seek a declaration that Defendant has no right to withhold these reimbursement payments and that it is the LTC Pharmacies, not the nursing home residents, to which the reimbursement is actually owed and should be paid forthwith.

**PARTIES**

4. Plaintiff LTCPA is a Delaware limited liability company headquartered in the District of Columbia and organized for the express purpose of protecting the interests of long term care pharmacies and long term care facility residents and advocating on their behalf before governmental and other entities.

5. In addition to speaking for the nation's nursing home residents, LTCPA represents its members, including the three largest long term care pharmacy companies in the United States -- Kindred

Pharmacy Services, Omnicare, Inc., and PharMerica. Kindred is a Delaware corporation and its principal place of business is in Kentucky. Omnicare is also a Delaware corporation that has its principal place of business in Kentucky. PharMerica is a wholly-owned subsidiary of AmerisourceBergen, a Delaware corporation with its principal place of business in Pennsylvania. PharMerica's principal place of business is in Florida. The LTC Pharmacies represented by LTCPA play a vital role in providing prescription medications and drug therapy for tens of thousands of senior citizens and individuals with chronic illnesses living in long term care facilities, including seniors and other individuals residing in nursing homes who are within the new Medicare drug benefit. LTCPA is authorized, on behalf of itself and its members, to bring this action.

6. Plaintiff ASCP is a Massachusetts corporation, with its principal place of business in Alexandria, Virginia. ASCP serves as the international professional society representing senior care and consultant pharmacists, including pharmacists across the United States and in the District of Columbia, by providing leadership, education, advocacy, and resources to advance the practice of senior care pharmacy. Consultant pharmacists and senior care pharmacists play a vital role in reviewing optimal drug therapy for millions of senior citizens and individuals with chronic illnesses living in long term care facilities and other community settings, including individuals in the District of Columbia. ASCP represents thousands of practicing pharmacists in the United States. ASCP is authorized, on behalf of itself and its members, to bring this action.

7. Defendant UnitedHealth is a corporation organized and existing under the laws of the State of Minnesota, with its headquarters and principal place of business in Minnetonka, Minnesota. UnitedHealth, directly and through its affiliates and subsidiaries, owns and operates the largest PDP (and other PDPs) which, among other things, provides prescription drugs to tens of thousands of full benefit dual eligible Medicare beneficiaries residing in nursing homes and other

institutions that are enrolled in its Plan. UnitedHealth accounts for about one-third of all PDP enrollees nationwide. Upon information and belief, UnitedHealth is doing business in the District of Columbia.

## JURISDICTION AND VENUE

8. Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 2201 and 28 U.S.C. § 1332 in that this is a diversity action for declaratory relief, Plaintiffs and Defendant are residents of different jurisdictions, there is an actual case or controversy present in this case, and the amount in controversy exceeds ten million dollars. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because Plaintiff LTCPA resides in this District, events giving rise to the claim occurred in this District, and Defendant is doing business in this District. Defendant has consented to this Court's exercise of personal jurisdiction over it.

## BACKGROUND

### Long Term Care Pharmacies and the Residents They Serve

9. LTCPA members, and many ASCP members, own and operate long term care pharmacies, meaning they are not open to the public and do not provide retail services. LTC Pharmacies focus on serving the needs of individuals who are frail, elderly, or disabled and reside in nursing homes. The average nursing home patient is approximately 83 years of age, has approximately 8 different medical diagnoses, and requires an average of 8 medications at any given time.

10. In order to serve this frail and fragile population, LTC Pharmacies provide numerous additional services in dispensing drugs to this population beyond those provided by retail pharmacies. For example, LTC Pharmacies provide specialized medication packaging in "unit dose packages" (referred to as "blister packs"), specialized drug regimen reviews, chart reviews, and consultant pharmacy services. In addition, the LTC Pharmacies deliver medications to long term care

residents and are available on a 24-hour a day, 7-day a week basis each and every day of the year. These extra services not only provide effective and efficient care for nursing home residents, but also save the poor and frail from possible medication errors or the need to be transported from their homes to hospitals for more intensive care. In turn, the Federal health care programs, Medicare and Medicaid, save billions of dollars through the avoidance of medication errors and additional health care costs.

