Ex. # 1 to Declaration of George M. Borababy

1

1          UNITED STATES DISTRICT COURT

2          FOR THE DISTRICT OF COLUMBIA

3    -----------------------------X

4    LONG TERM CARE PHARMACY

5    ALLIANCE, et. al.,              Civil Action No.

6              v.                    06-1221

7    UNITED HEALTH GROUP,            Washington, D.C.
                                     Thursday, March 22, 2007
8              Defendants,          4:07 P.M.
     -----------------------------X

9
                      TRANSCRIPT OF HEARING
10        BEFORE THE HONORABLE ELLEN SEGAL HUVELLE
              UNITED STATES DISTRICT JUDGE
11

12   APPEARANCES:

13   For the Plaintiffs: DAVID FARBER, ESQUIRE
                         ED GEHRES, ESQUIRE
14                       PATTON BOGGS
                         2550 M St., N.W.
15                       Washington, D.C.  20037
                         202-457-6000
16
     For Defendant:      MARK C. NIELSEN, ESQUIRE
17                       THOMAS F. FITZGERALD, ESQUIRE
                         MICHAEL PRAME, ESQUIRE
18                       MICHELE RENAUD, ESQUIRE
                         GROOM LAW GROUP
19                       1701 Pennsylvania Avenue, N.W.
                         Washington, D.C.  20006
20                       202-659-4503

21   Court Reporter:     Lisa Walker Griffith, RPR
                         U.S. District Courthouse
22                       Room 6409
                         Washington, D.C.  20001
23                       (202) 354-3247

24   Proceedings recorded by mechanical stenography, transcript
     produced by computer.
25

2

## P R O C E E D I N G S

1

THE DEPUTY CLERK:  Civil Action 06-1221.  Long

Term Care Pharmacy Alliance, et. al, versus United Health

Care Group.  I'm going to ask counsel to please come forward,

identify yourselves for the record.  State who you're

representing and all colleagues at the table.

MR. FARBER:  Thank you.  Good afternoon, Your

Honor.  David Farber, Patton Boggs, for the plaintiffs.  With

me is my colleague, Ed Gehres.

THE COURT:  Good afternoon.

MR. NIELSON:  Good afternoon, Your Honor.  Mark

Nielsen for the defendant and with me are my colleagues,

Thomas Fitzgerald, Michael Prame.

And due to an oversight on my part, Your Honor,

Mr. Prame and Mr. Fitzgerald, who both appeared on the

pleadings in this case, were not listed as counsel of record

on the Court's electronic docket.  I would like to move the

Court for permission for them to argue today's motion after

which I'll be filing a notice of appearance.

THE COURT:  Do you have any objection?

MR. FARBER:  No.

THE COURT:  Okay.  But I don't need a lot of

argument, counsel, if you don't mind me saying so.  I've read

enough of the papers.  I'm in the middle of a trial.  If I

don't get to it, I'll forget it all.  I'm leaving tomorrow.

3

1    Your timing was horrible, just horrible.

2          I have a suggestion, though.  Can I make a

3    suggestion?  This case is nuts.  Yes, they might not have

4    standing.  You owe somebody, right, defendants?  Who is

5    arguing?

6          MR. FITZGERALD:  I am, Your Honor, Tom Fitzgerald.

7          THE COURT:  Okay.  Mr. Fitzgerald, you owe somebody

8    something.  Maybe we don't know exactly how much you owe and

9    I understand that maybe they don't have standing.  Standing

10   is a terribly, complicated problem, but I'm not prepared to

11   address it.  You're telling me CMS has, I doubt that CMS has

12   even -- do they even know what's happening.

13         MR. FITZGERALD:  Your Honor, they do.  There has

14   been quite a lot of activity before CMS on the issue.

15         THE COURT:  And they're saying you better come up

16   with proper documentation to justify your disbursements in

17   order to get reimbursed?

