Exhibit 2

Westlaw.

Not Reported in F.Supp.2d                                                                 Page 1
Not Reported in F.Supp.2d, 2002 WL 1187207 (S.D.Fla.)
**(Cite as: Not Reported in F.Supp.2d)**

C
DDFA of South Florida, Inc. v. Dunkin' Donuts, Inc.
S.D.Fla.,2002.
Only the Westlaw citation is currently available.
United States District Court, S.D. Florida.
DDFA OF SOUTH FLORIDA, INC., A Florida
Not for Profit Corporation, Plaintiff,
v.
DUNKIN' DONUTS, INC., a Delaware
Corporation, Defendant.
**No. 00-7455-CIV.**

May 22, 2002.

Roberto Zarco, Zarco & Pardo, Miami, for DDFA of South Florida, Inc., a Florida Not For Profit Corporation, plaintiffs.
Harold Bradley Staggs, Paul D. Watson, Bush Ross Gardner Warren & Rudy, Tampa, David Worthen, Robert L. Zisk, Rebecca A. Hirselj, Schmeltzer Aptaker & Shepard, Washington, DC, for Dunkin Donuts, Inc., a Delaware Corporation, defendants.

ORDER GRANTING MOTION TO DISMISS
FIRST AMENDED COMPLAINT
LENARD, District J.
*1 THIS CAUSE is before the Court on Dunkin' Donuts Inc.'s Motion to Dismiss First Amended Complaint (D.E.19), filed March 15, 2001. On March 30, 2001, Plaintiff DDFA of South Florida, Inc. filed a Response to the Motion. (D.E.25.) On April 9, 2001, Defendant filed a Reply in support of its Motion. (D.E.27.)

I. Procedural Background

On October 2, 2000, Plaintiff DDFA, an association of Dunkin' Donut franchisees filed an action against Defendant Dunkin' Donuts, Inc. (DDI) on behalf of un-named members of its franchisee association. On November 15, 2000, Defendant filed a Motion to Dismiss, asserting that Plaintiff lacked standing as an association to bring suit for a Declaratory Judgment and Accounting, both of which sought damages for breach of contract. On February 26, 2001, Plaintiff filed an Amended Complaint, setting forth the legal issues which DDFA seeks to have resolved.

II. Factual Background

The following allegations are drawn from DDFA's Amended Complaint. DDFA was incorporated to articulate and advocate the needs, interests and lawful goals of its members by means of a constructive and cooperative relationship with DDI. (Am.Compl.¶ 5.) The Association was formed to foster and protect the economic investments of the individuals and entities comprising its membership. (*Id.*) Membership in DDFA is open to all franchisees of DDI who own and operate Dunkin' Donuts' franchises within the State of Florida.

DDI offers franchises to individuals, general partnerships and corporations in the United States and abroad. (*Id.*) In accordance with 16 C.F.R. 436.1, *et seq.,* DDI provides each prospective franchisee with a Franchise Offering Circular (the "FOC"), which includes 23 documents describing the business being franchised, the form of each agreement or contract the prospective franchisee will be required to sign, and the franchise agreement. (*Id.* ¶¶ 8,9.) With limited exception, the express terms of the franchise agreement between DDI and the franchisees are uniform and consistent regarding the duties, rights and obligations of each party.[FN1] (*Id.* ¶ 10.) Under the agreement, DDI permits its franchisees, *inter alia,* the right to sell proprietary food products, utilizing a specially designed building, equipment, management programs, standards, distribution and delivery methods and specifications and proprietary marks and information, collectively termed (the Dunkin' Donuts System). (*Id.* ¶ 11.)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                                  Page 2
Not Reported in F.Supp.2d, 2002 WL 1187207 (S.D.Fla.)
**(Cite as: Not Reported in F.Supp.2d)**

> FN1. DDI attaches various franchise agreements to support its position that a "uniform" franchise agreement did not exist. For the purposes of this Motion, the Court must accept DDFA's allegations as to the existence of a uniform contract as true.

