Exhibit 4

Westlaw.

Not Reported in F.Supp.2d                                                                                          Page 1

Not Reported in F.Supp.2d, 2005 WL 2128938 (N.D.N.Y.), 61 ERC 1182
**(Cite as: Not Reported in F.Supp.2d)**

**H**
Sherwin-Williams Co. v. Spitzer
N.D.N.Y.,2005.

United States District Court,N.D. New York.
SHERWIN-WILLIAMS COMPANY and National
Paint and Coatings Association, Inc., Plaintiffs
v.
Eliot L. SPITZER, Attorney General of the State of
New York, and Denise Sheehan Acting
Commissioner of the New York State Department
of Environmental Conservation in substitution of
her predecessor in Office Erin M. Crotty.
Defendants.
**No. 1:04CV185(DNH/RFT).**

Aug. 24, 2005.

Nixon and Peabody Law Firm, Albany, New York,
for the Plaintiffs, Daniel J. Hurteau, of counsel.
Hon. Eliot L. Spitzer, Office of the Attorney
General, State of New York, The Capitol, Albany,
New York, for the State Defendants, Joseph S.
Koczaja, of counsel.

*ORDER*
TREECE, Magistrate J.
**\*1** With a case of this nature, it is no surprise to this
Court that one of the parties would be making a
motion to compel disclosure or that the first blow to
be struck in this case would be delivered by the
State Defendants who request an order, pursuant to
Fed. R. Civ . P. 37, compelling disclosure from the
Plaintiffs of a multitudinous of documents and a
myriad of interrogatories.[FN1] The comprehensive
and complex nature of these discovery issues
compel a corresponding analysis from the Court.

    FN1. The parties' documents and pleadings
    reviewed by the Court in order to render a
    decision in this case are listed below:

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 2

Not Reported in F.Supp.2d, 2005 WL 2128938 (N.D.N.Y.), 61 ERC 1182
**(Cite as: Not Reported in F.Supp.2d)**

| Dkt. No. | Description |
|---|---|
| 1 | Complaint |
| 11 | Amended Complaint |
| 36 | Defs.' Mot. to Compel; Joseph Koczaja, Esq., Decl., dated Feb. 7, 2005, with Exs. A-G; Mem. of Law, dated Feb. 7, 2005. |
| 47 | Pls.' Opp. to the Mot. to Compel; Daniel J. Hurteau, Esq., Affirm., dated Mar. 28, 2005; Allen J. Danzig, Aff., dated Mar. 28, 2005; Mem. of Law, dated Mar. 28, 2005. |
| 48 | Defs.' Reply to Pls.' Opp.-Lt -Mem., dated Apr. 4, 2005; Daniel S. Brinsko, Aff., |

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 3

Not Reported in F.Supp.2d, 2005 WL 2128938 (N.D.N.Y.), 61 ERC 1182
(Cite as: Not Reported in F.Supp.2d)

dated Apr.
4, 2005,
with Exs.
A-E.

## I. FACTS

### A. State Regulation

A detailed recitation of the facts, which can be found in *Sherwin-Williams Co. v. Crotty,* 334 F.Supp.2d 187, 189-92 (N.D .N.Y.2004), need not be fully stated herein, but to the extent useful, this Court will provide an overview of the more salient facts and issues in this litigation. *See also* Dkt. No. 22, Ord., dated Aug. 19, 2004, at pp. 2-6.

In order to control the increased emission of air pollutants, Congress enacted the Clean Air Act, 42 U.S.C. § 7401 *et seq., * which has been significantly amended several times. One of its objectives is to achieve Air Quality Standards (AQS) for ozone. According to the Clean Air Act, the primary responsibility for preventing and/or controlling air pollution that may contribute to higher ozone levels falls upon the states. 42 U.S.C. § 7401(a)(3). A critical component of the Clean Air Act, as it relates to this litigation, is the establishment of the Northeast Ozone Transport Region (NOTR), which includes New York.[FN2] 42 U.S.C. § 7511c(a). In 1999, NOTR developed regulations for volatile organic compounds (VOC) in certain architectural, industrial, and maintenance coatings (AIM) in order to achieve a "1-hour" Air Quality Standard for ozone. Additional ozone control measures were considered and eventually developed into the AIM Model Rules.

> FN2. NOTR is composed of Connecticut, Delaware, the District of Columbia, Maine, Maryland, Massachusetts, New Hampshire, New Jersey, Pennsylvania, Rhode Island, Virginia, Vermont as well as New York. New York is a key player in NOTR due mostly to the Environmental Protection Agency (EPA) identifying New

York City as a "severe ozone non-attainment area." *See* 42 U.S.C. §§ 7502 & 7407(d).

On March 19, 2003, the State of New York proposed AIM Regulations which, *inter alia,* limited the amount of VOC that may be found in fifty-two (52) types of architectural and industrial maintenance coating (AIM), which includes varnishes and stains. Another critical component of these AIM Regulations is the creation of the small manufacturer exemption. A small business that produces less than 3,000,000 gallons of product each year and has few financial and technological resources may apply for an exemption from the implementation of the AIM Regulations for up to a three-year duration with the possibility of continuing the exemption until they are able to comply. N.Y. Envt. Conserv. LawW §§ 1-0101, 3-0301, 19-0105, 19-0305. The AIM Regulations were adopted by New York to take effect on January 1, 2005. *See generally,* Dkt. No. 11, Am. Compl.; *Sherwin-Williams Co. v. Crotty,* 334 F.Supp.2d 187.

### B. Litigation

Sherwin-Williams (SW) and the National Paint and Coatings Association (NPCA) commenced this action on February 9, 2004, against New York State officials, the Attorney General, and the Commissioner of the Department of Environmental Conservation (DEC), challenging the adoption of the state's AIM Regulations. [FN3] Dkt. No. 1, Compl.; *see also* Dkt. No. 11, Am. Compl. Plaintiff SW is one of the largest paint manufacturers in the world with several product lines of AIM coating. Am. Compl. at ¶ 27. Plaintiff NPCA is a voluntary nonprofit corporation comprised of approximately four hundred (400) members who are engaged in the manufacture and distribution of paints, varnishes, and coating which have collective sales of ninety (90) percent of the total national volume of paint and allied products. *Id.* at ¶ 28. An aspect

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                Page 4

Not Reported in F.Supp.2d, 2005 WL 2128938 (N.D.N.Y.), 61 ERC 1182
**(Cite as: Not Reported in F.Supp.2d)**

of NPCA's mission is to be "an advocate for its members on legislative, regulatory, and judicial issues at the federal, state, and local levels." *Id.*

> FN3. Currently, Sherwin-Williams and the National Paint and Coatings Association are represented by Nixon and Peabody, Daniel Hurteau, Esq., of counsel.

**\*2** Overall, Plaintiffs seek "to annul and declare void ... [the] regulation promulgated by [New York State] restricting the use of volatile organic compounds in certain so-called architectural and industrial and maintenance coatings." *Id.* at ¶ 2. Initially, six causes of action alleging violations of the United States Constitution, federal environmental and civil rights statutes, and New York environmental and administrative laws were pled. *See generally* Dkt. No. 1, Compl. at ¶ 1. The most predominate causes of action, which survived a Motion to Dismiss, are the actions that arise under the Commerce Clause (U.S. Const., art. 1 § 8, cl. 13) and the Equal Protection Clause (U.S. Const., amend. XIV, § 1) of the United States Constitution. [FN4] With regard to the Commerce Clause claims, the Plaintiffs allege that the state's AIM Regulations: (1) are an unreasonable burden upon interstate commerce by imposing VOC limits which are not technically feasible and considerably more stringent than corresponding federal and other state standards (¶ 97); (2) impose financial and administrative burdens on Plaintiffs that outweigh the benefits received by New York (¶ 98); (3) impermissibly discriminate against out-of-state manufacturers with its small manufacturer exemption, and its protectionism favors small, in-state manufacturers (¶¶ 99-101); (4) alternative standards exist that would not burden interstate commerce (¶ 102); and (5) impedes the Plaintiffs to market their products (¶ 103). Dkt. No. 11, Am. Compl. Succinctly, Plaintiffs' Equal Protection claim charges that the AIM Regulations' exemption for small manufacturers is arbitrary and capricious in that it discriminates against the larger manufacturers who are ineligible for the exemption and is not rationally related to any legitimate legislative purpose. *Id.* at ¶¶ 110-17; *see supra* Part I.B. at p. 4 (discussing the small business

exemption).[FN5]

> FN4. Defendants moved to dismiss the Complaint in its entirety pursuant to Fed. R. Civ. P. 12(b)(6). *See generally* Dkt. Nos. 12 & 16-21. On August 19, 2004, the Honorable David N. Hurd, U.S. District Judge, granted the Defendants' Motion in part and dismissed the federal environmental causes of action, state causes of action, and left standing the constitutional and § 1983 claims. *Sherwin-Williams,* 334 F.Supp.2d at 197; Dkt. No. 22 at pp. 14-15.

> FN5. To further elaborate on these two alleged constitutional violations, Plaintiffs argue, *inter alia,* that there is no technology available to manufacture products for a number of the categories limited by the AIM Regulations without seriously compromising their products. In order to comply with AIM Regulations, significant lead time to develop, test and market the new product would be necessary. Since SW and most of NPCA's membership are not eligible for the small manufacturer exemption, their current product would not be permitted to be manufactured after January 1, 2005, for sale in New York and thus are discriminated against and disadvantaged. Am. Compl. at ¶¶ 13-17.

Pivotal to our critique of this discovery dispute is the parties' Stipulation Limiting Commerce Clause Claim. *See* Dkt. Nos. 43 & 46 ("so ordered" on March 22, 2005). When this action was initiated, Plaintiffs' Complaint sought to annul the AIM Regulations as to the fifty-two (52) categories of AIM coating limited by the regulation. N.Y. Comp.Codes R. & Regs. tit. 6, § 205.3 (N.Y.C.R .R). By this Stipulation, the Commerce Clause claim, and possibly the entire Amended Complaint, now pertains to "only 2 of the 52 categories of AIM coating in 6 N.Y.C.R.R. § 205, which 2 categories are 'varnishes' and 'stains.' " Dkt. No. 46 at p. 2. Should there remain any doubt as to the diminution

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                      Page 5

Not Reported in F.Supp.2d, 2005 WL 2128938 (N.D.N.Y.), 61 ERC 1182
(Cite as: Not Reported in F.Supp.2d)

of the scope of the Commerce Clause Claim, the parties affirm the revised modification of this cause of action by stating that "for the purpose of this litigation only, the [P]laintiffs do not claim that the New York's AIM Regulations ... violate the Commerce Clause ... [ ] with respect to the remaining 50 categories." *Id.*[FN6]

> FN6. This Stipulation is signed by the lead attorneys for the respective parties to this litigation. *See* Dkt. No. 46 at p. 3. Defendants' first volley in this battle over discovery is that Plaintiffs cannot limit the scope of discovery as to varnishes and stains only. Defs'. Mem. of Law at p. 7. The irony of this shot across the bow is that the Defendants invited the Plaintiffs " to limit discovery ... [by] specify[ing] those AIM coating categories in 6 N.Y.C.R.R. [§ ] 205.3 that they are challenging in this lawsuit." Koczaja Decl. at ¶ 9. Subsequently, Plaintiffs accepted the invitation and obliged by agreeing to the Stipulation Limiting the Commerce Clause Claim, which was executed by agents of all parties. Dkt. No. 46. By virtue of the Stipulation, it is incontestable that the scope of discovery is limited to these two categories of AIM and the other fifty (50) categories are no longer an issue. Hurteau Affirm. at ¶¶ 40-41. Therefore, it will be a part of this Order that the scope of the disclosure does not include fifty-two (52) categories of AIM but only the two identified in the Stipulation.

