## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                                )
**LONG TERM CARE PHARMACY**      )
**ALLIANCE**, *et al.*,                          )
                                                )
       **Plaintiffs,**                      )
                                                )
       **v.**                                  )    **Civil Action No. 06-01221 (ESH)**
                                                )
**UNITEDHEALTH GROUP, INC.,**         )
                                                )
       **Defendant.**                      )
_____        )

## MEMORANDUM OPINION

Long Term Care Pharmacy Alliance ("LTCPA") and American Society of Consultant Pharmacists ("ASCP") have sued UnitedHealth Group, Inc., seeking a declaration that defendant has violated contracts and federal law by failing to reimburse plaintiffs' member pharmacies for co-payments that the pharmacies needlessly paid on behalf of indigent nursing home residents. Defendant has moved to dismiss for lack of standing and for failure to state a claim upon which relief may be granted. For the reasons set forth herein, the Court concludes that plaintiffs lack standing to bring these claims and will therefore dismiss the case pursuant to Federal Rule of Civil Procedure 12(b)(1).

## BACKGROUND

In December 2003, Congress enacted the Medicare Prescription Drug Improvement and Modernization Act, which provides prescription drug coverage to Medicare beneficiaries. (Am. Compl. ¶ 11.) Various private prescription drug plans ("PDPs"), including plans sponsored by defendant's subsidiaries, have contracts with the Centers for Medicare and Medicaid Services ("CMS") to administer the program, commonly referred to as Medicare Part D. (*Id.* ¶¶ 11-12;

Def.'s Mem. at 6.)  The PDPs, in turn, have contracts with the many pharmacies that dispense the drugs.  (Am. Compl. ¶ 21.)  After a pharmacy dispenses drugs to a beneficiary, it bills the PDP for reimbursement pursuant to the contract.  (*Id.* ¶ 12.)

Some Medicare beneficiaries, commonly known as "dual eligibles," are covered by both Medicare and Medicaid.  (*Id.* ¶ 15.)  Those who qualify under the Act as "institutionalized full-benefit dual-eligibles" -- dual eligibles who are "inpatient[s] in a medical institution or nursing facility for which payment is made under Medicaid" -- are not required to make any co-payments for covered medications obtained through their PDPs.  42 C.F.R. § 423.773.  (*See* Am. Compl. ¶ 18.)  Many of these patients receive their drugs from long-term care pharmacies, which serve nursing home residents and are not open to the general public.  (*Id.* ¶ 9.)

The Medicare Part D program went into effect on January 1, 2006.  (*Id.* ¶ 21.)  According to the complaint, defendant's subsidiary PDPs, along with most other PDPs, failed to recognize that a number of institutionalized full-benefit dual eligibles were not required to make co-payments to the pharmacies, and thus improperly reduced the reimbursement to the pharmacies by the standard co-payment amount.  (*Id.*)  This problem apparently arose because of errors in the data that CMS had supplied to PDPs regarding the subsidy status of beneficiaries.  (*See* Def.'s Mem. at 8; Pls.' Opp'n at 5.)  Defendant claims that because PDPs can only process claims in accordance with CMS data, if CMS data indicates that a particular beneficiary owes a co-payment, the PDP has no choice but to reduce the reimbursement to the pharmacy by the amount of the co-payment.  (Def.'s Mem. at 7.)  The PDPs thereby accumulated millions of dollars of erroneously withheld co-payments, while the pharmacies incurred a corresponding amount of debt.  (Am. Compl. ¶ 23.)

Plaintiffs, who represent long term care pharmacies and pharmacists,[1] worked with CMS and the PDPs to try to find a solution to the problem. (*Id.* ¶¶ 22-23.) CMS began correcting its data, and between April and May of 2006, it issued three guidance documents instructing the PDPs to make reimbursements directly to the long term care pharmacies where appropriate. (*Id.* ¶¶ 23-26.) Plaintiffs allege that defendant took no action to reimburse the pharmacies. (*Id.* ¶ 24.) In response, defendant claims that the contracts between its PDPs and the pharmacies have provisions that set forth a process by which claims must be resubmitted after a denial of payment and also set out the time frame in which claims must be resubmitted. (Def.'s Mem. at 8.) Plaintiffs' pharmacies, defendant claims, refused to resubmit their claims in accordance with the contractual provisions. (*Id.* at 9.) An April 18, 2006 CMS policy guidance instructed pharmacies to submit "a spreadsheet with claim information to the prescription drug plan" for reimbursement (Am. Compl. ¶ 23), but the same guidance also noted that processes for reimbursement "may vary between plans" and "[f]ollowing the drug plans' directions may ensure timely reimbursements."[2] (Def.'s Mem. Ex. 5.) Plaintiffs claim that defendant's