<u>The Federal Medicare Prescription Drug Program, and PDP Obligations</u>

11. In December 2003, Congress enacted the Medicare Prescription Drug Improvement and Modernization Act ("Act" or the "MMA") to provide prescription drug coverage for all Medicare beneficiaries. The benefit, also known as "Part D," became effective on January 1, 2006. The PDPs are the private entities directly providing the benefit to Medicare beneficiaries, and participate in the program through contracts with the Federal Centers for Medicare and Medicaid Services ("CMS"), an agency of the Department of Health and Human Services. LTC Pharmacies participate in the program by contracting with the PDPs. However, since the first day of implementation, the PDPs (including Defendant UnitedHealth) have failed to honor their contracts with Plaintiffs' member LTC Pharmacies, and instead, the PDPs have been reducing the reimbursement due to the LTC Pharmacies for hundreds of thousands of prescriptions dispensed to the PDPs' nursing home residents by an amount known as the "co-payment."

12. Each PDP, including Defendant, contracts with CMS to provide the benefit to Medicare beneficiaries. Many PDPs are well-known health insurers such as Aetna, Cigna, and Defendant UnitedHealth. Medicare beneficiaries enroll (or are auto-enrolled) in the various PDP plans and receive their drugs from the PDPs' network pharmacies – in this case the LTC Pharmacies.

Once the LTC Pharmacy dispenses a drug to a Plan enrollee (the nursing home resident, in this case), it bills the Plan (the PDP) for reimbursement pursuant to the network contract.

13. Federal regulations require PDPs participating in the Part D program to fulfill certain conditions before CMS will sign a contract enabling the PDP to participate. 42 CFR § 423.504. Prominent among these conditions is the requirement that PDPs have administrative and management services that are satisfactory to CMS. Specifically, the regulation provides that a PDP must demonstrate:

> Personnel and systems sufficient for the Part D plan sponsor to organize, implement, control, and evaluate financial and marketing activities, the furnishing of prescription drug services, the quality assurance, medical therapy management, and drug and or utilization management programs, and the administrative and management aspects of the organization.

42 CFR § 432.504(4)(ii). Thus, PDPs are required to have computer and information technology systems (along with appropriately trained professionals) sufficient to handle the challenges inherent in administering a comprehensive pharmacy benefits program.

14. In addition, under the contract that each PDP (including Plans sponsored by Defendant) is required to sign with CMS, the PDP agrees to comply with the regulatory requirements of the program. More specifically, and upon information and belief, the contract between CMS and Defendant's Plans provides that those Plans agree:

> to operate in accordance with the regulations at 42 CFR § 423.1 through 42 CFR § 423.910 . . ., sections 1860D-1 through 1860D-42 . . . of the Social Security Act, and the solicitation, as well as all other applicable Federal statutes, regulations and policies. This contract is deemed to incorporate any changes that are required by statute to be implemented during the term of this contract and any regulations or policies implementing or interpreting such statutory provisions.

PDP-CMS Contract, Article IA (attached to this Complaint as Exhibit 5).

### Dual-Eligibles and Cost Sharing

15. Within the class of all Medicare beneficiaries, there exists a special class of beneficiaries who are eligible under both the Medicare and Medicaid programs, commonly referred to as "dual eligibles." These individuals had previously received prescription drug coverage through their respective state Medicaid programs and are not voluntary participants in Part D. Rather, they were automatically enrolled by CMS in the program. The Part D coverage for dual eligibles effectively replaced the previous coverage available to them under the Medicaid program, which was no longer offered to these patients once the Part D program was effective on January 1, 2006.

16. Over 90 percent of the long term care residents participating in Part D qualify as "institutionalized dual eligibles," which allows them access to special subsidization under Part D that relieves them of the obligation to pay premiums and co-payment amounts.