18         MR. FITZGERALD:  Yes.

19         THE COURT:  What's your problem?

20         MR. FITZGERALD:  Your Honor, if I could just take a

21   couple of minutes, I think I could tell you or explain what

22   the issue is and how we are where we are.  Let me start by

23   agreeing with Your Honor that United understands that monies

24   are owed to the pharmacies.  That's not in dispute.  It's

25   what monies, for whom and so forth.

4

1          But if I could set the stage, P.D.P.s, Prescription

2    Drug Plans, United has a number of those, four or five to be

3    exact, that are separate, distinct plans that have contracted

4    with CMS to provide prescription drug coverage to eligible

5    participants.

6          In order to do that, the P.D.P., in terms,

7    contracts with pharmacies.  The P.D.P. is like a P.P.O., if

8    you will, or a health care plan, an H.M.O.  So it, turns

9    around and contracts with pharmacies to actually deliver the

10   prescription drugs and to provide the prescription drugs to

11   participants.  And it enters into contracts with them and

12   agrees upon a contracted rate to do that.

13         Now, the population in question are low income

14   status individuals, and there are a number of those.  And

15   depending on what status --

16         THE COURT:  The dual eligibles, you have to cut to

17   it, please.

18         MR. FITZGERALD:  Okay, cut down to the dual

19   eligibles.  Okay.  I've got it.  Now, Your Honor, what's

20   happened here is, is the CMS data was wrong, particularly --

21         THE COURT:  So I gather.

22         MR. FITZGERALD:  Right.

23         THE COURT:  So, they've got some responsibility

24   too.

25         MR. FITZGERALD:  Absolutely, Your Honor.  And what

1  happens is, is that, because the eligibility files were

2  wrong, CMS has been correcting those eligibility files.  Both

3  the pharmacies and the P.D.P.s rely upon those files.  So,

4  the pharmacies have been free to submit, resubmit their

5  pharmacy claims.

6          THE COURT:  And other pharmacies did it, but

7  plaintiff's pharmacies didn't?

8          MR. FITZGERALD:  Exactly, Your Honor.  In fact,

9  some of plaintiff's pharmacies did and have.  It's just

10  several that haven't done it.

11          THE COURT:  How many we got?  What's the amount in

12  claims approximately?  How much haven't you paid that they

13  say you should pay in a lump sum?

14          MR. FITZGERALD:  Your Honor, we have no idea

15  because they have not identified for us which of the claims

16  are for individuals that they believe are dual eligible

17  individuals.  They haven't done that, Your Honor, which is

18  part of the problem.  We need to know should we submit --

19          THE COURT:  How much money are you distributing to

20  dual eligibles in the next two weeks?

21          MR. FITZGERALD:  Your Honor, there are two

22  populations, but it can be as much as $70 or $80 million.

23  Now, we don't think that all of that are the dual eligibles.

24  We think that some of that, in fact, a large portion of that

25  is for other low income status people who have, but who are

1   not dual eligibles.  These people have some co-pay but

2   they're not confined to nursing homes.  It's not plausible to

3   distinguish them out.

4         THE COURT:  My understanding of your argument is

5   they're looking for contract damages.  They can always get

6   those.  There is no irreparable injury.  And you're

7   proceeding at your risk then, under that theory --

8         MR. FITZGERALD:  That's correct.

9         THE COURT:  -- to give, send the money to the dual

10  eligibles.  We're only dealing with people who are dual

11  eligibles, and I guess they had to be on the program for 30

12  days?

13        MR. FITZGERALD:  Correct, Your Honor.

14        THE COURT:  Maybe other criteria, but approximately

15  how much of your 70, 80 million is at issue here?  In other

16  words, if you lost it all in this case, and you mailed it to

17  people in what would be small checks, many of which won't be

18  cashed so you won't be at risk twice -- but it's more agony

19  than it's worth for some person to cash a check for $2 maybe.

20  How much are we talking about?  I understand it can't be

21  exact.