Each franchise pays DDI a 5% Continuing Advertising Fee and is contractually required to contribute up to an additional 1% of their store's gross sales in order to support special advertising and marketing programs, which are supported by a majority of all Dunkin' Donuts franchisees in a particular market. (*Id.* ¶ 16.) According to the 1997 FOC, franchisees must participate in the special marketing, advertising and other programs which are supported by a majority of shops, nationally and locally, depending on the nature of the program. (*Id.* ¶ 17.) DDI may enforce payment of the one percent advertising contribution under the terms of the uniform franchise agreements, which provide that:

*2 In addition, Franchisee shall participate in and make additional payments to the Fund with respect to all advertising, marketing, and other Dunkin' Donuts programs which from time to time are supported by a majority of producing Dunkin' Donuts Shops in the market in which the Dunkin' Donuts Shop is located with respect to local programs, and in the Continental United States, with respect to national programs. Dunkin' Donuts reserves the right in its sole and absolute discretion to designate or change the composition of shops included in the base for purposes of determining a majority.

(*Id.* ¶ 18.)

DDI disclosed in its FOCs that voting will take place among Dunkin' Donuts franchises to determine if a majority of Dunkin' Donuts franchisees support a particular advertising or marketing program. (Id.¶ 19.) The 1997 FOC stated that:
Voting is usually either one vote per franchisee or one vote per producing shop. Voting is usually determined in accordance with the practices of the Shop's local franchisee advertising counsel, unless Dunkin' Donuts otherwise provides in writing ... Once approved, such programs typically continue for their intended duration.

(*Id.*) Historically, DDI observed voting procedures established by the local advertising counsel, through which DDFA members approved an additional 1% advertising contribution for a specific purpose, usually for a period of one year. (*Id.* ¶ 20.)

The Amended Complaint alleges that starting in 1996, DDI began a campaign to ensure that a majority of DDFA members voted in favor of the percentage increase. At this time, DDI representatives for the first time began to request that voting ballots be signed in the presence of DDI representatives, who often intimidated, threatened and coerced DDFA members into voting for advertising fund increases. (*Id.* ¶ 20, 21.) In July of 1999, DDFA appointed an internally elected representative and collected ballots representing the majority's objection to the advertising increase and the manner in which the ballots were collected. (*Id.* ¶ 24.) DDI refused to recognize the DDFA representative and continued their practice of intimidation. (*Id.* ¶ 25.) As a result of this practice, DDI represents that a majority of owners have approved the advertising increase and now seeks to collect the advertising increase as a matter of right without designating the funds to any particular advertising or marketing purpose. (*Id.* ¶ 26, 27.)

DDFA asserts its belief that the advertising money administered by DDI has been used for the development of advertising, promotions and excessive administration expenses for other DDI affiliated franchise systems, including Baskin-Robbins and Togo's. (*Id.* ¶ 29.) DDFA contends that this practice violates Section 3.5 of the uniform franchise agreements which provide that:
To administer The Dunkin' Donuts Franchise Owners Advertising and Sales Promotional Fund (the "Fund") and to direct the development of all advertising and promotional programs. That portion of FRANCHISEES'S advertising equal to one percent (1%) of the Gross Sales of the Shop will be utilized, at the discretion of DUNKIN' DONUTS, to provide for the administrative expenses of the Fund

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                Page 3
Not Reported in F.Supp.2d, 2002 WL 1187207 (S.D.Fla.)
**(Cite as: Not Reported in F.Supp.2d)**

and for programs designed to increase sales and enhance and further develop the public reputation and image of DUNKIN' DONUTS and the Dunkin" Donuts System ... DUNKIN' DONUTS undertakes no obligation to insure that any individual franchisee benefits directly or indirectly or on a prorate basis from the placement, if any, of advertising in local markets.

*3 (*Id.* ¶ 28.)

The Amended Complaint further alleges DDI has implemented various assessment and performance rating systems designed to evaluate all Dunkin' Donuts franchises with ratings of "A," "B" or "C." DDFA contends that these rating systems fail to reflect the true level of a shop's operations, and a franchise could receive the lowest rating of "C" because it was late on two or more occasions in paying the Continuing Franchise or Advertising Fees, or because "a rag was inadvertently left on a counter." (*Id.* ¶ 31.) A rating of "C" remains in place for at least one year and serves to bar the franchise from offering new and improved products and services that comprise the Dunkin' Donuts System. (*Id.* ¶ 32.) An operator with a "C" rating may also be barred from participating in DDI functions, marketing decisions, and advertising and promotional campaigns. "C" operators may also be assigned a DDI Business Consulting Specialist whose stated goal is to remove the operator from the Dunkin' Donuts System. (*Id.* ¶ 33.) These consultants are often not advised when the shelf life of a product is extended, resulting in "C" ratings to individual franchisees. (*Id.* ¶ 35.)