### C. The Discovery Process

**\*3** The disclosure of reams of documents from the Plaintiffs have not proceeded in a manner and as expeditiously as the Defendants would like. Defendants suggest that they have promptly complied with discovery requests while the Plaintiffs have been dilatory and evasive.

Independent of the Rule 26 mandatory disclosures, on October 21, 2004, Defendants served twenty-two (22) Interrogatories and a Request for Documents on the Plaintiffs separately.[FN7] The Plaintiffs belatedly served their responses on January 14 and 18, 2005, raising objections such as a need for a protective order for confidential business information. Few documents were provided then. Koczaja Decl. at ¶¶ 6-13; Defs'. Mem. of Law at pp. 5-6; Exs. B-F; Brinsko Aff. at ¶¶ 6-18. Conversely, Plaintiffs made discovery demands shortly thereafter, which the Defendants inferred had been timely and completely responded to without objection. Koczaja Decl. at ¶ 14.

> FN7. Each Plaintiff was served with a set of Interrogatories and Documents Requests. *See* Dkt. No. 36, Exs. B-G. Pertinent to our discussion, Defendants served two Documents Requests upon NPCA. One set was directed at the Association and the second set was directed at NPCA's members. *Id.* at Exs. B & C. The delineation of the Document Requests to the individual members of NPCA is one of the primary discovery issues in this litigation. *See infra* Part II.A.

### II. DISCUSSION

We first note that the Court does not have to fully address any objections that the information sought is not relevant nor germane to the subject matter of the litigation. Fed. R. Civ. P. 26. Such objections are not being seriously raised by either Plaintiff and it appears that most, if not all, of the demands are relevant to this constitutional litigation.[FN8] Although there are a series of Interrogatories and Document Demands that have been objected to by the Plaintiffs for various reasons depending on the Plaintiff, the parties agree that there are several overarching legal issues that will affect the challenges to the outstanding Interrogatories and Document Requests.[FN9] Those encompassing issues are subsumed into the following topical disagreements: (1) whether NPCA and/or individual members of NPCA can invoke the First Amendment to withhold discovery; (2) are NPCA members considered non-parties and therefore not subject to ordinary party discovery processes as set forth in the Federal Rules of Civil Procedure; and (3) are

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                      Page 6

Not Reported in F.Supp.2d, 2005 WL 2128938 (N.D.N.Y.), 61 ERC 1182
**(Cite as: Not Reported in F.Supp.2d)**

Plaintiffs entitled to a protective order for their claims of sensitive business and proprietary information? The Court will examine these more comprehensive issues first and then, if necessary, tackle the specific Interrogatories or Document Requests.

> FN8. The Court however will briefly discuss discovery and relevancy as it pertains to the discussion on protective orders. *See infra* Part II.C.1.

> FN9. During the pendency of this Motion, the Court was privy to the parties' continual rankling over Plaintiffs' failure to disclose documents. *See* Dkt. Nos. 50-53 and related Text Orders. At the Court's direction, Plaintiffs provided the Court with a status report on their efforts to comply with discovery within the set discovery deadline. Dkt. No. 52. Recently, exclusive of the documents at the heart of what is to be decided herein, Plaintiffs declare that documents have been " produced over the past several months and further production ... [will include] over eight boxes of documents ... [which] are responsive to [Defendants'] First and Second Set of Interrogatories and, in many instances, responsive to [D]efendants' First Document Demand." *Id.* at p. 1. Moreover, Plaintiffs represent that they are "currently creating documents that will provide information on the products at issue, including volumes of products manufactured/sold in New York ..., [which] should be subject to the Protective Order." *Id.* Unsurprisingly, the Defendants take umbrage to Plaintiffs' representations of compliance. Dkt. No. 53 at p. 2 (submitting that the Plaintiffs are not taking this litigation very seriously and instead intend "to have this litigation serve as a 'placeholder action' while their lobbyists solicit changes in ... New York's .. . AIM regulations." Although Defendants have received from the Plaintiffs " approximately three small boxes and six

larger boxes of documents," they foreswear that such disclosure adequately responds to the "long-overdue discovery responses." *Id.*

### A. First Amendment

As stated above, Defendants served upon Plaintiff NPCA a separate Document Request directed at its members (*see supra* n. 7), and Document Request and Demand for Interrogatories directed to NPCA. Dkt. No. 36, Exs. B (Document Requests to Members), C (Document Requests to NPCA), & F (Interrogatories of NPCA). It appears that the Plaintiffs wish to cloak these disclosures with First Amendment protection. Originally and primarily, Plaintiffs refused to supply the identities of NPCA members as it may relate to the AIM Regulations' small manufacturer exemption issue. Koczaja Decl. at ¶ 15. It should be noted that Plaintiffs now aver that they have "reconsidered its decision to withhold the names of its members and agreed to provide such information to the [D]efendants," which should satisfy Defendants' Document Request # 1 to NPCA. FN10 Hurteau Affirm. at ¶ 6. Plaintiffs are now bound by this representation. Notwithstanding the admission to reveal the membership list to the Defendants, we still must address the Plaintiffs' invocation of the First Amendment as it may pertain to NPCA members and other document requests.

> FN10. NPCA membership is approximately 400, however, the total number of the membership impacted by the AIM Regulations, as it affects varnishes and stains, is roughly 158. Hurteau Affirm. at ¶ 15; Brinsko Aff. at ¶ 20.

**\*4** Discovery requests upon a membership organization, such as NPCA, on first blush, inexorably implicate the First Amendment protection, a restraint upon the freedom of speech and the right to freely associate. *NAACP v. Alabama,* 357 U.S. 449, 459-60 (1958); *New York State Org. for Women v. Terry,* 886 F.2d 1339, 1354-55 (2d Cir.1989). "Inviolability of privacy in

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 7

Not Reported in F.Supp.2d, 2005 WL 2128938 (N.D.N.Y.), 61 ERC 1182
**(Cite as: Not Reported in F.Supp.2d)**

group association may in many circumstances be indispensable to preservation of association, particularly where a group espouses dissident beliefs." *NAACP v. Alabama,* 357 U.S. at 462 (citation omitted); *New York State Org. for Women v. Terry,* 886 F.2d at 1355 (finding that the plaintiff in *NAACP v. Alabama,* "made an 'uncontroverted showing that on past occasions' disclosure of members' identities 'exposed [their] members to economic reprisal, loss of employment, threat of physical coercion, and other manifestations of public hostility' "). It is well-settled law that the First Amendment creates a qualified associational privilege from disclosure of certain information. If the discovery request adversely affects an organization's and/or its members' mission of advocacy and chills their ability to freely speak or to associate, the associational privilege may attach. Should there be a showing of reasonable probability that compelling disclosure will lead to some form or specter of harassment, threat, or reprisal of the organization and/or its members, such commanded disclosure runs afoul of the First Amendment. *Buckley v. Valeo,* 424 U.S. 1, 74 (1976); *Local 1814, Int'l Longshoremen's Assoc. AFL-CIO v. Waterfront Comm'n. of New York Harbor,* 667 F.2d 267, 271-73 (2d Cir.1981). Typically, the association privilege has been enforced to protect an organization's internal activities and documents, such as lists of members, contributors, and political affiliations when the association has made a showing that compelled disclosure will adversely affect the organization's ability to advocate or cause members to withdraw or expose them to threats, reprisal, and harassment. *Wyoming v. United States Dep't of Agric.,* 239 F.Supp.2d 1219, 1237 (D.Wyo.2002) (finding that if a request of internal association activities occurs, federal courts implicitly assume that the party has made a *prima facie* case for the privilege); *Int'l Soc'y For Krishana Consciousness, Inc. v. Lee,* 1985 WL 315, at *7 (S.D.N.Y. Feb. 28, 1995) ("It is hardly a novel perception that compelled disclosure of affiliation with groups engaged in advocacy may constitute [an] effective ... restraint on freedom of association." (quoting *NAACP v. Alabama,* 357 U.S. at 462)). Once there is a *prima facie* showing of hostility and adverse impact, the burden shifts to the party seeking the disclosure to demonstrate a compelling

need for the information that will survive "exacting scrutiny." *In re Grand Jury Proceedings; A Grand Jury Witness v. United States,* 776 F.2d 1099, 1102-03 (2d Cir.1985) (citing *Bates v. City of Little Rock,* 361 U.S. 516, 524 (1960) and *Buckley v. Valeo,* 424 U.S. 1, 64 (1976)); *see also Fed. Election Comm'n. v. Larouche Campaign,* 817 F.2d 233 (2d Cir.1987) (ruling that government will have to show sufficient need to justify compelled disclosure of the names of contributors).