---

[1] LTCPA is "organized for the express purpose of protecting the interests of long term care pharmacies and long term care facility residents and advocating on their behalf before governmental and other entities." (Am. Compl. ¶ 4.) ASCP, according to the complaint, "serves as the international professional society representing senior care and consultant pharmacists . . . by providing leadership, education, advocacy, and resources to advance the practice of senior care pharmacy." (*Id.* ¶ 6.)

[2] A May 26, 2006 CMS statement further instructed:

> For full benefit dual eligibles who are residents of long term care (LTC) facilities, a plan may develop procedures that rely on attestations from LTC pharmacy and facility personnel that certain residents who are enrollees of the plan are Medicaid eligible, have been or are expected to be residents of the facility for a full calendar month, and are under a Medicaid-covered stay. For LTC facility residents, Part D plans should rely on information that clearly indicates the elements necessary to confirm Medicaid

subsidiaries, unlike other PDPs, insisted that the pharmacies reverse and re-bill the original

transactions (Am. Compl. ¶ 27), whereas defendant insists that this procedure was necessary to

ensure that an adequate audit trail existed to support the PDPs' claims for reimbursement from

CMS.  (Def.'s Mem. at 9.)  When the pharmacies tried to follow these instructions, however,

defendant's PDPs allegedly rejected the claims.  (Am. Compl. ¶ 27.)

    Defendant notified LTCPA in June 2006 that its PDPs were preparing to send individual

reimbursement checks for each of the improperly withheld co-payments directly to the individual

Medicare Part D beneficiaries, rather than to the pharmacies.  (*Id.* ¶ 28.)  Defendant claims that

in the absence of claims resubmissions provided for under the PDPs' contracts with the

pharmacies, the PDPs are obligated by CMS regulations to pay co-payment adjustments directly

to the Medicare Part D beneficiaries.  (Def.'s Mem. at 8 (citing 42 C.F.R. § 423.800(c)).)  When

this lawsuit was filed in July 2006, plaintiffs first sought a temporary restraining order and

preliminary injunction barring defendant from sending the checks.  (Pls.' Mot. for TRO and

Prelim. Inj.)  Defendant agreed at that time to wait to send those checks. (Am. Compl. ¶ 30.)

The parties then informed the Court that they had settled the case, and the case was conditionally

dismissed without prejudice so that the parties could finalize the terms of their settlement

agreement.  *Long Term Care Pharmacy Alliance v. UnitedHealth Corp.*, No. 06-01221, Order

(D.D.C. Nov. 16, 2006).  Settlement negotiations apparently failed, however, and plaintiffs

renewed their motion for a temporary restraining order and preliminary injunction.  The renewed

motion was denied on March 29, 2007, on the basis that plaintiffs had not made the requisite

showing of irreparable injury because any injury could be addressed by money damages.

---

eligibility and LTC facility admission dates . . . .  As part of their
procedures, Part D plans should keep appropriate records in order
to reconcile low-income subsidy payments with CMS after the end
of the contract year.   (Def.'s Mem. Ex. 6.)

*Long Term Care Pharmacy Alliance*, Minute Order (Mar. 29, 2007); *see* Tr. of Mar. 29, 2007
Hr'g at 27.  Plaintiffs subsequently filed an amended complaint, which is the subject of the
instant motion to dismiss.

Defendant's motion to dismiss argues that plaintiffs lack standing to bring this action
(Def.'s Mot. to Dismiss at 11), that defendant is not a party to the contracts at issue, which are
between its subsidiaries and the pharmacies (*id.* at 19), that plaintiffs cannot sue to enforce the
contract (*id.* at 21), that plaintiffs lack a private right of action under Medicare regulations (*id.* at
23), and that in any case, the regulations do not obligate defendant to make the payments as
demanded. (*Id.* at 25.)  Because the Court agrees that plaintiffs lack standing, it need not reach
the merits.