17. Traditional Medicare and Medicaid programs typically include some aspect of cost sharing, or "co-payments," by beneficiaries in the structure of the benefit. Co-payments are flat, pre-determined payment amounts assigned to specific services that are paid by the beneficiary to contribute to cost coverage and prevent over-utilization. The calculation and implementation of co-payment amounts, however, is critical to ensuring that beneficiaries are not priced-out of essential medical care.

18. Congress, when implementing the Part D benefit, set co-payments for all dual eligibles at the same rate as had been in effect for the Medicaid program under which the duals had previously

received their drugs.[1] Congress also mandated a zero co-payment for nursing home duals, as had been the practice in Medicaid. Thus, under the Act and its implementing regulations subsequently promulgated by CMS, individuals who qualify as "institutionalized full-benefit dual-eligibles" were not to be assessed any co-payments for covered medication obtained through their Part D plans.

19. More specifically, MMA section 1860D-14(a)(1)(D)(i), 42 U.S.C. § 1395w-114D-14(a)(1)(D)(i), provided "in the case of an individual who is a full-benefit dual eligible and who is an institutionalized individual …[for] the elimination of any beneficiary coinsurance described [in the Act]." Consistent with the statutory bar on co-payments for institutionalized dual eligibles, CMS in its implementing regulations provided: "[f]ull benefit dual eligibles who are institutionalized have no cost sharing for covered Part D drugs covered under their PDP or MA-PDP plans." 42 C.F.R. §423.782(a)(2)(ii). The regulatory definition of "institutionalized" found in Section 1902(q)(1)(B) of the Act and 42 C.F.R. §423.772 specifically includes residents of a nursing facility whose services are being covered by Medicaid. As such, Congress specifically barred PDPs from charging dual eligibles residing in a long-term care facility, including nursing homes, *any* co-payment amount for drugs received through their PDP.

20. In its discussion of Congress' explicit elimination of the Part D co-payment obligation for institutionalized dual-eligibles, CMS noted that for these patients in particular, assessment of even a small cost-sharing amount would be a hardship. The preamble to the final Part D regulation promulgated by CMS explained that "[w]e believe that the Congress intended this provision to address the fact that dual-eligible persons residing as inpatients in medical

---

[1] In addition, Congress also created an additional co-payment, known as the "doughnut hole," when beneficiaries reached a certain level of drug spending. Some "doughnut hole" co-payments are also implicated in this case.

institutions are permitted to retain only a small personal needs allowance, which preclude payment of even nominal co-payments." 70 Fed. Reg. 4372 (Jan. 28, 2005).

Defendant Illegally Withheld Co-payments for the Institutionalized Dual-Eligibles

21. On January 1, 2006, the Part D program began and the LTC Pharmacies started providing prescription drugs to institutionalized dual-eligibles. The PDPs, including Defendant, were supposed to begin immediately reimbursing the LTC Pharmacies for each prescription dispensed, at rates determined by contracts between each LTC Pharmacy and PDP. However, virtually every PDP, including Defendant, failed to recognize that this special class of institutionalized dual-eligibles had no co-payments, and the PDPs, including Defendant, improperly reduced LTC Pharmacy reimbursement by the standard Part D co-payment amount. Cognizant of the fact that these beneficiaries did not have the means to pay the cost-sharing amounts, and assured by CMS that these issues would be retroactively resolved, LTC Pharmacies continued to refrain from assessing the cost-sharing amount to beneficiaries.

22. Among others, Plaintiffs, on behalf of the LTC Pharmacies, immediately brought the issue to the attention of CMS, and began working with CMS and the PDPs, including Defendant, to address this significant problem.