22        MR. FITZGERALD:  Your Honor, if I could ask

23  Michelle Renaud.

24        THE COURT:  Certainly.

25        (There was a pause in the proceedings.)

7

1          MR. FITZGERALD:  Your Honor, that $80 million

2     number is the closest they can get to.  They cannot get to

3     the next number without readjudicating the claim, and they

4     can't readjudicate the claims unless they're resubmitted.

5     So, it's some portion of the $80 million.  I'm going to say

6     it's more than ten percent, my understanding, but less

7     than --

8          THE COURT:  But, so when you're doing this, in

9     order to get reimbursed by the Federal Government, you're

10    taking a risk that you pay out people who aren't owed any

11    money and mail the checks out some time in early April?

12         MR. FITZGERALD:  That's correct, Your Honor.

13         THE COURT:  You're going to mail out to, money in

14    small little chunks really, I mean small checks, to

15    beneficiaries who aren't out any money because his clients,

16    the pharmacies, are out the money and some way or another, if

17    you lose the case, you're going to be paying twice and you

18    can't get reimbursed by CMS obviously?

19         MR. FITZGERALD:  That's correct.

20         THE COURT:  So what you're doing doesn't entirely

21    make any sense to me.

22         MR. FITZGERALD:  Can I explain that, Your Honor,

23    because I think one point and I'll cut to the chase.

24         Let's say there's a hundred dollar claim here, a

25    prescription drug that costs a hundred dollars, the co-pay is

1    $5.  Ordinarily, under our contract with the pharmacies, we

2    would pay them a hundred less the five dollars, which is what

3    we did here because we thought that these people --

4            THE COURT:  Right.

5            MR. FITZGERALD:  All right.  But we only paid them

6    95.  Now, in order to submit to CMS, not just for the $5, we

7    have to process that and get that out the door.  We cannot

8    process, we don't think that we can submit for the $95 to CMS

9    for the claim at all.  Unless the claim is completely

10   processed, you can't submit it for reimbursement.

11           THE COURT:  Don't we want to bring the Federal

12   Government into this?  This is absolute insanity.  This suit

13   was insanity before you guys -- you are mature people.  You

14   resolved it in some fashion.  I don't care how it fell apart.

15   The fact is you're moving at a risk that might cost you

16   twice?

17           MR. FITZGERALD:  Right.

18           THE COURT:  I'd be happy to have you take the sum

19   that represents at least the universe.  I understand that you

20   have, frankly, a basis to ask for submission.  I don't buy

21   the plaintiff's argument that they just cut me a check.  And

22   I understand that you have some time constraints.  I could

23   accommodate the world by ordering you to put $8 million in

24   escrow and let CMS take me on about whether or not you've

25   done what you had to do.

1    I mean, this is -- I mean, if we got them in here,

2    I assure you the other possibility is that you pay the money

3    to them and then an accounting gets done subject to your

4    rules and regulations so you can satisfy, as long as CMS

5    knows this.  And then if they have to fork it back because

6    you run some risks here.

7    And I'm not going to save you from the risks that

8    maybe you made some mistakes.  Or CMS made the mistakes.  I

9    don't know.  They seem like a necessary party to me.  They

10   messed this up but good.  I'm not surprised.  But we have two

11   intelligent lawyers with big clients who are both struggling

12   with their mistakes.

13   So, you can give me the money.  I'll take good care

14   of it and then when CMS will say you paid it, to whom, who

15   cares or give it to him and you do your accounting.  And if

16   he owes you, he'll pay you.

17   MR. FITZGERALD:  Your Honor, if I could because we

18   thought about that.

19   THE COURT:  I'm sure you have.

20   MR. FITZGERALD:  We thought about it.  In order to

21   come up with the number and in order to do a proper

22   submission to CMS by the end of the month, we have to run the

23   process.  We have to run all of these outstanding link change

24   claims, and then we can know the number as to what it is.