A. Count I: Declaratory Judgment

DDFA incorporates these allegations in Count I of its Amended Complaint, which seeks a Declaratory Judgment. In Count I, DDFA seeks declaratory relief in support of its contention that the current practices of the local advertising counsel must be followed in order to demand the payment of an additional 1% in advertising fees under the franchise agreement. (*Id.* ¶ 40.) DDFA also requests the Court to declare that the 1% must be used for related programs and not for the general advertising fund or administrative expenses. (*Id.*) Finally, DDFA seeks a declaration that its members have the right to use and promote all new products and services irrespective of the DDI rating system. (*Id.* ¶¶ 42-44.)

B. Accounting

In Count II, DDFA alleges that difficult accounting concepts are involved in determining whether the Fund was properly administered and maintained. It further states that the Fund, involving millions of dollars in assets and liabilities, is too complicated for a fact finder to adequately determine damages.

III. Standard of Review

The Eleventh Circuit has clearly established the standard of review for a motion to dismiss under Rules 12(b)(1) and (6) of the Federal Rules of Civil Procedure. For purposes of considering a motion to dismiss, the Court must accept as true the allegations set forth in the Complaint and all reasonable inferences drawn therefrom. *United States v. Pemco Aeoroplex, Inc.,* 195 F.3d 1234 (11th Cir.1999); *Stephens v. Dep't of Health and Human Servs.,* 901 F.2d 1571, 1573 (11th Cir.1990). Moreover, the Court may only dismiss an action with prejudice where it is clear that the "plaintiff can prove no set of facts in support of the claims in the Complaint." *Canadyne-Georgia Corp. v. NationasBank, N.A. (South),* 183 F.3d 1269, 1272 (11th Cir.1999); *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957).

IV. Parties' Arguments

*4 In its Motion to Dismiss Amended Complaint, DDI asserts that DDFA lacks standing to bring this action as an "association" because both the "claim asserted" and "the relief requested require[ ] the participation of individual members in the lawsuit." *Hunt v. Washington Apple Advertising Commission,* 432 U.S. 333, 343 (1977), citing *Warth v. Seldin,* 422 U.S. 490, 501, 511 (1975). (Mot. at 3-9.) DDI also argues that DDFA's Amended Complaint is

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                Page 4
Not Reported in F.Supp.2d, 2002 WL 1187207 (S.D.Fla.)
**(Cite as: Not Reported in F.Supp.2d)**

inconsistent with the purposes of the Declaratory Judgment Act. Lastly, DDI argues that DDFA's request in Count II for an accounting should be dismissed because the underlying claim is meritless and because DDFA has not met its burden of showing a "fiduciary relationship" or a "complex transaction" pursuant to Florida law.

DDFA argues in its Response that it does have associational standing under *Hunt* because the individual participation of its members is not required. It further asserts that declaratory relief is appropriate because the Amended Complaint, unlike the original Complaint, does not seek monetary damages and because it is not asking for a declaration of wrongdoing with regard to past actions. With respect to Count II, DDFA argues that an accounting is required because this action involves a complex transaction.

In its Reply, DDI argues that the language of its franchise agreements, attached to the Amended Complaint is dispositive of DDFA's claims and that the underlying nature of the claim is one for breach of contract, seeking damages, and requiring individual member participation to acquire standing.

V. Analysis

A. Declaratory Judgment Act

The Declaratory Judgment Act, 28 U.S.C. 2201, provides in pertinent part that:
(a) In a case of actual controversy within its jurisdiction ... any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

28 U.S.C. § 2201(a). The Supreme Court has held that "[t]he Declaratory Judgment Act was an authorization, not a command. It gave the federal courts competence to a make a declaration of rights; it did not impose a duty to do so." *Public Affairs*