**\*5** The associational privilege's proscription has been extended to a limited cache of documents. Even though it is limited in scope, the association privilege cannot be used to circumvent general and legitimate discovery where the specter of intimidation and reprisal is not present. *Wilkinson v. FBI,* 111 F.R.D. 432, 436 (C.D.Cal.1986) (finding that the privilege is qualified, not absolute, and can't be used as a "blanket bar to discovery"); *Anderson v. Hale,* 2001 WL 503045, at *7 (N.D.Ill. May 10, 2001) (citing *NAACP v. Alabama,* 357 U.S. at 462-63, for the proposition that the Supreme Court " did not intend to provide publicly identified members of dissident organizations with a nearly impenetrable shield ... to block general discovery requests"). In our case, Plaintiffs have failed to make such a showing of reasonable probability of a chill or threat to NPCA or its members. *Fed. Election Comm'n. v. Larouche Campaign,* 817 F.2d 233. Speculating that the document demands may cause a withdrawal of membership does not bolster their claim of a First Amendment infringement. *Doyle v. New York State Div. of Housing and Community Renewal,* 1999 WL 177441, at *8 (S.D.N.Y. Mar. 30, 1999); *Anderson v. Hale,* 2001 WL 503045, at *6 ("The risk of inducing members to withdraw ... is too remote and speculative."). In fact the threat of a withdrawal of membership in our case isn't real in our view. Plaintiffs' concerns pale in comparison to the real threats of bodily harm and intimidation confronted by the NAACP and its members in 1958. *NAACP v. Alabama,* 357 U.S. 449; *Nat'l Org. for Women (NOW) v. Sperry Rand Corp.,* 88 F.R.D. 272, 274-75 (D.Conn.1980) (finding that the level of harassment imposed upon NOW "did not equate" with the threatened level of coercion encountered by the NAACP). Neither does this case rise to the heightened political and social

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2005 WL 2128938 (N.D.N.Y.), 61 ERC 1182
**(Cite as: Not Reported in F.Supp.2d)**

concerns raised in *Bates v. City of Little Rock,* 361 U.S. 516. *See, e.g* ., *P. & B. Marina, Ltd. P'ship v. Logrande,* 136 F.R.D. 50 (E.D.N.Y.1991) (describing the plaintiff's nature as hardly analogous to the NAACP and other political and social organizations). It should also be duly noted that once a party initiates or joins an action, "it cannot realistically hope to pursue [the] suit in a risk-free atmosphere." *NOW v. Sperry Rand,* 88 F.R.D. at 275. Further, juxtaposed against the other axis of the balancing test is that the Defendants have shown a compelling need for the information requested and have met the "exacting scrutiny" standard all courts are expected to employ in determining access to such records, at least as to the effect of the associational privilege. *Local 1814 v. Waterfront Comm'n.,* 667 F.2d 267 (noting that some discovery is appropriate when there is a proven compelling state interest); *Int'l Soc'y v. Lee,* 1985 WL 315, at *8 (ruling that the party seeking disclosure must show that the information sought is crucial to their case); *Anderson v. Hale,* 2001 WL 503045, at *4 (noting that discovery must go to "the heart of the matter"). Therefore, the Association and its members' First Amendment privileges cannot be argued as a bar of discovery in this case. Although we find that the First Amendment privileges are not applicable in this matter, except for one Interrogatory, this finding does not dispel the Plaintiffs' claims of other privileges and protections.

*6 The Interrogatory in which First Amendment privilege is ripe is the First of Set of Interrogatories, Interrogatory # 22:
Have all members of NPCA identified in Interrogatory No. 3 given their express approval to commence this lawsuit in the N.D.N.Y.? Produce all documents showing the approval of this lawsuit by the members of the NPCA, and all documents by the NPCA, its members and Sherwin-Williams concerning this lawsuit.

Dkt. No. 36, Ex. F (Interrog.# 22).

This Interrogatory strikes at the heart of an association's internal activities which provokes protection by the associational privilege as well as being totally irrelevant to the claims and/or defenses in this action. Such compelled revelation would

create a chill on NPCA and its members' First Amendment rights of speech and group association which is indispensable to the preservation of this organization. Further, how the individual members voted on whether this action would be commenced by NPCA is not germane to the subject matter at hand. Therefore, Plaintiff NPCA nor its members will be required to answer this Interrogatory.

*B. Demands of Association's Members*

Discovery Demands to NPCA have been carefully sequestered by the Defendants into categories of Demands to the Association generally and the specific Demands to the members. *See* Dkt. No. 36, Ex. B. (Resp. to Request For Documents Related to Individual Members of NPCA). However, the Demand for Interrogatories are not so clearly delineated. Although propounded to NPCA, there are specific inquires definitively eliciting members' information. *Id.* at Ex. F (Interrogatories to NPCA). Such sequestration and denudation of inquiries helps crystalize our next discussion on whether the NPCA has to bear the burden of what may constitute a monumental discovery effort by them. Plaintiff NPCA raises several challenges to the disclosure demands directed at the members as being overly burdensome, seeking confidential documents, and being a form of harassment; however, we will focus on the novel dispute as to whether NPCA has the duty to be a clearinghouse for the requested information that would inextricably come from the individual members and not NPCA.

NPCA contends that if Defendants want specific information as to the individual members who may be seriously impacted by the AIM Regulations, the Defendants should then direct their demands for discovery directly to the members through available discovery devices, such as Rule 45 subpoenas. Presumably this massive ream of documents requesting members' individual information is not in NPCA's possession. Hurteau Affirm. at ¶¶ 15-17. In order for NPCA to comply with these demands, they would have to contact each member who is so affected, reiterate the Defendants' demands, collect and then collate the data that may come from as

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                     Page 9

Not Reported in F.Supp.2d, 2005 WL 2128938 (N.D.N.Y.), 61 ERC 1182
**(Cite as: Not Reported in F.Supp.2d)**

many as 158 members. *Id.* NPCA's essential argument is that the individual members are non-parties and the method of acquiring information from and about them should be pursued by Rule 45 (subpoenas) rather than Rules 33 and 34 (interrogatories and production of documents and tangible things) to NPCA. Fed. R. Civ. P. 33, 34 & 45; Dkt. No. 47, Pls.' Mem. of Law at pp. 2-5 (Point I).

**\*7** If this is accurate, that is that the NPCA's individual members are non-parties to the action, such status then begs the obvious question of how can NPCA, an organization with the mission of protecting and promoting their members' interests, even has standing to bring this action if they can avoid the obligation and risks of initiating this litigation. Conversely, being able to evade the task of discovery creates the quandary that any association may be able to bring a lawsuit and then shirk or even shift the duties imposed by the Federal Rules of Civil Procedure upon either their members or the defendants. Such a scenario, on its face, does not appear to be fair.

When raising constitutional claims that affect a significant number of an organization's membership, presumably the association may be the correct party to assert the rights of its members. *St. German of Alaska Orthodox Catholic Church v. United States,* 840 F.2d 1087, 1092 (2d Cir.1988) (citing, *inter alia, NAACP v. Alabama,* 357 U.S. at 458-49).[FN11] However, there is no automatic default that an association has standing. In order to maintain a suit to redress members' grievances and injuries, the courts have applied a three prong test:

> FN11. As a general proposition, an association, consistent with its mission, may be the most proper party to assert the rights of its members. *NAACP v. Alabama,* 357 U.S. at 459-60. Still, an association may be put to its task of establishing that it has standing. An association can establish standing on either constitutional or prudential grounds. *See Trans. Workers Union of Am. Local 100, AFL-CIO v. New York City Transit Auth.,* 342 F.Supp.2d

160, 165 (S.D.N.Y.2004) (for a full discussion of this issue); *In re Methyl Tertiary Butyl Ether Prod. Liab. Litig.,* 2005 WL 1500893, at \*2 (S.D.N.Y. June 24, 2005) (citing *Elk Grove Unified Sch. Dist. v. Newdow,* 542 U.S. 1, _, 124 S.Ct. 2301, 2309 (2004)); *M.O.C.H.A. Soc'y, Inc. v. City of Buffalo,* 199 F.Supp.2d 40 (W .D.N.Y.2002). "Even in the absence of injury to itself [an organization can have standing] solely as the representative of its members." *Transp. Workers,* 342 F.Supp.2d at 167 n. 40 (quoting *Warth v. Seldin,* 422 U.S. 490, 511 (1975)). However, "[j]udgments as to prudential standing are vested in the court's sound discretion since they involve 'judicial self-imposed limit[s] on the exercise of federal jurisdiction, not a constitutional mandate." ' *M.O.C.H.A.,* 199 F.Supp.2d at 49 (citation omitted).

[an] association has standing if "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."
*Bano v. Union Carbide Corp.,* 361 F.3d 696, 713 (2d Cir.2004) (quoting *Hunt v. Washington State Apple Adver. Comm'n.,* 432 U.S. 333, 343 (1977); and further citing *United Food & Commercial Workers Union Local 751 v. Brown Group, Inc.,* 517 U.S. 544, 553 (1996) (*"Brown Group"* ); *Int'l Union, United Automobile, Aerospace & Agric. Implement Workers of Am. v. Brock,* 477 U.S. 274, 282 (1986) (*"Brock"* ); *Warth v. Seldin,* 422 U.S. 490, 511 (1975)).

The third prong is often the most critical component of this test which personifies the prudential rather than a constitutional requirement for standing. *Bano v. Union Carbide,* 361 F.3d at 715 (citing *Brown Group,* 517 U.S. at 557); *see also supra* n. 11.[FN12] "[W]hether an association has standing to invoke the court's remedial powers on behalf of its members depends in substantial measure on the nature of the relief sought." *Warth v. Seldin,* 422

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2005 WL 2128938 (N.D.N.Y.), 61 ERC 1182
**(Cite as: Not Reported in F.Supp.2d)**

U.S. at 515. As an illustration, when an association is pursuing monetary damages on behalf of its members, it is axiomatic that it does not have standing. *Bano v. Union Carbide,* 361 F.3d at 714 & 715 ("Association standing carves out a narrow exception from the ordinary rule that a litigant ' must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." ') (citations omitted)); *In re Methyl Tertiary Butyl Ether Prod. Liab. Litig.,* 2005 WL 1500893, at \*3 (for the proposition that associational standing can rebut the "presumption ... that litigants may not assert the rights of the absent third parties"). However, as a general proposition, where an association seeks a declaratory judgment, injunction, or some form of perspective relief, which "will inure to the benefit of those members of the association [who are] actually injured," standing is presumed, though not guaranteed. *Warth v. Seldin,* 422 U.S. at 515. An association, under these circumstances, lacks standing

> FN12. Evidently, NPCA's members, such as Sherwin-Williams, could have brought this action in their own right and it is NPCA's purpose to protect its members' interest and rights. *See supra* Part I.B. In this respect, it appears that the first two elements of the test can be easily demonstrated.

\*8 to assert claims of injunctive relief on behalf of its members where "the fact and extent" of the injury that gives rise to the claims for injunctive relief "would require individualized proof," *Warth v. Seldin,* 422 U.S. at 515-16, 95 S.Ct. 2197, or where "the relief requested [would] require [ ] the participation of individual members in the lawsuit," *Hunt,* 432 U.S. at 343, 97 S .Ct. 2434. *Bano v. Union Carbide,* 361 F.3d at 714; *see also In re Agent Orange Prod. Liab. Litig.,* 373 F.Supp.2d 7, 51 (E.D.N.Y.2005) (citing *Bano v. Union Carbide* ).