## ANALYSIS

### I.     Standard of Review

A party invoking federal jurisdiction bears the burden of demonstrating standing to bring
suit.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).  The plaintiff must demonstrate
standing separately for each form of relief sought.  *Friends of the Earth, Inc. v. Laidlaw Envtl.
Servs.*, 528 U.S. 167, 185 (2000).  The plaintiff's responsibility to establish standing increases
throughout the litigation concomitantly with its responsibility to establish any other matter on
which it has the burden of proof.  *Lujan*, 504 U.S. at 561.  Thus, in evaluating standing at the
pleading stage, the Court must accept all material allegations of the complaint as true.  *Warth v.
Seldin*, 422 U.S. 490, 501 (1975).

In addition to considering the complaint, the Court may consider affidavits that support a
claim of standing.  *Id.* at 501-02.  If standing is not apparent from "all materials of record," the

complaint must be dismissed. *Id.*; *see also Haase v. Sessions*, 835 F.2d 902, 908 (D.C. Cir. 1987) ("In considering standing under 12(b)(1) . . . the court . . . can elicit information outside the pleadings. This permits the court to undertake an independent investigation to assure itself of its own subject matter jurisdiction.").

## II.     Plaintiffs Lack Standing to Sue on Their Own Behalf

A plaintiff has standing to sue when it has suffered an injury-in-fact that is attributable to the defendant and that can be redressed by a favorable court decision. *Lujan*, 504 U.S. at 560-61. If an organization satisfies this test, it may have standing to sue on its own behalf. *See Warth*, 422 U.S. at 511 ("There is no question that an association may have standing in its own right to seek judicial relief from injury to itself and to vindicate whatever rights and immunities the association itself may enjoy.").

Plaintiffs argue that they have suffered an injury because defendant's conduct has forced them to divert resources from other priorities, such as advocating for the improvement of federal statutes and regulations, to focus on the reimbursement conflict with defendant.[3]  (*See* Pls.' Opp'n at 15-16.)

Several cases suggest that a diversion of resources away from an organization's core activities may constitute an injury giving rise to standing. For instance, in *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982), the Supreme Court found that an organization whose purpose was to further equal opportunities in housing had standing in its own right to sue for violations of

---

[3] Although the amended complaint did not refer to this injury, in a belated attempt to stave off a standing challenge, plaintiffs have attached two declarations to their opposition to defendant's motion to dismiss.  (*See* Second Decl. of Paul Baldwin ¶¶ 13-14; Decl. of Thomas Clark ¶¶ 9-10.)  Defendant argues that the Court should not consider these declarations, as a complaint may not be amended through a memorandum of law.  (*See* Def.'s Reply at 17.)  As noted above, however, a court may consider materials outside the pleadings in evaluating a plaintiff's standing to bring suit.

fair housing laws.  *Id.* at 379.  The plaintiff alleged that the defendant's illegal racial steering

practices rendered plaintiff less able to provide counseling and referral services to low-income

homeseekers, and that it had been forced to divert significant resources to counteracting

defendant's practices.  *Id.* at 369.  "Such concrete and demonstrable injury to the organization's

activities -- with the consequent drain on the organization's resources -- constitutes far more than

simply a setback to the organization's abstract social interests."  *Id.* at 379.  Similarly, in *Abigail*

*Alliance for Better Access to Developmental Drugs v. Eschenbach*, 469 F.3d 129 (D.C. Cir.

2006), *reh'g en banc granted*, No. 04-5350 (D.C. Cir. Nov. 22, 2006), the plaintiff organization

challenged an FDA regulation limiting access to developmental drugs.  In finding standing, the

Court relied on plaintiff's assertion that the FDA regulation caused plaintiff to expend time and

resources "helping its members and the public address the unduly burdensome requirements that

the FDA imposes on experimental treatments" and that it was thus forced to focus less on

counseling, education, and other services.  *Id.* at 132-33.

   However, not every diversion of resources away from an organizational goal will confer

standing.  Rather, a diversion of resources only becomes relevant where a defendant's conduct

impedes the plaintiff organization's activities.  In *Fair Employment Council of Greater*

*Washington, Inc. v. BMC Marketing*, 28 F.3d 1268 (D.C. Cir. 1994), the D.C. Circuit explained:

> The Court [in *Havens*] did not base standing on the diversion of resources from
> one program to another, *but rather on the alleged injury that the defendants'*
> *actions themselves had inflicted upon the organization's programs*.  To be sure,
> the Court did mention the "drain on the organization's resources".  Yet this drain
> apparently sprang from the organization's need to "counteract" the defendants'
> assertedly illegal practices, and thus was simply another manifestation of the
> injury that those practices had inflicted upon "the organization's noneconomic
> interest in encouraging open housing", an interest that is quite intelligible apart
> from the allied efforts at increasing legal pressure on civil-rights violators.