CMS Response to Incorrect Cost Sharing Charges

23. Throughout February, March and April 2006, Plaintiffs worked with CMS and the PDPs to address this issue. Yet, by the end of March 2006, the magnitude of the problem was enormous, with millions of dollars of improperly withheld co-payments accumulating on the PDP books, and with a corresponding amount of debt for these unpaid amounts accumulating at the LTC Pharmacies. On April 18, 2006, CMS issued a guidance for Part D participants that directly addressed the issue:

> **How will pharmacies be reimbursed for reduced payments on behalf of unidentified dual eligibles who live in long-term care facilities and qualify for the $ 0 copayment?**
>
> Dual eligibles who reside in long-term care facilities may not have to pay co-payments for their prescription drugs. Pharmacies will receive a one-time payment for the amount of any uncollected co-payments for people who were incorrectly identified as having to pay co-payment amounts. The pharmacy will need to submit a spreadsheet with claim information to the prescription drug plan.

Exhibit 1 hereto ("How Medicare Drug Plan Members can Seek Repayment of Premiums and Copayments", Centers for Medicare and Medicaid Services, Apr. 18, 2006).

24. CMS again directly addressed this issue in an April 2006 "question and answer" guidance:

> When implementing retroactive subsidy level changes for a full-benefit dual-eligible who meets the definition of an institutionalized individual but is incorrectly charged cost sharing amounts under the Part D benefit, *plans should not automatically reimburse beneficiaries residing in long-term care facilities*. In such situations, it is unlikely that LTC pharmacies have collected the applicable cost-sharing from beneficiaries due to the expectation that the plan eventually would reimburse the pharmacy retroactively for such amounts. *In such situations, Part D plans should work with their pharmacies to provide them with direct reimbursement for any cost-sharing amount not collected from institutionalized individuals.*

Exhibit 2 hereto ("Reimbursement to LTC Pharmacies for Retroactive Subsidy-level Cost Sharing Charges," Centers for Medicare and Medicaid Services (Apr. 2006)) (emphasis added). Yet, the PDPs (including Defendant), who by this point were holding tens of millions of dollars in improperly withheld co-payments, took no action to reimburse the LTC Pharmacies that were holding the debt.

25. Subsequent to the guidance from CMS, LTC Pharmacies, through their Plaintiff associations, again contacted the PDPs, and specifically Defendant UnitedHealth, to make arrangements to retroactively receive the "one time" payments for claims that had been underpaid due to the failure to properly identify institutionalized dual-eligibles. During the resulting discussion, however, UnitedHealth steadfastly refused to agree to process the retroactive payments.

26. Given UnitedHealth's endless excuses, Plaintiffs LTCPA and ASCP, on behalf of their members, again appealed to CMS to address the UnitedHealth concerns, which resulted in yet another CMS guidance document on the issue.  Specifically, CMS, on May 5, 2006, instructed PDPs to "use the 'best available data' when [PDPs] have knowledge that a beneficiary's cost sharing level is not correct."  Additionally, the CMS letter stated that PDPs "are encouraged to *reimburse LTC Pharmacies directly* when implementing retroactive subsidy level changes.  *Plans should not automatically reimburse beneficiaries in long-term care facilities* because it is unlikely that the LTC Pharmacies have billed the beneficiaries for their co-payments."  Exhibit 3 hereto (Letter to All Part D Plan Sponsors from Centers for Medicare and Medicaid Services, May 5, 2006) (emphasis added).

<u>Defendant's Continued Failure to Reimburse LTC Pharmacies</u>

27. By May 2006, following three separate and clear CMS guidance documents, many PDPs began to work with the LTC Pharmacies and reimbursed the backlog of inappropriately withheld co-payments directly to the LTC Pharmacies.  Defendant, however, took a different approach and continued to refuse to take such action.  Instead, Defendant insisted that, rather than submitting a "bulk claim" for the amounts of improperly withheld co-payments, supported by specific claim information, each of the LTC Pharmacies had to reverse the original transactions and rebill them.  When Plaintiffs' members tried to follow Defendant's direction, however, they quickly learned that Defendant was rejecting the entirety of the claim, rather than just not paying the improperly withheld co-payment.