25   And until we do that, we cannot make the submission at the

1  end of May that would entitle us not just to the $5 at issue

2  but to the 95 as well.  So we need to run those through in

3  order to complete the claims processing on that, either pay

4  them or pay the participant.

5          We would have been happy to pay them.  We can't.

6  We'll pay the participant.  We understand, Your Honor, that,

7  if we go forward and do that and they prevail in their

8  lawsuit against us for breach of contract that we didn't pay

9  them when we should have, we understand that we're at

10  jeopardy for having to pay that again.

11          THE COURT:  That wouldn't be very useful.

12          MR. FITZGERALD:  But, Your Honor, remember what's

13  at stake.  The $8 or $9 million represents the dollars --

14          THE COURT:  I'm looking for -- sorry to cut you

15  off.  I'm looking for a way around that.  I want the U.S.

16  Government, CMS, to help out here.  I'm looking for the way

17  that you're not at risk and they get paid.  If they've been

18  slightly overpaid in some fashion, it works out down the

19  road.

20          Mr. Farber, do you have any?  We're looking for

21  solutions.  I'm not looking for you to be sending $2 checks

22  to nursing home people because CMS wants a piece of paper

23  saying you paid $95 plus $2.  And you may have to pay them $2

24  too.  It's not in your interest.  It's really not in the

25  interest of the Federal Government.  The person who's going

1    to get the check, won't know what the check is for.

2    And then I think you're crying wolf that you have

3    to go get it from them.  That's ridiculous.  You're not going

4    to do that.  It won't make any sense whatsoever.  In fact,

5    they're already saying if they really owe it to you, if that

6    gets proved, they pay twice.  So your irreparable injury is

7    lost on me.

8    Okay.

9    MR. FARBER:  If I may, Your Honor.

10   THE COURT:  You're going up on a TRO, we're looking

11   for solutions.

12   MR. FARBER:  I appreciate that.  A few quick

13   points.  First of all, irreparable injury is the chaos that's

14   going to be wrought upon nursing home residents and their

15   relationship their pharmacists.  That's a very, very --

16   THE COURT:  They're going to get an extra dollar

17   maybe.

18   MR. FARBER:  If you're an 83-year-old cognitively

19   impaired nursing home resident, remember we're talking about

20   nursing home residents now.  We're talking about nursing home

21   residents.  These people are really sick, 60 percent

22   cognitively impaired.

23   THE COURT:  You don't represent them, sir.

24   MR. FARBER:  But we represent their interests

25   throughout this whole process.

12

1          THE COURT:  What's going to happen to them?

2    They'll get something in the mail and maybe they will or will

3    not cash it.

4          MR. FARBER:  That's correct.  But they're also

5    going to get very upset at what happened.  We've seen this

6    happen before when bad information goes out from the federal

7    agency.

8          THE COURT:  Let's go.

9          MR. FARBER:  Okay.  Second point --

10          THE COURT:  I'm sorry.  I can't see people going

11    into chaos by mistakingly getting a check that no one is ever

12    going to touch.

13          MR. FARBER:  We'll move off the point.  The fact of

14    the matter is, with all due respect to opposing counsel, they

15    know, they've adjudicated these claims.  They have the

16    checks.  They know the exact amounts for which beneficiaries

17    for which claims.  So the notion --

18          THE COURT:  Why are they so pig headed if they may

19    pay twice?

20          MR. FARBER:  That's a great question, Your Honor,

21    and it's our question, too.  And the answer, I suggest and we

22    suggest it in the papers, is they know exactly what's going

23    to happen, which is exactly what Your Honor has already said.

24    Most of the checks will go uncashed.  They're going to submit

25    their claims to the feds.

1      They'll say to CMS, we wrote the checks, right?

2  The feds will pay them and they got the float.  These are

3  insurance companies, Your Honor.  And this is how they work.

4  They work on the float.  I got to tell you that there are a

5  lot of other P.D.P.s around the country who figured out a way

6  to navigate this process.  Most of them said give me a

7  one-page certification that these are legitimate claims.