*Associates, Inc. v. Rickover,* 369 U.S. 111, 112 (1962). "It is well-settled ... that a declaratory judgment may be refused where it would serve no useful purpose." *Yellow Cab Co. v. City of Chicago,* 186 F.2d 946, 950-51 (7th Cir.1951). The former-Fifth Circuit has held that "in the exercise of their sound discretion to entertain declaratory actions, the district courts may not decline on the basis of whim or personal disinclination; but they may take into consideration the speculativeness of the situation before them and the adequacy of the record for the determination they are called upon to make..." *Hollis v. Itawamba County Loans,* 657 F.2d 746, 750 (5th Cir.1981). "The declaratory judgment is an all-purpose remedy designed to permit an adjudication whenever the court has jurisidiction, there is an actual case or controversy and an adjudication would serve a useful purpose." *Allstate Ins. Co. v. Employers Liability Assur. Corp.,* 445 F.2d 1278, 1280 (5th Cir.1971). Similarly other circuits have held that a declaratory judgment should be granted*5 (1) when the judgment will serve a *useful purpose* in clarifying and settling the legal relations in issue, or (2) when it will terminate and afford relief from the uncertainty, insecurity and controversy giving rise to the proceedings.

*Continental Casualty Company v. Coastal Savings Bank,* 977 F.2d 734, 737 (2d Cir.1992); *McGraw-Edison Company v. Preformed Line Products Company,* 362 F.2d 339, 342 (9th Cir.1966).

B. Inappropriateness of Declaratory Relief

Taking the allegations asserted in the Amended Complaint as true, the Court finds that DDFA has not sufficiently alleged a claim upon which this Court should grant declaratory relief. The Amended Complaint clearly alleges the existence an actual controversy. (Am.Compl.¶¶ 5-37.) Notwithstanding DDFA's assertion that this controversy "arises" under the language of the franchise agreements, these factual allegations address an array of alleged tortious acts and breaches of contract, i.e., issues as to whether the parties have *performed* or *violated* their obligations under the contract. The Amended Complaint does

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                   Page 5
Not Reported in F.Supp.2d, 2002 WL 1187207 (S.D.Fla.)
**(Cite as: Not Reported in F.Supp.2d)**

not make allegations regarding differences in the *interpretation* of specific contract language, which could usefully be resolved through the issuance of a declaratory judgment by this Court.

In particular, DDFA asserts that "DDI employees often intimidated, threatened and coerced DDFA members into voting for the [1%] advertising fund increases" and also made misrepresentations to achieve a majority vote. (*Id.* ¶¶ 22, 23.) In addition, DDI refused to accept ballots presented by DDFA (*id.* ¶¶ 24, 25), sought to collect the 1% increase "as a matter of right" (*id.* ¶¶ 27), and used these funds for other programs (*id.* ¶¶ 24, 25). DDI has also allegedly employed its rating system to prevent franchises from offering new products and services. (*Id.* ¶¶ 24, 25.) In paragraphs 12, 13, 15, 18, 19 and 28, the Amended Complaint specifically cites provisions of the uniform franchise agreement which give franchisees various "rights" at the *sole* discretion of DDI and provisions which refer to prior "typical practices." Nowhere in the Amended Complaint does DDFA cite a dispute as to the meaning of its members rights under these extensively cited contractual provisions.

The inability of DDFA's requested declaratory relief to address the allegations in the complaint is also clear when one looks at the section requesting a declaratory judgment (*id.* ¶¶ 38-45), which incorporates the General Allegations section by reference (id.¶¶ 5-37). DDFA seeks a declaratory judgment in Count I that in order for DDI to demand payment of the 1% increase, "the current practices and procedures of the local franchise advertising counsel must be followed." (*Id.* ¶ 40) DDFA asserts that the DDI must adhere to its "current practices," but does not allege that this is required under the contract or any other authority. DDFA asks the Court to declare that the 1% must be used for related programs and not for the general advertising fund or administrative expenses (*id* ), but does not allege a disagreement arising from its interpretation of the franchise agreement. Instead, it asserts a claim of misappropriation. DDFA also alleges that it has the right under the agreement to use, promote and offer all products and services, irrespective of the rating system. The general allegations section includes language from the franchise agreement supporting the position that franchisees must use trademarked Dunkin' Donuts' products and that DDI has the right to withhold new products in accordance with the rating system. (¶ 28) DDFA does not cite provisions either supporting its position or indicating contradictory provisions, which reveal a lack of clarity as to its rights.

*6 Questions regarding whether torts have been committed or a contract has been adequately performed require individual determinations of conduct with respect to an unknown number of un-named franchises. As such, DDFA alleges an array of tortious acts and breach of contract claims, which cannot be addressed by a declaration of the parties' respective rights and obligations under the contract. Accordingly, the Court finds that DDFA has not sufficiently alleged a basis upon which declaratory relief would be useful in clarifying the legal relations in issue or would resolve uncertainty regarding the controversy giving rise to the proceedings. *Allstate,* 445 F.2d at 1280; *Continental Casualty Company v. Coastal Savings Bank,* 977 F.2d at 737.