In this context, if the lawsuit raises a pure question of law, the association will have standing for the simple reason that the benefit will inure to the members generally or are common to a substantial majority of the entire membership. *Brock,* 477 U.S. at 278; *Warth,* 422 U.S. at 515; *Transport Workers,* 342 F.Supp.2d at 168 (no individual's participation is required to adjudicate the claim or grant the relief). On the other hand, if the individual members have to be involved in the proof of the claim in some material fashion, because of the "substantive nature of the claim or the form of the relief sought requires [member] participation," then the association's standing will be lost. *Bano v. Union Carbide,* 361 F.3d at 715; *M.O.C.H.A,* 199 F.Supp.2d at 48 (citing *Rent Stabilization Ass'n v. Dinkins,* 5 F.3d 591, 596 (2d Cir.1993)). Even if the lawsuit does not pursue damages, should the "facts and the extent" of the injury asserted require consideration of the unique and peculiar circumstances of individual members and the court has to engage in *ad hoc* inquiries therein, then the association would not be permitted standing to solely bring this action. *Bano,* 361 F.3d at 714-15 (finding in that case that in order for an organization to be successful the members would have to participate); *Presbyterian Church of Sudan v. Talisman Energy, Inc.,* 2005 WL 1060353, at \*1 (S.D.N.Y. May 6, 2005); *see also Methyl Tertiary,* 2005 WL 1500893, at \*4 (individual assessment required).

With the above discussion in hand, we return to the issue of whether the individual members of NPCA are required or necessary parties to this litigation, and if so, will NPCA lose standing to pursue this matter further. As we know, the remaining claims in this litigation are constitutional in nature seeking only a declaratory judgment and injunctive relief. *See* Am. Compl. There is no pursuit of monetary damages on behalf of the members. Unequivocally, NPCA, without a need for particularized proof from its members, has standing as to the Equal Protection Clause cause of action. The same is true with regard to most of the Commerce Clause cause of action. *Hunt v. Washington,* 432 U.S. at 344 (an organization has standing where "neither the interstate commerce claim nor the request for declaratory and injunctive relief requires individualized proof and both are thus properly resolved in a group context."). However, one aspect of the Commerce Clause claim,[FN13] which states that the "AIM Regulations unreasonably burden

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                Page 11

Not Reported in F.Supp.2d, 2005 WL 2128938 (N.D.N.Y.), 61 ERC 1182
**(Cite as: Not Reported in F.Supp.2d)**

interstate commerce by imposing financial and administrative burdens" (Dkt. No. 11 at ¶ 98), would not on its own give NPCA standing because such a claim indubitably requires proof of economic and administrative burdens from the individual members. [FN14] Yet, in light of the fact that NPCA would have standing on an appreciable portion of this action, as noted above, and the fact that the Court has inherent discretion in extending prudential jurisdiction in mixed bag cases like this, NPCA's standing is not jeopardized. The Defendants raise, as their second affirmative defense, that neither Plaintiff in this case has standing. Dkt. No. 22, Answer. If there is ever a finding that an association does not have standing, this Court could issue, *sua sponte,* a report and recommendation, pursuant to 28 U.S.C. § 636(b), to the District Court recommending that the action be dismissed for lack of standing, at least to the Association. Such a recommendation would have no effect on SW's ability to prosecute the action on its own nor prevent a class action should one be pursued. Hence, since NPCA's standing is not imperiled, the issue of the scope of discovery becomes more crystallized.

FN13. Under the Commerce Clause of the United States Constitution, Congress is ascribed the power "[t]o regulate Commerce ... among the several States." U.S. Const., art. I, § 8, cl. 3. Enumeration of this power necessarily limits, by negative implication, the power of the states to regulate or interfere with interstate commerce. *See, e.g., Fort Gratiot Sanitary Landfill, Inc. v. Michigan Dep't of Natural Resources,* 504 U.S. 353 (1992) (cited in *New York State Trawlers Ass'n v. Jorling,* 16 F.3d 1303, 1307 (2d Cir.1994)). Generally, the criteria for determining the validity of a state statute that affects interstate commerce has been stated as follows:
Where the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits.... If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course, depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities.
*Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142 (1970) (internal citations omitted).
In interpreting what has come to be known as the *Pike* Balancing Test, the Second Circuit has explained that the "incidental burdens" to which *Pike* refers "are burdens on interstate commerce that exceed the burdens on intrastate commerce." *New York State Trawlers Ass'n v. Jorling,* 16 F.3d at 1308 (citing *Minnesota v. Clover Leaf Creamery Co.,* 449 U.S. 456, 471-72 (1981)). Furthermore, the party challenging the statute "must show that a statute enacted for a legitimate public purpose, although apparently evenhanded, actually imposes burdens on interstate commerce that exceed the burdens on intrastate commerce, ... and that those excess burdens on interstate commerce are clearly excessive in relation to the putative local benefits." *Freedom Holdings, Inc. v. Spitzer,* 357 F.3d 205, 217-18 (2d Cir.2004) (internal quotation marks and citations omitted).

FN14. If the NPCA's economic and administrative burdens claims rested solely on the cost to implement highly sophisticated technology in order to meet the VOC limits, then this Court would find that particularized information from each of the members is unnecessary. Dkt. No. 11 at ¶ 97. Generally speaking the cost to become technically feasible would be reasonably similar for all of the similarly situated members.

**\*9** First, the role of discovery will not defeat standing. A case on point, which this Court finds persuasive on whether there is a discovery

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2005 WL 2128938 (N.D.N.Y.), 61 ERC 1182
**(Cite as: Not Reported in F.Supp.2d)**

dichotomy between an organization and its members is *New Hampshire Motor Transp. Ass'n. v. Rowe,* 324 F.Supp.2d 231 (D. Maine 2004). The carrier association therein commenced an action against the Attorney General of Maine challenging the provisions of the Maine Tobacco Delivery Law. Notwithstanding the nature of the substantive claim and the relief sought, the District Court of Maine properly observed that both sides would require detailed information in order to prosecute and defeat this action. *Id.* at 235. UPS, the largest carrier in Maine, was deemed not a party to the action despite the fact it had significant information related to the claim, which was not in the possession of the association, but "instead in the sole control of nonparty UPS." *Id.* (emphasis added). Maine's Attorney General's lament on discovery was the same as the Defendants in this case. The association members refused to subject themselves to the " normal discovery process" depriving them of immediate access to this vital information. In order to determine the association's role in the discovery process, much like this Court's task, the District Court of Maine found that the association's standing was not a legal obstacle to the proper pre-trial litigation practice. For that court, the assessment of the association's standing under prong three of the *Hunt* test, pertaining to the necessity of individual members' participation, was properly focused on the nature of the relief sought, and "not on discovery." *Id.* at 236. Thus, the association's standing did not turn on the indispensable involvement of the association's members. *Id.* at 236-37 (finding that there was no need "to allocate damages to each individual member, the basis for the requirement of individualized proof"). In spite of the fact that the members' involvement was not critical to initiate the Maine action, discovery had to proceed in an orderly fashion. The Maine District Court recognized that the opposing party's need for information from the individual members could be done without making them a party. *Id.* at 236 (" [J]ust because a claim may require proof specific to individual members of an association does not mean the members are required to participate as parties in the lawsuit.") (quoting *Playboy Enters., Inc. v. Public Serv. Comm'n. of Puerto Rico,* 906 F.2d 25, 35 (1st Cir.1990)). The court opined, based upon First Circuit precedent, that such discovery could be

obtained by using a subpoena *duces tecum. Id.; see also Gouge v. GDP Technologies, Inc.,* 931 F.2d 896 (9th Cir.1991) (a non-party cannot be compelled to comply with a Rule 34 discovery request); *R.L. Fisher v. Marubeni Cotton Corp.,* 526 F.2d 1338, 1341 (8th Cir.1975) (Rule 37 applies only to parties, not non-parties.). Acknowledging how cumbersome and costly nonparty disclosure may be, the Maine District Court still found that such a burden was not sufficient to overcome associational standing or derail the litigation. *New Hampshire Transp.* 324 F.Supp.2d at 237.FN15

> FN15. The District Court of Maine further anticipated the dilemma that possibly the plaintiff-association, in cahoots with its members, may have ratcheted up the Attorney General's cost by requiring non-party subpoenas or that the prosecution of this matter was being used as a sword and a shield in terms of discovery for the same reason. To guarantee that there was not such an improper motive or to minimize an " excessively inefficient" or "hampered" discovery process caused by the association and its members, the court would revisit and reconsider its ruling as to the third prong of the *Hunt* test. *New Hampshire Transp.,* 324 F.Supp.2d at 237.

**\*10** The Defendants herein are similarly situated to the Maine Attorney General in *New Hampshire Transport.* Defendants exclaim that they need the individual members' information in order to defend the Plaintiffs' Equal Protection cause of action, though this Court does not discern how. Dkt. No. 48 at p. 11; *see supra* n. 14. If Defendants desire records from the individual members, they will have to resort to Rule 45 and issue subpoenas *duces tecum.* Therefore, in order to enforce the Defendants' Request for Documents Related to Individual Members of NPCA, the Defendants will have to seek the information from the non-party individual members by subpoena.

Furthermore, and for precisely the same reasons,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2005 WL 2128938 (N.D.N.Y.), 61 ERC 1182
**(Cite as: Not Reported in F.Supp.2d)**

this facet of the Order is applicable to the Defendants' First Set of Interrogatories to NPCA in that Defendants will have to serve subpoenas for records and/or depositions upon the individual members in order to get answers to Interrogatory 3, 4, 7, 8, 9, 17, 20, and 21, unless such documents are within the possession of NPCA. Dkt. No. 36, Ex. F (First Set of Interrogatories). Since Sherwin-Williams is a proper Plaintiff in this action, these mandates do not apply to those same Interrogatories that include and impact them.

There are several ancillary issues related to this issue we need to confront. With regard to the Document Demand to the Individual Members, there is a time element which is a prominent thread in Requests 1 through 4, and 6. Although this issue was not raised by the Plaintiffs in opposition to the Defendants' Motion to Compel, the Court finds that asking for nine years worth of documents (1997 to present) is not only unconscionable but totally irrelevant as well. The AIM Regulations in issue were formulated in 2003 to become effective in January 2005. It is this three-year period that is the relevant period of inquiry. There is no need to gather information going back to when the EPA established protocol for the Clean Air Act nor have the Defendants provided any. Hence, the Document Demands are hereby restricted to the period of 2003 to present.