*Id.* at 1277 (emphasis added); *see also Abigail Alliance*, 469 F.3d at 133 ("The court has distinguished between organizations that allege that their activities have been impeded from those that merely allege that their mission has been compromised.").  The pivotal inquiry is therefore not whether the organization has diverted resources from one priority to another, but whether its activities have been directly impeded by defendant's activities, thus necessitating the diversion of resources.

The law is clear that actions contrary to an organization's mission do not create an injury if the organization's activities are not somehow impeded.  In *Sierra Club v. Morton*, 405 U.S. 727 (1972), the Supreme Court explained that the plaintiff's advocacy on environmental issues did not create standing under the Administrative Procedure Act. "[A] mere 'interest in a problem,' no matter how longstanding the interest and no matter how qualified the organization is in evaluating the problem, is not sufficient by itself to render the organization 'adversely affected' or 'aggrieved' within the meaning of the APA."  *Id.* at 739; s*ee also Ctr. for Law & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1162 n.4 (D.C. Cir. 2005) ("In *Sierra Club*, the Supreme Court recognized that to hold a lobbyist/advocacy group had standing to challenge government policy with no injury other than injury to its advocacy would eviscerate standing doctrine's actual injury requirement . . . .").

Aside from asserting an abstract conflict between defendant's activities and plaintiffs' advocacy goals, plaintiffs have not alleged that their activities have been impeded in any way. Because the reallocation of resources was not made necessary by a legitimate injury-in-fact, the reallocation of resources alone does not constitute an injury-in-fact.  Were an association able to gain standing merely by choosing to fight a policy that is contrary to its mission, the courthouse door would be open to all associations.  "By this logic, the time and money that plaintiffs spend

in bringing suit against a defendant would itself constitute a sufficient 'injury in fact,' a circular

position that would effectively abolish the requirement altogether." *Fair Employment*, 28 F.3d at

1277; *see also Abigail Alliance*, 469 F.3d at 133 ("[A]n organization is not injured by expending

resources to challenge the regulation itself; we do not recognize such self-inflicted harm.").

Consistent with this binding precedent, it is clear that if a cognizable injury exists at all, it

belongs to the pharmacies, not to the organizations that represent them.

## III.    Plaintiffs Lack Standing to Sue on Behalf of Their Members

As an alternative to suing on its own behalf, an association can sue on behalf of its

members when (1) its members would otherwise have standing to sue in their own right; (2) the

interests at stake are germane to the association's purpose; and (3) neither the claim asserted nor

the relief requested requires the participation of individual members of the association. *Hunt v.

Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977). Only the third prong of this test is

at issue here.

In virtually all cases, a claim for monetary damages requires the participation of

individual members of the association, thus failing the third prong of the *Hunt* test. In *Warth*, the

Supreme Court recognized that a damages claim raises significant problems when brought by an

association on behalf of its members:

> [W]hether an association has standing to invoke the court's remedial powers on
> behalf of its members depends in substantial measure on the nature of the relief
> sought. If in a proper case the association seeks a declaration, injunction, or some
> other form of prospective relief, it can reasonably be supposed that the remedy, if
> granted, will inure to the benefit of those members of the association actually
> injured. Indeed, in all cases in which we have expressly recognized standing in
> associations to represent their members, the relief sought has been of this kind.
> The present case, however, differs significantly as here an association seeks relief
> in damages for alleged injuries to its members.

422 U.S. at 515 (citations omitted); *see also Telecomm. Research & Action Ctr.* ex rel. *Checknoff v. Allnet Commc'ns Servs.*, 806 F.2d 1093, 1095 (D.C. Cir. 1986) (noting that while there is not a *per se* rule against it, courts "have consistently rejected association assertions of standing to seek monetary, as distinguished from injunctive or declaratory, relief on behalf of the organization's members").