28. By mid-June 2006, Defendant UnitedHealth communicated with Paul Baldwin, Executive Director of the LTCPA, and informed him that, effective June 16, 2006, UnitedHealth was going to begin distributing checks for each individual improperly withheld co-payment directly

to the nursing home residents, rather than to the LTC Pharmacies that were owed the funds, unless the LTC Pharmacies reversed and rebilled each transaction.

29. Following repeated requests by both Mr. Baldwin and CMS, UnitedHealth agreed to extend its "deadline" until June 23, 2006. On June 23, however, UnitedHealth refused to extend the deadline further. Prior to June 23, 2006, many of Plaintiffs' member LTC Pharmacies had submitted bulk claims with individual prescription backup for the improperly withheld co-payments that UnitedHealth owed each of them. Notwithstanding the LTC Pharmacies' direct compliance with CMS direction, and CMS's clear statement that the PDPs (including UnitedHealth) were to make a "one-time payment for the amount of any uncollected co-payments for people who were incorrectly identified as having to pay co-payment amounts," *see* Exhibit 1 hereto, UnitedHealth refused to process those requests.

30. After Plaintiffs initiated this lawsuit in July 2006, Defendant UnitedHealth agreed temporarily to defer sending the checks directly to nursing home residents. Thereafter, Plaintiffs and UnitedHealth continued to attempt to resolve this matter by negotiation.

31. Because the repayment matter had not been resolved by December 2006, CMS published a fourth guidance addressing the reimbursement issues. Exhibit 4 hereto. In this guidance, CMS reminded "Part D plan sponsors that they are *obligated* to reconcile any claims that may have resulted in incorrect cost sharing" for beneficiaries eligible for a low income subsidiary (including dual eligible nursing home residents) (emphasis added). In addition, CMS recognized that "problems with cost sharing have disproportionately impacted beneficiaries who are residents of nursing homes, and for whom long-term care (LTC) pharmacies are holding receivable balances rather than charging beneficiaries incorrect cost sharing amounts." Recognizing that, in many cases, money was owed to long term care pharmacies rather than to the dual eligible beneficiaries themselves, CMS emphasized the PDPs' obligation to remit

payment to these pharmacies. While noting its general policy that overpayments are refunded to beneficiaries, CMS explained that

> it is important that Part D plans be aware of the role LTC pharmacies have played with respect to cost sharing amounts overcharged to LTC residents, particularly some dual eligibles who should not have paid any cost sharing for their covered Part D drugs. Many LTC pharmacies did not collect the cost sharing amounts that were incorrectly charged...Part D plan sponsors need to work with [LTC pharmacies] to ensure appropriate reconciliation of amounts owed....[P]lan sponsors should not automatically reimburse beneficiaries for cost sharing amounts that were not collected by their LTC pharmacies. Rather, *plan sponsors need to work directly with their network LTC pharmacies to provide them with direct reimbursement for any cost sharing amounts that were not collected from [low income subsidy]-eligible beneficiaries.*

Exhibit 4 hereto (emphasis added). Thus, the guidance informs PDPs that once "appropriate documentation and attestations are provided to justify payment," reimbursement for cost sharing overpayments should be made directly to long term care pharmacies.

32. Despite the clear language of CMS regulations and CMS guidance, Defendant, in March 2007, once again informed Plaintiff LTCPA that payments will be issued directly to nursing home residents, including those who did not pay the co-payments concerned. Upon information and belief, Defendant has not, as of the filing of this Amended Complaint, actually begun issuing such payments.

33. When Defendant begins sending those checks, it will be in violation of another CMS regulation. That regulation, 42 C.F.R. § 423.800(c), provides:

> (c) *Reimbursement for cost-sharing paid before notification of eligibility for low-income subsidy.* The Part D sponsor offering the Part D plan must reimburse subsidy eligible individuals, and organizations paying cost-sharing on behalf of such individuals, any excess premiums and cost-sharing *paid* by such individual or organization after the effective date of the individual's eligibility for a subsidy under this subpart. (emphasis added).