8  Give me a C.D. of your claims and we're done.  And that's

9  what happened.

10      United is one of the very few, and certainly, out

11  of the largest P.D.P., they have asked for resubmission of

12  claims and rebilling.  The reality is the claims are there.

13  I can't say a hundred percent because there's too many

14  pharmacies in the country.  But well over 80 percent of the

15  pharmacies have given them exactly what they wanted, which is

16  resubmission of their claims back in October, last month,

17  it's going on this month, but they don't need it because

18  they've already adjudicated the short fall of the

19  co-payments.

20      THE COURT:  How could they have adjudicated it?

21      MR. FARBER:  How else would they know what amounts

22  to send to which beneficiaries?  They already know exactly

23  the checks that need to be sent, what amounts and what

24  claims.

25      THE COURT:  They're talking about float.  There is

14

1   not much float here in the sense that they're going to issue

2   $2 checks, hypothetically, to thousands of dual eligibles,

3   then you win because -- you or your pharmacies, whoever has

4   the standing, you're going to win the $2 too.

5           So they run a risk of getting more.  Plus you're

6   going get, it seems to me, the money was owed way back when

7   so there could be pre-judgment and there's post-judgment

8   interest.  So the problem is a little bit allusive here.  I

9   know.  Listen, this case should have been settled before and

10  it should be settled now.

11          I'm happy to issue an order to bring in CMS to get

12  you either more time or we can have a little way to construct

13  this so that they're satisfied about your reimbursement.  If

14  there is some particular claims that you feel that you're

15  being hosed on, my guess is there aren't, they'll come up

16  with some better documentation.  The vast majority of these

17  are just not going to be contested.

18          How much do you think is at issue here?

19          MR. FARBER:  Approximately $20 million owed to the

20  pharmacies.

21          THE COURT:  How many people?  Well, owed to the

22  pharmacies, you mean your clients, not all pharmacies?  You

23  only have certain clients?

24          MR. FARBER:  Right.  But it's a lot of pharmacies.

25  Between the A.F.C.P. pharamacies and the L.T.C.P.A.

15

1    pharmacies, it's lots and lots of pharmacies, approximately

2    $20 million.  We have no idea what the aggregate number of

3    claims is.

4            THE COURT:  What do you mean you don't know what

5    the aggregate --

6            MR. FARBER:  The number of beneficiaries.  I mean

7    my rough approximation is in the neighborhood of 50,000

8    beneficiary, each of whom would have multiple claims, every

9    month new claim.

10            THE COURT:  You mean the beneficiaries, the people

11    in the nursing homes?

12            MR. FARBER:  Right, in the nursing home.

13            THE COURT:  So you're going to waste all this

14    mailing too and all this processing.  Have you cut checks

15    yet?  This is crazy.

16            MR. FITZGERALD:  No, Your Honor.

17            THE COURT:  I'm not happy that I was culled to say

18    that I needed about four days to figure this whole thing out.

19    So, the first thing is, we have to get the government to give

20    us more time so you don't cut the checks.  You save

21    administrative costs.  You don't run the risk of double dues.

22    You get your money as soon as we can work out the accounting

23    and so whether there is any interest and all the rest.

24            MR. FITZGERALD:  Your Honor, may I respond to your

25    suggestion about CMS?

1          THE COURT:  Wait.  Who is going out of the

2     jurisdiction Thursday?

3          MR. FARBER:  I am, Your Honor.

4          THE COURT:  You're not here any time of the week?

5          MR. FARBER:  I'm going overseas Thursday the 29th,

6     back the 12th.

7          THE COURT:  You know, I have a little time on the

8     29th.  That's all I can do.

9          MR. FARBER:  I have the morning, Your Honor.  If

10    not me, we can bring someone in.