C. Associational Standing

The Court also finds that Plaintiff lacks standing to bring this suit as an association. The question of whether an entity has standing involves both constitutional and prudential limitations on federal court jurisdiction. *Warth v. Seldin,* 422 U.S. 490, 501 (1975). The Amended Complaint asserts jurisdiction on the basis of diversity of citizenship pursuant to 28 U.S.C. § 1332. In diversity cases, federal courts apply federal procedural law and state substantive law. *Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 78 (1938). "Although standing requirements in state courts are often less stringent than those of Article III, the issue lacks relevance here, as standing in federal court is determined *entirely* by Article III and depends in no degree on whether standing exists under state law." *Dalworth Oil Co. v. Fina Oil and Chemical,* 758 F.Supp. 410, 411 (N.D.Texas), citing Phillips *Petroleum Co. v.. Shotts,* 472 U.S. 797, 804 (1985)(emphasis added).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                    Page 6
Not Reported in F.Supp.2d, 2002 WL 1187207 (S.D.Fla.)
(Cite as: Not Reported in F.Supp.2d)

The Supreme Court articulated a three-prong test for "associational standing" in *Hunt v. Washington Apple Advertising Commission,* in which it stated that:

[A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of the members in the lawsuit.

*Hunt v. Washington Apple Advertising Commission,* 432 U.S. 333, 343 (1977), citing *Warth,* 422 U.S. at 511. In *Warth,* the Supreme Court explicitly held that "[e]ven in the absence of injury to itself, an association may have standing solely as the representative of its members."

The Court finds that DDFA has met the first two elements of the Supreme Court's test in *Hunt.* Accepting the allegations in the Amended Complaint as true, DDFA's members would have standing to sue in their own right in tort or for breach of contract. The interests that the association seeks to protect are also germane to the organization's purpose. The Amended Complaint states that: "The DDFA was incorporated to articulate and advocate the needs, interests and lawful goals of its members [and] to protect and enhance the economic investments of Dunkin' Donuts' franchisees in the State of Florida." (Am.Compl. ¶ 5.)

*7 The third element of *Hunt* provides that associational standing is only permissible where "neither *the claim asserted* nor *the relief requested* requires the participation of the members in the lawsuit." *Hunt,* 432 U.S. at 343 (emphasis added). In *Warth,* the Court held that "an association of construction firms could not seek damages for the profits and business lost by its members because ' whatever injury might have been suffered is peculiar to the individual member concerned, and both the fact and extent of injury would require individualized proof." ' *Brock,* 477 U.S. at 287 (quoting *Warth,* 422 U.S. at 515-516). By contrast, the Court in *Brock* held that a request for declaratory relief by an association on behalf of its members does not require the individual participation of its members where the "suit raises a pure question of law." *Brock,* 477 U.S. at 287.

Unlike most prior associational standing cases, this action does not challenge a statute, regulation or ordinance, but rather seeks a declaratory judgment with respect to "uniform" franchise agreements between DDI and DDFA's members. As noted above, DDFA's allegations do not set forth a discrete legal issue. Instead, the Amended Complaint sets forth allegations of tortious conduct and breach of contract. As such, the Amended Complaint requires individual determinations as to whether DDI committed various torts against certain of its members and whether DDFA's members or DDI itself complied with the provisions of the franchise agreement. Accordingly, the Complaint does not raise a "pure question of law," which can be considered without the individual participation of DDFA's members.

### D. Accounting

As the Court finds that declaratory relief is inappropriate and DDFA lacks standing to pursue its claims, the request for an accounting is denied. Accordingly, it is

ORDERED AND ADJUDGED that

(1) Dunkin' Donuts Inc.'s Motion to Dismiss First Amended Complaint (D.E.19), filed March 15, 2001 is GRANTED.

(2) This case is CLOSED.

(3) All pending motions not ruled upon separately are DENIED as moot.

S.D.Fla.,2002.
DDFA of South Florida, Inc. v. Dunkin' Donuts, Inc.
Not Reported in F.Supp.2d, 2002 WL 1187207 (S.D.Fla.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.