Exactly like the *New Hampshire Transport* court, this Court is cognizant of the tremendous discovery burden that has been foisted upon the Defendants by virtue of the individual members' non-party status and the need for subpoenas and is likewise keenly aware of discovery abuses that may possibly be contrived by NPCA and its members. This Court will not, in any mode or manner, permit NPCA and its members to use discovery as a sword and a shield. Therefore, if the Defendants bear the cost and effort to secure the requested documents from the individual members and NPCA asks Defendants to provide them with a copy of those documents, Plaintiffs shall bear the cost of duplication of these records.[FN16] Conversely, however, if the individual members send the requested documents to the Plaintiffs first, or without the exercise of subpoenas, NPCA shall provide them to the

Defendants consistent with the directives of the Order. And for the reason stated above, NPCA, consistent with their agreement to do so (Hurteau Affirm. at ¶ 6), shall provide to the Defendants forthwith, a list of those members who are so affected by these AIM Regulations. *See supra* Part II.A.

> FN16. In the Northern District of New York, it is the general practice, especially when there are voluminous documents to be exchanged, that the parties share their respective and acquired records with the other party at no cost. This form of reciprocity, eschewing reimbursement of costs, has worked well for eons. In this case however, we do not want the Plaintiffs to invoke this long-standing practice to their benefit, discounting the exorbitant cost to themselves, since they claim it would be a colossal hardship and inordinately unfair for them to be saddled with garnering, gathering, and sharing of the individual members' information.

### C. Protective Order

**\*11** To reiterate, just because the associational privilege is not applicable under these facts, except with one inquiry found in the Demand for Interrogatories, does not necessarily mean that all other protections from some aspect of discovery have similarly become tangential or unenforceable.

In order to comply with Demands for Interrogatories, Plaintiffs and NPCA's members will have to produce business records which contain confidential business information. To summarize the overall requests for information being made of the Plaintiffs, a review of Interrogatory 8, 9,[FN17] 10, 12, 15, and 19, indicate that the Defendants are seeking, *inter alia,* business records, such as: (1) the sale volumes of the Plaintiffs' coating products in New York as compared to their sales nationwide, in California and other NOTR states; (2) whether Plaintiffs have conducted research on low VOC coating; and (3) how compliance with the challenged regulations causes financial and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                            Page 14

Not Reported in F.Supp.2d, 2005 WL 2128938 (N.D.N.Y.), 61 ERC 1182
**(Cite as: Not Reported in F.Supp.2d)**

administrative burdens. Plaintiffs had asked the Defendants for a protective order, which would designate as confidential and for use only in this litigation commercially sensitive and proprietary information as well as trade secrets. Such entreaty was refused by the Defendants. Defendants' reasons for denying Plaintiffs' importune are several: (1) a protective order is unnecessary for the records sought and, since the state Defendants are not competitors, disclosure to them would not imperil nor result in a "clearly defined and very serious injury" to the individual companies' business standing; (2) Plaintiffs have not met their burden in establishing a need for a protective order; and (3) many of the records have already been disclosed to the public and thus any appropriate privilege has been waived. *See* Dkt. Nos. 36, Defs.' Mem. of Law & 48, Defs.' Reply Lt-Mem. Mem. at pp. 6-9.

> FN17. Initially, the Defendants resisted a protective order for this Interrogatory, but now have relented. Interrogatory # 9 reads, in part, as follows:
> Has Sherwin-Williams and every member of the NPCA conducted research on the development of low VOC coatings.... Identify every member of the NPCA who has conducted such research. Produce all documents, including but not limited to test data, relating to Sherwin-Williams' research and development of low VOC coatings?
> Dkt. No. 36, Exs. E & F.
> Now, Defendants agree to a protective order as to this Interrogatory, and further suggest provisions for the protective order. Dkt. No. 48 at p. 6. In reference to proposed provisions for the protective order, Plaintiffs have likewise made proposals for the Court to consider. Hurteau Affirm. at ¶¶ 29-35.

### 1. Relevancy

Under the Federal Rules of Civil Procedure governing discovery, a party is entitled to discovery on matters relevant to its claims and defenses which are not covered by a privilege. The scope of

discovery is governed by Fed. R. Civ. P. 26(b), which states in pertinent part:
Parties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party, including the existence, description, nature, custody, condition, and location of any books, documents, or other tangible things.... For good cause, the court may order discovery of any matter relevant to the subject matter involved in the action. Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence.

Fed. R. Civ. P. 26(b)(1); *see also Oppenheimer Fund, Inc. v. Sanders,* 437 U.S. 340, 350-51 (1978).

The word relevance is to be construed broadly by the court, and will include "any matter that bears on, or that could reasonably could lead to other [information] that could bear on, any issue that is or may be in the case." *Oppenheimer Fund, Inc.,* 437 U.S. at 351; *see also Hickman v. Taylor,* 329 U.S. 495, 501 (1947). However, applying a liberal construction of the discovery rules does not mean that there are no limitations to discovery. *In re Six Grand Jury Witnesses,* 979 F.2d 939, 943 (2d Cir.1992). Limitations may be, and are, imposed on any discovery "sought in bad faith, to harass or oppress the party subject to it, when it is irrelevant, or when examination is on matters protected by a recognized privilege." *Hickman v. Taylor,* 329 U.S. at 501; *see also In re Six Grand Jury Witnesses,* 979 F.2d at 943. Therefore, the trial judge is armed with discretion "to determine whether to limit the boundaries of discovery 'in light of the relevant facts and circumstances of a particular case.' " *Gelb v. Am. Tel. & Tel. Co.,* 813 F.Supp. 1022, 1034 (S.D.N.Y.1993); *see also In re Surety Ass'n. of Am.,* 388 F.2d 412, 414 (2d Cir.1967) (the trial judge has considerable discretion on the issue of relevancy).

**\*12** Applying these basic principles to the issue at hand, it is reasonable to conclude that the information sought by the Defendants is relevant to the action and their defenses. Indisputably, Plaintiffs' sales volumes (Interrog. # 8), the financial and administrative burdens imposed upon the Plaintiffs by the AIM Regulations (Interrog.#

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2005 WL 2128938 (N.D.N.Y.), 61 ERC 1182
**(Cite as: Not Reported in F.Supp.2d)**

10), reports submitted to the EPA (Interrog. # 12), market analysis for AIM coatings (Interrog.# 15), and SW's purchase of Duron, Inc., and its technology (Interrog.# 19), in short, bear on the issues in the case and, therefore, are relevant. Dkt. No. 36, Exs. E & F.

### 2. Commercial and Proprietary Interest and Trade Secrets

It is settled within the Second Circuit what factors are to be considered when weighing whether to impose a protective order. Those factors include (1) the extent to which information is known outside the business; (2) the extent to which information is known to those inside the business; (3) the measures taken to guard the secrecy of the information; and (4) the value of the information to the business and its competitors.

*Bank of New York v. Meridien BIAO Bank Tanzania Ltd.,* 171 F.R.D. 135, 143-44 (S.D.N.Y.1997) (citations omitted).

Generally speaking, to obtain a protective order, there must be a specific demonstration of the facts as they relate to all of the factors, a specific articulation of the harm, and no reliance upon stereotypical and conclusory statements that the information is confidential. *See Bank of New York,* 171 F.R.D. at 144-45 (citing, *inter alia,* Fed. R. Civ. P. 26(c)); *see also Madanes v. Madanes,* 186 F.R.D. 279, 288-89 (S.D.N.Y.1999). But, where a party has failed to provide specific facts to support each of the factors, a court may still grant an order of protection to information that is deemed to be relevant, even though the court is not inclined to find the information to be specifically a trade secret or proprietary in nature. Helpful instruction in this regard can be found in *In re Livent, Inc.,* 2003 WL 23254 (S.D.N.Y. Jan. 2, 2003). *In re Livent* involved securities litigation against an accounting firm wherein the firm was ordered to produce its audit manuals, despite their contention that such manuals contained proprietary trade secrets. *Id.* at *2. The court relied on a prior ruling which stated: [the audit manual] and materials are likely the best source of information available to Plaintiffs

regarding how [the firm] conducted the [ ] audit. Understanding these materials could be vital to conducting meaningful depositions of the accountants who worked on the [ ] audit.... The Court need not reach the issue of whether [the firm's] audit materials constitute trade secrets because the Confidentiality Order ... will serve to protect any proprietary information contained in [the firm's] audit manual and materials.

*In re Livent, Inc.,* 2003 WL 23254, at *2 (citing *In re Oxford Health Plans, Inc.,* 2001 WL 34780563, at *2 (S.D.N.Y. Apr. 30, 2001)).[FN18]

> FN18. It is important to note that in *In re Oxford Health Plans* the audit manuals were accompanied by a Confidentiality Order. However, though not mentioned in the decision, we will accept that in *In re Livent,* an audit manual was not accompanied with such a Confidentiality Order.

**\*13** In spite of the rule that the party resisting discovery should prove that the disclosure of their confidential information will cause "very serious injury," *In re Livent* suggests a prophylactic and workable scheme in terms of handling categories of documents that are obviously, by their very nature, confidential and that their disclosure may cause some apparent long-term harm. Ostensibly, the equities of the parties are best balanced on the fulcrum of a such a protective order. To this extent then, a court should not neglect its power to restrict discovery where "justice requires [protection for] a party or person from annoyance, embarrassment, oppression, or undue burden or expense...." Fed. R. Civ. P. 26(c). "With this authority at hand, judges should not hesitate to exercise appropriate control over the discovery process." *Herbert v. Lando,* 441 U.S. 153, 177 (1979).

Facially, sales volume in dollar amounts, research on the development of low VOC coating, financial records to support financial and administrative burdens, market analyses, and documents regarding the purchase of another business that have not already been publicly disclosed, command a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2005 WL 2128938 (N.D.N.Y.), 61 ERC 1182
**(Cite as: Not Reported in F.Supp.2d)**

Page 16

protective order. Not only do the Defendants seek this information from SW and NPCA, but from NPCA's individual members as well. To insist that a party must provide further proof for the need of a protective order under these circumstances and when those documents are conspicuously privileged is seeking nothing more than superfluous surplusage. *Dove v. Atlantic Capital Corp.,* 963 F.2d 15, 19 (2d Cir.1992) (suggesting in dictum that a protective order may be justified depending upon the circumstances, such as to prevent an abuse of the liberal discovery rules).