Plaintiffs argue that because they are seeking only a declaration that defendant is required to pay erroneously withheld co-payment amounts directly to the pharmacies and not to the individual beneficiaries,[4] the individual participation of the member pharmacies is not required. (Pls.' Opp'n at 13.) Defendant counters that plaintiffs are elevating form over substance, for

---

[4] Plaintiffs ask the Court for a declaratory judgment providing:

i. that Defendant UnitedHealth was not, and is not, entitled by law *or contract* to withhold co-payment amounts from reimbursements to LTC Pharmacies for medications dispensed under Medicare Part D to eligible institutionalized beneficiaries;

ii. that Defendant UnitedHealth is *obligated to pay to LTC Pharmacies the co-payment amounts withheld from reimbursement to such LTC pharmacies for medications dispensed under Medicare Part D to dual eligible beneficiaries*;

iii. that Defendant UnitedHealth violated 42 C.F.R. § 423.504 and 423.800(c) by paying, or causing to be paid, withheld co-payment amounts to beneficiaries who had not paid such co-payments and by failing timely to pay such amounts to the LTC Pharmacies to which such funds are owed;

iv. that the payment of such withheld co-payment amounts to beneficiaries does not relieve UnitedHealth of its obligation to pay such withheld co-payment amounts to the LTC Pharmacies from which they were withheld; and

v. that defendant is obligated to continue to process all claims for such withheld co-payment amounts, including all 2006 claims.

(Am. Compl. at 16-17) (emphasis added).

-10-

their request is nothing more than a poorly disguised request for damages, and thus plaintiffs do not have standing to pursue such a claim on behalf of their members.  (Def.'s Mem. at 15.)

A plaintiff organization "may not circumvent the standing requirements by seeking a declaration of entitlement to money damages."  *Pesticide Pub. Policy Found. v. Village of Wauconda, Ill.*, 622 F. Supp. 423, 435 (D.C. Ill. 1985); *see also Black Farmers & Agriculturalists Ass'n v. Veneman*, No. 04-1561, 2005 WL 711821, at *2 (D.D.C. Mar. 29, 2005) ("[P]laintiff's complaint seeks declaratory relief that each individual class member suffered discrimination and is deserving of damages . . . . [T]he Court is unwilling to interpret plaintiff's vague claims as requesting declaratory relief which is fully segregable from plaintiff's claims for damages."); *Watkins v. Westinghouse Hanford Co.*, 12 F.3d 1517, 1528 n.5 (9th Cir. 1993) (noting that a court must look to the "substance of the remedy sought . . . rather than the label placed on that remedy" (citing *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 255 (1993))).

Moreover, even if the Court were to treat plaintiffs' claims as legitimate requests for declaratory relief, plaintiffs would still lack standing if the participation of individual members of the associations is required.  As recognized by the D.C. Circuit, the participation of individual members may be required if the declaratory relief creates an entitlement to subsequent monetary relief.  For instance, in *Air Transport Ass'n of America v. Reno*, 80 F.3d 477 (D.C. Cir. 1996), an association representing airlines challenged a regulation that required the airlines to pay the expenses of certain travelers who arrived illegally in the United States without a visa.  The association sought a declaration both that the policy was illegal and that its members were entitled to make individualized showings of damages.  The Court explained that a relevant question to determining whether a suit by an association requires the members of an association to be participants is whether declarative relief would judicially "end the matter."  *Id.* at 484

-11-

("[T]he question in each case is whether the monetary relief can be awarded without 'individualized proof.'"). Because the court system would have had to be involved with individual members of the association (by calculating damages) after granting a declaratory judgment, the Court held that the association lacked standing. *Id.*

Similarly, this case cannot proceed without the participation of the individual members of the associations for two reasons. First, plaintiffs fail to allege that the contracts obligating the PDPs to reimburse the pharmacies are uniform. Indeed, the complaint refers to contracts "between *each* LTC pharmacy and PDP." (Am. Compl. ¶ 21) (emphasis added). Because there appear to be different procedures and conditions for pharmacy reimbursements set forth in each contract between the various PDPs and the various pharmacies (*see* Def.'s Mem. at 8), defendant may have breached its obligations to some of the pharmacies, but not to other ones. As a result, the Court is not in a position to issue a declaration stating that monies are owed under the various contracts in the absence of any knowledge of the terms of these contracts. Second, even if the contracts were uniform and their terms were undisputed by the parties, the amount of money owed to each pharmacy is certainly not uniform or undisputed. Under *Air Transport,* if the court system will eventually need to be involved in the calculation of monies owed, then the participation of the individual members of the association is required from the beginning. *Air Transport*, 80 F.3d at 484. Though plaintiffs are seeking a declaration that defendant must pay their members the improperly withheld co-payments, they argue that they are not actually seeking a declaration that their members are entitled to an award of damages that would require individualized proof. (*See* Pls.' Opp'n at 13 n.5 & 14 n.6.) This is a distinction without a difference, however, as the declaratory relief sought would be meaningless if it did not eventually result in the receipt by plaintiffs' member pharmacies of the funds they claim they are