It is undisputed that here, the beneficiaries did not pay the co-payments at issue, and that the LTC Pharmacies are the organizations that effectively paid the cost-sharing on behalf of such

individuals by holding the debt for the unreimbursed cost sharing amounts. Thus, there should be no reimbursement directly to such beneficiaries, and the regulation mandates reimbursement to the LTC Pharmacies.

34. In addition to announcing that it would pay beneficiaries in violation of program regulations and guidance, on April 20, 2007, Defendant UnitedHealth informed participating network pharmacies, including many of Plaintiffs' member LTC Pharmacies, that it has discontinued processing 2006 claims. Exhibit 6 hereto. The letter, issued by "Ovations, A UnitedHealth Group Company," stated:

> In response to your inquiry regarding outstanding 2006 claims, please note that UnitedHealth Group ("UHG") has discontinued processing 2006 claims.
>
> As you know, UHG extended the deadline for readjudicating 2006 claims in a good faith effort to provide every opportunity to resolve various issues, including those presented by CMS's retroactive subsidy-level changes. UHG repeatedly communicated the necessary deadlines and requirements for reprocessing 2006 claims. Because UHG is required to process and reconcile claims within the absolute constraints created by the CMS PED-submission deadline of May 31, 2007, it can no longer re-process any 2006 claims.

*Id.* Upon information and belief, there is no such "deadline" or "absolute constraint" by CMS. Rather, CMS has informed the public, including Defendant, that the claims submission process will continue past the May 31, 2007 data submission date.

35. Defendant's sudden refusal to re-process any further 2006 claims is a complete and unexpected reversal of its previous position, is the latest bad faith act by Defendant UnitedHealth in this dispute, and guarantees that legal action is the only remaining option for its resolution.

36. Defendant UnitedHealth has been, and will continue to be, inappropriately benefited at the expense of tens of thousands of nursing home residents across the country, as well as Plaintiffs' member LTC Pharmacies, by sending reimbursement checks to individual beneficiaries rather than to the LTC Pharmacies to which they are owed. It is widely known that a large portion of nursing home residents do not have the capacity or wherewithal to understand what these

checks represent, or that the funds are actually owed to the LTC Pharmacies that dispensed their drugs without full payment. By sending checks to nursing home residents, approximately 60% of whom suffer from some form of cognitive impairment, a large number of the checks will go unredeemed, resulting in an unconscionable windfall to Defendant UnitedHealth. Defendant has sought to, but cannot, justify its failing to reimburse LTC pharmacies and, instead, wrongfully reimbursing beneficiaries on the ground that its computer systems do not measure up to what is required by Federal regulations. Yet Defendant will submit its claims to CMS on May 31, 2007 and seek Federal reimbursement for these payments as if the prescriptions have been paid for by Defendant, when they have not and when, instead, Defendant owes tens of millions of dollars in unreimbursed co-payments to LTC Pharmacies.

### COUNT I – DECLARATORY RELIEF (28 U.S.C. § 2201)

37. Paragraphs 1-36 of this Complaint are incorporated by reference.

38. Defendant, directly or through its affiliates, has one or more "network pharmacy contracts" with each of Plaintiffs' member LTC Pharmacies, as required by the Act and CMS regulations. Defendant, directly or through its affiliates, also has contracts with CMS that include the contractual provisions quoted above. Yet, Defendant has violated 42 U.S.C. § 1395w-114D-14(a)(1)(D)(i), the MMA co-payment provision, and its implementing regulations, including 42 C.F.R. §§ 423.504, 423.782(a)(2)(ii) and § 423.800(c), subsequent CMS guidance (including Exhibits 1, 2, 3 and 4, quoted above) and its contractual obligations to CMS and to its network LTC Pharmacies, by reimbursing, or causing its affiliates to reimburse, the indisputably and illegally withheld co-payment amounts at issue directly to nursing home residents, rather than to the LTC Pharmacies to which such payments are owed. Defendant was, and remains, obligated to reimburse the improperly withheld co-payment amounts directly to Plaintiffs' member

pharmacies, in (according to CMS) a lump-sum upon presentation of information documenting the claims at issue, or in some other fashion if not a lump sum. Yet, Defendant has repeatedly refused to directly reimburse LTC Pharmacies for the incorrectly withheld amounts despite being directed to do so by CMS.