11         THE COURT:  Yes.  I am going to ask my magistrate

12    judge willing to do that.  Get some time.  Get an accounting

13    framework.  I know they may not have standing.  It will take

14    six months to figure it out.  The defendants have now

15    conceded.  I have a personal order waived any order about

16    personal jurisdiction.

17         But this doesn't require legal analysis and motions

18    to dismiss.  It requires figuring out how much is owed, and

19    getting it to the pharmacies and whether he's the right

20    plaintiffs, who cares.  Bring it to an end.

21         You want to get your reimbursement.  How in the

22    world is it good to get reimbursement and run the risk that

23    maybe a few dual eligibles will go cash the check, what would

24    be a laugh on you guys.

25         Anyways, all right, I'm going to refer this to the

1   magistrate judge.  I'm going to require him to meet with you

2   early next week and a representative.  I don't know who's at

3   CMS, but they caused the problem.  If they can't give you

4   some leeway to solve the problem, I don't know what you've

5   been doing since last July, but whatever it is, it wasn't

6   very productive.

7          I realize 20 million is a lot of money.  But if

8   other pharmacies got paid, they can get paid.  So maybe you

9   can send them the money and then--.

10         MR. FARBER:  We'll bring in the C.D.s of the

11  claims, hand it to them with the attestation.  We're done.

12  They have it already actually.  Obviously, there's a

13  computer --

14         THE COURT:  Now, well, the problem for your folks

15  is, they say that CMS has refigured out who is eligible.  You

16  may lose some eligibles then the 20 million go down.  That's

17  where the fight is.  But what you want to do is have a master

18  figure this out.  I don't want to be figuring out how many

19  dual eligibles are out there.

20         I'm not going to long-term care facilities.  So

21  we're going to have a structure in place before we get back

22  here next Thursday.  It involves the Federal Government

23  entirely.  It involves getting them their money.  If in fact

24  some of your dual eligibles that you made a mistake, you're

25  out of luck, you, the plaintiffs.

18

1          MR. FARBER:  If we're not due the money, we don't

2     want it.

3          THE COURT:  And if there are disputed claims,

4     you're going to have a little structure.  You would think

5     that the Federal Government would have some mediation process

6     that could help out here.  But pretty soon, they get the

7     money with a small pot in dispute.  That's all that's going

8     to happen.

9          So, we'll send them a referral.  See what he can

10    do.  Call me next, call my law clerk next week.  We can

11    address this on the morning of the 29th.  That's when Mr.

12    Farber leaves.

13         MR. FARBER:  Any time before 1:00, Your Honor.

14         THE COURT:  It would have to be before 10:00.  A

15    TRO is not the way to go.  Ask the Federal Government whether

16    you could put the money in over there or with me.  I'll take

17    it.  We can put it in escrow.  You can figure this all out

18    with somebody else besides me.  Okay.

19         MR. FARBER:  Thank you, Your Honor.

20         MR. FITZGERALD:  Thank you, Your Honor.

21         THE COURT:  Magistrate Judge Facciola is expecting

22    to hear from you.  I know you can work this out.  You worked

23    it out once before.

24         MR. FITZGERALD:  Thank you, Your Honor.

25         MR. FARBER:  Thank you.

19

1          THE COURT:  We'll plan to see you next Thursday if

2     you haven't figured it out.  We'll tentatively put it down

3     for the 29th at 9:15.  But give us a call before then to say

4     that everything is fine.  The case is going away.  But I want

5     a magistrate to work with you.  Last time I lost you.

6          MR. FITZGERALD:  Thank you.

7          THE COURT:  Thank you.  Good luck.

8          (Whereupon, at 4:30 P.M. the hearing  adjourned.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

20

1

2                    **CERTIFICATE OF REPORTER**

3            I, Lisa Walker Griffith, certify that the

4  foregoing is a correct transcript from the record of

5  proceedings in the above-entitled matter.

6

7

8

9

10

11  _____    _____

    Lisa Walker Griffith, RPR
12

13

14

15

16

17

18

19

20

21

22

23

24

25