The Court also accepts the view that controversy may ensue if individual members' data are shared with the Defendants, if not otherwise shared publicly. *See* Danzig Aff. The Defendants float the nonsensical notion that since they are not a competitor of the Plaintiffs and NPCA's individual members, the companies' proprietary information is in safe hands. Dkt. No. 36, Defs.' Mem. of Law at p. 24 ("Defendants have no compelling or vested reason to use [P]laintiffs' financial and other information in a competitive manner."). Sharing these documents and data with the Defendants, without the security of a protective order, as the Defendants surely know, is a waiver maybe for eternity, exposing such information to the public at large, including business competitors. Furthermore, once such information is in the hands of these State Defendants, the data and documents are vulnerable to a Freedom of Information Request. N.Y. Pub. Off. LawW §§ 87, *et seq.* The Defendants conveniently forgot that NPCA is comprised of competing businesses who would relish to have the internal documents and thinking of their competitors. *Bank of New York v. Meridien,* 171 F.R.D. at 143-44 (noting that the fourth element of the test for a protective order weighs that the information may be of value to business competitors). Under these circumstances, the individual members may be subject to great embarrassment and possibly competitive disadvantage, and for this reason a protective order should be considered and implemented, unless, to reiterate, this data has already been shared publicly. *Moore U.S.A. Inc. v. Standard Register Co.,* 2000 WL 876884, at *8 (W.D.N.Y. May 26, 2000) (quoting *DDS, Inc. v. Lucas Aerospace Power*

*Trans. Corp.,* 182 F.R.D. 1, 5 (N.D.N.Y.1998), " Revealing confidential [business] information to one's direct competitor presents a clear risk that the other side will use the information to its own advantage.").

**\*14** However, the Defendants raise, citing several examples, that the information they seek is already in the public domain and, if this is accurate, any confidentiality that had attached to the data and documents have been waived. We agree with the Defendants that if any of this information has been publicly disseminated via marketing documents, advertisements, publication, sales literature, press releases, and in other forums, the Plaintiffs nor NPCA's members can assert a claim of confidentiality. In this respect, the Defendants refer to the business information and data revealed on the NPCA's website.[FN19]

> FN19. *http://www.paint.org* last visited on Aug. 11, 2005.

Although it takes some endeavor, and certain information is blocked from the public view as restricted for members only, the public can collect some data that may be responsive to the Defendants' inquiries. For example, with some ingenuity, you can discern the names of the individual members. As another example, Defendants seek market analysis for AIM coating from SW and NPCA's individual members. *See* Dkt. No. 36, Exs. E and F, Interrog. # 15. Initially, under this Court's analysis, that information would deserve a protective order. However, blazoned across the face of NPCA's website is an advertisement for the sale of *U.S. Paint & Coatings Market Analysis (2004-2009* ) for the handsome sum of $3,495 for the public or the greatly discounted price of $1,195 for members. This market analysis is touted as the "industry source for fundamental market research for the next two years." Further, this marketing analysis has chapters on regulatory overview, challenges and opportunities for small and mid-size paint companies, specific market share information, and customer segmentation and growth within the market for architectural coating, just to name a few. If this comprehensive analysis which is being

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 17

Not Reported in F.Supp.2d, 2005 WL 2128938 (N.D.N.Y.), 61 ERC 1182
**(Cite as: Not Reported in F.Supp.2d)**

promoted and sold by NPCA contains the information that the Defendants have requested, including marketing analyses, such information could have only come from the individual members and/or documents in the public domain. And if that is so, then all of the data and information contained within the analyses now being sought by the Defendants is deemed waived. In the same respect, any commercial, proprietary and trade secrets belonging to individual members which were shared with NPCA is also deemed waived. With the exception of the qualified associational privilege discussed above, there is neither a federal common law privilege nor statutory privilege that cloaks information shared with an association of this kind. [FN20] Therefore, any data that may satisfy any of Defendants' Interrogatories that has already been shared with NPCA will not receive protection under an order by virtue of the fact that such information was provided to a third-party where a confidential privilege does not exist.

> FN20. Plaintiffs have rightfully taken the position that the NPCA's individual members are non-parties and, in essence, they have no control, nor do they want such control, over the members' business information. By taking this posture, NPCA is not entitled to raise either for its benefit or its membership any agency right of confidentiality. If, however, NPCA was to cling to a theory of agency in which they could invoke the rights of its members to gain confidentiality, this Court would then find that NPCA would have to bear the burden of collecting all of this data from the 158 members so affected. NPCA can't have it both ways.

The Defendants fairly raise the existence of a waive r as to any reports and documents submitted to any governmental agency. In Interrogatory # 12, the Defendants inquired whether "any plaintiff submitted any report to the EPA pursuant to 40 C.F.R. Part 59 Subpart D ... [and] if so, provide a copy of all such reports and documents submitted." Dkt. No. 36, Exs. E & F. 40 C.F.R. Part 59 Subpart D Reports consist of the "exceedence fees" and "

tonnage exemptions" for AIM manufacturers. *See* 40 C.F.R. Part 59 Subpart D, Tbl. 1 (setting the limits on VOC per gram per liter).[FN21] Because sensitive business information is being shared with the EPA juxtaposed against the formidable public policy of open disclosure, these regulations establish an elaborate process by which certain business information, upon request, may remain confidential by the EPA and avoid public revelation. *See* 40 C.F.R. § 59.413(b) ("All confidential business information entitled to protection under section 114(c) of the Act that must be submitted or maintained by each manufacturer or importer of architectural coatings pursuant to this section shall be treated in accordance with 40 C.F.R. Part 2, Subpart B."); 40 C.F.R. § 2.202(a) (setting forth how the regulatory scheme found in sections 2.201 through 2.215 establishes basic rules governing business confidentiality claims, and how they will be determined to be entitled to confidential treatment for reasons of business confidentiality).[FN22] Not every business record is eligible to be deemed confidential. For example, " information which is emission data, a standard or limitation, or is collected pursuant to section 211(b)(2)(A) of the Act is not eligible for confidential treatment." 40 C.F.R. § 2.301(e); *see also* 42 U.S.C. § 7414(c).[FN23] Stated another way, under the totality of the EPA regulations pertaining to data shared with it concerning AIM coating, some of that data and information may be considered by the EPA to be confidential and exclusive of the public and other records are just not eligible for such consideration.

> FN21. 40 C.F.R. Part 59, Subpart D requires significant volume of data in order to determine the VOC limits of certain product and to also determine appropriate fees by employing highly complicated formulas. 40 C.F.R. § 59.405 (requiring the manufacturer to provide the necessary information to make certain calculations); § 59.403 (is to determine what may exceed the applicable VOC content limits); § 59.404 (to determine limited quantity of coating to be exempt); § 59.407 (requires recording keeping).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2005 WL 2128938 (N.D.N.Y.), 61 ERC 1182
**(Cite as: Not Reported in F.Supp.2d)**

FN22. 40 C.F.R. Part 2, Subpart A acknowledges the breadth and restrictions of their ability to disclose data to the public by incorporating the Freedom of Information Act (FOIA). 40 C.F.R. § 2.105 (citing FOIA, 5 U.S.C. § 552(b), exemption categories). FOIA recognizes that "trade secrets and commercial or financial information obtained from a person are privileged or confidential." 5 U.S.C. § 552(b)(4).

FN23. 42 U.S.C. § 7414(c) states, in part: Any records, reports or information obtained under subsection (a) of this section shall be available to the public, except that upon a showing satisfactory to the Administrator by any person that records, reports, or information, or particular part thereof, (other than emission data) to which the Administrator has access under this section if made public, would divulge methods or processes entitled to protection as trade secrets of such person, the Administrator shall consider such record, report, or information or particular portion thereof confidential in accordance with the purposes of section 1905 of Title 18, except that such record, report, or information may be disclosed to other officers, employees, or authorized representatives of the United States concerned with carrying out this chapter or when relevant in any proceeding under this chapter.

*15 The Defendants in their rather broad Interrogatories do not distinguish between the confidential status of these various documents. They make no exception for records which the EPA could have held to be confidential. Dkt. No. 36, Exs E & F, Interrog. # 12 ("[P]roduce all reports and documents submitted to the EPA."). The disadvantage the Court experiences in reconciling between those records and information disclosed to the EPA which may be confidential and those that are not is the fact that neither party has seen fit to make such a delineation for the Court. Each took

diametrically and broad sweeping postures on the data: Plaintiffs argue that all of the information is confidential while the Defendants strongly intimate that all of the information is within the public domain. Neither position fits all of the documents presented to the EPA. Therefore, those documents which are ineligible for EPA designated confidentiality shall be disclosed without the benefit of a protective order, and only those business documents, records, and the like which the EPA confers confidentiality upon shall be disclosed pursuant to a protective order. However, the Plaintiffs will have to make a showing to the Defendants as to each document presented to EPA, if challenged, which were reckoned to be confidential.[FN24]

FN24. The Plaintiffs have been rather emphatic that they do not intend to seek protection from any item that has reached the public domain. Dkt. No. 47, Pls.' Opp.

As a general legal proposition, when a party interjects an issue into the litigation, such as the Plaintiffs' claim that the AIM Regulations create financial and administrative burdens, any pertinent privileges are determined to be waived. *See* Dkt. No. 36, Exs. E & F, Interrog.10 & 13. However, this general rule runs contrary to the universally recognized significance of protecting proprietary information and trade secrets. This Court will lean on the side of caution, and to the extent that these records have not already been placed in the public's view, the records which would provide a satisfactory response to these Interrogatories shall initially be cloaked by a protective order. Whether their protective status continues after discovery will be determined by the trial court. In terms of providing a response and documents that will answer Interrogatory # 11 (how are the AIM Regulations burdensome), SW has agreed to answer this Interrogatory. Hurteau Affirm. at ¶ 49 (SW has agreed to revise its response "to provide the specifics the Defendants seek").

*3. Application of Protective Order*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                       Page 19

Not Reported in F.Supp.2d, 2005 WL 2128938 (N.D.N.Y.), 61 ERC 1182
**(Cite as: Not Reported in F.Supp.2d)**

As stated above, this Court may issue protective orders fashioning conditions it deems most appropriate for cases such like this. *Dove v. Atl. Capital Corp.,* 963 F.2d at 19; Fed. R. Civ. P. 26(c). This Court has already determined that certain information being requested is relevant and therefore subject to disclosure. Although we do agree with the Defendants that the Plaintiffs may not have put forth everything they could or should have to support their blanket claim of confidentiality on their business records and confidential information, yet, in the scheme of things, we disagree nonetheless with Defendants that a protective order is not warranted under these circumstances.[FN25] Rather, this Court believes that Plaintiffs have loosely shown that some of their business information falls "within a broad spectrum on internal corporate documents that courts regularly hold, or [should hold] to be confidential business information." *Bank of New York,* 171 F.R.D. at 144.[FN26] As stated above, whether or not a court should protect material depends upon an array of factors. *See id.* (quoting *Sullivan Mktg, Inc. v. Valassis Communications, Inc.,* 1994 WL 177795, at *2 (S.D.N.Y. May 5, 1994)). Under these standards, Plaintiffs have made more than a thin reed showing that SW and NPCA's individual members are entitled to a protective order, more so because of "possible" unintended consequences than anything else. Based upon all of this, the Court considers the Plaintiffs' proof to be a sufficient showing of entitlement to a protection order. Moreover, we find that a protective order of this nature will not impede, in any way, Defendants' ability to defend this action. In doing so, we are not making a blanket ruling which fits all circumstances when protection is sought for this type of information nor are we diminishing the requirement of Rule 26(c)(7). Such should be done on a case by case basis.