owed, which would necessarily require the resolution of what type of documentation the pharmacies would need to provide to support their claims for reimbursement and a calculation of the monies owed under the contracts. The Court is thus unable to adjudicate the pharmacies' entitlement to money without their participation in this suit.

The cases relied on by plaintiffs do not change this result. In *United Food & Commercial Workers Union Local 751 v. Brown*, 517 U.S. 544 (1996), the Supreme Court held that a labor union could sue for damages on behalf of its members without the members of the union being party to the suit. *Id.* at 546. However, the Court's decision was based on the Worker Adjustment and Retraining Notification ("WARN") Act, 29 U.S.C. § 2101 *et seq.*, which specifically gave the representatives of their employees the authority to bring suit. *Brown*, 517 U.S. at 546 ("The questions presented here are whether, in enacting the WARN Act, Congress intended to abrogate th[e] otherwise applicable standing limitation [of *Hunt*] so as to permit the union to sue for damages running to its workers, and, if it did, whether it had the constitutional authority to do so. We answer yes to each question."). "Because Congress authorized the union to sue for its members' damages, and because the only impediment to that suit is a general limitation, judicially fashioned and prudentially imposed, there [wa]s no question that Congress may abrogate the impediment." *Id.* at 558.

Nor is *International Union*, *United Auto, Aerospace & Agricultural Implement Workers of America v. Brock*, 477 U.S. 274 (1986), of any solace to plaintiffs. In that case, a union sought a declaration that the Secretary of Labor had incorrectly interpreted the Trade Act of 1974, 19 U.S.C. § 2101 *et seq.*, causing several state agencies to deny benefits to union members. The Supreme Court allowed the suit, holding that the declaratory relief sought raised a pure question of law: whether the Secretary had correctly interpreted the Act. *Brock*, 477 U.S.

-13-

at 287. The D.C. Circuit expressly distinguished *Brock* in *Air Transport*, however, noting that in *Brock*, once the declaratory judgment was issued, it was left for the state agencies -- not the courts -- to fashion the appropriate relief. *Air Transport*, 80 F.3d at 484. In *Brock*, moreover, the Secretary had interpreted the Trade Act only once, and his interpretation applied to everyone. It is therefore not analogous to this case, which involves a host of individual pharmacies and contracts.

Finally, *American Medical Ass'n v. United Healthcare Corp.*, No. 00-2800, 2002 WL 31413668 (S.D.N.Y. Oct. 23, 2002) is inapposite. In that case, an association representing doctors, among many other plaintiffs, challenged the way that defendant calculated the rate that it paid when an insured person visited an out-of-network physician. After defendant moved to dismiss, the court held that the association had standing until discovery proved otherwise, provided that the relief sought was entirely prospective. *Id.* at *3. The instant case is not analogous, since no amount of discovery can change the fact that plaintiffs are, in effect, seeking a declaration of entitlement to compensatory damages for activity that occurred in the past. Moreover, in *American Medical Ass'n*, the source of defendant's obligations was a New York statute, not a variety of differing contracts among various parties. *Id.* at *1.

In short, because the Court finds that the participation of plaintiffs' individual members would be necessary to provide the ultimate relief that plaintiffs seek, plaintiffs lack standing to sue on their members' behalf. *See Hunt*, 432 U.S. at 343.

## CONCLUSION

Because the Court concludes that the plaintiff associations lack standing, the Court lacks subject matter jurisdiction over their claims. Accordingly, defendant's motion to dismiss is

-14-

granted, and plaintiffs' complaint is dismissed with prejudice.  A separate order accompanies this

Memorandum Opinion.


_____/s/_____
ELLEN SEGAL HUVELLE
United States District Judge

Date: July 30, 2007