39. Now, in addition to refusing to send the reimbursement payments to the LTC Pharmacies, Defendant has stated that it will refuse to process any further 2006 reimbursement claims.

40. Plaintiffs seek a declaration, pursuant to 28 U.S.C. § 2201, that (a) the direct distribution of refund checks to misidentified institutionalized dual eligible Part D beneficiaries is illegal and contrary to law and contract, (b) those co-payment amounts are owed to LTC Pharmacies, not to individual dual-eligible beneficiaries, consistent with law, CMS policy, CMS guidance, and the network contracts, and (c) Defendant is prohibited by Federal law and its network contracts from refusing to process further 2006 reimbursement claims.

41. A justiciable controversy now exists between the parties that Plaintiffs have standing to pursue and that is capable of resolution by this Court.

**RELIEF REQUESTED**

WHEREFORE, Plaintiffs respectfully request the following relief:

a. That the Court enter judgment declaring:

(i) that Defendant UnitedHealth was not, and is not, entitled by law or contract to withhold co-payment amounts from reimbursements to LTC Pharmacies for medications dispensed under Medicare Part D to dual eligible institutionalized beneficiaries;

(ii) that Defendant UnitedHealth is obligated to pay to LTC Pharmacies the co-payment amounts withheld from reimbursement to such LTC Pharmacies for

medications dispensed under Medicare Part D to dual eligible institutionalized beneficiaries;

    (iii)    that Defendant UnitedHealth violated 42 C.F.R. § 423.504 and 423.800(c) by paying, or causing to be paid, withheld co-payment amounts to beneficiaries who had not paid such co-payments and by failing timely to pay such amounts to the LTC Pharmacies to which such funds are owed;

    (iv)    that the payment of such withheld co-payment amounts to beneficiaries does not relieve Defendant UnitedHealth of its obligation to pay such withheld co-payment amounts to the LTC Pharmacies from which they were withheld; and

    (v)    that Defendant is obligated to continue to process all claims for such withheld co-payment amounts, including all 2006 claims;

b.    That this Court enter judgment awarding Plaintiffs' costs, expenses, and attorneys' fees incurred herein; and

c.    That this Court order such other relief as the Court deems proper and necessary.

May 4, 2007                                        Respectfully submitted,

                                                          /s/   David Farber
                                          David Farber (D.C. Bar No. 415899)
                                          PATTON BOGGS LLP
                                          2550 M Street, N.W.
                                          Washington, D.C.  20037
                                          Telephone:  (202) 457-6000
                                          Facsimile:  (202) 457-6315

                                          Counsel for Plaintiffs

## VERIFICATION

I, Darrell McKigney, Acting Executive Director of the Long Term Care Pharmacy Alliance, pursuant to 28 U.S.C. § 1746, do hereby verify and state under penalty of perjury that I have reviewed the foregoing Amended Complaint and attest that the facts stated therein are true and correct to the best of my knowledge.

Dated: May 4, 2007

*[signature]*
Darrell McKigney

**CERTIFICATE OF SERVICE**

The undersigned certifies that a copy of Long Term Care Pharmacy Alliance and American Society of Consultant Pharmacists' Verified Amended Complaint was served via electronic delivery and first-class mail, postage prepaid, on this 4th day of May, 2007, upon the following:

>Thomas F. Fitzgerald, Esq.
>Mark C. Nielsen, Esq.
>GROOM LAW GROUP, CHARTERED
>1701 Pennsylvania Avenue, NW
>Washington, D.C.  20006
>Telephone:  (202) 857-0620
>Facsimile:  (202) 659-4503
>Email:  mcn@groom.com
>            tff@groom.com

      /s/   Edward D. Gehres

4882397