FN25. The Defendants now agree to a protective order for the documents related to Interrgatory # 9 which generally seeks research development. Dkt. No. 48 at p. 6.

FN26. For example, the following cases have held that the disputed documents

were internal corporate documents and were confidential business information: *Am. Standard Inc. v. Pfizer Inc.,* 828 F.2d 734, 737, 740-41 (Fed.Cir.1987) (marketing plans, pricing information); *Gohler v. Wood,* 162 F.R.D. 691, 693-94 (D.Utah 1995) (audit practice manuals); *Tonnemacher v. Sasak,* 155 F.R.D. 193, 195 (D.Ariz.1994) ("[I]nternal manuals are highly confidential and constitute proprietary trade secrets."); *Gelb v. Am. Tel. & Tel. Co.,* 813 F.Supp. 1022, 1034-35 (S.D.N.Y.1993) (revenue information).

***16** To recapitulate, NPCA has no basis to raise a confidentiality claim in its own right or on behalf of its members. *See supra* n. 20. Only SW and the individual members of NPCA may invoke the following protective order. That is, if Defendants pursue these records by a subpoena pursuant to Rule 45, the following protective order shall be a component of their request. The Court hereby enters a protective order pursuant to Fed. R. Civ. P. 26(c), which is designated as Appendix 1.

*4. Other Interrogatories and issues*

To the degree that they have not been resolved above, or to reprise on the impact on the rulings above, we are prepared to address the remaining Interrogatories and outstanding discovery issues.[FN27]

FN27. We asked the parties to provide the Court with a status report in terms of complying with the undisputed aspects of discovery. The Plaintiffs stated summarily that they have finally caught up with their discovery obligations and are now on course. Dkt. No. 52. However, the Defendants refute the Plaintiffs' declarations and disclaim that significant discovery, notwithstanding the issues of this Motion, remain unfulfilled. *See* Dkt. No. 53. Not to lose a foothold on the argument, Plaintiffs have written a letter to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2005 WL 2128938 (N.D.N.Y.), 61 ERC 1182
**(Cite as: Not Reported in F.Supp.2d)**

the Court arguing that it is the Defendants who are mistaken as to the extent of the recent disclosure. Dkt. No. 54. To the extent possible, the Court will attempt to address those outstanding ails.

Defendants' Document Demands that have not been challenged and have yet to be disclosed shall be disclosed within thirty (30) days of the receipt of this Order. Plaintiffs represented that they would make certain disclosure in order to comply with Interrogatory6, 7, 11, 12, 16, 17, 20, and 21 without the need of a protective order. Dkt. No. 36, Ex. E. Defendants decry that relevant documents which would satisfactorily complete the Plaintiffs' responses have not been served upon them. Dkt. No. 53, Koczaja Lt., dated Aug. 4, 2005, at pp. 3-4. Likewise then, the Plaintiffs shall provide these documents and data within thirty (30) days of the receipt of this Order.

NPCA states that they would produce documents to satisfy Interrogatory6, 10, and 15, without asseverating a need for a protective order. Dkt. No. 36, Ex. F. All of the other outstanding Interrogatories not complied with have been resolved in the rulings above. Those documents in NPCA's possession, even those from members, shall be turned over to the Defendants, since there are no privileges, and if any existed they have been waived. NPCA has thirty (30) days from the receipt of this Order to serve these records upon the Defendants. Those Interrogatories which are truly directed to NPCA's members have to be pursued through a subpoena. *See supra* Part II.C.

A Second Set of Interrogatories, for which responses were due on June 13, 2005, have not been complied with. Dkt. No. 53 at p. 2. Presumably, more than thirty days have passed and the Plaintiffs have not raised any objection. Fed. R. Civ. P. 33(b)(3) (either an answer to the interrogatories or an objection thereto shall be served within thirty (30) after service of the interrogatories). If this true as of the date of this Order, and in this respect, the Court deems all objections waived. Hence, Plaintiffs shall serve their answers within thirty (30) days of the receipt of this Order.

Defendants accused Plaintiff SW of not providing documents requested related to its acquisition of Duron, Inc., and its technology.[FN28] In opposing this Motion, SW states that it has "no issue in producing all of Duron, Inc. information but only as it relates to varnishes and interior wiping stains." We have, of course, resolved the scope of discovery as including only varnishes and interior wiping stains and not the other 50 categories. *See supra* Part II.A. Yet, by this Plaintiffs' response, the Court cannot discern if SW is still seeking a protective order as to the Duron information. In this regard, disclosure of Duron's documents shall be consistent with the Court's rulings above. Where documents are within the public domain, there shall be no protection. As to any other documents, they shall be cloaked by the above protective order.

> FN28. SW Interrog. # 19: State whether Sherwin-Williams has purchased or acquired the rights to Duron Inc., its products or technology. If so, produce all documents related to the purchase of this company or rights to its technology or products, as well as all documents Duron, Inc., has issued from 2000 to the present relating to AIM coating, including but not limited to VOC content limits.
> *Resp.: Subject to the entry of a protective order for confidential business information, Sherwin-Williams states that it purchased the stock of Duron, Inc., and will produce relevant except related to the purchase and sale documents and documents related to the VOC content limits of varnishes and interior wiping stains made by Duron.* Dkt. No. 36, Ex. E.

**\*17** To prepare for Defendants' subpoenas to the appropriate individual members (non-parties), the Court directs NPCA to place all affected members on alert by providing them with a copy of this Order.[FN29] *See supra* Part II.B. In the event the Defendants pursue disclosure from the members, a copy of the protective order shall be attached.

> FN29. Fed. R. Civ. P. 45(c)(3)(B)(i) and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2005 WL 2128938 (N.D.N.Y.), 61 ERC 1182
**(Cite as: Not Reported in F.Supp.2d)**

26(c)(7) should be read together. "If a subpoena requires disclosure of a trade secret or other confidential research, development, or commercial information ... the court may, to protect a person subject to or affected by the subpoena ... modify the subpoena." Fed. R. Civ. P. 45(c)(3)(B)(i). The court is permitted the authority to make any order which justice requires to protect a party and to designate ways in which commercial information may be revealed. Fed. R. Civ. P. 26(c)(7).

Lastly, the Court will consider amending the Uniform Pretrial Scheduling Order *sua sponte*. It has become patently obvious to this Court that by this Order the discovery process has expounded tenfold, especially if the Defendants decide to pursue relevant information from the 158 or more individual members. And should the Defendants contemplate depositions of the non-parties this litigation will have a long life of its own. While the Court has no desire to allow this litigation to remain in perpetuity, we must nevertheless accept that an extended discovery duration is inescapable.[FN30] Therefore, the Uniform Pretrial Scheduling Order is amended as follows: (1) the discovery deadline is extended to September 15, 2006; (2) the motion filing date is extended to December 15, 2006; (3) the trial ready date is extended to March 15, 2007; and (4) all other provisions of this Scheduling Order shall remain in effect.

FN30. The initial Uniform Pretrial Scheduling Order was contemplated to comply with a trial ready date of eighteen (18) months from the filing of the Complaint as mandated by the Civil Justice Reform Act. That aspiration must now be abandoned. Certain large cases, such as this litigation, defy such a mandate and flexibility is critical. Although the Court will extend discovery for a healthy duration, we do not want any party or non-party to abuse this generosity and make discovery any more arduous than it already is. In the event the Defendants have completed discovery with the

Plaintiffs and decide not to pursue discovery from non-parties, it is permissible for them to pursue dispositive motions prior to the end of discovery, but it is being done at the party's peril. If either party decides to pursue dispositive motions prior to the discovery deadline and before full discovery is fulfilled, this Court will not stay nor extend discovery. Essentially, the Court expects the parties to complete discovery expeditiously and thoroughly before pursuing motions.

### III. CONCLUSION

WHEREFORE, it is hereby

ORDERED, that the following summarizes the various rulings incorporated herein
1. Plaintiffs are bound by their representation to the Court that they will disclose the names of its members, and if such disclosure has not yet taken place, Plaintiffs shall do so within thirty (30) days from the receipt of this Order;
2. No First Amendment privilege is applicable, except as to Defendants' First Set of Interrogatories, Interrogatory # 22, wherein no answer is required;
3. With regard to Plaintiffs' Equal Protection Claim, in order to enforce the Defendants' Request for Documents Related to Individual Members of NPCA, the Defendants will have to seek the information from the non-party individual members by subpoena as set forth in Fed. R. Civ. P. 45;
4. The same ruling applies to Defendants' First Set of Interrogatories to NPCA, that is, the Defendants must serve subpoenas for records and/or depositions upon the individual members in order to get answers to Interrogatory3, 4, 7, 8, 9, 17, 20, & 21, unless such documents are within the possession of NPCA;
5. Since Sherwin-Williams is a proper Plaintiff in this action, these mandates do not apply to those same Interrogatories that include and impact them;
6. With regard to the discovery, all demands shall be restricted to 2003 to the present and varnishes and stains and not the other fifty (50) categories;
7. If the Defendants bear the cost and effort to secure the requested documents from the individual members and NPCA asks Defendants to provide

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2005 WL 2128938 (N.D.N.Y.), 61 ERC 1182
**(Cite as: Not Reported in F.Supp.2d)**

Page 22

them with a copy of those documents, Plaintiffs shall bear the cost of duplication of these records. Conversely, if the individual members send the requested documents to Plaintiffs first, or without exercise of subpoenas, NPCA shall provide the information to Defendants consistent with their general practice heretofore;

*18 8. The following rulings apply to the Plaintiffs' Application for a Protective Order:

a. The information sought by Defendants is relevant to the action and defenses asserted and the Court considers the Plaintiffs' proof to be a sufficient showing of entitlement to a protection order. The Court hereby enters a protective order pursuant to Fed. R. Civ. P. 26(c), which is designated as Appendix 1. NPCA has no basis to raise a confidentiality claim in its own right nor on behalf of its members. Only SW and the individual members of NPCA may invoke the protective order;

b. Undisclosed business and proprietary information deserves protection, however, any information already in the public domain, via marketing documents, advertisements, publication, sales literature, press releases, and in other forums, constitutes a waiver of any confidentiality privilege and should be disclosed, as set forth below;

c. Information contained on NPCA's website which has been made public and/or information other members may access are not protected since any privilege that may have attached has been waived by the publication to a third party;

d. Any information, commercial, proprietary, and/or trade secrets, that has been shared with NPCA by the individual members is not protected as any privilege has been waived;

e. Those documents shared with the EPA, which are ineligible for EPA designated confidentiality, shall be disclosed without the benefit of a protective order, and only those business documents, records, and the like which the EPA confers confidentiality upon shall be disclosed pursuant to a protective order. However, the Plaintiffs will have to make a showing to the Defendants as to each document presented to EPA, if challenged, which were reckoned to be confidential;

f. To the extent that records have not already been placed in the public's view, the records which would provide a satisfactory response to Interrogatory 10 & 13 shall initially be cloaked by a protective order.

Whether their protective status continues after discovery will be determined by the trial court;

g. If Defendants pursue records by a subpoena pursuant to Rule 45, the protective order shall be a component of their request.

9. Defendants' Document Demands that have not been challenged and have yet to be disclosed shall be disclosed within thirty (30) days of the receipt of this Order;

10. With regard to Interrogatory 6, 7, 11, 12, 16, 17, 20, and 21, Plaintiffs shall provide these documents and data within thirty (30) days of the receipt of this Order;

11. As to the Defendants' Second Set of Interrogatories, which responses were due on June 13, 2005, more than thirty days have passed and the Plaintiffs have not raised any objection. The Court deems all objections waived and Plaintiffs shall serve their answers within thirty (30) days of the receipt of this Order;

12. As to information sought from SW regarding acquisition of Duron, Inc., disclosure of Duron's documents shall be consistent with the Court's rulings above. Where documents are within the public domain, there shall be no protection. As to any other documents, they shall be cloaked by the protective order;

*19 13. NPCA shall place all affected members on alert by providing them with a copy of this Order;

14. The Uniform Pretrial Scheduling Order is amended as follows: (1) the discovery deadline is extended to September 15, 2006; (2) the motion filing date is extended to December 15, 2006; (3) the trial ready date is extended to March 15, 2007; and (4) all other provisions of this Scheduling Order shall remain in effect;

15. The Clerk of the Court shall serve a copy of this Order on the parties to this action;

16. The Clerk of the Court shall separately docket the Protective Order, designated as Appendix 1.


SO ORDERED.


*APPENDIX 1*

PROTECTIVE ORDER [FN31]

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                      Page 23

Not Reported in F.Supp.2d, 2005 WL 2128938 (N.D.N.Y.), 61 ERC 1182
(Cite as: Not Reported in F.Supp.2d)

FN31. For the purpose of this Order, the term "Plaintiffs" applies to Sherwin-Williams, the National Paint and Coatings Association Inc ., and National Paint and Coatings Association's members.

1. Those relevant aspects of the confidential information shall be used for no purpose other than litigating this action. In the event the Defendants object to any designation of a document as being confidential, the Defendants shall disclose the challenged document(s) to the Plaintiffs as soon as possible providing their reasons for the challenge of the designation. Upon receipt of the Defendants' challenges, the Plaintiffs shall immediately reexamine the document(s). If the document was mistakenly designated confidential, the Plaintiffs shall correct that notation immediately and advise the Defendants within five (5) days of the receipt of the objections that there was a mistake as to the designation. On the other hand, if the Plaintiffs still claim the document to be confidential, the Plaintiffs shall advise Defendants within five (5) days of their unchanged position on the document. Should the Defendants still feel aggrieved by the designation, they may avail themselves of the Court and bring the issue for the Court to resolve.

2. With respect to the confidential information, copies shall be furnished to Defendants' Counsel only and shall be designated "CONFIDENTIAL-ATTORNEYS ONLY." Such information shall be kept confidential and shall not be given, shown, made available, discussed, or otherwise communicated in any manner ("disclosed" ), either directly or indirectly, to any person not authorized to receive the information under the terms of this Protective Order.

3. Except as permitted by further Order of this Court or by subsequent written agreement of the designating party, disclosure of " CONFIDENTIAL-ATTORNEY ONLY" information shall be limited to the following, in addition to the Defendants' staff:

(a) Defendants' Counsel, paralegal, stenographic, videographic, clerical, and secretarial personnel employed by such counsel;

(b) Judges, law clerks, stenographic and videographic reporters, and clerical personnel of the Court before which this action is pending, as well as any Court to which an appeal in this action might lie;

(c) Department of Environmental Conservation (DEC) Counsel, deputy commissioners, and employees who are assisting the Attorney General's Office in defending this action.

4. In the event that Defendants' Counsel considers it necessary to disclose this confidential information for purposes of this litigation to persons other than those authorized to review this information, Counsel may propose limited disclosure of such confidential information to such persons by giving written notice of such proposed disclosure, by facsimile and by overnight courier, to Plaintiffs' Counsel. Such written notice shall (i) identify the name, address and current employer of the person to whom disclosure is proposed, (ii) list (with specificity) the confidential information proposed for disclosure, (iii) state the reason that such disclosure is necessary for purposes of this litigation, and (iv) confirm that the person to whom disclosure is proposed has received a copy of this Order and signed a copy of the statement set forth as Appendix A to this Order. Within five (5) business days of receiving notification of the proposed disclosure, the designating party may object by giving written notice to the receiving party that disclosure to the proposed recipient is inconsistent with the language or intent of this Order for the reason identified in such objection, or that such disclosure should not be made for other good and sufficient cause identified in such objection. If the parties are unable to resolve all of their differences on this issue within ten (10) business days after receipt of such notice, the party seeking to disclose the confidential nformation may request a discovery conference pursuant to Local Rule 7.1 for resolution of the issue. In the resolution of such matter, the party proposing to make the disclosure pursuant to this paragraph shall bear the burden of establishing that such disclosure should be made to such person. The confidential information shall not be disclosed to the proposed recipient until the Court rules on such request. If the designating party does not object to the proposed

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                    Page 24

Not Reported in F.Supp.2d, 2005 WL 2128938 (N.D.N.Y.), 61 ERC 1182
**(Cite as: Not Reported in F.Supp.2d)**

disclosure as provided in this paragraph, the receiving party may proceed with disclosure to the intended recipient, provided that the intended recipient has signed the statement attached as Appendix A to this Order and returned such signed statement to Counsel for the party proposing disclosure. Failure to object to the proposed disclosure as provided in this paragraph shall not preclude any subsequent objection to continued access to or disclosure of confidential information if the designating party subsequently learns of facts providing a basis for objection.

**\*20** 5. If, in the course of this proceeding, depositions are conducted that involve this confidential information, counsel for the witness or party producing such information may state, on the record, the portion of the deposition which Counsel believes may contain confidential information. If such designation is made, that portion of the deposition will be taken with no one present except the reporter, the litigants, and those persons who are authorized to have access to such confidential information in accordance with the Protective Order. Subject to the terms hereof, confidential information may be disclosed by Plaintiffs' or Defendants' Counsel, to the extent that its use is necessary, only at the depositions of:

(a) present directors or officers of the Plaintiffs;

(b) present and former employees of the Plaintiffs, to the extent such persons would be entitled to receive such information pursuant to the Plaintiffs' internal policies respecting confidentiality;

(c) an author, addressee, or other person indicated on the face of the document as a lawful recipient of a document containing the information;

(d) a person clearly identified in prior discovery or by the deponent in his or her deposition as an author or recipient of the information (without prior disclosure of the specific confidential information).

That portion of the deposition transcript which reflects inquiries and responses related to this confidential information shall be sealed until such time a Court or the parties by mutual agreement

deem it otherwise.

6. Any document, such as trade secrets, commercial, and proprietary interest filed with the Court that reveals any confidential information shall be filed under seal. Documents so labeled shall be kept by the Clerk under seal and shall be made available only to the Court or persons authorized by the terms of this Order to have access thereto.

7. No person or party shall directly or indirectly utilize or disclose any confidential information obtained pursuant to pretrial discovery in this action, except for the purpose of this action only and in accordance with any further order issued by the Court. Restrictions on the use or disclosure of confidential information as specified in this Order, or as modified by a subsequent Order, shall continue during review of the record in this case. The use of such information as evidence within this case shall be subject to such protection as the Court shall determine.

8. Nothing in this Order shall bar or otherwise prevent any attorney herein from rendering advice to his/her client with respect to this litigation and, in the course thereof, from relying upon his/her examination or knowledge of confidential information; provided, however, that in rendering such advice and in otherwise communicating with his/her client, such attorney shall not disclose the contents of any confidential information to any person who is not authorized to receive such information under the provisions of this Order.

**\*21** 9. Nothing in this Order shall prevent disclosure as required by governing law, or by any judicial, governmental, or administrative body with jurisdiction over the parties under any law, regulation, or order, provided, however, that the party being required to disclose confidential information shall give five (5) business days prior written notice of such disclosure by facsimile and by overnight mail to the other party's attorneys, unless the judicial, governmental, or administrative body's law, regulation, or order requires disclosure sooner, in which case the disclosing party shall give such notice by telephone and facsimile as soon as practical, but in any event before any disclosure is

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2005 WL 2128938 (N.D.N.Y.), 61 ERC 1182
**(Cite as: Not Reported in F.Supp.2d)**

made. The disclosing party shall include with any confidential information disclosed under this paragraph a notice that the information disclosed is confidential and to be used only for the purpose for which the law, regulation, or order was issued. Under these circumstances, the New York Freedom of Information Act is not applicable.

10. The Protective Order shall not prevent any party from applying to the Court for relief therefrom, or from applying to the Court for further or additional protective orders, or from agreeing among themselves to modify or vacate this Protective Order, subject to the approval of the Court. The parties may stipulate in writing at any time to a modification of this Order as to any particular portion of the confidential information without affecting the confirmed validity of this Order as to any other confidential information.

11. At the conclusion of this action, including any appeals, all confidential information furnished pursuant to this Protective Order, and all copies thereof, shall be returned to the Plaintiffs' Counsel, or, at Counsel's option, be destroyed by Defendants' Counsel. If the destruction option is utilized, Defendants' Counsel shall provide certification of such destruction. The provisions of the Protective Order insofar as it restricts the disclosure, communication of, and use of, confidential information produced hereunder shall continue to be binding after the conclusion of this action.

SO ORDERED.

*Appendix A*

ACKNOWLEDGMENT

I, _____, the undersigned, hereby acknowledged that I have carefully read and fully understand all of the terms of the Protective Order, dated August 24, 2005. I further understand that any documents provided to me pursuant to this Protective Order are confidential and will remain as such only to be used for this litigation. I agree to the terms of the

Protective Order and will keep the information and data contained within any document provided to me confidential. At the conclusion of this litigation, any documents within my possession will be promptly destroyed.

N.D.N.Y.,2005.
Sherwin-Williams Co. v. Spitzer
Not Reported in F.Supp.2d, 2005 WL 2128938 (N.D.N.Y.), 61 ERC 1182

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.